## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **THOMAS JESSE WARD,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **Case No.**   CIV-23-146-JFH |
| **v.** | ) | |
| | ) | |
| **DAVID BUSS, WARDEN,** | ) | |
| | ) | |
| **Respondent.** | ) | |

### PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2254

Mark H. Barrett, OBA No. 557
P.O. Box 896
Norman, OK 73070
Tel: (405) 364-8367
barrettlawoffice@gmail.com

Daniel G. Webber, Jr., OBA No. 16332
Ryan Whaley
400 North Walnut Avenue
Oklahoma City, OK 73104
Tel: (405) 239-6040
Facsimile: (405) 239-6766
dwebber@ryanwhaley.com

Gregory R. Swygert (*pro hac vice* admission pending)
Center on Wrongful Convictions
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
Tel: (312) 503-8576
gregory.swygert@law.northwestern.edu

Robert N. Hochman (*pro hac vice* admission pending)
David H. Hoffman (*pro hac vice* admission pending)
John G. Levi (*pro hac vice* admission pending)
Emily Scholtes (*pro hac vice* admission pending)
Matthew Binder (*pro hac vice* admission pending)
William Lawrence (*pro hac vice* admission pending)
Sidley Austin LLP
1 South Dearborn
Chicago, IL 60603
Tel: (312) 853-7000
rhochman@sidley.com
david.hoffman@sidley.com
jlevi@sidley.com
escholtes@sidley.com
mbinder@sidley.com
bill.lawrence@sidley.com

## TABLE OF CONTENTS

BACKGROUND AND SUMMARY OF EVIDENCE ............................................................ 2

    I.    Evidence Presented At Mr. Ward's 1989 Retrial ........................................ 2

        1.    The weak evidence supposedly placing Mr. Ward at the location where Ms. Haraway was abducted .............................................. 2

        2.    The evidence concerning what Ms. Haraway was wearing on the night she was taken .......................................................................... 5

        3.    The repeated questioning of Mr. Ward months after the crime and his ultimate "confession" ............................................................ 6

        4.    Other testimony concerning Mr. Ward's location on the night of the crime .................................................................................. 13

    II.    Evidence Of Mr. Ward's Innocence Suppressed By The State At Trial ............ 15

        1.    Exculpatory Evidence Regarding Ms. Haraway's Clothing .................... 16

        2.    Evidence of Other Leads Ignored by Investigators ................................. 26

        3.    Evidence Casting Further Doubt on the Already Weak Evidence Placing Mr. Ward at the Scene ................................................ 32

        4.    Mr. Ward's Exculpatory Statements ........................................................ 38

        5.    Evidence of Witness Tampering ............................................................... 39

PROCEDURAL HISTORY ............................................................................................ 41

        1.    Joint Trial of Mr. Ward and Fontenot and First Direct Appeal ............... 41

        2.    Second Trial and Second Direct Appeal .................................................. 41

        3.    State Post-Conviction ............................................................................... 42

ARGUMENT ................................................................................................................. 44

    I.    Despite the State's long-standing efforts to bury evidence Favorable to Mr. Ward, the new record establishes his Innocence ............................................. 47

        1.    The State's Case at Trial Was Exceedingly Weak ................................... 48

        2.    The State's Anchor Is Untethered ............................................................ 50

        3.    Additional Evidence Shows Mr. Ward's Innocence ................................. 52

4.      Since Mr. Ward's Trial, the Science of False Confessions Has
        Advanced, and an Infamous False Confession Coerced by an
        Officer in Mr. Ward's Case Has Been Exposed ..................................... 55

5.      Mr. Ward Is Actually Innocent ................................................. 57

II.     Mr. Ward Is Entitled To A New Trial Because The Pontotoc County
        District Attorney Suppressed Favorable Material Evidence................................ 59

1.      The State Suppressed Evidence ............................................... 62

2.      Mr. Ward Could Have Used the Suppressed Evidence to Show His
        Innocence and to Impeach Key State's Witnesses................................... 69

3.      This Buried Evidence Would Have Had a Material Impact on Mr.
        Ward's Trial ...................................................................... 70

4.      The State Solicited False Testimony.......................................... 80

III.    Mr. Ward Has Demonstrated Cause and Prejudice ............................... 82

CONCLUSION ............................................................................... 83

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Alcorta v Texas*,
   355 U.S. 28 (1957) ................................................................................ 80

*Banks v. Dretke*,
   540 U.S. 668 (2004) ................................................................. 47, 82, 83

*Banks v. Reynolds*,
   54 F.3d 1508 (10th Cir. 1995) ............................................................ 70, 71

*Bland v. Sirmons*,
   459 F.3d 999 (10th Cir. 2006) ................................................................ 60

*Brady v. Maryland*,
   373 U.S. 83 (1963) ............................................................................ *passim*

*Cruz v. New York*,
   481 U.S. 186 (1987) ............................................................................ 41

*Douglas v. Workman*,
   560 F.3d 1156 (10th Cir. 2009) .............................................................. 60

*Fontenot v. Allbaugh*,
   402 F. Supp. 3d 1110 (E.D. Okla. 2019) .................................... *passim*

*Fontenot v. Crow*,
   142 S. Ct. 2777 (2022) ........................................................................ 45

*Fontenot v. Crow*,
   4 F.4th 982 (10th Cir. 2021) .......................................................... *passim*

*House v. Bell*,
   547 U.S. 518 (2006) ........................................................................ 45, 46

*Keeney v. Tamayo-Reyes*,
   504 U.S. 1 (1992) ................................................................................ 45

*Kuhlmann v. Wilson*,
   477 U.S. 436 (1986) ............................................................................ 45

*Kyles v. Whitley*,
   514 U.S. 419 (1995) ...................................................................... *passim*

*Lopez v. Trani*,
   628 F.3d 1228 (10th Cir. 2010) .............................................................. 45

iii

*McCleskey v. Zant,*
    499 U.S. 467 (1991)..................................................................................................45

*McQuiggin v. Perkins,*
    569 U.S. 383 (2013)........................................................................................2, 45, 46

*Miller v. Pate,*
    386 U.S. 1 (1967)....................................................................................................80

*Moore v. Gibson,*
    195 F.3d 1152 (10th Cir. 1999) ...............................................................................71

*Napue v. Illinois,*
    360 U.S. 264 (1959)................................................................................................80

*Nuckols v. Gibson,*
    233 F.3d 1261 (10th Cir. 2000) .........................................................................71, 72

*Schlup v. Delo,*
    513 U.S. 298 (2005)............................................................................................2, 45

*Scott v. Mullin,*
    303 F.3d 1222 (10th Cir. 2000) .........................................................78, 79, 80, 82

*Smallwood v. Gibson,*
    191 F.3d 1257 (10th Cir. 1999) ...............................................................................60

*Smith v. Sec'y of N.M. Dep't of Corr.,*
    50 F.3d 801 (10th Cir. 1995) ...........................................................................60, 62, 71

*State v. Ward,*
    PC-2021-8, PR-2020-958 (Okla. Crim. App. 2021)..................................................43

*Strickler v. Greene,*
    527 U.S. 263 (1999)............................................................................................82, 83

*Trammell v. McKune,*
    485 F.3d 546 (10th Cir. 2007) .................................................................................72

*United States v. Bagley,*
    473 U.S. 667 (1985)............................................................................................69, 78

*United States v. Garcia,*
    793 F.3d 1194 (10th Cir. 2015) ...............................................................................80

*United States v. Robinson,*
    583 F.3d 1265 (10th Cir. 2009) ...............................................................................77

*Ward v. State*,
 755 P.2d 123 (Okla. Crim. App. 1988)............................................................2, 41

*Williamson v. Reynolds*,
 904 F. Supp. 1529 (E.D. Okla. 1995) ....................................................................57

*Williamson v. Ward*,
 110 F.3d 1508 (10th Cir. 1997) .......................................................................56, 57

**Statutes**

28 U.S.C. § 2244.................................................................................................44, 47

28 U.S.C. § 2254.............................................................................................43, 60, 63

Okla. Stat. tit. 22 § 22 ..............................................................................................55

**Other Authorities**

ELECTRONIC RECORDING OF CUSTODIAL INTERROGATIONS,
 http://www.nacdl.org/electronicrecordingproject ..................................................55

*Exculpatory Evidence*, *Black's Law Dictionary* (11th ed. 2019)..................................69

John Grisham, *The Innocent Man: Murder and Injustice in a Small Town* (2006).......................57

THE NATIONAL REGISTRY OF EXONERATIONS, https://www.law.umich.
 edu/special/exoneration/Pages/ExonerationsContribFactorsByCrime.aspx ..........................55

Richard A. Leo & Richard J. Ofshe, *Consequences of False Confessions:
Deprivations of Liberty and Miscarriages of Justice in the Age of
Psychological Interrogation*, 88 J. CRIM. L. & CRIMINOLOGY 429, 429
(1998)...................................................................................................................55

**BRIEF IN SUPPORT OF MR. WARD'S PETITION FOR WRIT OF HABEAS CORPUS**

Thomas Jesse Ward has been wrongfully imprisoned for nearly 40 years for the 1984 robbery, abduction, and murder of Donna Denice Haraway. It has taken nearly that long to pry from the hands of Oklahoma law enforcement authorities the evidence that demonstrates that he is actually innocent of these crimes. He "confessed" to these crimes, but we now know the confession was false. Only one eyewitness placed Mr. Ward at the scene of Ms. Haraway's disappearance (approximately an hour before the abduction), but we now know that this witness came forward in the hopes of receiving a $5,000 reward, actually identified someone else from an initial photo array presented to him, and offered otherwise varying and conflicting testimony regarding his identification. No physical evidence has ever connected Mr. Ward to the crimes. There is more, much more, evidence that Mr. Ward has only recently been able to uncover showing just how state prosecutors' and investigators' tunnel vision led to the wrong man being convicted of these horrible crimes. Prosecutors instructed witnesses not to reveal critical exculpatory facts, set aside and concealed evidence confirming Mr. Ward's alibi, and hid evidence that both undermined their witnesses' credibility and provided substantial reasons to pursue other suspects.

Mr. Ward's supposed co-conspirator in the crime, Karl Fontenot, was released from prison more than three years ago by order of this Court. *Fontenot v. Allbaugh*, 402 F. Supp. 3d 1110, 1240 (E.D. Okla. 2019). It is long overdue to stop this continuing and terrible miscarriage of justice.

An Oklahoma trial court, having considered the accumulated evidence previously unavailable to Mr. Ward, ordered his release. The Oklahoma Court of Criminal Appeals stayed his release and then, more than a year and a half later, vacated that ruling without hearing oral argument. It determined that Mr. Ward's claims were procedurally barred by res judicata and

laches. That an Oklahoma court closed its eyes to the official misconduct and wrongful incarceration of Mr. Ward provides no reason for this Court to do the same. The evidence of Mr. Ward's actual innocence more than warrants this Court considering the merits of his claim. *See McQuiggin v. Perkins*, 569 U.S. 383, 392–94 (2013); *see generally Schlup v. Delo*, 513 U.S. 298 (2005). And the evidence of the widespread wrongful suppression of exculpatory evidence in violation of the Due Process Clause of the Fourteenth Amendment, *see Brady v. Maryland*, 373 U.S. 83 (1963), independently provides more than sufficient cause and prejudice to excuse Mr. Ward's state procedural default and ultimately warrants a writ of habeas corpus ordering his release.

## BACKGROUND AND SUMMARY OF EVIDENCE

### I.    EVIDENCE PRESENTED AT MR. WARD'S 1989 RETRIAL

Mr. Ward was initially tried and convicted with Fontenot in a single trial. The convictions were vacated because it was unconstitutional to try the two defendants together. *Ward v. State*, 755 P.2d 123, 124 (Okla. Crim. App. 1988). He was retried in 1989, convicted, and to this day is serving his sentence stemming from that conviction. What follows recites the evidence presented at that second trial, which includes evidence disclosed about law enforcement's investigation of the crime.

#### 1.    The weak evidence supposedly placing Mr. Ward at the location where Ms. Haraway was abducted

On April 28, 1984, Donna Denice Haraway was working as a cashier at McAnally's convenience store in Ada, Oklahoma. At approximately 7:30 p.m., customer James Moyer testified that he saw two men enter McAnally's and act suspiciously. A0206–07. Moyer claimed that when

he left five minutes later, he passed a gray-primered Chevrolet pickup truck in the parking lot. A0209–10.[1]

Around 8:30 p.m. (an hour later), Gene Whelchel and his nephews, Lenny and David Timmons, arrived at McAnally's. A0222–25, A0238, A0248. They noticed a gray or light blue-primered pickup in the parking lot. A0222–25, A0238, A0248. They then saw *one man* and *one woman* walk out of the store together and leave in the pickup. They did not observe anything unusual about the pair's behavior, and they saw no one else at the store or in the pickup. A0225, A0231, A0243, A0245. Lenny Timmons entered McAnally's and found no one present. The cash register was open and, behind it, Lenny Timmons saw schoolbooks, a purse, and a cigarette burning in an ashtray. A0226–27. David Timmons entered afterward and noticed that nothing in the store was "cluttered" or otherwise in a state that would arouse his suspicion. A0244. The men called the police. A0234–35. Whelchel later identified the departing woman as Ms. Haraway. A0251. None of these witnesses identified Mr. Ward as the man they saw leaving the store.

At about 8:40 p.m., Arthur and Mary Scroggins saw a gray-primered pickup speeding west through Ada. A0257–260, A0263–64. Mary Scroggins testified that it was dark and the truck was driving quickly, but she nevertheless was able to spot three people in the truck. Neither Arthur nor Mary Scroggins identified any of the three people as Mr. Ward.

After receiving a dispatch at 8:50 p.m., Ada Police Officer Harvey Phillips was the first officer to arrive at McAnally's around 9:00 p.m. A0267–68. Soon after, the owner, O.E. McAnally, and the manager, Monroe Atkeson, arrived at the store. A0271, A0274. Officer Phillips did nothing

---

[1] Mr. Ward has assembled three appendices in support of his petition. Appendix A was filed with his initial state court application for post-conviction relief and is cited in the format "A####." Appendix B, cited "B000###," was filed with his amended state court application. Finally, Appendix C is cited as "C####" and contains state court materials in support of this federal habeas petition.

to treat McAnally's as a crime scene and allowed Atkeson to check the register. He discovered that $167 was missing. When Detective Mike Baskin arrived at around 10:00 p.m., the scene was already contaminated, rendering fingerprint identification or later DNA testing impossible. A0333–34, A0349, A0400–01.

Karen Wise was working that same night as a cashier at J.P.'s Pak-to-Go, another convenience store located 0.3 miles from McAnally's. Around 7:00 p.m., Wise noticed two men in a spotted red-and-gray-primered pickup truck arrive at J.P.'s. The men spent the next hour and a half shooting pool and "watching [her] a lot" before leaving. A0159–60, A0162–66, A0176, A0182. A little after 8:00 p.m., Jack Paschall arrived, and Wise pointed the two men out to him. A0165–66. Paschall, who had been drinking, vaguely recalled seeing an older Chevrolet pickup with "grayish-blue primer" in the parking lot. A0188, A0203.

The Oklahoma State Bureau of Investigation, or OSBI, prepared two composite sketches of the men at J.P.'s based upon Wise's descriptions of them. A0168, A0250–51, A0254–55. That is, the OSBI chose to create images of potential suspects for the crime at McAnally's based on their presence at another location (J.P.'s) and without any evidence that any of these individuals were actually seen at the crime scene. *See Fontenot*, 402 F. Supp. 3d at 1143–44. Whelchel confirmed that one composite accurately portrayed the *single* man he saw at McAnally's, though he vaguely recalled making a revision to it. A0250–51, A0254. Investigators showed the same sketch to Lenny and David Timmons (who, like Whelchel, saw only one man and one woman leave McAnally's) and to Paschall (who was with Wise at J.P.'s, and not at McAnally's). Without contributing to either drawing, these "eyewitnesses" generally agreed that the sketches resembled

the individuals they had observed. A0201, A0211, A0227–28, A0240–41.[2] Police also showed the sketches to James Moyer. A0210–11. Notably, Moyer had been at McAnally's (not J.P.'s) at 7:30 p.m., which is when the individuals represented by the sketches were at J.P.'s. A0206–07, A0163, A0176.

These sketches were widely distributed and published on television and in the local paper. A0201–02. Police received numerous calls identifying fifteen to twenty possible suspects who callers said resembled the drawings. A0544–46. Although the State did not disclose the full list of fifteen to twenty "look-alikes,"[3] Ada Detective Captain Dennis Smith testified that police received a similar number of calls (more than twenty each) regarding two particular individuals: Mr. Ward and Billy Charley. A0467; *see* A0544–46.[4] These calls led Detectives Baskin and Smith to interview Mr. Ward on May 1, 1984. A0343–44. Mr. Ward told police that he spent the afternoon of Ms. Haraway's disappearance fishing with Fontenot until almost dark. Afterwards, he went to a party at the home of his friend Janette Roberts, staying until early the next day.

### 2. The evidence concerning what Ms. Haraway was wearing on the night she was taken

The body of Ms. Haraway was not located for roughly a year and a half. Indeed, the first trial of Mr. Ward and Fontenot took place before a body was even found. But, as will become clear, identifying what Ms. Haraway was wearing on the night of the crime would become an enormously significant fact in the case.

---

[2] Paschall did not testify as to his impressions of the composite sketch police showed him. *See* A0201.

[3] Some of these witnesses were featured in the new documents from Ada Police. *See* A0122–25.

[4] Smith testified that there were "somewhere between seventy-five and a hundred callers," and that, out of this number, Mr. Ward was identified "at least thirty time[s]" and another potential suspect, Billy Charley, was identified "at least twenty" times. A0466–67.

Over the first twenty-four hours following Ms. Haraway's disappearance, Detective Baskin spoke with family members, including Ms. Haraway's husband, Steve Haraway, and her mother, Pat Virgin, regarding the clothing she likely was wearing on April 28. Among the items the family mentioned was a plaid shirt or blouse, which matched an anonymous tip. A0340–41, A0393; *see also* A0280. Based on these descriptions, in some reports Detective Baskin described the shirt that Ms. Haraway was wearing on the evening of her disappearance as plaid; in others, he left the clothing description blank. *See* A0338–42. Detective Baskin explained to the jury his decision *not* to note any clothing description in some reports: "[A]ll I had at this time was just her usual dress. I had no one that could say that Mrs. Haraway was wearing any particular clothing at that time." A0339 at 60:8–10. He added, "[T]his was the next day and at that point a clothing description really didn't seem that important to me." A0338 at 59:20–21. Detective Baskin testified that, at that stage of the investigation, dental records would be more important for identification than an accurate description of what she was wearing, apparently assuming that Ms. Haraway was murdered less than twenty-four hours after her disappearance. *Id.* at 59:21–25.

An Ada Police Officer, Richard Holkum, testified that he saw Ms. Haraway a few hours before her disappearance. He recalled her wearing a light lavender or blue blouse with a small print. A0291.

### 3. The repeated questioning of Mr. Ward months after the crime and his ultimate "confession"

Several months into the investigation, Detectives Baskin and Smith interviewed Ada resident Jeff Miller. A0351, A0404–07, A0476. Miller told police that Mr. Ward, Fontenot, and a man named Odell Titsworth were at a gathering at the Blue River on April 28th. A0475–81. Fontenot and Titsworth feature prominently in Mr. Ward's later "confession."

Police decided to interview Mr. Ward again on October 12. This second interrogation was at the Norman Police Department, and police accused Mr. Ward of being at the Blue River on April 28 and thereafter committing the crimes against Ms. Haraway. A0351, A0365; *see generally* A1855–919. At that time, Mr. Ward corrected his initial statement and informed police that he had spent part of April 28 fixing his mother's plumbing with his brother-in-law and part of the day at Roberts's party. He explained that he mistook his fishing trip as occurring that same day when it actually occurred the day before the party. A0350–54, A0357–61.

Detectives Baskin and Smith interrogated Mr. Ward using a variety of psychologically high-pressure and coercive techniques. The detectives falsely told him that "there's people that will testify" that he drove a borrowed pickup into Ada the night Ms. Haraway disappeared (no such testimony existed). A0365; *see also* A0377–78. Additionally, they repeatedly accused Mr. Ward of lying, A0364–65, A0377–78; *see generally* A1855–919, while simultaneously encouraging him to "[u]se [his] imagination" as if he had committed the crimes, A0368; *see also* A0369–71, A0410. They offered detailed suggestions regarding the crimes' specifics:

> Detective Smith: Use your imagination just for a moment. This girl was taken out of a grocery store at night . . . Two guys come in and got her, got in a pickup, and they drove away. What do you think they did with the body? Do you think that they may have gone in the store and she recognized them and they knew that she recognized them and they decided they had to get rid of her because she could identify them? Beautiful girl like that, I wonder maybe if they might have raped her before they killed her?

> Detective Baskin: Maybe a witness pulled in at the end of the drive . . . They saw him coming, they didn't know what to do. Maybe they panicked and took her . . . [T]hen they left with this girl. Well, then they had this girl and maybe they tried to get her not to tell. [M]aybe she takes off running from them and she slips and falls. [I]f they don't come up with an explanation and come forward it's going to be a First Degree Murder, which carries a death penalty. Maybe this other guy . . . begged him not to do it . . . maybe the other guy was crazy and killed her anyway . . . .

7

A0368–71 at 123:24–126:10, A0381–82 at 146:23–147:22. The detectives pleaded with him to help find Ms. Haraway's body so that her family could give her a Christian burial. A0368, A0370, A0373–74, A0383–84. They also threatened him with the death penalty unless he confessed. A0382.

Despite all the intense pressure, Mr. Ward consistently and categorically denied the detectives' allegations. A0364–65, A0317–30, A0377–78, A0386. The detectives lied to him again, falsely stating that his alibi was inconsistent with numerous witnesses' accounts; Mr. Ward responded that he might have "got[ten] the days mixed around." A0378 at 137:17–18. He also wanted to get these witnesses' testimonies—which, unbeknownst to him, did not exist—"straightened out, because they're wrong." A0377 at 136:16–18. Ultimately, over an hour and a half later, Mr. Ward was released. A0412.

Six days later, on October 18, OSBI Deputy Inspector Rusty Featherstone, OSBI Agent Gary Rogers, and Detective Smith subjected Mr. Ward to nine more hours of interrogation, culminating in a roughly thirty-minute taped "confession." A0499–503. Through all of the questioning, investigators never offered Mr. Ward an attorney. He had none present with him. Featherstone was with Mr. Ward for the entire nine hours; Rogers and Smith were "in and out" of the interrogation room; and Rogers phoned Detective Baskin regularly throughout the day. A0389–90, A0500.

Featherstone testified that Mr. Ward asserted his innocence, but Featherstone accused him of being untruthful. A0490. At some point, Mr. Ward stated that "he really had nothing at all to do with the disappearance of Mrs. Haraway, but that he had had a dream" about her disappearance. *Id.*, A0500. Featherstone then asked Mr. Ward to describe the dream. Featherstone claimed that details from Mr. Ward's dream matched the limited details Featherstone already knew about the

crimes, for example, "what the vehicle was, where it was parked, the direction of travel as it left and as it was parked." A0491 at 12:17–22. He told Mr. Ward that it was "unusual" that "his dream was so consistent" with this information. A0492 at 13:17–19. Featherstone testified that, in response to this prompting, Mr. Ward denied it was a dream and said he participated in the crimes against Ms. Haraway. *Id.* This purported "confession" was not recorded and, according to Featherstone, occurred at around 2:00 p.m., three and a half hours into the interrogation. A0500. Featherstone, now joined by Rogers (and later by Smith), instructed Mr. Ward to start over again and "go through the entire story of what happened that night." A0492–93.

Over the next three to five hours, interrogators "went through" the statement with Mr. Ward multiple times, all without recording any of the exchanges. A0493–94, A0502. Finally, Featherstone asked Mr. Ward "if he would be willing to repeat the statement on a videotape"; Mr. Ward agreed. A0494 at 15:18–19. At the conclusion of his taped "confession," Mr. Ward was arrested. A0497.

The taped confession was played for the jury over Mr. Ward's objection. *See* A0089–98, A0101–02, A0505–41. The jury heard Mr. Ward state that, on the night of Ms. Haraway's disappearance, he left a keg party with Fontenot and Titsworth, both of whom Miller had previously told the police were with Mr. Ward on the night of Ms. Haraway's disappearance.[5] Mr. Ward repeatedly misstates Titsworth's name as "Titsdale" despite multiple corrections by his

---

[5] Miller was never offered as a witness at trial. *See* A0407. Detective Smith later rejected his own preliminary hearing testimony that police learned of Titsworth's name from Miller, insisting that police did not learn of Titsworth's supposed involvement until Mr. Ward's "confession" on October 18. A0475–81, A0484. He also rejected his own prior testimony that he, personally, "wonder[ed] where [Mr. Ward] came up with the name Odell Tittsworth [sic], and the only time [he could] recall a possible mention [prior to October 18] . . . was the time in Norman [where police interrogated Mr. Ward on October 12], we may have mentioned his name at that time." A0485–87.

interrogators. A0510, A0512, A0515–16, A0528. Police later ruled out Titsworth as a suspect. According to the "confession," Titsworth sought a place to rob (despite it later being determined that he had a broken arm at the time of the crime (A0006–07 at 708:21–25)). Mr. Ward suggested McAnally's because it had previously been robbed. A0511. Mr. Ward, Titsworth, and Fontenot drove a pickup to McAnally's. The confession never mentions J.P.'s or spending any time there, much less an hour and a half. At McAnally's they encountered Ms. Haraway, whom Mr. Ward describes as wearing a white button-up blouse with a print of little blue roses and with lace around the collar and sleeves. A0511, A0513–15, A0534. As the recording makes clear, Mr. Ward received prompting from the detectives when it came to describing the blouse. Mr. Ward testified that police pressured him to "add" to the vague imagery of his dream by suggesting certain specific details in the "confession," including some detail regarding the description of the blouse; Mr. Ward was asked to choose between a white shirt with blue roses and a red-and-white striped shirt, options provided by Detective Smith. A0553–60.

The "confession" continues with the three men deciding to take Ms. Haraway to keep her from being a witness to the robbery. A0512. The confession describes how Titsworth, armed with a knife, "started throwing stuff around" the aisles (even though the scene was undisturbed when witnesses and investigators arrived) before grabbing Ms. Haraway and shoving her toward Mr. Ward. A0244, A0511, A0514. Mr. Ward grabbed Ms. Haraway's arm, which he forcibly put behind her back, and walked her out of the store while Titsworth took money from the register. A0514–15. As Mr. Ward and Ms. Haraway were leaving, Titsworth grabbed Ms. Haraway again and put her in the pickup truck. A0515. Ms. Haraway was placed between Titsworth, who drove, and Mr. Ward, who sat in the passenger seat, while Fontenot sat in the back of the pickup. A0512.

10

This description of three men and one woman leaving the store does not match the only eyewitness account of Ms. Haraway leaving with a lone man.

According to the "confession," the three men drove Ms. Haraway to a power plant, where Titsworth announced his intention to kill Ms. Haraway to prevent her from identifying them. A0513, A0515–16. The confession graphically describes Titsworth as raping Ms. Haraway, while Mr. Ward held her down. A0517–19. Mr. Ward cut Ms. Haraway twice with Titsworth's knife and tried to rape her. A0519–20, A0523, A0536. Fontenot then raped Ms. Haraway, while Titsworth held her down and cut her throat with his knife. A0521, A0523, A0525. Then Mr. Ward walked home but returned fifteen or twenty minutes later. At that point, Ms. Haraway was dead, with large knife wounds across her body. A0522, A0525–26, A0532–34, A0537. The three then discussed disposing of her body in a concrete bunker or an abandoned house by Sandy River. A0527–28.[6] Mr. Ward says he helped lift Ms. Haraway's body onto Titsworth's shoulders and then went home while Fontenot and Titsworth carried away her body. A0528. A few days later, Fontenot told Mr. Ward that he and Titsworth threw Ms. Haraway's body into a bunker by Sandy Creek and set the bunker on fire. A0529.

As noted earlier, this "confession" occurred long before the police discovered Ms. Haraway's body. That did not happen until January 1986, when a woman's skull and torso were discovered near Gerty, in Hughes County, Oklahoma—about 26 miles east of Ada and Sandy Creek. A0113–19. Numerous items were recovered from the scene including a portion of a red and white shirt and matching red and gold earrings. A0122, A0125, A0127, A0129–30, A0133–34, A0137, A0140, A0156, A0605–07; s*ee also* A0628–29. Ms. Haraway was identified through

---

[6] This location is referred to as both "Sandy River" and "Sandy Creek." *Compare* A0527, *with* A0529.

dental records. A0413–44, A0147. An autopsy determined that the cause of death was a single gunshot wound to the head. A0150. Dr. Larry Balding, the forensic pathologist who conducted the autopsy, testified that there was "no evidence, *per se*, that she had been stabbed." A0153 at 109:8–10. The State presented no physical evidence that the body was stabbed or burnt. Put simply, numerous details from Mr. Ward's "confession" were, on their face, false, including such significant details as the location of the body and the cause of death.

Nonetheless, the jury was assured by prosecutors that the confession remained valid because it included details that could not have been known to Mr. Ward but for his involvement in the crime. Prosecutors acknowledged that many of these supposed details had been known to police before Mr. Ward supposedly "confessed." But not all. In particular, the State emphasized at closing that the description of the blouse was an "anchor" tying Mr. Ward to the crimes, and that it was "obvious . . . we had no description of that blouse to give to this Defendant." A0617. According to the State, the *only* way Mr. Ward could have known the description of Ms. Haraway's blouse was if he had seen her wearing it. The police could not have told Mr. Ward about the blouse or suggested it to him in any way because, as prosecutors assured the jury, at the time of the confession police "had no description" of it. A0617–18. They maintained this view despite the fact that no blouse matching the description from the confession was recovered from the scene. Instead, as noted above, a *different* shirt, roughly matching other reports of her clothing that day, was found near her body. A0137, A0628–29. Detective Captain Dennis Smith could not list "anything to be true" from the "confession." A0470–73.

The jury heard how Ms. Haraway's mother, Pat Virgin, had been contacted by Assistant District Attorney Chris Ross *after* Mr. Ward's "confessions" to see if Ms. Haraway owned a light-colored blouse with a blue flower print. A0312. Virgin told Ross that Ms. Haraway did own such

a blouse, which she described as "light lavender." A0312–13. She told the jury she had not previously discussed this blouse with law enforcement. A0313–14. The same night Virgin spoke to Ross, Virgin mentioned the blouse to Ms. Haraway's sister, Janet Weldon, who remembered it. Weldon had discovered this very blouse was missing *the day after* Ms. Haraway's disappearance on April 28. A0297–308. But, incredibly, Weldon testified that, even though she knew the blouse was missing the day after Ms. Haraway disappeared, she did not inform law enforcement about it until nearly six months later, after speaking with her mother. A0295–96, A0307.

### 4.    Other testimony concerning Mr. Ward's location on the night of the crime

On October 24, 1984, Karen Wise, who had been at J.P.'s but not at McAnally's, identified Mr. Ward in a lineup. A0171–72. According to Wise, Mr. Ward was the only individual in the lineup who remotely resembled the composite sketch she had helped create of the two men she had seen at J.P.'s. A0185. Initially, Wise was unable to identify Fontenot in a separate lineup, though she later reversed course. *See* A0173–74. On November 8, 1984, J.P.'s customer Jack Paschall identified Mr. Ward in a lineup, after visiting with police on "about two or three occasions" to view "numerous photographs" of suspects in addition to the composite sketches. A0191–94. On November 19, 1984, James Moyer, the McAnally's customer, identified Mr. Ward in a lineup after looking at the composite sketch and a photo array. A210–11, A0214, B000501 at 96:18–22. Nearly a month later, Moyer identified Fontenot in a lineup (but he later recanted this identification). A0217–19.

Mr. Ward's brother-in-law, Robert Cavins, testified that, during the day on April 28, he and Mr. Ward installed a septic tank at Mr. Ward's mother's house, where they both lived. A0582. He stated that Mr. Ward was still at the home when he left for work at around 2:30 p.m. A0584. When he returned, at around 11:20 p.m., he observed Mr. Ward sleeping on the couch. *Id.* About 30 minutes later, he woke up Mr. Ward so that the two could fix a broken water pipe. A0584–85.

Janette Roberts and her neighbor, Gordon Calhoun, hosted a keg party on the night of April 28. Roberts testified that Mr. Ward attended the party; Calhoun testified that Mr. Ward did not. A0588, A0417–18. In addition, while Stacey DePrater (now Shelton), a guest at the party, could not "say positively" that Mr. Ward was there, she "knew that he had to have been there" based upon his description of the party during his taped interrogation on October 12, including how Calhoun and DePrater's brother played specific musical instruments that night. A0591–92.

On January 9, 1985, at a hearing for the first (joint) trial, Mr. Ward spontaneously announced a new version of his story. The audio of the statement was played to the jury on retrial over the defense's objection. A0421–63; *see also* A0089, A0095, A0101–02. In it, Mr. Ward claimed that he *was* present at J.P.'s and McAnally's on April 28, 1984, but with a different person named Marty Ashley. He claimed that Ashley "picked up" Ms. Haraway from McAnally's in an apparent romantic tryst, without taking money from the register, and that Ashley and Ms. Haraway dropped him off at his house before anything occurred. A0421–63. Mr. Ward stated that he had made up his initial, contradictory "confession" because he thought police were "playing with [him], and so [he] just made up the lie." *Id.* at 156:6–12. He added: "I tried to explain it to you about being a lie and everything, and it was just backfiring." *Id.*

Mr. Ward testified at the second trial. He disavowed both his October 18, 1984, "confession" and his January 9, 1985 in-court statement. He explained that the October 18 "confession" evolved from an amorphous dream he mentioned to police, but the police pressured him to "add" details to that dream. A0553–57, A0579. Mr. Ward testified that he incorporated details suggested to him by officers both because he was afraid the police would hurt him (and even shoot him) if he did not and because he "figured they would go out and see that she wasn't out there and then just run me out for lying to them, because they seen [sic] that the statement

wasn't true." A0556–60, A0579. His in-court statement stemmed from an inmate's advice that he make yet another false confession; Mr. Ward believed he would be sentenced to death and that this false confession would potentially lessen this sentence. A0572–73. Further, he "figured if the police seen that I was making up lies and everything, that they would finally realize I didn't do it." A0563 at 144:16–18. He conformed the January 9 statement to testimony he had heard during the preliminary hearing to the first (joint) trial. *Id.*

Mr. Ward also denied being at either J.P.'s or McAnally's on April 28, 1984, committing any act of violence against Ms. Haraway, or having any knowledge of such acts. A0563–64, A0576. Instead, he attended Roberts's and Calhoun's party on April 28, walked home later that night, and fell asleep on the couch. A0565–66, A0569. Later his brother-in-law roused him from the couch to fix a broken water pipe. A0569. Finally, Mr. Ward denied owning or ever driving a gray-primered pickup truck. A0576. Despite the State's efforts, a "pickup was never located matching any of the witnesses' descriptions," 2020 Order at 29 (C0796), and Detective Smith "admitted the police never found . . . the gray-primered pickup truck." 2020 Order at 23 (C0790).[7]

Mr. Ward was convicted of robbery, kidnapping, and first-degree murder. A0625–26. He was sentenced to life in prison for first-degree murder, and ten years each for robbery and kidnapping. A1923–24. Those convictions and sentences—the subject of this petition—were affirmed on direct appeal. A0630–32.

## II.   EVIDENCE OF MR. WARD'S INNOCENCE SUPPRESSED BY THE STATE AT TRIAL

On December 1, 1992, in response to the motion of Mr. Ward's former co-defendant, Karl Fontenot, the Oklahoma Court of Criminal Appeals ordered OSBI to produce to Fontenot "any

---

[7] The state trial court's ruling on Mr. Ward's *Brady* claim is cited in the style "2020 Order."

and all reports or other documents related or referring to possible suspects in the case."[8] A1565–66. The State produced the 860-page OSBI File to Fontenot's counsel but *not* to Mr. Ward's counsel through the Oklahoma Indigent Defense System. This was nearly *eight years* after the start of the first (joint) trial. There is no dispute that nothing from the OSBI File was disclosed to Mr. Ward's trial counsel.

Mr. Ward did not receive a version of the OSBI File until around 2003 when the Oklahoma Indigent Defense System provided his counsel with only a partially legible version.[9] Not until around 2008 did the State finally provide to Mr. Ward's counsel mostly legible pages from the OSBI File. *See* A1851 at 62:1–14; *see also* 2020 Order at 9 (C0776).

Years later, Mr. Ward's counsel received the Medical Examiner's file from Fontenot's attorney. B000283 ¶ 8.[10] This file, which was not included in the OSBI File, contained an "Updated Missing Persons Report." Mr. Ward continued to receive previously undisclosed materials, including in early 2019, when subpoenas returned hundreds of pages of new and material documents. As described below, these long-withheld materials contain substantial exculpatory evidence as well as impeachment evidence regarding key State witnesses.

### 1.    Exculpatory Evidence Regarding Ms. Haraway's Clothing

OSBI and Ada Police Department documents that were not provided to Mr. Ward at either of his trials leave no doubt that law enforcement knew about Ms. Haraway's floral print blouse

---

[8] OSBI agents helped investigate the Haraway case, interrogated Mr. Ward leading to his false confession, and testified against him at both trials.

[9] To compare the legibility of different versions of the OSBI File, see A1520–21 and A0935–36.

[10] The Updated Missing Persons Report was likely provided in 2013, and it was certainly not included in any other file that he received prior to 2010. B000283. The Medical Examiner's file also reveals that the police contaminated the site where the bones were found: the County Medical Examiner was not notified or able to view the scene before the bones were removed, "If this is not Donna Harriway [sic] they've screwed up the crime scene," and "No one seems to give a 'shit' . . . ." A1531.

before Mr. Ward's "confession." Other evidence uncovered only by the independent work of Mr. Ward's counsel fully confirms what the withheld evidence demonstrates: when the prosecutor told the jury at closing that the description of Ms. Haraway's blouse was the "anchor" tying Mr. Ward to the crime *because* that description had not been provided to police before Mr. Ward's "confession," he flatly misrepresented the truth that was known at the time of trial and concealed it from Mr. Ward and his counsel. Indeed, not only was this evidence withheld from Mr. Ward, but government lawyers permitted witnesses to testify falsely about what government investigators knew of the blouse and when. The lengths to which the government went to bolster the supposed validity of the "confession" that investigators extracted from Mr. Ward through multiple days of grueling interrogation are, simply, shocking.

Ms. Haraway's sister, Janet Weldon, described the blouse to police early in the investigation. *See* A0878, A0926. According to an interview report summary concealed from Mr. Ward, Weldon informed Ada Police Detective Baskin that the blouse that she had discovered missing from her sister's belongings "since the robbery" was "a light lavender colored blouse, with small blue flowers on it" and "had lace around the collar and gathered with elastic on the sleeves and buttoned down the front." A0878. Likewise, another document, which appears to be the final page of the "Background on Haraway" section of the OSBI file, A0978–80,[11] notes that Weldon had given Ms. Haraway a blouse, described as a "light lavender blouse that was very lightly tinted. It had blue flowers on it and had lace around the collar with elastic around the sleeves. The shirt was made of thin material and buttoned down the front." A0926.

---

[11] Specifically, the last line of A0980 would read "the merchandise was returned to the shelves in August of 1984" when paired with A0926, and the handwritten numbers in the bottom-right corner of the documents are in reverse sequential order.

Weldon's description of the missing blouse—including the pattern, buttons, and collar—was nearly identical to the description Mr. Ward provided during his "confession." In response to interrogation questions regarding "what [Ms. Haraway's] blouse looked like," whether it was a "[b]utton-up or slip-on," and whether it "would . . . be just a regular collar," Mr. Ward described the blouse as having "little blue roses on it," being "button-up," and having "buttons on the collars and . . . little fringe deals around her collar and around the end of her arm, end of the sleeves." A0534 at 58:15–22. He was even asked whether he meant "lace" when he said fringe. *Id.* at 58:23–24.

Mysteriously, this report summary of Janet Weldon's interview is the *only* undated summary out of thirty-five interviews contained in the "prosecutorial summary" prepared by OSBI for the State.[12] *Compare* A0878 and A0926, *with* A0862–63 and A0877–960. According to Richard Carson, former Assistant Chief of Ada Police, the substance contained in the undated documents should have been reflected in one or more original dated interview reports of Weldon, but none have been produced to Mr. Ward, despite numerous requests. B000264 ¶¶ 7–10. Agent Rogers, who created the prosecutorial summary, stated that the interview report summary should have been dated and did not know why it was not. B000121 at 90–92. Likewise, Detective Baskin stated that including the date and time in a report "would be important" and was part of his policy; he could not give a single example of another occasion when he chose not to date a report. B000009–10 at 33–34, B000030 at 116. Notably, he stated that Weldon's interview summaries

---

[12] The last page of "Background on Haraway" is presented as though it were the actual interview report of Weldon from which the interview report summary was created ("Janet Lyons Weldon" is handwritten at the top), similar to the longer interview reports corresponding with each of the other dated interview summaries, but is in fact yet another undated summary of Detective Baskin's interview of Weldon.

were likely created from several other reports or notes—none of which have been disclosed to Mr. Ward. *See* B000030 at 114–15.

Nonetheless, there is now ample reason to conclude that this information was known to investigators prior to Mr. Ward's "confession." Indeed, there can be no doubt that the information reflected in this undated interview report was known to investigators soon after the crime was committed.

To begin, the document on its face strongly suggests it was created early in the investigation. It refers only to a "robbery," A0878, which is not how the crime would be characterized months later, when the "confession" occurred, at which point the investigation was assumed to be for kidnapping. *See, e.g.*, A1520–21, B000520–22 (interview reports referring to "kidnapping," "Haraway kidnapping," and "the day she was taken."). Importantly, the document also contains the following description: "JANET LYONS WELDON told Detective MIKE BASKIN that DONNA HARAWAY was JANET's sister." *Id.* This remark makes sense only *early* in the investigation, before the officers were familiar with family members. The police would not have needed clarification on the relationship between Ms. Haraway and Weldon six months into the investigation. Indeed, Baskin testified in his 2019 deposition that he knew that Janet Weldon was Ms. Haraway's sister "fairly early on," and certainly within the first month or so of the investigation. *See* B000027–28 at 105:12–106:7. Moreover, the final page of the "Background on Haraway" document includes the names of Ms. Haraway's former boyfriends and a bible study companion, as provided by Weldon to police and contains *nothing* about Mr. Ward. A0980. If Mr. Ward's false confession were the impetus for Weldon to contact the police regarding the blouse, it does not make sense that Weldon would, during that same interview with police, provide information about Ms. Haraway's ex-boyfriends rather than confirm whether she or Ms. Haraway

knew Mr. Ward. This further suggests that Weldon helped police in their investigative efforts early on.

Other documentary evidence withheld from Mr. Ward confirms that these reports were created early in the investigation and most certainly well before the "confession." At trial, the State introduced into evidence an OSBI Missing Person or Unidentified Deceased Report for Donna Denice Haraway ("Missing Persons Report") dated April 29, 1984, just one day after the crime. B000342–45. Detective Baskin drafted this original report, which included limited information such as Ms. Haraway's driver's license number and hair color. *Id*., B000030 at 117.

But the Missing Persons Report submitted at trial, which contained no description of the blouse, was not the most complete version available at the time. The State's long overdue disclosures included a different, updated version of this document. *See* A1550. The "Updated Missing Persons Report" includes additional, specific information regarding Ms. Haraway's social security number, hair color, and clothing, and the "report, still dated April 29, 1984, added that Ms. Haraway's blouse was '*possibly lavender w/ blue flowers, lace around neck line*.'" 2020 Order at 25 (C0792) (quoting A1550 (emphasis added)). In depositions taken in 2019, Detective Baskin and Agent Rogers stated they believe that the new information came from one of Ms. Haraway's family members, and likely shortly after Ms. Haraway's disappearance. B000034 at 131, B000140 at 166. Detective Baskin and Agent Rogers acknowledged that the specific and intimate details must have been provided by a family member. B000019 at 72:5–7 (noting that clothing sizes had to come from family members), B000034 at 131:4–10, B000140 at 166:15–167:10. Weldon did not recall providing Ms. Haraway's shoe size or bra size, though she "imagine[d]" Steve Haraway would have provided the new information, since, as Ms. Haraway's husband, he would know these types of details. B000235 at 106:11–21. She said Ms. Haraway's mother, Pat Virgin, "maybe"

20

knew these details too. *Id.* at 106:22–24. According to Weldon, both Steve Haraway and Pat Virgin had told her that police were trying to figure out what Ms. Haraway wore when she disappeared. B000214 at 23:5–20. Despite this deposition testimony and the most recent discovery productions by OSBI and the Ada Police Department, the State has still not provided Mr. Ward with any interview reports or notes with family members regarding Ms. Haraway's clothing (other than the undated interview report summary with Janet Weldon) as described in the Updated Missing Persons Report.

Former OSBI analyst Lydia Williams has confirmed that she added the details to the Updated Missing Persons Report using police reports. B000334–38 ¶¶ 6(c), 8. She also stated that these updates—including the blouse description—likely were provided "early on" following Ms. Haraway's disappearance, probably between April and June of 1984. *Id.* ¶ 9(a).

At a minimum, the State had this "updated" report in its possession but chose to present to the jury (and Mr. Ward's counsel) a Missing Persons Report it *knew* was incomplete in *precisely* the respect that would bolster the hotly disputed credibility of Mr. Ward's "confession."

In addition to the Updated Missing Persons Report, Lydia Williams completed a "Regional Organized Crime Information Center" (ROCIC) Submission Card on June 11, 1984, which was included in the OSBI File. A0723. The ROCIC Card's pre-statement information aligns with the information in the Updated Missing Persons Report, further establishing the State's knowledge of the blouse's details prior to Mr. Ward's interrogation. In the Updated Missing Persons Report, Baskin's handwritten "blonde" hair description is crossed out and replaced by Williams to say: "dyed blonde/brown w/ red tint." Because these reports were for internal use only, Williams likely used the Updated Missing Persons Report to complete the ROCIC Card because it contained much of the same information, for example: date of birth, height, weight, social security number, driver's

license number, eye color, and hair color. Within the Card's space for hair color, the words "blonde/brown" are typed; it does not read simply "blonde" as in the original Missing Persons Report. Baskin acknowledged that both a missing person's hair color and social security number would be the type of information gathered very early on in the investigation. B000038 at 147–48. When Rogers was shown both reports, he admitted that the June 11, 1984 ROCIC Card's description "was probably taken from" the Updated Missing Persons Report. B000142 at 175. Thus, the ROCIC Card is further evidence that police knew the blouse description that investigators purportedly "learned" from Mr. Ward's "confession" months before they took that confession.

Mr. Ward also now has overwhelming and unequivocal testimony from key witnesses that leaves no doubt that they shared the description of the blouse with investigators shortly after Ms. Haraway's disappearance. Weldon distinctly recalled that Steve Haraway and Pat Virgin discussed Ms. Haraway's clothing with the police during the first month of the investigation. B000214 at 23:5–20. Mr. Ward also knows that Weldon had given to Steve Haraway a detailed description of the blouse that matches the description from Mr. Ward's "confession" in those early days after the crime. A0023–25. She also acknowledged speaking with the police on numerous occasions early in the investigation and possibly telling officers about the missing blouse on one of those occasions. B000228–29 at 80:16–83:1. Detective Baskin also acknowledged speaking with Weldon, Pat Virgin, and Steve Haraway early in the investigation about the clothes Ms. Haraway may have worn when she disappeared. B000017 at 63:17–23, B000024–25 at 93:23–94:1. Steve Haraway's interrogatory responses make clear that he most certainly told police of the blouse in the days following Ms. Haraway's disappearance. B000538–44. Steve Haraway declared that he "spoke to Det. Dennis Smith and . . . Baskin on 4/29/84. Janet [Weldon] and I, at the request of

Smith, went through Denice's belongings on the same day (29th) to determine what was missing. We described the blouse mentioned in [the Updated Missing Persons Report] and told Smith it was missing." B000541.

All of this fits comfortably not only with common sense (some description of what the victim is wearing is all-critical during a missing persons investigation) but also with early sworn testimony from Weldon. At the preliminary hearing for the first (joint) trial, Weldon testified about realizing the blouse was missing the day after her sister disappeared:

Q: And since Donna's disappearance, have you done anything to locate this shirt?

A: Yes.

Q: What have you done?

A: I looked through my clothes and I looked through hers, and it is not there.

Q: When you say you looked through her clothes what did you do, exactly?

A: The day after she turned up missing and they weren't for sure what she had on, and no one could recall the shirt, and I thought of it. And I went through her clothes the next day, when I was putting some of her stuff away.

A0004 at 133:4–15.

Likewise, Detective Baskin testified at Mr. Ward's retrial that he had asked family members within a day of Ms. Haraway's disappearance what clothing she may have been wearing. A0337–41, A0595–98. Ms. Haraway's family was in constant contact with police during the days, weeks, and months after her disappearance. *See* A0341; *see also* A0028, B000017 at 63:17–23, B000024–25 at 93:23–94:1. It is simply not plausible that they would have determined what clothing was missing from Ms. Haraway's home but withheld that information from investigators.

Recently disclosed records indicate police may have learned early on about the blouse from even more people, including James Boardman, a McAnally's customer who was among the last people to see Ms. Haraway. Boardman called the police just days after Ms. Haraway's kidnapping

23

to inform them that he had been at McAnally's on the evening of the disappearance and was "pretty sure" Ms. Haraway had been wearing "a blue short sleeve T shirt." B000515 (below).



```
                    INTERVIEW WITH JAMES BOARDMAN

      JAMES BOARDMAN                           EMPLOYEE OF
   ADA NEWS.

      A FEW DAYS AFTER DENISE HARAWAY DISAPPEARED
   MR.BOARDMAN CALLED THE POLICE DEPT. AND AVVISED HE WAS
   AT THE MCANALLY STORE ON ARLINGTON ABOUT 5 PM ON 4-28-84
   THERE WERE TWO MEN IN THE STORE THAT IN HIS OPINION WERE
   ACTING FUNNY.

      SUBJ.#1 6 FT.BRN HAIR,BRN SHIRT,BLUE JEANS.
      SUBJ.#2 6 FT.BLOND HAIR,BLUE PLAID FLANNEL SHIRT.

      HE THOUGHT THEY WERE IN A LIGHT COLORED PICKUP.
   BOARDMAN WAS PRETTY SURE DENISE WAS WEARING A BLUE
   SHORT SLEEVE T SHIRT
```

Prosecutors were well aware of the importance of the timing of when investigators learned the description of Ms. Haraway's missing blouse. Specifically, they were aware that it might seem odd that clothing descriptions were not considered important at the outset of a missing persons investigation. So, they invented a reason why nobody specifically talked about or noted the description of the clothing Ms. Haraway was wearing. Detective Baskin acknowledged that he had some discussion of clothing early in the investigation. *See* A0340–41.[13] Yet Baskin sought to downplay the importance of these conversations. When asked at Mr. Ward's retrial why he failed to provide a clothing description in an April 29, 1984 missing persons alert, Baskin responded that

---

[13] The State itself has even acknowledged that "there is no reasonable belief that a husband would not have spoken to the police about his wife to investigators including what she might have been wearing on the day she disappeared. Of course, law enforcement would ask a husband what his wife might be wearing . . . ." (Obj. to Pet'r's Mot. to Enforce Subpoenas and Conduct Additional Limited Disc. 27 (C1566)).

"her father-in-law was a dentist" and "he had a complete set of dental records. He thought that the clothing wouldn't be that important" to identify her. A0338 at 59:21–25.

Testimony by former Ada Police officers Richard Holkum and Richard Carson further reaffirms the State's knowledge of the blouse prior to Mr. Ward's "confession." Holkum testified at trial that he saw Ms. Haraway at McAnally's on the night she disappeared and told Ada Police the next day that she had been wearing a light lavender or blue blouse. A0290–92. No record introduced at trial or disclosed to Mr. Ward's counsel indicated that officers investigating the Haraway disappearance were told by anyone that Ms. Haraway was wearing a blue blouse with a print pattern, and Baskin denies remembering the conversation. A0292, A0396–97. In a recent declaration, Holkum confirmed that he told Ada Police the description of the blouse, adding that he personally provided that same blouse description to the members of tactical search teams he joined during the weeks following Ms. Haraway's disappearance. B000330–31 ¶¶ 10–11. These search teams included "Ada police officers, OSBI agents . . . , Pontotoc Sheriff's deputies, and civilians." *Id.* Holkum informed the detectives about the blouse because "it would be paramount for police to have an accurate description of what Ms. Haraway may have been wearing when she disappeared, especially in the days soon after." *Id*. Remarkably, although Detective Smith acknowledged that Holkum described Ms. Haraway's blouse to the Ada Police within one or two days of the disappearance, he insisted that police "didn't know anything about the blouse from Officer Holkum until later after [Mr. Ward and Fontenot] were arrested" because they did not actually interview Holkum about the blouse until six months after the incident. B000466–70 at 1629, 1631, 1633.

A recent declaration of former Assistant Chief of Ada Police Richard Carson, who was working as a patrolman on the night of April 28, 1984, and aided in subsequent searches, also

shows that he was aware of the blouse description. He remembered Ada Police officers, on the night of April 28, 1984, providing him a somewhat vague clothing description to the effect of "shirt with a print." B000332 ¶ 5. However, Carson recalled receiving a more detailed description through a police radio dispatch the following day. Carson believed that the police received this updated clothing description from Steve Haraway after he searched Ms. Haraway's closet for missing clothes and realized an item was missing. The dispatch message described Ms. Haraway's blouse as a "light-colored (possibly pink) blouse with a print that may have been floral, and with lace*." Id*. ¶ 6. Carson learned of the blouse the day after Ms. Haraway's disappearance and confirmed "that other officers in the Ada Police Department [also] knew of this blouse description" because he, like Holkum, discussed the clothing with other officers. *Id.* ¶ 7.

In spite of this commonsense view that a description of the clothing worn by a woman who had disappeared would be important to the investigation, the State incredibly argued that, because police could use dental records and other methods to identify Ms. Haraway, "the description of somebody's clothing in a missing persons report [was] not that important." A0598 at 50:15–18. For the same reason, the State posited that it made sense that Janet Weldon would decide not to inform police about her sister's missing blouse the day after her sister disappeared. A0597. The State invited the jury to accept this explanation for the absence of any early description of the blouse when, in fact, there was nothing to explain. They had the description of the blouse. They had it early. They just invited the jury to conclude otherwise because it was essential to obtain the conviction.

### 2. Evidence of Other Leads Ignored by Investigators

The OSBI File and documents not produced by the Ada Police Department until 2019 also contain exculpatory information concerning other leads, including evidence suggesting different motives and perpetrators that may explain what happened to Ms. Haraway.

26

*First*, the OSBI file reveals that an unknown man was harassing Ms. Haraway at McAnally's. A0638, A0696–97, A0888, A0978–80. McAnally's manager, Monroe Atkeson, told authorities that Steve Haraway had informed him about a "Vietnam veteran" who had been harassing Ms. Haraway. A0638. Atkeson knew of the man; he also believed that he attended a rehabilitation school. *Id.* Steve Haraway also told Atkeson that Ms. Haraway had received "obscene" calls at McAnally's before her disappearance. *Id.* Steve Haraway confirmed this, telling OSBI about the "Vietnam veteran" and "obscene" calls. A0696–97. Additionally, Atkeson informed OSBI that *another* man behaved strangely while shopping at McAnally's and drove a gray 1957 Chevrolet pickup truck like the one reported by "eyewitnesses" at McAnally's. A0638. This man was noticeably shorter than Mr. Ward (five foot six inches) and of possible Mexican descent, Mr. Ward is not. *Compare id.*, *with* A0645. The State failed to provide Mr. Ward with this information, and Steve Haraway, a State witness, did not testify about the "Vietnam veteran" or the obscene phone calls.

An undated "background" report about Ms. Haraway contains troubling details about the obscene phone calls. According to the report, Ms. Haraway told her sister, Janet Weldon, *an hour before her disappearance*, that she "hated working at the store because it did not have an alarm and a lot of weirdo's [sic] come in and out of the store." A0980. Additionally, Ms. Haraway told Weldon that "the phone calls had started again" and were coming from "a man that said he was going to come out to the store some night and wait outside while she was working." *Id.* This confirms that the State had evidence that Ms. Haraway was concerned about someone dangerous coming to wait outside her work. Recently deposed former District Attorney Bill Peterson even acknowledged that evidence regarding the obscene phone calls—which he did not recall

disclosing—"appears to be" the type of material he would have been obligated to provide to defense counsel. *See* A1826 at 53:15–17.

*Second*, unbeknownst to Mr. Ward, police collected hundreds of pages of evidence into other suspects. A0645–59, A0664–66, A0686–87, A1345–46, A1349–87, A1406–09, A1413–18, A1422–51, A1465–77 (Floyd DeGraw), A0727–29 (Elmer and Albert Sorrell), A0730–39 (Bill Frank Tacchio), A0740–42 (Jerry East, described as "match[ing] the description of the number two suspect"), A0744–47 (Ricky Paul Hogan), A0750–60 (Denver Russell Davis, Daryl Patrick Robins, Christopher Lynn Hammock), A0761 (Dennis and Orvel Reeves, who abducted a female convenience store clerk in Tulsa in August 1984), A0762–63 (Bruce Arms), B000524 (Chuck Shaw and Joe Shutte), B000526 (Arley and Bill Rowell, Ronnie and Everett Duncan). Police were also aware of multiple individuals who drove gray-primered trucks in May 1984. B000521–22 (Bryan Cox), B000523 (Dan Phillip Clover), B000526 (Rowell brothers), B000527 (Clinton Lackey), B000528 (Billy Charley), B000529 (Washburn brothers), B000530 (Ladon Wainscott, Marty Stevenson). None of this evidence was available to Mr. Ward. Indeed, at a pretrial hearing, then District Attorney Bill Peterson flatly denied the existence of *any* other suspects besides Mr. Ward and Fontenot. A0046 (below).

> **MR. PETERSON:** I have no knowledge of any suspects, other than Tommy Ward and Karl Fontenot. I don't know how much plainer I could be. I know of no other individuals in this case.

Two other suspects, Floyd DeGraw and Billy Charley, merit special attention in light of recently uncovered and previously concealed evidence.

28

*1. Floyd DeGraw.* More than a hundred pages of the OSBI File concern Floyd DeGraw, revealing him to be a suspect in the case, unbeknownst to Mr. Ward or the jury. These reports show that DeGraw resembled one of two suspects in the Haraway case; had a history of violence toward women; was arrested for rape in Texas mere days after Ms. Haraway disappeared; was driving a blood-stained car with "Floyd loves Donna" written on the rear window (Ms. Haraway's first name is Donna); had a red and white plaid flannel shirt in his car, consistent with descriptions police received of the shirt Ms. Haraway may have been wearing, along with a brown wallet containing identification and a check book for a woman who lived in Ada; and became extremely emotional when presented with Ms. Haraway's photo and details of her disappearance. A0645–59, A0664–66, A0685–87, A1345–46, A1349–87, A1407–09, A1413–18, A1422–51, A1465–77.[14] Still more police files related to DeGraw are attached to an August 2017 court filing by Fontenot; Fontenot represents they were part of the Pontotoc County District Attorney's Haraway file. *See* Am. Pet. for Writ of Habeas Corpus at 58 & Ex. 90, *Fontenot v. Allbaugh,* Case No. 6:16-cv-00069-JHP-KEW (E.D. Okla. Aug. 18, 2017), ECF No. 77 (C1402 and C1509–C1539). OSBI documents about other suspects were briefer and less detailed than the DeGraw files (and, in many cases, hardly legible). *See* A0671, A0677, A0743–56, A0794–96, A0847, A1520–51. These files stand in stark contrast to the State's representations that it knew of no other suspects. Nothing in the files explains why or even if police ever eliminated DeGraw as a suspect. *See, e.g.*, *Fontenot*, 402 F. Supp. at 1182 ("Why and if OSBI and ADA PD eliminated DeGraw as a suspect remains a mystery given his story was completely fabricated.").

---

[14] According to DeGraw's May 3, 1984 arrest report, Captain Dennis Smith called authorities in Texas to advise that Ms. Haraway "was wearing a red and blue pla[id] cotton shirt, that looked like flannel." A1349–50. The report notes that DeGraw's vehicle contained "a red and white cotton flanned [sic] shirt." *Id.*; *see* A0651 (report listing red and white plaid flannel shirt as item in DeGraw's vehicle).

*2. Billy Charley*. The newly discovered Ada Police Department records include numerous undisclosed reports of calls to police indicating that the composite sketches resembled suspect Billy Charley. B000519, B000536–37. David Yockey, who spent time with Billy Charley and Jim Bob Howard and described the two of them as "very close friends," believes that Charley "was the only person [he knew] of who both was close in appearance to the sketch and drove a primered pickup." A1580–83. According to Yockey, "more so than anyone [he] knew in the 1980s [Charley] was wild enough and mean enough to have kidnaped [sic] and killed Denice Haraway." *Id.* In November 1984, Yockey informed police that "Billy Charley most likely was one of the perpetrators in the Haraway case" and that Mr. Ward could not have committed the crimes. *Id.*, A1588. Upon reviewing a police summary of his 1984 interview, Yockey states it is "incomplete, misleading, and sometimes inaccurate" because it omits that he told police that "Billy Charley matched the composite and that [he] suspected Charley of abducting and/or killing Denice Haraway." *Id.*; *see* A0933–34. By that time, Mr. Ward's "confession" had been induced, and investigators were committed to holding Mr. Ward responsible for the crimes.

Yockey was not alone in suspecting Charley. The Ada Police did too. Charley's father, James Charley, acknowledged in an interview that Ada Police questioned his son days after Ms. Haraway disappeared "because he owned a gray primered pickup at the time Denice Haraway disappeared." A1588–91 ¶ 8.[15] James Charley said that Billy Charley's grandmother heard the phrase "that's Billy Charley's truck" on a police scanner the night of Ms. Haraway's disappearance. *Id.* And several witnesses informed police that Charley matched one of the composite sketches and used to drive a gray-primered pickup truck. B000528, B000536.

---

[15] This is consistent with Detective Smith's testimony at the first (joint) trial that police "brought in" Charley for questioning based on phone calls stating that he resembled one of the composite sketches. But this testimony did not describe Charley owning a pickup. A0010–11.

At the time of Ms. Haraway's disappearance, it appears that Ms. Haraway's sister, Janet Weldon, likewise suspected Charley. Notes not disclosed until 2019 from Ada Police reveal that Weldon discussed Charley (including a detailed description of his personal appearance) with police on April 30, 1984, just two days after her sister's disappearance: "Janet Lyons said that Billy Charley was wearing contact lens [sic] now and has lost some weight. Said that Billy Charley had been out to the store. Need to reinterview for more information."[16] B000534. This was the first time Mr. Ward learned that a family member identified an alternate suspect who had presumably been to McAnally's and that the alternate suspect was known by a family member of Ms. Haraway (and presumably by Ms. Haraway herself). To date, neither the Ada Police Department nor the OSBI have disclosed any interview reports of Charley, despite having interviewed him at least once per his own father's account, and possibly more.[17]

Also uncovered was an admission by Jim Bob Howard to a robbery and murder of a young female convenience store clerk. A1573–75. According to Randy Stane, who had lived with Howard for a short time in Joplin, Missouri, A1575, Howard told him in 2009 "that [Howard] and some buddies used to commit robberies in Oklahoma" and "that a girl ended up getting shot and killed in connection with one of the robberies." A1573–74. Howard never said "who the 'buddies'

---

[16] Lyons is Janet Weldon's maiden name. Following this note was another note, stating "Need more information on Jerry East, where he is and was on that night. If he has been at the store." B000220. Weldon and her sister, Ms. Haraway, had previously testified against East in a prior burglary trial. B000640–53.

[17] Such reports should exist, as it was the policy of the Ada Police Department at that time to "make reports of interviews on major cases, including murder cases, [and] to preserve and store those files." *See* A1586–87. Moreover, Rogers, one of the law enforcement officials who interviewed Charley, testified in a recent deposition that if he had interviewed Charley, he would have written an interview report as part of his common practice. B000144 at 182:11–22. However, Rogers also indicated that in creating the prosecutorial summary, materials about other suspects whom law enforcement had looked into were possibly excluded at times when defense attorneys could "take it off from a direction—take it away from their client." B000183 at 204:25–205:24; B000189–90 at 231:9–232:10.

of his were" and "never mentioned . . . Karl Fontenot or Tommy Ward." *Id.*[18] In 2010, Howard also acknowledged knowing "Billy Charley since [they were] very small" and that, over the years, he "helped Billy out like friends help each other." A1578–79. Howard admitted that "Billy Charley and Tommy Ward looked a lot alike in 1984" and that "[t]he sketch that looked like Billy also looked like Tommy."[19] *Id.* He added that "[s]ometimes other people were in danger from Billy. . . . I've seen him do physical violence to other people when he was frustrated." *Id.*

Law enforcement was also aware of Billy Charley's violent nature; some officers had even been targets of it. Charley was charged with two violent felonies before Ms. Haraway's disappearance, including one for assaulting an Ada Police officer by attempting to run him over with a car. A1584–85, A1590 ¶ 10. Another violent incident occurred when Charley shot at Officer Danny Ray after Ray was dispatched to Charley's residence because he had threatened to kill anyone who came near his house. A1590 ¶ 11.

### 3.  Evidence Casting Further Doubt on the Already Weak Evidence Placing Mr. Ward at the Scene

The OSBI File and recently produced Ada Police Department documents also contain impeachment evidence of James Moyer, the only witness to place Mr. Ward at McAnally's. District Attorney Peterson acknowledged Moyer's importance to the case, writing to him that

---

[18] Steve Capps, whom OSBI mentioned in the summary of its interview with Jim Bob Howard, knew Howard often played pool at J.P.'s in the early 1980s, even though Howard denied this to police. A1677–714. This supports what Karen Wise now says that she told authorities: that Howard was one of four (not two) suspicious men there that evening. *See* A1567–72.

[19] A high school picture of Charley from the 1980s and the composite sketch that was said to resemble both Mr. Ward and Charley can be seen at A1571–72.

"[w]ithout your testimony we could have never presented sufficient evidence to the jury for them to return a guilty verdict." A0850 (below); *see also* 2020 Order at 13 (C0780).



*First*, in a letter to OSBI two months before testifying at Mr. Ward's retrial, Moyer requested "to be considered for all or part of" a $5,000 reward "for information concerning the April disappearance of Donna Denice Haraway" after "[i]ncorrectly assuming that [he] would be contacted after offering information." A0852–55. Moyer "was of the opinion he would receive a reward for his portion of the testimony." 2020 Order at 13 (C0780).

*Second*, a different, previously undisclosed police report reveals important details about the photo array lineup in which Moyer participated on November 6, 1984, almost two weeks before the live lineup where he identified Mr. Ward. B000517. At that photo lineup, Moyer selected the picture of an individual referred to as "#1" from the "Ward folder." *Id.* Like Moyer, James Boardman also selected individual #1 from the "Ward folder . . . [a]round the first of November 1984. B000515. Neither Moyer's interview report nor Boardman's interview report asserts that they identified Mr. Ward. *Id.*; B000517; *see also* 2020 Order at 14–15 (C0781–82). The only photo lineup available to Mr. Ward is State's Exhibit 10-S from both the joint trial and Mr. Ward's retrial, and there Mr. Ward is identified as photo #5. C0001–02. This means that Boardman and Moyer both selected someone *other than Mr. Ward* in the photo lineup. Boardman's interview report is particularly significant considering the newly disclosed fact that, within a few days of Ms. Haraway's disappearance, he informed the police that he had seen her at McAnally's the day she went missing. B000515. That Boardman was never called to testify raises serious suspicion as

to the photo lineup process for both witnesses. Moreover, whatever exposure Moyer had to the photos may well have contaminated his subsequent identification of Mr. Ward (which already was problematic for many reasons, not least of which because Moyer was hypnotized beforehand[20]).

*Third*, "Moyer's testimony was inconsistent and changed over time." 2020 Order at 13 (C0780). Newly uncovered documents present serious concerns about the credibility of Moyer's observations from the evening of April 28, 1984, because they show that his account was inconsistent and evolved over time with respect to the order in which he saw the suspects enter the store and their clothing to further match the State's theories of the case. An April 30, 1984 Ada Police report indicates Moyer saw a pickup pull in facing the building and that "a dark haired guy came in the store first, then a blond haired guy came in later" and that Moyer left "approximately one minute after" the two men came in. B000525; *see also* 2020 Order at 13–14 (C0780–81). On November 6, 1984, Moyer told police that "there was a dark haired male at the back of the store, but he did not get a very good look at him," and that a second man, who was blond, "came in the door and walked past him" while he spoke with Ms. Haraway. B000517; *see also* 2020 Order at 13–14 (C0780–81). He also mentioned seeing a pickup as he was leaving but said nothing about seeing one pull in. Another written report from the same day said that when Moyer arrived at McAnally's, there was "one person *already* in the store" and that a second subject "came into the store and walked past him." B000518 (emphasis added); *see also* 2020 Order at 13–14 (C0780–81). But, at Mr. Ward's trial, Moyer testified that when he arrived at McAnally's, his vehicle was

---

[20] Mr. Ward's counsel had objected to Moyer's identification of Mr. Ward because Moyer had been subject to hypnosis, but it was allowed in over that objection (additionally, the State succeeded in excluding the fact that Moyer had been hypnotized, again over the defense's objection). B000504–05 at 104–05. Dr. William Starns, who performed the hypnosis, recounted that he used the "age regression" method of hypnosis to take Moyer through the events of April 28, 1984, and noted that Moyer was unable to provide a description of the two men he saw at McAnally's because "he did not get a good look at them and did not directly look at their faces." B000388 ¶ 4.

the only one there and then two people entered the store. A0220 at 112:2–24; *see also* 2020 Order at 13–14 (C0780–81).

Also of note is that none of the written interview reports of Moyer's observations included a clothing description. But Moyer testified at the joint preliminary hearing that both men who walked into McAnally's wore blue jeans, though he could not recall their shirts. B000396 at 219:9–12. Later, under further questioning, Moyer indicated "I thought Tommy was wearing a t-shirt" but indicated he was "not positive" and did not provide a color. B000398 at 232:9–10. At Mr. Ward's retrial, Moyer's testimony continued to evolve; this time, without hesitation, he said Mr. Ward wore a "T-shirt, light in color, possibly light blue." A0209 at 88:14–15; *see also* 2020 Order at 13–14 (C0780–81). If the interview reports were available at trial, testimony could have been elicited to highlight how Moyer went from providing no clothing description to offering one increasingly similar to Karen Wise's description of the blond suspect wearing blue jeans and a "light colored tee-shirt." A0690.

*Fourth*, a recently disclosed interview report reveals Moyer told police he "did not get a very good look" when describing the "dark haired male" whom he later identified as Fontenot. B000517. Oddly, at Mr. Ward's trial, Moyer indicated that he *did* examine the suspects' faces. For instance, with regard to the first man who entered the store—whom Mr. Moyer initially identified as Fontenot—Moyer noted "I looked up twice, each time he was looking at me. He was walking around the back isles [sic] in a U-shape from where he entered the front door." A0207 at 86:14–16. Despite this, Moyer recanted his identification of Fontenot—interestingly, not on the basis that he did not get a good look at the dark-haired suspect as he had told police in November 1984, but rather because he fortuitously saw an individual in the courtroom at the preliminary hearing "that looked kind of familiar . . . that confused me about this dark-haired person." A0217–19. Moyer

also claimed he looked at and "studied" the second, blond suspect "a little bit." A0208 at 87:6–12.

But he failed to mention that he "only saw [the blond individual] from the right side," as he had

testified to at a preliminary hearing in the joint trial. B000397 at 231:10–12. Further, his statement

to the police describing the suspects was not "in detail" and he "couldn't add too much to the"

composites other than that "[t]he hair was more ruffled." B000492–93 at 55:21–56:3. Moyer

indicated he consistently saw drawings "in the paper and what was in the store windows

downtown." B000401 at 243:6–7. Moyer's identifications of Mr. Ward, therefore, were based on

the composite sketches more than Moyer's actual memory of his very short encounter with the

suspects.[21] If defense counsel had been provided with these interview notes, they could have

impeached Moyer as to his willingness to identify a suspect at which he did "not get a good look."

*See* B000517 (below).



```
                      HARAWAY CASE

                  INTERVIEW WITH JIM MOYER

   ON 11-6-84 DETS BARRETT AND FOX WENT TO MARTINS PHILLIP
66 STATION ON ARLINGTON AND TALKED TO  JIM MOYER.
MR.MOYER SAID HE WENT TO MCANALLYS ON ARLINGTON ABOUT
7:30 PM ON 4-28-84.MOYER SAID THERE WAS A DARK HAIRED
MALE AT THE BACK OF THE STORE,BUT HE DID NOT GET A VERY
GOOD LOOK AT HIM. WHILE MOYER WAS AT THE COUNTER TALKING
WITH DENISE HARAWAY A SECOND MALE CAME IN THE DOOR AND
WALKED PAST HIM. THIS PERSON HE DESCRIBED AS BEING BLOND
HEADED AND OF AVERAGE HEIGHT AND WEIGHT.MOYER SAID HE
STAYED IN THE STORE ONLY A MINUTE OR TWO AFTER THE SECOND
SUBJ. CAME IN. AS HE WAS LEAVING HE SAW A PICKUP PARKED
INTO THE CURB FACEING THE STORE. HE ONLY KNEW IT WAS
PRIOR TO A 1971 MODEL AND WAS A FORD OR A CHEVY. MOYER
LOOKED AT THE PICTURE LINEUPS AND SAID THE PICTURES THAT
MOST RESEMBLED THE MEN HE SAW WAS #1 IN THE WARD FOLDER
AND #2 IN THE TITSWORTH FOLDER.


                              D.W.BARRETT
                              REPORTING OFFICER
```

---

[21] Not to mention, the composites were based on a description of men whom Karen Wise saw at J.P.'s, who were there between 7:00 and 8:30 p.m., *see* A0163, A0176; therefore, if both witnesses' testimonies were correct, Moyer could not possibly have seen the same men when he was in McAnally's at 7:30 p.m.

Numerous previously undisclosed witness accounts also refute the prosecution's theory that Ms. Haraway left McAnally's with Mr. Ward and Fontenot in a gray-primered pickup truck. To begin with, a witness named Duney Alford informed police that he had come to the store near the time of Ms. Haraway's disappearance and had noticed a parked "chalky gray" pickup truck as well as a "dark haired, kind of slick downed" man with his hair "parted on the side" standing by the front door of the store. B000520. This does not describe Mr. Ward at all—he had blond hair that was parted down the middle. Similarly, Shelia Dawn Turner described to the police that, at 6:00 p.m. in McAnally's on the night of Ms. Haraway's disappearance, there was "a large heavy set man . . . in his late thirties or early forties" with light brown or blond thinning hair whom Ms. Haraway noted had been in the store for about forty-five minutes and seemed to make Ms. Haraway uneasy. A0698. John McKinnis, a McAnally's regular and one of the last people to see Ms. Haraway at the store, told police he had seen a strange, upset man—not Mr. Ward or Fontenot—behind the counter at McAnally's the night Ms. Haraway went missing. A1597–99. A recently produced Ada Police document confirms that McKinnis informed police that there was a "huge guy with [a] full beard," approximately 5'11, 195-200 pounds, "26-30 years old" standing behind the counter. B000531. Jimmy Simpson told Ada Police that when he arrived at McAnally's, no one was there, and he saw a car with "three or four people aroun[d] it" as well as a pickup with a "man in the driver side and a woman next to him." B000516. This description of the scene conflicts with the statements by David Timmons and Gene Whelchel that the suspects drove off with Ms. Haraway immediately. A0238–39, A0251. The descriptions provided by these witnesses create further doubt as to the identity of the perpetrators, as they are entirely inconsistent with Mr. Ward's appearance and with the State's representations at trial. These details were never provided to defense counsel.

Newly disclosed information from the OSBI File and the 2019 Ada Police Department production also corroborates Mr. Ward's alibi, while contradicting the testimony of key witness Gordon Calhoun, whom the State relied on to discredit Mr. Ward's alibi.

Calhoun testified at trial that Mr. Ward did not attend his party the night Ms. Haraway disappeared. A0417–18. Ignoring the testimony of two other witnesses who placed Mr. Ward at the party, the State argued at closing: "[H]ow is it that the only two people who take that stand that are at the party, both say they didn't see him?" A0601. But during a November 1984 interview with the District Attorney's Office, Calhoun had conceded the possibility that Mr. Ward *was* at the party. Calhoun said that he met Mr. Ward "in April, 1984," and that Mr. Ward "would attend the parties" he held during this time. A0940.

### 4.    Mr. Ward's Exculpatory Statements

The OSBI File contains two withheld interview reports of Mr. Ward in which he maintained his innocence: (1) a report from his first interview on May 1, 1984; and (2) a report from an October 31, 1984 interview from jail, conducted by a District Attorney investigator. A0908–10. Each report is listed prominently in the "prosecutorial summary's" table of contents. A0862, A0908–10. Yet, the State failed to disclose both reports—and, in fact, stated affirmatively that no such reports existed.

In response to the trial court's inquiry about the existence of additional statements by Mr. Ward, Bill Peterson answered that he, personally, was not "aware of" any such statements. A0052–54; *see also* 2020 Order at 6 (C0773). When pressed, Peterson responded: "If I have any— I will make a concerned [sic] effort to obtain, if they exist, any more statements of the Defendant. How's that, Judge?" A0054. Five months later, Peterson claimed that the State "ha[d] given [the defense] either a [sic] audio or video cassette tape of every statement we have." He continued: "I have nothing in my file that was ever written down as to we [sic] interviewed Tommy Ward or he

came over and asked us to talk to him or anything like that." A0107–08. With respect to the May 1, 1984 interview, Peterson stated: "I have no memorandum as to the conversation that the defendant had with Detective Baskin and Detective Smith on May the 1st." A0107. Based on these representations, the court overruled a defense discovery motion, noting, "it appears that the State's furnished all . . . copies of all statements in writing that they plan to use and I know of no others." A0109. The State possessed other statements.

### 5. Evidence of Witness Tampering

In a sworn declaration, Karen Wise says that Pontotoc County District Attorney Bill Peterson instructed her to withhold testimony that conflicted with the prosecution's theory. A1567–72. When initially interviewed by police, Wise described not two men, as she testified at trial, but four men who were together at J.P.'s before Ms. Haraway's disappearance. *Id*. Her description of these men led to the creation of the two composite sketches, including one that the State claims matches Mr. Ward.[22] A0168, A0250–51, A0254–55. Wise's testimony that she saw Mr. Ward at J.P.'s around the time of Ms. Haraway's disappearance from nearby McAnally's was critical to the State's case. *See, e.g.*, A0603–04. Besides Moyer, who placed Mr. Ward at McAnally's roughly *an hour before* Ms. Haraway's disappearance, and Mr. Ward's false confession, the case depended upon Wise and one other witness placing Mr. Ward at J.P.'s around the time Ms. Haraway disappeared.

Additionally, Wise now states that she identified two other suspects, Jim Bob Howard and Bubba Daggs, to police and the District Attorney's Office. *Id*. According to Wise, District Attorney Peterson directed her not to mention the presence of Howard and Daggs in her testimony, and she

---

[22] "Instead of focusing on the facts and evidence gleaned from McAnally's, the actual crime scene, police almost immediately generated two suspects matching descriptions of two of the four individuals in J.P.'s with no evidence that these men were seen at the crime scene." *Fontenot*, 402 F. Supp. 3d at 1144.

complied. *Id.* The OSBI File corroborates Wise's account because it shows that Howard was questioned about being in J.P.'s that evening. A0935–36 ("Howard said he didn't know where he was on April 28, 1984, but he was probably at home. Howard said he had been in JP's store before to get a sandwich or something, but he never played pool there.").

Other witnesses came forward with similar experiences. In his false confession, Mr. Ward identified Odell Titsworth as the third participant in the crimes.[23] A0510, A0512, A0515–16, A0528. Titsworth stated in 2014 that District Attorney Peterson instructed him prior to trial to alter his testimony so that Titsworth could "get even" with Mr. Ward and Fontenot for implicating him. A1592–93. Specifically, Titsworth "was encouraged to testify in a way that would incriminate Ward and Fontenot."[24] *Id.* Titsworth "was convinced Mr. Peterson was asking [him] to lie." *Id.* Prior to the joint trial, Titsworth tape-recorded conversations with Mr. Ward and Fontenot at the county jail at the direction of Pontotoc County authorities. Titsworth stated, "[i]t was obvious . . . from the way they were talking that Fontenot and Ward didn't have a clue about what happened to Haraway." *Id.* Mr. Ward has still not received these potentially exculpatory tape recordings.

Stacey Shelton (formerly DePrater) also accuses District Attorney Peterson of intimidating her during Mr. Ward's trial. Peterson demanded that she stay in an office "until [she] agreed to recant" her testimony that supported Mr. Ward's alibi of being at a party on the night of Ms. Haraway's disappearance. A1595 ¶ 12. The Ada Police Department and Pontotoc District

---

[23] According to prior testimony that he later disavowed during Mr. Ward's retrial, Ada Detective Captain Dennis Smith thought that Mr. Ward may have learned of Titsworth's name when police provided it to him during his October 12 interrogation, before his "confession" on October 18. A0484–87.

[24] Titsworth did not testify as a State witness at either the first (joint) trial or Mr. Ward's retrial, but he did testify as a State witness at the preliminary hearing to the first (joint) trial. *See* A0014.

Attorney's Office knew that Ms. Shelton's testimony was damaging to their case against Mr. Ward. *See Fontenot*, 402 F. Supp. 3d at 1171.

## PROCEDURAL HISTORY

### 1.   Joint Trial of Mr. Ward and Fontenot and First Direct Appeal

In September 1985, Mr. Ward and Fontenot were jointly tried on charges of robbery, kidnapping, and murder in the Pontotoc County District Court (Case No. CRF-1984-183). The State presented no physical evidence tying Mr. Ward to the crimes because none existed, but Mr. Ward and Fontenot were found guilty of kidnapping and first-degree murder and sentenced to death. They each appealed.

The Oklahoma Court of Criminal Appeals (OCCA) ultimately reversed Ward's convictions in *Ward*, 755 P.2d at 124, due to the United States Supreme Court's decision in *Cruz v. New York*, 481 U.S. 186, 193–94 (1987), reversing its prior position on joint trials for defendants with interlocking confessions. Fontenot's convictions were reversed for the same reason. Both cases were remanded for new trials. C1156.

### 2.   Second Trial and Second Direct Appeal

Before his retrial, Mr. Ward filed a discovery motion, requesting any information related to the discovery of Ms. Haraway's remains, any information that was exculpatory or favorable or might lead to the discovery of the same, and all written and recorded statements or memoranda of written or oral statements from witnesses to the alleged crime, among other categories of evidence. *See generally* A0035–A0055 (excerpts from the hearing on this discovery motion). As discussed, the State did not comply with this request. Throughout the jury trial, the State relied heavily on the description of the blouse and Moyer's testimony. On June 16, 1989, Ward was convicted of robbery, kidnapping, and murder in the Pottawatomie County District Court. A0625–26 (Case No.

CRF-1988-208).[25] On July 10, 1989, he was sentenced to life imprisonment on the murder charge, ten years for kidnapping, and ten years for robbery. A1923–24.

Mr. Ward timely appealed, Case No. F-1990-17, setting forth ten propositions of error in support of his appeal. May 18, 2020 Resp. in Opp. to Post-Conviction Relief, Ex. 1 (C1164–1341).[26] OCCA affirmed Mr. Ward's convictions and sentences on January 7, 1994. *Id.*, Ex. 3 (C1342–44), A0630–31.[27]

### 3.  State Post-Conviction

On November 1, 2017, Mr. Ward filed his Application for Post-Conviction Relief in the District Court of Pontotoc County. *Ward v. State*, Pontotoc County Case No. CRF-1984-183 (C0003–C0008). He sought and received a period of limited post-conviction discovery from the District Court of Pontotoc County and deposed OSBI Agent Gary Rogers, Ada Police Department Detective Mike Baskins, and Ms. Haraway's sister, Janet Weldon.

Beginning in January 2019, Mr. Ward obtained documents from the Ada Police Department (APD), OSBI, and Oklahoma Medical Examiner's Office—including hundreds of

---

[25] At trial, Mr. Ward was represented by attorneys Truman B. Simpson and Janette C. Elliott.

[26] On appeal, Mr. Ward, represented by attorney James Barry, raised the following propositions of error: 1) his confession was coerced and obtained in violation of his constitutional and statutory rights including the Fifth and Sixth Amendments of the United States Constitution; 2) there was insufficient evidence to support the conviction in the absence of any evidence to establish the trustworthiness of Ward's confession or otherwise corroborate the confession; 3) the in-court identifications of Ward by the witnesses should have been suppressed as improperly hypnotically enhanced or unduly influenced by an improper lineup; 4) the trial court erred by allowing the introduction of inadmissible hearsay concerning the extra-judicial confessions by Fontenot; 5) improper evidence of an uncharged crime was submitted to the jury; 6) the trial court erred when it did not sustain Ward's entire request for discovery and disclosure; 7) the trial court erred when it refused to give Ward's requested jury instruction concerning the effect of circumstantial evidence; 8) the trial court erred when it allowed the State to impeach a witness with notices of alibi filed in the previous trial; 9) the trial court erred when it redacted all references to a polygraph exam from the video tape of Ward's confession as it was shown to the jury; and 10) the trial court erred when it refused Ward's request for funds to hire an investigator.

[27] Mr. Ward (Prisoner No. 148915) is currently incarcerated at R.B. Dick Conner Correctional Center in Hominy, Oklahoma.

documents from the APD, much of which he had never seen before. These documents contained statements and reports responsive to Ward's 1988 pre-trial discovery requests that should have been produced by the State as required by the federal and state constitutions and caselaw at that time. The District Court also granted Mr. Ward's Motion to Enforce Subpoenas against the OSBI and the Ada Police Department, and to submit an interrogatory by mail to Steve Haraway, Ms. Haraway's surviving husband.

Following the conclusion of discovery, Mr. Ward filed an Amended Application on March 2, 2020. C0356–C0361. The Application contained *Brady*, *Napue*, and newly discovered evidence claims pertaining to the blouse, alternate suspects, and impeachment evidence against James Moyer, the State's key witness. The State filed a Response, and Mr. Ward replied.

On December 18, 2020, Judge Paula Inge of the District Court of Pontotoc County issued an Order vacating Mr. Ward's judgments and sentences, dismissing the charges originally filed against him, and ordering that he be discharged from custody. The Order followed a voluminous review of the record. Among other things, the court concluded that Mr. Ward had been "denied due process" in his convictions and would "not be able to receive a fair trial" today because Oklahoma officials withheld exculpatory, material evidence for decades, through at least 2019. 2020 Order at 32–33 (C0799–800).[28]

On January 8, 2021, the State appealed the Order to OCCA and requested a stay pending appeal, which OCCA granted, resulting in Mr. Ward's continued detention. *See State v. Ward*, PC-2021-8, PR-2020-958 (Okla. Crim. App. 2021). Over a year and a half later, on August 26, 2022,

---

[28] In the December 18, 2020, order, Judge Inge made a series of findings of facts while evaluating Mr. Ward's post-conviction petition. Following appeal and remand, the state court incorporated its findings of fact from the 2020 Order. *See* C1159. Facts found by the state court are presumed correct under 28 U.S.C. § 2254(e)(1).

in a nine page order, OCCA reversed the District Court's Order as to Mr. Ward's second claim under Section 1080(a) of the Oklahoma Post-Conviction Procedure Act (PCPA), Okla. Stat. tit. 22, § 1080, *et seq*. OCCA ruled that Mr. Ward's *Brady* claim was barred by res judicata and waiver and that the District Court abused its discretion in deeming laches inapplicable. OCCA then lifted its stay and remanded Mr. Ward's Amended Petition to the District Court for further proceedings consistent with its Order, specifically the disposition of Mr. Ward's newly discovered evidence claim. C1008–16.

On remand, Mr. Ward filed supplemental briefing, arguing that new evidence discovered only after his initial post-conviction filing in 2017, even standing alone, compelled his immediate release in the interest of justice under Section 1080(d) of the PCPA. He also raised Oklahoma law-based actual innocence and gateway innocence claims. The State responded to the supplemental brief, and Mr. Ward submitted a reply brief.

On December 29, 2022, based on OCCA's remand order, Judge Inge denied Mr. Ward's claim for post-conviction relief. "[L]imited by the OCCA's reversal of [the] Court's decision [granting post-conviction relief] based on the procedural bars of *res judicata*, waiver and laches," Judge Inge held that Mr. Ward did not meet the appropriate burden under Oklahoma law to demonstrate actual innocence, by clear and convincing evidence, based on newly discovered evidence. C1162. As a result, Mr. Ward remains in custody and now files this Petition for Writ of Habeas Corpus seeking relief from his state court convictions and sentences.

## **ARGUMENT**

Under 28 U.S.C. § 2244(d)(1) a state petitioner challenging his felony conviction must file his Petition for Writ of Habeas Corpus prior to the lapse of the one-year statute of limitations. However, a delayed filing is allowed upon a credible finding of actual innocence in order to prevent

a fundamental miscarriage of justice. *McQuiggin*, 569 U.S. at 386, 392 ("[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief."). Further, federal courts waive procedural defects to prevent a manifest injustice of continuing to incarcerate one who is actually innocent. *See Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986) (plurality opinion) (allowing successive petitions with rejected constitutional claims); *McCleskey v. Zant*, 499 U.S. 467, 494–95 (1991) (explaining that an "abusive petition" can be excused to prevent a fundamental miscarriage of justice); *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 11–12 (1992) (actual innocence trumps failure to develop facts in state court); *Lopez v. Trani*, 628 F.3d 1228, 1230–31 (10th Cir. 2010) (actual innocence is an exception to procedural barriers in a petitioner's case, including statute of limitations).

To satisfy the actual innocence gateway standard, a petitioner must show that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327; *see also House v. Bell*, 547 U.S. 518, 538 (2006). "Removing the double negative, a petitioner's burden at the gateway stage is to demonstrate 'that more likely than not any reasonable juror would have reasonable doubt.'" *Fontenot v. Crow*, 4 F.4th 982, 1030 (10th Cir. 2021) (quoting *House*, 547 U.S. at 538), *cert. denied*, 142 S. Ct. 2777 (2022). "'[T]he *Schlup* standard does not require absolute certainty about the petitioner's guilt or innocence'—that is, a petitioner need not make 'a case of conclusive exoneration.'" *Id.* (quoting *House*, 547 U.S. at 538); *see also Schlup*, 513 U.S. at 327 ("[T]he showing of 'more likely than not' imposes a lower burden of proof than the 'clear and convincing' standard . . . ."). In meeting this standard, a petitioner must present newly discovered evidence that a jury did not consider. *See Schlup*, 513 U.S. at 324, 327. The evidence is "new" for purposes of the *Schlup* analysis "so long as it was

'not presented' at trial" regardless of the availability of the evidence at trial through the exercise of due diligence. *Fontenot*, 4 F.4th at 1032 (quoting *Kidd v. Norman*, 651 F.3d 947, 952 (8th Cir. 2011) and adopting the "newly presented" standard). A federal court must conduct a cumulative assessment of the prosecution's evidence at trial, along with the newly discovered evidence when considering whether the requirements of the gateway claim are met. *See House*, 547 U.S. at 537–38.

As detailed above, Mr. Ward is actually innocent of his convictions. No reasonable juror would have found him guilty beyond a reasonable doubt had they known all the facts wrongfully concealed from Mr. Ward and had they known how far the investigators and prosecutors were willing to go to preserve the credibility of the "confession" they wrongfully coerced from him and the credibility of their star witness. Mr. Ward's actual innocence "serves as a gateway through which" the one-year statute of limitations may be waived. *See McQuiggin*, 569 U.S. at 386; *see also Fontenot*, 4 F.4th at 1030 (considering Mr. Ward's former co-defendant's habeas petition on the merits after holding that a credible showing of actual innocence, based on evidence similar and sometimes identical to that at issue here, overcame his procedural default).

Because he is actually innocent, Mr. Ward's extraordinary case opens a gateway that allows this Court to consider the merits of his petition. And the merits are straightforward. The State buried evidence that Mr. Ward could have used to impeach key prosecution witnesses and to show that he did not commit the crimes for which he was convicted. This is undisputed. Moreover, this buried evidence would have changed the course of his trial, had it been disclosed. The State also solicited or allowed false testimony to go undisputed. In addition to Mr. Ward's arguments relying on actual innocence to overcome state court procedural default and the statute of limitations set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), it is worth noting

46

that evidence of a *Brady* violation is also evidence of cause and prejudice, which overcomes state procedural default. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004). Although Mr. Ward is actually innocent and therefore not bound by AEDPA's statute of limitations, he has filed this petition within AEDPA's statute of limitations, as the timer did not start running while his state court post-conviction was pending when additional *Brady* material was produced by the state. *See* 28 U.S.C. § 2244(d)(2). Thus, even if this Court disagrees with the ample record of Mr. Ward's actual innocence, this Court can still consider the merits of Mr. Ward's timely petition because the State's repeated failure to turn over favorable and material evidence caused Mr. Ward to procedurally default his claims in state court.

## I.   DESPITE THE STATE'S LONG-STANDING EFFORTS TO BURY EVIDENCE FAVORABLE TO MR. WARD, THE NEW RECORD ESTABLISHES HIS INNOCENCE

For reasons that have never been explained, investigators focused on Mr. Ward months after the crime, refusing to follow up on promising leads, including at least two suspects to whom the evidence pointed. Mr. Ward, alone and unrepresented, was then subjected to two lengthy interrogations at police stations on separate days in less than a week, the second one lasting nine hours. The recorded "confession" that was extracted after coercive techniques had been deployed on Mr. Ward was, by the time of the second trial, known to be wrong in the most central details. But the State was committed to convicting Mr. Ward, instructed witnesses to avoid giving testimony inconsistent with holding Mr. Ward accountable, and even lied to the jury about what investigators knew about the description of Ms. Haraway's blouse so they would have some evidentiary basis to "anchor" Mr. Ward to the crimes. They concealed evidence calling into doubt the testimony of the only person who ever put Mr. Ward at the scene. The reality is that the so-called "evidence" of Mr. Ward's guilt rests on lies and concealment. Literally no evidence untainted by prosecutorial misconduct ties Mr. Ward to these horrible crimes. He is innocent. And

47

no reasonable juror who evaluated the evidence *now* known to exist, but wrongfully concealed by the government, could possibly have found Mr. Ward guilty beyond a reasonable doubt.

### 1.    The State's Case at Trial Was Exceedingly Weak

Even before considering any new evidence, the State's case against Mr. Ward at trial was already extremely weak. The State's case rested primarily on two key pieces of evidence: Mr. Ward's confession and James Moyer's identification of Mr. Ward at McAnally's the night of Ms. Haraway's disappearance. Both were riddled with inconsistencies from the start.

As to Mr. Ward's confession, by the time of his 1989 retrial, the discovery of Ms. Haraway's remains had proved that, in addition to the participation of Odell Titsworth in the crimes against Ms. Haraway, Mr. Ward had also gotten wrong (1) the cause of Ms. Haraway's death and (2) the location of Ms. Haraway's body. A0150, A0113–19, A0006–07 at 708:21–25. The only supposedly corroborated detail from Mr. Ward's confession was his description of the blouse that Ms. Haraway's sister had confirmed was missing from among Ms. Haraway's clothes. A0297–308. But Ms. Haraway's remains were found along with a portion of a red and white shirt and matching red and gold earrings, not the blouse Mr. Ward had described. *See* A0628–29. Mr. Ward testified at trial that he had been fed the description of the blouse. A0559–60.

The circumstances surrounding the discovery of the missing blouse by Janet Weldon, Ms. Haraway's sister, and her reporting its description to the police did not make sense even at the time of trial. Weldon testified that, even though she discovered Ms. Haraway's blouse was missing the day after her disappearance, she did not tell authorities about the blouse until after learning the contents of Mr. Ward's "confession," *six months after* Ms. Haraway's disappearance. A0297–308. This was despite the fact that Ada Police Detective Mike Baskin testified that, during the days following Ms. Haraway's disappearance, he *was in touch with family members* about Ms. Haraway's clothing. Baskin testified he "had no one that could say that Mrs. Haraway was

wearing any particular clothing at that time," A0339–41, and downplayed the significance of his discussions with family members, claiming that obtaining a clothing description at that time "wouldn't be that important." A0338. Weldon's supposed sixth-month delay in reporting the missing blouse is hard to reconcile with the active police investigation into Ms. Haraway's disappearance long before Mr. Ward's "confession."

As to Moyer's identification of Mr. Ward at McAnally's, his testimony directly contradicted that of Karen Wise and Jack Paschall, the two other key witnesses concerning the whereabouts of the suspects to Ms. Haraway's disappearance. Moyer testified that he saw Mr. Ward at McAnally's at 7:30 p.m. A0206–07. But Wise, whose description of the men at J.P.'s was the basis for the composite sketches that led to Mr. Ward's identification as a suspect, said the men at J.P.'s were there from 7:00 until 8:30 p.m. A0163, A0176. Jack Paschall also said he saw the men at J.P.'s when he arrived at 8:00 p.m. A0165–66. Moreover, Moyer identified Mr. Ward in a lineup only after looking at the composite sketch and a photo array. A210–11, A0214, B000501 at 96:18–22. Further, Moyer's statement to the police describing the suspects was not "in detail" and he "couldn't add too much to the" composites other than that "[t]he hair was more ruffled." B000492–93 at 55:21–56:3.

Moyer's testimony also contradicted that of Gene Whelchel and the Timmons brothers, who testified that they saw *one* man and *one* woman walk out of McAnally's together at 8:30 p.m. and leave in a gray- or light blue-primered pickup truck. A0222–25, A0238, A0248. Whelchel later identified the woman as Ms. Haraway. A0251.

The State's testament against Mr. Ward at trial rested on two pieces of flimsy evidence that did not square with the other evidence in the case. The new evidence Mr. Ward has finally

obtained, which undercuts *both* pieces of evidence even further, topples the State's entire case against him.

### 2.   The State's Anchor Is Untethered

The State would not have been able to convict Mr. Ward had it not been able to make the confession stick. As Agent Rogers admits, the blouse was the only material detail from the "confession" that was *not* disproven, uncorroborated, or known by police beforehand. *See* A0549–50. Accordingly, the State devoted a substantial portion of its closing to it, arguing it was an "anchor" that compelled Mr. Ward's conviction. And the State repeatedly maintained that it could not have fed Mr. Ward the description, insisting that "the police didn't tell him because they didn't know" about the blouse. A0617–18. The State expended great effort to build up its theory that Mr. Ward must have come up with the description of the blouse on his own, underscoring how essential that theory was to a conviction. In reality, the police had received the description of the blouse from multiple sources, and they fed it to Mr. Ward.

The undisclosed interview report summary of Janet Weldon in which she provided the blouse's description to Detective Baskin shows that police had the description *before* Mr. Ward's "confession." *See* A0878 (below).

> JANET LYONS WELDON told Detective MIKE BASKIN that DONNA HARAWAY was JANET'S sister and she had given DONNA a light lavender colored blouse, with small blue flowers on it. It had lace around the collar and gathered with elastic on the sleeves and buttoned down the front. JANET checked DONNA'S clothes, since the robbery and did not find the blouse.

Weldon admits that she discovered the blouse was missing *the day after* her sister disappeared, and she repeatedly discussed the missing blouse with Steve Haraway, who in turn discussed with police what clothes Ms. Haraway may have worn. A0023–25, A0277, A0279–80, B000422 at

825:17–19. Weldon's description of the blouse is also provided in the continuation of the "Background on Haraway" document at A0978–80. And Steve Haraway now says that he went through Ms. Haraway's belongings the day after her disappearance and told Detective Smith that the blouse was missing. B000541.

Moreover, the Updated Missing Persons Report contains additional evidence that shows the blouse description was added to the report long before Mr. Ward's "confession" in October 1984. For example, the word "possibly" precedes the blouse's description. *See* A1550 (below).



If, as the State represented, authorities first learned of the blouse during the "confession," after which they confirmed its existence with Weldon, they would have been sure of what Ms. Haraway wore when she disappeared. As Detective Baskin pointed out, "if I knew what something was, I would have said what it was, I wouldn't have said possibly." B000036 at 138:1–2. Agent Rogers also said that the word "possibly" "could probably" indicate that the description was provided before Mr. Ward's confession, adding "it's one of those deals where . . . you're kind of throwing stuff up in the air and—and seeing what's going to stick and—you know, it could be before. It could be after. I don't know." B000140 at 169:18–22. Further, the description of Ms. Haraway's shirt in State's Exhibit 72—the version of the Missing Persons Report entered into evidence at trial—was "size 7 plaid color unknown." B000344. This tentative description remained on the Updated Missing Persons Report, while Ms. Haraway's social security number and hair color were updated, with the original entries crossed out. A1550. This suggests that, at the time the blouse description was added, police were not yet certain about Ms. Haraway's clothing, which they would have been had they learned of this new description from Mr. Ward's "confession."

Otherwise, like her hair color and social security number, they would have also crossed it out and updated it.

*   *   *

The State "anchored" its case on Mr. Ward's description of the blouse. Without that anchor, the State's already weak case drifts away. Multiple witnesses, including Ms. Haraway's husband, Steve Haraway, provided detailed descriptions of the blouse, and law enforcement created and shared multiple reports containing those descriptions long *before* Mr. Ward's "confession." *Every* material detail from Mr. Ward's "confession" *not otherwise known by police beforehand* was either false or unproven. There is now compelling evidence, gathered for the first time, that police had a description of this blouse that could be fed to Mr. Ward. There is also compelling evidence that the State knew that its knowledge of the blouse description would make or break its case; otherwise, why wouldn't it have turned over this information to Mr. Ward's trial counsel?

There is simply *nothing* about Mr. Ward's false confession that could support a conviction. Without the confession, the State could not have convicted Mr. Ward. Accordingly, there is certainly a "reasonable probability," and likely much more confidence than that, that the trial result would have been different had the State disclosed its pre-"confession" knowledge of the blouse.

### 3.    Additional Evidence Shows Mr. Ward's Innocence

The jury was not allowed to know that the State's key witness was biased toward the prosecution, gave contradictory testimony that added details to match the State's story over time, and did not identify Mr. Ward during a photo lineup; that police had other serious suspects to the crimes against Ms. Haraway; and that Ms. Haraway had been receiving threatening phone calls at McAnally's.

Recall that James Moyer was the only eyewitness to place Mr. Ward at McAnally's. The jury heard Moyer's testimony placing Mr. Ward with Ms. Haraway, but it did not hear that Moyer

wrote a letter to OSBI seeking a reward for his testimony and promising to testify at the retrial and "again . . . identify and place Ward at the scene." A0852–53. Nor did the jury hear that Moyer identified someone other than Mr. Ward in an initial photo lineup. Recall too that both Moyer and Boardman selected #1 from the "Ward folder" in early November 1984. Neither the Boardman report nor the Moyer report specify who individual #1 is, and neither says that Mr. Ward was the individual identified. *See* B000515, B000517. Mr. Ward is individual #5 in the only photo lineup available to him, State's Exhibit 10-S from both the joint trial and Mr. Ward's retrial. C0001–02. *But Boardman was not called at trial.* The State did not view his identification of individual #1 as being probative of Mr. Ward's guilt; individual #1 must have been a different man.

Also concealed from the jury was the progression of Moyer's story over time. Although Moyer testified to the clothing he allegedly saw Mr. Ward wearing in McAnally's and claimed he told police what the suspects were wearing, B000493 at 56:9–11, not one of the recently produced interview reports of Moyer included a clothing description for the suspects. *See* B000517, B000518, B000525. If the interview reports were available at trial, they could have been used to highlight how Moyer went from providing no clothing description to offering one increasingly similar to Karen Wise's description of the blond suspect wearing blue jeans and a "light colored tee-shirt." A0690.

The jury was not allowed to hear evidence of the State's other suspects. For example, over one hundred pages of the OSBI File relate to an investigation into Floyd DeGraw, who had multiple suspicious connections to the facts of Ms. Haraway's disappearance and was at times identified as the primary suspect. *See* A0645–59, A0664–66, A0685–87, A1345–46, A1349–87, A1407–09, A1413–18, A1422–51, A1465–77. Yet, prosecutors failed even to disclose DeGraw as a suspect; indeed, they disclosed *no* suspects. Nor did the jury hear about Billy Charley. State

witness David Yockey told law enforcement in November 1984 that he suspected Charley had committed the crimes against Ms. Haraway and that Charley owned a gray-primered pickup. A1580–83. Yockey says that the report of his interview with the police misleadingly and inaccurately omits information he told police incriminating Billy Charley and adds evidence incriminating Mr. Ward. *Id.* The jury did not hear that Janet Weldon tipped off police about Billy Charley's resemblance to the composite sketch or that Charley had been out to McAnally's. B000534 (below).



The jury heard none of this evidence because the State represented that it knew "of no other individuals in this case." A0046.

In addition to evidence of other suspects, the OSBI File reveals additional leads that may explain the true cause of Ms. Haraway's disappearance. Most significant is the revelation that Ms. Haraway had been receiving "obscene" calls, including threats by a caller that he would wait outside for her at McAnally's. Two different State witnesses—Steve Haraway and Monroe Atkeson—reported the calls to authorities prior to Mr. Ward's two trials. A0638, A0696–97, A0980. This detail contradicts the State's story that the crime was a robbery gone wrong, and it would have been critical for the defense to undermine that theory. As the district court noted in *Fontenot*:

> [i]t is unclear whether the Ada police or the OSBI ever investigated who was making these calls to McAnally's. No telephone records were obtained of incoming

54

calls to the convenience store according to the disclosed OSBI reports. No witnesses were interviewed regarding men who may have hung around the store or watched Ms. Haraway in the months and weeks leading up to her disappearance. Obviously, whomever was making these calls knew her work schedule because the telephone calls occurred only during her shifts. The man making these calls targeted Ms. Haraway and had been doing so for an extended period of time before her abduction.

402 F. Supp. 3d at 1139 (citations omitted).

**4.      Since Mr. Ward's Trial, the Science of False Confessions Has Advanced, and an Infamous False Confession Coerced by an Officer in Mr. Ward's Case Has Been Exposed**

Updates in understanding the science of false confessions further show Mr. Ward's innocence. Until recently, confessions were almost "universally treated as damning and compelling evidence of guilt" and, thus, were "likely to dominate all other case evidence and lead a trier of fact to convict the defendant." Richard A. Leo & Richard J. Ofshe, *Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation*, 88 J. CRIM. L. & CRIMINOLOGY 429, 429 (1998). The legal community now recognizes, however, that "the problems caused by police-induced false confessions are significant, recurrent, and deeply troubling." *Id.* at 430. Data from the National Registry of Exonerations shows that, of 3,299 individuals exonerated nationally since 1989, twelve percent (407 exonerations) involved a false confession. THE NATIONAL REGISTRY OF EXONERATIONS,        https://www.law.umich.edu/special/exoneration/Pages/Exonerations ContribFactorsByCrime.aspx (last visited Apr. 28, 2023). In fact, that percentage jumps to twenty-three percent for exonerations involving homicide. *See id.* In response to the real danger of police-induced false confessions, many states, including Oklahoma, now require law enforcement to electronically record custodial interrogations in some or all felony cases. COMPENDIUM: ELECTRONIC RECORDING OF CUSTODIAL INTERROGATIONS, http://www.nacdl.org/ electronicrecordingproject (last updated Feb. 25, 2019); Okla. Stat. tit. 22 § 22 (requiring "[a]ll

law enforcement agencies . . . [to] adopt a detailed written policy requiring electronic recording of a custodial interrogation of an individual suspected of homicide or a felony sex offense"). With that background, false-confessions expert Dr. Richard Leo believes that the State's interrogation tactics used against Mr. Ward were "highly psychologically coercive": repeated accusations of murder and lying, confrontations claiming incontrovertible evidence of guilt, implicit and explicit inducements, plays for sympathy, and the especially coercive threat of the death penalty. A1612–15 ¶¶ 9–21, A1617 ¶ 32. Dr. Leo concludes that Mr. Ward's "hypothetically-delivered incriminating statement bears no indicia of reliability" because it lacks factual corroboration between the confession and the discovery of Ms. Haraway's body. A1617–18 ¶ 34.

In the past two decades, Oklahoma courts have witnessed the evolving science of false confessions. The Oklahoma false-confession case of Ronald Keith Williamson for the murder of Debbie Sue Carter is strikingly similar to Mr. Ward's case. *See Williamson v. Ward*, 110 F.3d 1508, 1510–12 & n.3, 1519–20 (10th Cir. 1997); A1778–80. Both cases arose in Pontotoc County, were prosecuted by District Attorney Bill Peterson, were based on an investigation led by Ada Detective Captain Dennis Smith and OSBI Agent Gary Rogers, featured conveniently undated reports critical to its case within OSBI's "prosecutorial summary,"[29] and involved "dream

---

[29] In the report, a key witness claimed he saw Williamson ask Carter to dance—an advance that she declined—shortly before her murder. A1776. While that report lacked a date, it included the witness's address. *Id.* But the address was one at which the witness did not live until years after Carter's death, indicating that the interview clearly occurred, if at all, long after the State represented it did. *See* A1779. Meanwhile, a second interview with the same witness, dated one day after Carter's murder and witnessed by OSBI Agent Gary Rogers, made no mention of Williamson, yet was undisclosed to the defendant. *See* A1778; A1775. The State's "omission of exculpatory evidence" (the dated report) and "inclusion of debatably fabricated evidence" (the undated report) led the U.S. District Court for the Eastern District of Oklahoma, in a civil action brought by defendants after their exonerations, to conclude that "sufficient evidence ha[d] been presented to present [sic] to the jury as to whether a conspiracy to deprive [Williamson's] constitutional rights existed." A1777–804.

confessions." *See Williamson*, 110 F.3d at 1510–12, 1519–20; A1778–80. Law enforcement in both cases also relied on information from the same jailhouse informant, Terri Holland (formerly Terri McCartney), who claimed she heard a defendant in each case confess while in jail. *See Williamson*, 110 F.3d at 1511–12 & n.3; *Williamson v. Reynolds*, 904 F. Supp. 1529, 1550–51 (E.D. Okla. 1995), *abrogated on other grounds by Nguyen v. Reynolds*, 131 F.3d 1340 (10th Cir. 1997). In addition to claiming she heard Williamson's "confession," Holland claimed Fontenot "confessed" to her—and specifically alleged that that confession implicated Mr. Ward. A0017–19.[30] Around the time she relayed each supposed "confession" to Pontotoc County officials, Holland received "lenient treatment" for her own criminal charges. *Williamson*, 110 F.3d at 1511 n.3; *see also Reynolds*, 904 F. Supp. at 1550–51. Additionally, one of the OSBI officials who obtained Mr. Ward's false "dream confession," Agent Rogers, also took Williamson's false "dream confession." *See Williamson*, 110 F.3d at 1512.

In 1995, the U.S. District Court for the Eastern District of Oklahoma granted Williamson habeas relief. *Id*. at 1522–23. The Tenth Circuit affirmed, concluding that his counsel's failure to conduct pretrial investigation precluded him from properly dealing with the confessions at trial. *Id*. Williamson and his co-defendant, Dennis Fritz, were exonerated in 1999 on the basis of DNA evidence. A1777–1804; *see also* John Grisham, *The Innocent Man: Murder and Injustice in a Small Town*, 374–80 (2006).

### 5.    Mr. Ward Is Actually Innocent

Caselaw demonstrates that the new evidence Mr. Ward has raised, along with the weakness of the State's case against him, meets the *Schlup* actual innocence gateway standard. The Tenth

---

[30] Although Holland did not testify at Mr. Ward's second trial, she testified at both the joint preliminary hearing (the only such hearing that Mr. Ward received) and the first (joint) trial. An interview with her is also contained in the OSBI File. *See* A0017–19 (Ward-Fontenot Prelim. Hr'g), A0033 (Ward-Fontenot Trial), A0914–21 (OSBI File).

Circuit in *Fontenot* held that Fontenot's case met the standard. 4 F.4th at 1056. Specifically, the Tenth Circuit described the case against Fontenot as "extremely weak" and pointed out that the State "lacked a plausible motive and had no physical evidence." *Id.* at 1052. The court noted that Fontenot's "confession" was "shot through with clear falsehoods and inconsistencies, produced no independently verifiable information, and provided the police no new facts about the crime." *Id.* The court also considered the "major holes" in the "State's picture of the events at McAnally's and J.P.'s on April 28," including the fact that Moyer testified he was at McAnally's at 7:30 p.m. even though Karen Wise testified that the men she saw at J.P.'s were there from 7:00 to 8:30 p.m. *Id.*

The court then examined Fontenot's new evidence, including evidence that Ms. Haraway had been receiving obscene phone calls while at work at McAnally's in the days before her disappearance and Ms. Wise's affidavit that she had actually seen four men at J.P.'s, not two, and that it was the two additional men who made her nervous. *Id.* at 1051. Considering this new evidence along with the State's already weak cases, the *Fontenot* court held that:

> [N]o reasonable juror would lack reasonable doubt that Mr. Fontenot was involved in the abduction and murder of Ms. Haraway. Specifically, a reasonable juror would be led to doubt whether the two men seen in McAnally's by Mr. Moyer were the same two men seen in J.P.'s by Ms. Wise and Mr. Paschal . . . and, most critically, whether Mr. Fontenot ever set foot in either store that night. Newly presented evidence of the phone calls Ms. Haraway received at the store . . . would further enhance that doubt, suggesting that someone else had a motive for the crime . . . . When combined with the plethora of inconsistencies and inaccuracies strewn throughout Mr. Fontenot's confession, the holistic judgment about all the evidence required by *Schlup* would erode the credibility of that confession beyond repair.

*Id.* at 1055 (citations omitted).

In all material respects, the State's case against Mr. Ward is just as weak as it was against Fontenot. Mr. Ward's confession is just as "strewn" with a "plethora of inconsistencies and inaccuracies." As with Fontenot, the State had no physical evidence or motive to tie Mr. Ward to

the crimes against Ms. Haraway. And the discrepancy between the timelines in the testimony of Karen Wise and James Moyer applies just as much in Mr. Ward's case.

Similarly, Mr. Ward's new evidence destroys any remaining confidence a jury might have had in this weak case. When one combines all the reasons to doubt the reliability of Moyer's identification of Mr. Ward as having been at the scene (an hour earlier than Ms. Haraway's disappearance), with all the illegitimate efforts by the State to preserve any semblance of credibility for the "confession" they extracted from Mr. Ward, with the absence of literally *any* other evidence connecting Mr. Ward to these crimes, with all the leads ignored and all the corroborating evidence of Mr. Ward's alibi suppressed, no reasonable juror, in light of all the evidence that *should have been* presented at trial but the State frustrated, could plausibly have found, beyond a reasonable doubt, that Mr. Ward committed these crimes.

Indeed, the *Fontenot* court did not consider any new evidence directly showing that Fontenot's confession was false. Yet it concluded that he had presented "evidence of innocence so strong that a court cannot have confidence in the outcome of [his] trial" nor be "satisfied that [his] trial was free of nonharmless constitutional error." *Fontenot*, 4 F.4th at 1031. Mr. Ward's innocence claim is at least as strong. Because Mr. Ward has met the actual innocence gateway standard, this Court may consider the merits of Mr. Ward's underlying *Brady* claim.

## II.     MR. WARD IS ENTITLED TO A NEW TRIAL BECAUSE THE PONTOTOC COUNTY DISTRICT ATTORNEY SUPPRESSED FAVORABLE MATERIAL EVIDENCE

The disclosure of the OSBI File, Medical Examiners Report, and the 2019 APD production revealed that the State withheld from Mr. Ward reams of favorable, material evidence—evidence that refutes the State's "anchor tying Mr. Ward to the crimes," impeachment evidence of key witnesses, and evidence of other suspects. The effect of the withheld evidence raises a reasonable

probability that its disclosure would have produced a different result at Mr. Ward's trial.[31] Prosecutors are constitutionally required to disclose all material and favorable evidence to the defense. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). A *Brady* violation has three elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Fontenot*, 4 F.4th at 1062 (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). The good or bad faith of the prosecutor is irrelevant to this analysis. *See, e.g.*, *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 824 (10th Cir. 1995) ("[T]he term 'suppression,' in the *Brady* context, does not require a finding of bad faith or any other culpable state of mind on the part of the prosecutor."). Prejudice ensues if the evidence withheld is material, meaning "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Douglas v. Workman*, 560 F.3d 1156, 1173 (10th Cir. 2009) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)).

When assessing the materiality of evidence, the United States Supreme Court has emphasized four points:

1)    The defendant is not required to demonstrate that "disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal";

2)    Materiality is not a sufficiency of evidence test: the "defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict";

---

[31] Mr. Ward's *Brady* claim was denied in state post-conviction proceedings on procedural grounds. *See* Aug. 26, 2022 OCCA Order (C1008–16). Mr. Ward thus satisfied his presentment requirement under 28 U.S.C. § 2254(c). Moreover, Section 2254(d)'s deferential standard of review does not apply, as the federal court is not reviewing a decision on the merits by the state court. *Bland v. Sirmons*, 459 F.3d 999, 1010 (10th Cir. 2006) ("The § 2254(d) standard does not apply to issues not decided on the merits by the state court."); *see also Smallwood v. Gibson*, 191 F.3d 1257, 1264 (10th Cir. 1999); *Fontenot*, 4 F.4th at 1061.

3)      There is no harmless *Brady* error;

4)      "[S]uppressed evidence [is] considered collectively, not item by item."

*Kyles*, 514 U.S. at 434–36. Courts "evaluate the materiality of withheld evidence in light of the entire record in order to determine if 'the omitted evidence creates a reasonable doubt that did not otherwise exist.'" *Fontenot*, 4 F.4th at 1080–81 (10th Cir. 2021) (quoting *Banks v. Reynolds*, 54 F.3d 1508, 1518 (10th Cir. 1995)). "As a result, 'if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.'" *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 113 (1976)).

The State's case at trial was weak, and the suppressed evidence removes whatever confidence had been left in the conviction. The *only* evidence connecting Mr. Ward to the crimes was Mr. Ward's own "confession" and the testimony of Moyer placing Mr. Ward at McAnally's. But despite the weak case, the State proceeded full steam ahead, vigorously asserting that Mr. Ward was the only suspect and that the police could not have fed him one crucial fact from his false confession—the description of the blouse Ms. Haraway was wearing. Withheld evidence revealed that these assertions were false. The evidence the State failed to turn over to Mr. Ward likely would have overcome the State's weak case at trial because it would have shown that every fact from Mr. Ward's "confession" was either patently false or known to police beforehand, in contrast to what the State argued. It also would have shown that Moyer had a motive to testify against Mr. Ward and that Moyer had issued several, prior inconsistent statements—*adding* details to align with the State's narrative as time went on, and that Moyer identified a different man in the initial police photo lineup, thereby giving the jury ample reason to question his credibility. Had Mr. Ward been able to present this evidence, there is more than a reasonable probability that the jury's outcome would have been different.

### 1.      The State Suppressed Evidence

Reams of evidence contained in the OSBI File, Medical Examiner's Report, and 2019 APD Production were suppressed at Mr. Ward's retrial. Having collected and obtained the evidence during its investigation into the case, the State knew of and possessed this evidence. What the State failed to do was disclose the evidence to Mr. Ward and often obscured the truth in representations to Mr. Ward and the trial court, thereby violating his due process rights to a fair trial. The prosecutor, on behalf of the State, is "ultimately accountable for the nondisclosure of evidence," and this term encompasses the "prosecutor's entire office, as well as law enforcement personnel and other arms of the state" involved in the investigation. *Smith*, 50 F.3d at 824 (citation omitted). Courts impose on the "individual prosecutor . . . a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437. Thus, even evidence suppressed by the APD or OSBI is suppressed for the purposes of *Brady*.

The State has never disputed that this evidence was suppressed at trial. Nor could it. Mr. Ward was retried in the summer of 1989,[32] and it was not until 2003 that the Oklahoma Indigent Defense System—not OSBI—produced a partially legible version of the OSBI file to

---

[32] It is undisputed that the State failed to provide the OSBI File, including the prosecutorial summary, to either Mr. Ward's or Fontenot's trial counsel. The lead prosecutors in those trials testified in June 2017 depositions that—out of the 860-page OSBI File—they received only the 144-page "prosecutorial summary," which they had a policy of not providing to defense counsel. *See, e.g.*, A1843–44 at 9:2–10:17, A1813–14 at 14:19–15:22, A1822–23 at 48:18–49:18. Trial counsel for both Mr. Ward and Fontenot swear in affidavits that they did not receive exculpatory materials contained in the OSBI File, at the time of trial. A1669–71 ¶¶ 8–10, A1672–74 at 1–2; *see* A1665–68 ¶ 16 (investigator for Wyatt, and later for a Fontenot attorney, never received OSBI File). The OSBI File was not produced to Fontenot's counsel until 1992, and Mr. Ward did not receive a legible copy until 2008.

Mr. Ward. *See* 2020 Order at 9 (C0776).[33] The OSBI File includes a "prosecutorial summary" that OSBI provided to the State before the first (joint) trial, but the State failed to disclose at either trial. In 2008, "the State finally produced mostly legible pages to Ward's counsel," including pages from the "prosecutorial summary." 2020 Order at 9 (C0776); *see also* A1851 at 62:1–14. Years later, Mr. Ward's counsel received the Medical Examiner's file from Fontenot's attorney. 2020 Order at 9 (C0776); *see also* B000283 ¶ 8. This file, which was not included in the OSBI File, contained the "Updated Missing Persons Report" containing various additional identifying information for Ms. Haraway and, most importantly, a description of the missing blouse. A1550.

Mr. Ward has continued to receive previously undisclosed materials, including in early 2019, when subpoenas issued during post-conviction discovery returned hundreds of pages of new and material documents. The state court found that these new documents were responsive to Mr. Ward's pre-trial discovery requests: "Ward's attorneys saw for the first time, statements and reports responsive to Ward's 1988 pre-trial discovery requests . . . ." 2020 Order at 11 (C0778). These long-withheld materials contain substantial exculpatory evidence as well as impeachment evidence regarding key State witnesses. There is no dispute that these materials were not disclosed to Mr. Ward at the time of his retrial. *Cf. Fontenot*, 4 F.4th at 1065 ("We thus determine that the investigative reports contained in the prosecutorial, in addition to the rest of the 860 pages of . . .

---

[33] The facts found by the state court are reviewed for clear error. *Fontenot*, 4 F.4th at 1061 ("Even when reviewing a habeas claim de novo rather than under § 2254(d), state-court factfinding still receives the benefit of doubt under § 2254(e)(1): that is, '*[a]ny state-court findings of fact that bear upon the claim are entitled to a presumption of correctness* rebuttable only by clear and convincing evidence.'" (emphasis added) (quoting *Hooks v. Workman*, 689 F.3d 1148, 1164 (10th Cir. 2012))); 28 U.S.C. § 2254(e)(1) (limiting deferential review to decisions of the state court on the merits). The State has never argued that these facts are clearly erroneous. *See generally* Jan. 6, 2021 State's Petition in Error (C0814–68).

[the] OSBI disclosure, were known to the [State] but not disclosed to trial counsel." (citation and internal quotation marks omitted) (second alteration in original).

The Pontotoc County District Attorney has admitted that, not only did the prosecutor's office fail to turn over this material, but it also had a policy or practice to commit *Brady* violations. District Attorney Bill Peterson and Assistant District Attorney Chris Ross, who tried the cases against Mr. Ward and Fontenot, have revealed their fundamental misunderstanding about *Brady*'s requirements: they thought that they had to turn over only information about which *they* were aware, without regard for what the APD or OSBI knew. When asked to produce various forms of exculpatory evidence during pretrial hearings before Mr. Ward's retrial, the prosecutor reiterated their belief that the focus was on their personal knowledge:

> "If I'm aware of it, [the Defense] can have any sketch, diagram, drawing, photograph, whatever. But, if I'm not aware of it . . . I don't think I should be held to the standard that I can't obtain." A0038.

> "I have everything that I know of in this case in my files." A0039.

> "I have no knowledge of any suspects" in the case. A0046.

> "I have no knowledge [of a photograph requested by the Defense]." A0049.

> "I do not have in my possession or know whether there exists any [additional medical evidence]." A0050.

> "I know of no inconsistencies, Your Honor, between all three hearings and any of the witness' testimonies." A0052.

This position was confirmed by District Attorney Bill Peterson and Assistant District Attorney Chris Ross at their 2017 depositions in Fontenot's federal habeas case. For example, Peterson—the lead prosecutor at Mr. Ward's retrial—asserted that at the time he had *no scope of authority* over any law enforcement. A1807 at 4:23–25. He did not recall any policy requiring law enforcement, including the Ada Police Department and OSBI, to disclose exculpatory material to him. He could not even recall communicating to law enforcement that they should turn over all

evidence, including exculpatory evidence, to his office. A1817–19 at 18:6–20:25; *see also* 2020 Order at 8 (C0775). Instead, the pattern and practice of not divulging documents continued in Mr. Ward's retrial, where Peterson insisted that his obligations began and ended with whatever evidence of which he, personally, was aware, *i.e.*, "*If I knew about it*, I would divulge it." A1819 at 20:25 (emphasis added). Meanwhile, Ross stated he had "no idea" whether he asked law enforcement for exculpatory materials. A1847 at 28:12–15. In fact, Peterson and Ross suggested that they knew of *nothing* in the Haraway investigation other than what was in the "prosecutorial summary" specifically prepared by law enforcement for Mr. Ward's and Fontenot's trials. A1810–14 at 11:1–15:22, A1817–19 at 18:6–20:25, A1843–44 at 9:2–10:17 ("We only got the prosecutorial, which was, like, 144 [pages]."). This view of *Brady*'s mandate is wrong. *Cf. Kyles*, 514 U.S. at 437.

Peterson's complete reliance on the prosecutorial summary is especially troubling because he not only actively failed to seek out exculpatory materials from the Ada Police Department and OSBI, but he also never ensured that the law enforcement officers at these entities were taught how to recognize and turn over exculpatory information on their own:

> Q: Did you have a relationship or understanding with law enforcement about exculpatory material?
>
> A: You know, I don't recall if I had an understanding with them at all. They've been to police school. They know about Brady. It's not something that's sprung on them.
>
> Q: You offered no training to them?
>
> A: No sir, I—no. [. . .]
>
> Q: Okay. So, isn't it your responsibility as a Prosecutor to make sure exculpatory evidence is disclosed to you from police?
>
> A: Of course. I expect to receive all of the evidence.
>
> Q: And how did you communicate that to the Ada police?

A: Well, I don't know that I ever sat down and actually communicated that. That's part of their job.

A1816–18 at 17:14–22 and 18:20–19:4. Peterson imprudently relied on the judgment of law enforcement officers to provide him with exculpatory evidence; "Peterson also testified he could not remember if his office had a policy requiring law enforcement to disclose exculpatory material, assuming but not confirming, law enforcement was aware of their obligation to turn over exculpatory evidence." 2020 Order at 8 (C0775). He did not "think it [was] their job to determine what is and what isn't [exculpatory]." A1819 at 20:9–12.

In a 2001 deposition for a similar wrongful conviction civil suit against the State of Oklahoma and City of Ada, former Assistant Ada Police Chief Rick Carson testified that Ada Police lacked an internal training program in the 1980s, let alone one that addressed exculpatory evidence, and it even lacked such training two decades later. B000511–12 at 10, 67–68. Thus, experienced police officers were unable to discern the meaning of exculpatory evidence. Ada Police Chief James Fox (who assisted with the Ward investigation, *see* B000517) testified that he did not know what "exculpatory evidence" meant. B000509 at 67:15–16. Carl Allen, who was a former director of training programs and currently serves as the Chief of Ada Police, testified that "[t]he meaning eludes me right now" when asked his familiarity with the term "exculpatory." B000514 at 30:18–21. Even more alarming is Agent Roger's 2019 deposition, where he said that in creating the prosecutorial summary for district attorneys, material (including about other suspects) useful to the defense was excluded to prevent defense attorneys from being "able to distract a jury or distract the judge [and] take it off from a direction—take it away from their client." B000183 at 205:4–8, B000190 at 232:2–10. As the state court found, "Rogers stated the investigators rarely ever included all interviews, because it would 'muddy the waters, … including stuff that … may or may not have had a lot to do with the particular case, and *it would just add*

*another element that the State would have to defend.*'" 2020 Order at 8 (C0775) (citation omitted and emphasis added). When asked his opinion on the content of a prosecutorial summary, Agent Rogers continued: "By sticking with the interviews and the facts that pertain to the case, it would make it more simplistic and make it easier for the . . . prosecutor . . . to put on the case." *Id.*

In addition to relying *solely* on OSBI's "prosecutorial summary" to learn about the case and failing to look further, the Pontotoc District Attorney's Office refused to provide even *those files* to Mr. Ward at trial. Peterson even claimed that these materials were enshrined with "work product" protection. A1814.[34] The Pontotoc County District Attorney's "open file policy"—which allowed the defendant access to "anything" in the file—thus served no use to Mr. Ward.

The system Peterson and Ross established fell far short of their constitutional obligations to uncover and disclose any exculpatory material evidence in the possession of state officials. Indeed, if one tried to design a system to conceal exculpatory evidence from the defense, you could hardly do better. Peterson's deposition testimony makes clear his indifference to his constitutional obligations:

Q: Do you recall what evidence the law enforcement brought you to make [the] decision [to charge Fontenot]?

A: The prosecutorial report.

Q: Okay. Can you tell the record what a prosecutorial is?

A: A prosecutorial report is the information that they've gathered in an investigation of an alleged crime. It's put in a—

Q: And I don't mean to interrupt. Is that all of the evidence in a crime in the prosecutorial?

---

[34] Similarly, at a pretrial hearing for Mr. Ward's retrial, Ross refused to turn over OSBI reports contained in the prosecutorial summary, insisting—erroneously—they were "work product." He then offered the following blatantly incorrect explanation: "Work product is any report prepared for the State by a police officer that does not contain the defendant's statement and that's what this is." A0085–86.

A: It is *all of the written reports*. If it had chemistry reports, like DNA or something like that, hair evidence, or whatever, those would be in there. Everything that they had that showed, at least, probable cause on any criminal case. [ . . . ]

Q: For example, were OSBI to have recovered evidence and had it examined at the laboratory, you would have received a copy of that report?

A: More than likely, sure. It would have been in the prosecutorial.

Q: Would that have been the *sole method* that you would receive a report from the OSBI lab or from OSBI, is through the prosecutorial?

A: That's correct. [ . . .]

Q: Did your policy—or did your office at that time have a policy about disclosures to defense counsel?

A: Yes, we had an open file policy.

Q: What does that mean?

A: That means if we have it in our files they have access to it, *everything but our work product*. They would be entitled to come in and look through the file and make copies of whatever they wanted to.

Q: So, was the policy that a defense attorney had access to the entirety of the prosecutorial?

A: He would not have access to my prosecutorial report. That's my work product. I make notes in it. I make research in it. That's what I use to decide what I was going to do with the case. Whether I was going to charge, or not charge. [ . . .]

Q: [ . . .] Did you have a policy to give them access to the prosecutorial before you claim work privilege?

A: No, I did not. First of all, until I made a charging decision I wouldn't know who the defense attorney was.

A1810–14 at 11:1–15:22 (emphases added).

The prosecutor's office fundamentally misunderstood the fact that a constitutional obligation trumps a discovery rule: "[O]f course, regardless of the designation of various reports as work product, Oklahoma courts still recognized that 'the work-product privilege may not be applied in derogation of a criminal defendant's constitutional rights to disclosure of evidence

favorable to the defendant.'" *Fontenot*, 4 F.4th at 1063 (quoting *Nauni v. State*, 670 P.2d 126, 133 (Okla. Crim. App. 1983)). Given the clear constitutional defects described by Peterson and Ross, in their own words, it is unsurprising that the State failed to disclose exculpatory evidence.

### 2.   Mr. Ward Could Have Used the Suppressed Evidence to Show His Innocence and to Impeach Key State's Witnesses

The withheld evidence is favorable to Mr. Ward. Evidence is favorable if it is exculpatory or can be used for impeachment, *United States v. Bagley*, 473 U.S. 667, 676 (1985), and the withheld evidence contains both evidence tending to establish Mr. Ward's innocence and evidence that could have been used to impeach the State's witnesses at trial. Evidence is exculpatory if it "tend[s] to establish a criminal defendant's innocence." *Exculpatory Evidence*, *Black's Law Dictionary* (11th ed. 2019). And evidence can be used for impeachment if it can undermine a witness's credibility; "if disclosed and used effectively," such evidence "may make the difference between conviction and acquittal." *Bagley*, 473 U.S. at 676. Note too that "[i]mpeachment evidence merits the same constitutional treatment as exculpatory evidence." *Fontenot*, 4 F.4th at 1067 (quoting *Bowen v. Maynard*, 799 F.2d 593, 610 (10th Cir. 1986)). The evidence withheld from Mr. Ward at trial includes: exculpatory evidence regarding Ms. Haraway's blouse; impeachment evidence regarding Mr. Ward's alibi; exculpatory evidence regarding other suspects and leads; and impeachment evidence against the only witness to place Mr. Ward at McAnally's with Ms. Haraway.

The OSBI File, Medical Examiner's Report, and 2019 APD Production include:

- Evidence demonstrating that witnesses, including Ms. Haraway's sister, Janet Weldon, had provided to the police a description of the blouse that Ms. Haraway was wearing when she disappeared, casting doubt on the good faith of the prosecution and its trial theme that, prior to Mr. Ward's confession, the police had no knowledge of the blouse and could not have fed that description to him.

- Evidence impeaching a witness who tried to break Mr. Ward's alibi.

- Evidence supporting Mr. Ward's alibi that he was at Gordon Calhoun's party the night of the crime.

- Evidence of other leads, including a man who was harassing Ms. Haraway at work through obscene phone calls.

- Evidence impeaching the bias of the State's key witness, James Moyer.

- Evidence impeaching the substance of Moyer's testimony as contradictory and uncredible.

This evidence is favorable to Mr. Ward. It is exculpatory, impeaches key State witnesses, and shows that the State acted in bad faith throughout the investigation and trials—impeaching the very prosecution against him.

### 3. This Buried Evidence Would Have Had a Material Impact on Mr. Ward's Trial

Mr. Ward's retrial likely would have had a different result if the OSBI File, Medical Examiner's Report, and 2019 APD Production had been disclosed. This withheld evidence would give any reasonable juror doubt that Mr. Ward was involved in the crime at all—far above the standard required for materiality. "[R]egardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 433 (quoting *Bagley*, 473 U.S. at 682).

Withheld evidence is evaluated cumulatively, considering the entire record, to determine the effect it would have had on the trial. *Id.* at 436; *Banks*, 54 F.3d at 1518. "What might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict." *Banks*, 54 F.3d at 1518 (quoting *United States v. Robinson*, 39 F.3d 1115, 1119 (10th Cir. 1994)). Although the prosecutor's duty to disclose is independent of any request, in a case like this one, where the defense requested specific favorable evidence and the prosecutor denied its existence, "the specificity of the request is inversely related to the prosecution's disclosure

70

obligation. As the specificity of the defendant's request increases, a lesser showing of materiality will suffice to establish a violation." *Smith*, 50 F.3d at 827. This means that the court considers "any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case . . . in light of the totality of the circumstances." *Id.* (quoting *Bagley*, 473 U.S. at 683). Evidence rebutting critical elements of the State's case is material— particularly where the petitioner shows that the State manufactured the case against them. *See Moore v. Gibson*, 195 F.3d 1152, 1165 (10th Cir. 1999) ("If proved, petitioner's allegations that police officers planted this evidence, therefore, would be material—i.e., there is a reasonable probability that the result of the proceeding would have been different."). Relatedly, withheld material that undercuts the sole evidence linking the defendant to the crime is material. *Nuckols v. Gibson*, 233 F.3d 1261, 1266 (10th Cir. 2000). Finally, because "evidence in the hands of a competent defense attorney may be used 'to uncover other leads and defense theories,'" the court "may draw reasonable inferences as to what those other lines of defense may have been." *Banks*, 54 F.3d at 1519 (quoting *Bowen*, 799 F.2d at 612). Mr. Ward need not prove that he would have been acquitted—even if he can—and he need not prove that the prosecution would not have had sufficient evidence to convict; instead, "a defendant establishes a *Brady* violation 'by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Fontenot*, 4 F.4th at 1080 (quoting *Kyles*, 514 U.S. at 453).

### a.    Ms. Haraway's Blouse

First, the blouse. Janet Weldon's interview report, the Updated Missing Persons Report, Steve Haraway's interrogatory responses, Boardman's call to the police, Weldon's testimony, and declarations by multiple Ada Police officers all verify that police had a description of the missing blouse long before Mr. Ward's false confession. The importance of the timing of when the State

learned the description of the blouse is revealed by the State's own emphasis in its closing arguments. *Cf. Trammell v. McKune*, 485 F.3d 546, 552–53 (10th Cir. 2007) (holding as material key evidence corroborating the defense theory, the absence of which the State emphasized in its closing); *see also Nuckols*, 233 F.3d at 1262 (holding that, where the State needs the defendant's confession to convict, evidence that undercuts the value of that confession is material). The State emphasized at closing that the description of the blouse was an "anchor" tying Mr. Ward to the crimes and that it was "obvious . . . we had no description of that blouse to give to this Defendant." A0617. Moreover, the State argued that Mr. Ward's description of the blouse, along with testimony of Ms. Haraway's sister, "prove[d] that the police didn't tell [Mr. Ward]" about the blouse and "had no description" of it. A0617–18; *see also* A0615 at 137:23–25 (emphasizing, in the State's closing argument, that Weldon never told the police about the missing blouse).

There was a competing theory put on by the defense, that the police fed him this information to bolster a confession that lacked any basis in reality. The State withheld a wealth of favorable information relating to the blouse worn by Ms. Haraway which supports just that theory. *See* A0878, B000515, A0926 (below).



Had this information been disclosed to the defense, Mr. Ward would have been able to refute this prosecution theory and support his own. The Tenth Circuit agrees:

> [T]he suppressed evidence prevented Mr. [Ward] from establishing that the police did indeed have each detail contained in the confessions about Ms. Haraway's floral blouse by the time of the arrests, including a description of the shirt's sleeves. This evidence would have significantly strengthened the defense's contention that the police fed these highly specific facts to Mr. [Ward] during his interrogation. Lacking the summary of information provided to police by Ms. Weldon in August 1984 also deprived the defense of material that could have been used to impeach key witnesses and question whether the interrogators and the prosecution were acting in good faith.

*Fontenot*, 4 F.4th at 1082. Evidence that Ms. Haraway's sister and/or others gave the description of the missing blouse to the police early in the investigation is material because it could have been used to shred the State's version of events presented at closing arguments and to impeach key State witnesses. *See id.*; *see also id.* at 1078–79 (holding that the Weldon interview report was "highly favorable to the defense," "exculpatory," and "carried major impeachment value").

The State emphasized the blouse at closing because it knew that the blouse description was the only piece of evidence Mr. Ward did not already have that supported his claim that the police fed him his confession. And the ability to refute that pivotal point would have had a material effect on the trial. Had the police disclosed these reports before the retrial, there is a reasonable probability that the verdict would have been different. This withheld evidence shows that, "[a]lthough in possession of a description of Ms. Haraway's floral blouse since the day after the abduction, the prosecution maintained that several key details of this blouse remained unknown to the police prior to the confessions in October 1984." *Id.* at 1078. Had this withheld evidence been disclosed, Mr. Ward should have been able to "impeach State's witnesses, cast doubt on the motives and integrity of the police and the prosecution, and bolster the defense that Mr. [Ward] was fed details about the blouse in a coordinated effort to apply a patina of independent corroboration to his confession." *Id.* at 1080. By suppressing this evidence, the State deprived Mr. Ward of the ability to put forth a full defense; now that the evidence has been disclosed, it has stripped away any confidence in the guilty verdict. If the description of the blouse was an anchor

73

sufficient to sink Mr. Ward, stripping away the last vestige of credibility from his "confession" is enough to free him.

### b. *Exculpatory Evidence Regarding Other Leads and Defense Theories*

Mr. Ward was unable to present information on other leads—including that an unknown man was harassing Ms. Haraway at McAnally's—because the State withheld this exculpatory information.

*First*, the OSBI file reveals that the police knew that Ms. Haraway was being harassed by an unknown man at McAnally's. The state court found that, "There is no evidence that authorities ever investigated who was making the harassing or obscene phone calls to the store or whether they interviewed the Vietnam veteran" and "Ward was never made aware of the problems Haraway was having at the store, and therefore, missed the opportunity to investigate or question the witnesses about the harassing and obscene calls she was receiving." 2020 Order at 22 (C0789).

Mr. Ward could have put forth a more robust defense had Weldon's statements been produced that Ms. Haraway called her—scared of this unknown caller—a mere hour before she disappeared: "additional corroboration of these calls from people close to Ms. Haraway would have been of significant value to Mr. [Ward] . . . [, and] a powerful defense could have emerged: that Ms. Haraway was receiving strange calls in the weeks before her abduction which led her to become increasingly uneasy at work, and that whoever made the calls was involved in her murder." *Fontenot*, 4 F.4th at 1075. Furthermore, "[t]his evidence of an alternate suspect who was targeting Ms. Haraway while she worked the night shift at McAnally's in the weeks leading up to her disappearance, if presented at trial, would most likely have planted seeds of reasonable doubt in the mind of a reasonable juror regarding whether Mr. [Ward] was involved in her murder." *Id.* at 1039. The State painted the crime as a robbery gone bad. But at the same time, it suppressed

evidence of an alternate suspect who had called her repeatedly and threatened to "wait outside while she was working." A0980.

Evidence of these calls could have been used in two ways. First, it is exculpatory: "the suppressed evidence points to an alternate suspect—whoever targeted Ms. Haraway in the weeks leading to her abduction by making obscene calls to McAnally's—and thus deprived the defense of a critical investigatory lead," and second, "the evidence of these obscene calls would also raise an opportunity to attack 'the thoroughness and even the good faith of the investigation.' The defense could have probed why the police failed to conduct any investigation into the evidence of the harassing calls, despite 'its obvious relevance to the case.'" *Fontenot*, 4 F.4th at 1081 (first quoting *Kyles*, 514 U.S. at 445, and then quoting *Fontenot*, 402 F. Supp. 3d at 1139). Such strong evidence of alternate suspects and police misconduct raises the reasonable probability that Mr. Ward's trial would have reached a different result had it been disclosed.

*Second*, numerous previously undisclosed witness accounts from the OSBI File or 2019 APD Production refute the prosecution's theory that Ms. Haraway left McAnally's with Mr. Ward and Fontenot in a gray-primered pickup truck. Duney Alford saw a dark-haired man, and Shelia Dawn Turner and John McKinnis both saw a very large man in the store, who possibly drove a "chalky gray" pickup. Newly discovered evidence reveals that these witnesses all saw individual(s) in the store bearing no resemblance to Mr. Ward. The descriptions provided by these witnesses create further doubt as to the identity of the perpetrators, as they are entirely inconsistent with Mr. Ward's appearance and with the State's representations at trial.

Other withheld evidence—evidence of violent men with connections to either Ms. Haraway or the facts of the crime—undercuts the prosecution's version of the case and casts doubt on its motives. The OSBI File and APD records contain documents implicating numerous

suspects besides Mr. Ward and Fontenot. *See supra* Background Section II.2. None of this evidence was available to Mr. Ward. Indeed, at a pretrial hearing, the State flatly denied the existence of *any* other suspects besides Mr. Ward and Fontenot. A0046. Had Mr. Ward known about these other suspects, he could have cast further doubt on the integrity of the police investigation. Mr. Ward could have told the jury about Floyd DeGraw and Billy Charley. He could have asked police why they abandoned their leads into these violent men. He could have asked the APD why it doctored David Yockey's interview report to be "incomplete, misleading, and sometimes inaccurate" in omitting Yockey's statements that "Billy Charley matched the composite and that [Yockey] suspected Charley of abducting and/or killing Denice Haraway." *Id.*; *see* A0933–34. The newly produced evidence of other suspects casts serious doubts on the motives of the prosecution.

These details were never provided to defense counsel and could have swung the trial for Mr. Ward—especially Janet Weldon's revelation that Ms. Haraway was being harassed and threatened at work. Combined with the other witness reports of a suspicious heavyset man who made Ms. Haraway uneasy, and the man driving a "chalky gray" pickup truck, Mr. Ward could have investigated these leads and presented a compelling defense of alternate suspects—thus raising the reasonable probability that he was not involved in the crime at all. With these materials, Mr. Ward could have shown the State's repeated assertion that it knows of no other suspects to be a lie, and if the State is willing to lie about not having other suspects, a reasonable juror could believe that the State was also willing to lie about not feeding Mr. Ward the description of the blouse before coercing him to confess.

### c.    *The State Buried Evidence Relating to Mr. Ward's Whereabouts*

Withheld evidence also impeaches the testimony of Gordon Calhoun, on whom the State relied in its closing to discredit Mr. Ward's alibi. Had Calhoun's contradicting accounts been

disclosed prior to trial, Mr. Ward could have mounted a more robust alibi defense, refute the State's points emphasized at closing that he was not at the party, and been able to impeach Calhoun's trial testimony with Calhoun's November 1984 interview. *See Fontenot*, 4 F.4th at 1081–82 ("[B]y failing to turn over . . . Mr. Calhoun's two 1984 interviews, the prosecution prevented the defense from rebutting Mr. Calhoun's testimony at the new trial that neither Fontenot nor Mr. Ward attended the keg party on April 28, 1984.").

Further, the State's card-tower case rested on just two cards: the blouse which made the confession reliable and James Moyer, the only witness to place Mr. Ward at McAnally's or with Ms. Haraway. But the State withheld evidence that shows that Moyer provided information at trial that was unsupported or contradicted by his earlier law enforcement interviews; impeaching Moyer on these inconsistencies could have altered the verdict. "Showing that the government's star witness lied on the stand could well have impacted the jury." *United States v. Robinson*, 583 F.3d 1265, 1272 (10th Cir. 2009). In a withheld letter, District Attorney Peterson himself recognized that Moyer's testimony was not only material, it was the lynchpin of the case: "[W]ithout [Moyer's] testimony we ***could have never presented sufficient evidence to the jury for them to return a guilty verdict***." A0850 (emphasis added); *see also Kyles*, 514 U.S. at 444 (explaining that the "likely damage" done by suppressing evidence that the stories of key witnesses evolved over time "is best understood by taking the word of the prosecutor" who touted the witnesses' statements). Withheld evidence about James Moyer—the only witness to place Mr. Ward at McAnally's—was material as it would have allowed Mr. Ward to impeach Moyer in three key ways:

*First*, in a letter to OSBI two months before testifying at Mr. Ward's retrial, Moyer requested a reward. The fact that a key witness has a desire to profit from his testimony is prime

impeachment evidence. *Cf. Bagley*, 473 U.S. at 683–84 (remanding to the district court to determine whether rewards paid to key witnesses had a material effect on the trial); *Kyles*, 514 U.S. at 429, 442 n.13 (holding to be *Brady* material the fact that an eyewitness told police that he expected a reward for his help since it could impeach his motivations). This reward gave Moyer a direct stake in the conviction and a bias toward the prosecution, and it would have opened him to having his motivations impeached. The State did not disclose that Moyer sought a reward.

*Second*, new records from the APD could have been used to impeach the substance of Moyer's testimony. Where the reliability of a given witness can be determinative of guilt or innocence, evidence that impeaches the reliability of that witness is material if it had a reasonable likelihood of affecting the judgment of the jury. *Scott v. Mullin*, 303 F.3d 1222, 1232 (10th Cir. 2000); *see also Kyles*, 514 U.S. at 445 ("[Suppressed evidence allowing] the effective impeachment of one eyewitness can call for a new trial . . . ."). The 2019 APD document production reveals that Moyer participated in a photo lineup and did not identify Mr. Ward. B000517. At that photo lineup, Moyer selected the picture of an individual referred to as "#1" from the "Ward folder." *Id.* Likewise, James Boardman selected individual #1 in November 1984. B000515. Had Mr. Ward known that the State's key witness and a suspiciously uncalled witness, Boardman, both selected suspect #1 when the only records show that Mr. Ward's photo was #5, Mr. Ward could have developed the information needed to show that he was not the man they selected. This evidence would have "significantly enhance[ed] the quality of the impeachment evidence" by contradicting contentions that Moyer had previously and consistently identified Mr. Ward and thus "satisf[ied] the materiality standard." *See Fontenot*, 4 F.4th at 1081 (first alteration in original) (quoting *Douglas*, 560 F.3d at 1174); *cf. id.* ("Suppressing the report on Mr. Boardman's information denied the defense a strong counter to The State's emphasis at trial

on the fact that Mr. Moyer had previously identified Fontenot at both the preliminary hearing and a live lineup.").

*Third*, documents produced in 2019 show Moyer's observations from the evening of April 28, 1984, to be uncredible. Moyer's account was inconsistent, as the state court found, and evolved with more specific details as time progressed to further match the police narrative. 2020 Order at 14 (C0781). Moyer's reports fluctuated as to the order in which the suspects entered the store, he added details of the suspects' clothing, and he lied about his ability to see the suspects' faces—all without effective impeachment based on his prior contradicting statements. The undisclosed evidence is material because Mr. Ward could have impeached the State's key witness about his inconsistent stories and to show that Moyer added details to his testimony not found in his contemporaneous statements. Defense could also have impeached Moyer as to his willingness to identify a suspect at which he did "not get a good look." *See generally Fontenot*, 4 F.4th at 1040–41; *see also Kyles*, 514 U.S. at 444 ("[T]he evolution over time of a given eyewitness's description can be fatal to its reliability . . . . The fact that neither [key witness] could have provided a consistent eyewitness description pointing to [the petitioner] would have undercut the prosecution . . . ."). Any of the impeachment evidence against Moyer would have been especially helpful to the defense because Moyer's version of the events that occurred the night Ms. Haraway disappeared was not corroborated by any witness. In fact, it noticeably contradicted the testimony of Karen Wise, who placed Mr. Ward at J.P.'s at the same time Moyer placed him at McAnally's. *Compare* A0206 *with* A0163, A0176.

Few cases applying *Brady* concern conduct as extreme as what has happened to Mr. Ward—besides *Fontenot*. For example, in *Scott v. Mullin*, the petitioner was convicted of murder, based on the testimony of several individuals with whom the petitioner had been partying

at a motel the evening of the murder. 303 F.3d at 1224. The petitioner later learned that the police had suppressed evidence that a different partygoer at the motel had confessed to the crimes in a conversation with his mother (suggesting that the partygoers, several of whom testified at trial, pinned the crime on the petitioner). *Id.* at 1229–30. The Tenth Circuit granted habeas relief—the crux of the conviction was the testimony of the partiers, and this confession could have been used to impeach one of them and cast serious doubt on the testimony of the others. *Id.* at 1232. The conviction was built on a house of cards, and the suppressed evidence removed the bottom card. In *Scott*, a case where several people testified that the petitioner committed the murder, suppressed evidence impeaching one witness and casting doubt on the others was held to be material. Mr. Ward was convicted on the testimony of a *single* eyewitness placing him at the scene, and the suppressed evidence does more than cast doubt on Moyer's testimony—it directly impeaches him.

### 4.    The State Solicited False Testimony

The State corrupted the truth-finding function and violated Mr. Ward's due process rights by soliciting and allowing false testimony to go uncorrected. *See generally Napue v. Illinois*, 360 U.S. 264 (1959). "A *Napue* violation occurs when (1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material." *United States v. Garcia*, 793 F.3d 1194, 1207 (10th Cir. 2015). A petitioner may demonstrate that a prosecutor knew or should have known that a statement was false by demonstrating the prosecutor's exposure to prior contradictory statements, including statements found in police investigatory reports. *Miller v. Pate*, 386 U.S. 1, 6 (1967); *Alcorta v Texas*, 355 U.S. 28, 29–31 (1957). And although due process is violated when the State solicits false testimony, it is also violated when "the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue*, 360 U.S. at 269.

New evidence shows that the State both purposefully ignored exculpatory evidence and encouraged and intimidated witnesses not to testify about exculpatory material. For example, three State witnesses—Karen Wise, Stacey Shelton, and Odell Titsworth—each recounted that District Attorney Bill Peterson pressured them to suppress or alter their testimony to incriminate Mr. Ward. A1567–72, A1592–93, A1594–96. In the most notable instance of this improper witness tampering, Wise was pressured to change her testimony to fit the State's theory. Perhaps concerned that the presence of four people at J.P.'s would undermine the State's theory that two men— Mr. Ward and Fontenot—abducted and killed Ms. Haraway, District Attorney Peterson pressured Wise to testify that there were only two men there. A1567–72. Had Wise not been pressured into giving false testimony, there is a "reasonable probability" that the verdict would have been different, since testimony that four men were at J.P.'s could have called the State's entire theory into question. Additionally, as described above, recently discovered evidence and the OSBI File show that police and prosecutors (who were in possession of the prosecutorial summary at trial) *knew* that Steve Haraway and Janet Weldon described the missing blouse *before* Mr. Ward's false confession. But the State solicited testimony from Detective Baskin, Agent Rogers, Steve Haraway, Janet Weldon, and Pat Virgin to the contrary—knowing that it was false. Worse, the State knowingly doubled down on this false timeline at closing and asked jurors to find Mr. Ward guilty on that basis. That alone requires vacating Mr. Ward's convictions.

\*   \*   \*

The net effect of this withheld evidence raises a reasonable probability that its disclosure would have produced a different result. Materiality is "considered collectively, not item by item." *Kyles*, 514 U.S. at 436. The prosecution's failure to comply with *Brady* buried evidence that could have been used to impeach the State's key witness. The buried evidence also shows that—in

opposition to the State's arguments at closing—every detail from Mr. Ward's confession was either known to police beforehand or patently false. The cumulative effect of the withheld evidence shows that there is no evidence connecting Mr. Ward to the crime and raises serious doubts as to the integrity and motives of the investigating officers and prosecution. The cumulative effect of the withheld evidence is to remove any possible remaining confidence from an already weak conviction. The cumulative effect of the withheld evidence is to entitle Mr. Ward to have his convictions vacated because he was deprived of due process of law by the State's failure to turn over exculpatory evidence.

## III.   MR. WARD HAS DEMONSTRATED CAUSE AND PREJUDICE

The State's repeated failures to turn over exculpatory material within its possession caused Mr. Ward to procedurally default his claims in state court. The elements of a *Brady* violation are inextricably intertwined with those of "cause and prejudice":

> Corresponding to the second *Brady* component (evidence suppressed by the State), a petitioner shows "cause" when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence; coincident with the third *Brady* component (prejudice), prejudice within the compass of the "cause and prejudice" requirement exists when the suppressed evidence is "material" for *Brady* purposes.

*Banks*, 540 U.S. at 691; *see also Scott*, 303 F.3d at 1232 (granting habeas relief where petitioner showed material evidence was suppressed, as this demonstrated cause and prejudice and a *Brady* violation). Thus, if a petitioner demonstrates a *Brady* violation, he necessarily also demonstrates cause and prejudice. *Banks*, 540 U.S. at 691; *Scott*, 303 F.3d at 1232.

Like in *Strickler v. Greene*, key actions by the State caused Mr. Ward to default his *Brady* claim in state court: "[t]he documents were suppressed by the [State, and] the prosecutor maintained an open file policy [that lacked key files favorable to the defense.]" 527 U.S. at 283. As has been detailed above, the State failed to turn over hundreds of pages from the OSBI File,

Medical Examiner's Report, and 2019 Production before trial. Despite the fact that the State claimed to have had an open file policy, on which Mr. Ward reasonably relied, he now knows that the open file policy was more akin to an open-unless-it-is-exculpatory-or-impeaching file policy. The State causes a petitioner to default his *Brady* claims when the State promises that it has disclosed all exculpatory material, while holding some back. *Banks*, 540 U.S. at 698; *Strickler*, 527 U.S. at 283 ("[T]he nondisclosure and the open file policy[ ]are both fairly characterized as conduct attributable to the Commonwealth that impeded trial counsel's access to the factual basis for making a *Brady* claim"). Exactly what happened here. Mr. Ward has also established prejudice by showing that the buried evidence was material. When material evidence is suppressed, its suppression gives rise to sufficient prejudice to overcome a procedural default. *Banks*, 540 U.S. at 698 (quoting *Strickler*, 527 U.S. at 282). As chronicled above, the State's case hinged on the description of the blouse—and that anchor has been cut—as well as Moyer's testimony— testimony that could have been refuted by withheld evidence on cross-examination. This withheld evidence would have made a material difference at Mr. Ward's trial, and he was prejudiced by its suppression.

Mr. Ward cannot be faulted for the State's repeated and systemic failure to turn over this material. In the face of pointed requests, subpoenas across two cases, and its constitutional obligations, the State instead flatly denied that this material existed. Mr. Ward's counsel has had to pull teeth to obtain this evidence, and still Mr. Ward has good reason to believe that there is additional evidence that he has never received. And every time he has been able to obtain new evidence, he found something material.

## **CONCLUSION**

With no body, no physical evidence, no fingerprints, no DNA, and no weapon, authorities found themselves in an uphill battle to solve Ms. Haraway's disappearance. For reasons known only

to State officials, investigators chose to focus on Mr. Ward and Fontenot, closing their eyes to other potential suspects. They had little to go on. Rather than track down leads against other suspects, they resorted to coercive interrogations, which resulted in an unreliable "dream confession" from Mr. Ward and an equally unreliable statement from Fontenot. As discussed above, the details of those "confessions" were largely proven to be false, leading the State to cling to the only detail it had left: a description of a blouse Ms. Haraway purportedly wore when she disappeared. Because police knew about that blouse before Mr. Ward gave his coerced "confession," and the blouse itself was never found, even that detail cannot be believed.

Perhaps realizing the weakness of its case, the State stymied Mr. Ward so he could not mount a proper defense. The State failed to disclose exculpatory evidence and encouraged and intimidated witnesses not to testify about exculpatory material. The State's deliberate and successful efforts to hide the truth from Mr. Ward, the court, and the jury led to Mr. Ward's convictions. Thomas Jesse Ward has now spent almost forty years in prison for crimes he did not commit. Allowing Mr. Ward's convictions and sentences to stand would perpetuate a gross and tragic miscarriage of justice that has robbed Mr. Ward of what should have been the prime years of his life. Mr. Ward asks this Court—like it did with Mr. Ward's former co-Defendant Karl Fontenot—to issue a writ of habeas corpus ordering Mr. Ward's release.

## Request for Relief

For the foregoing reasons, Mr. Ward asks this Court to grant his habeas petition and any other relief to which he may be entitled.

Dated this 28th day of April 2023.

Respectfully submitted,

*/s/ Mark H. Barrett*
*An Attorney for the Petitioner*

Mark H. Barrett, OBA No. 557
P.O. Box 896
Norman, OK 73070
Tel: (405) 364-8367
barrettlawoffice@gmail.com

Daniel G. Webber, Jr., OBA No. 16332
Ryan Whaley
400 North Walnut Avenue
Oklahoma City, OK 73104
Tel: (405) 239-6040
Facsimile: (405) 239-6766
dwebber@ryanwhaley.com

Gregory R. Swygert (*pro hac vice* admission pending)
Center on Wrongful Convictions
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
Tel: (312) 503-8576
gregory.swygert@law.northwestern.edu

Robert N. Hochman (*pro hac vice* admission pending)
David H. Hoffman (*pro hac vice* admission pending)
John G. Levi (*pro hac vice* admission pending)
Emily Scholtes (*pro hac vice* admission pending)
Matthew Binder (*pro hac vice* admission pending)
William Lawrence (*pro hac vice* admission pending)
Sidley Austin LLP
1 South Dearborn
Chicago, IL 60603
Tel: (312) 853-7000
rhochman@sidley.com
david.hoffman@sidley.com
jlevi@sidley.com
escholtes@sidley.com
mbinder@sidley.com
bill.lawrence@sidley.com