No. CIV-23-146-JFH-GLJ

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

---

**THOMAS JESSE WARD,**

**Petitioner,**

**-vs-**

**DAVID BUSS, Warden,**

**Respondent.**

---

**BRIEF IN SUPPORT OF PRE-ANSWER MOTION TO DISMISS PETITION FOR WRIT OF HABEAS CORPUS AS TIME-BARRED BY THE STATUTE OF LIMITATIONS**

---

**GENTNER F. DRUMMOND**
**ATTORNEY GENERAL OF OKLAHOMA**

**THEODORE M. PEEPER, OBA #19909**
**JOSHUA R. FANELLI, OBA #33503**
**ASSISTANT ATTORNEYS GENRAL**

**313 NE 21ˢᵗ Street**
**Oklahoma City, Oklahoma 73105**
**(405) 521-3921**
**(405) 522-4534 (FAX)**

**ATTORNEYS FOR RESPONDENT**

---

**JUNE 30, 2023**

## TABLE OF CONTENTS

<u>INTRODUCTION</u>................................................................................................1

<u>STATEMENT OF THE CASE</u>.........................................................................3

<u>ARGUMENT AND AUTHORITY</u> .................................................................7

    *A.*     *Relevant Background* ............................................................7

    *B.*     *The Petition is Statutorily Untimely under 28 U.S.C.*
          *§ 2244(d)(1)* ...........................................................................9

    *C.*     *Petitioner is Not Actually Innocent and Cannot Overcome*
          *His Untimeliness*..................................................................12

          **1.**     **The state district court found Petitioner not actually innocent, and
Petitioner has failed to rebut those factual findings by clear and
convincing evidence** ...............................................14

          **2.**     **The blouse description is not "new," and Petitioner is
not innocent** ...........................................................15

          **3.**     **Billy Charley and Floyd Degraw are not "new," and Petitioner
is not innocent**........................................................21

          **4.**     **Alleged impeachment evidence regarding the eyewitness
is not "new," and Petitioner is not innocent** ...........................24

<u>CONCLUSION</u> ....................................................................................25

<u>CERTIFICATE OF SERVICE</u> ...............................................................26

# TABLE OF AUTHORITES

## FEDERAL CASES

*Brady v. Maryland,*
    373 U.S. 83 (1963) ..................................................................... **2, 6, 8**

*Calderon v. Coleman,*
    525 U.S. 141 (1998) ..................................................................... **23**

*Campbell v. Artus,*
    No. 14-CV-5594 (RRM), 2019 WL 1434976 (E.D.N.Y. Mar. 29, 2019) ............ **10**

*Clark v. Oklahoma,*
    468 F.3d 711 (10th Cir. 2006) ......................................................... **11**

*Coleman v. Calderon,*
    150 F.3d 1105 (9th Cir. 1998) ......................................................... **23**

*Cruz v. New York,*
    481 U.S. 186 (1987) ..................................................................... **4, 20**

*Day v. McDonough,*
    547 U.S. 198 (2006) ..................................................................... **10**

*Fisher v. Gibson,*
    262 F.3d 1135 (10th Cir. 2001) ....................................................... **8, 10, 11**

*Fontenot v. Crow,*
    4 F.4th 982 (10th Cir. 2021) .......................................................... **16**

*Harris v. Pettigrew,*
    No. 20-CV-0533-JED-JFJ, 2021 WL 1723225 (N.D. Okla. Apr. 30, 2021) ......... **10**

*Herrera v. Collins,*
    506 U.S. 390 (1993) ..................................................................... **2**

*Holland v. Florida,*
    560 U.S. 631 (2010) ..................................................................... **13**

*Hooks v. Workman,*
    689 F.3d 1148 ........................................................................... **15**

*House v. Bell,*
    547 U.S. 518 (2006) ..................................................................... **12, 13, 19, 20**

*Lopez v. Trani*,
     628 F.3d 1228 (10th Cir. 2010) ............................................................. 13

*McQuiggin v. Perkins*,
     569 U.S. 383 (2013) ................................................................. Passim

*Napue v. Illinois*,
     360 U.S. 264 (1959) .................................................................. 2, 6

*Ross v. Pettigrew*,
     No. 20-CV-0396-JED-CDL, 2021 WL 1535365 (N.D. Okla. Apr. 19, 2021) ...... 10

*Sallahdin v. Gibson*,
     275 F.3d 1211 (10th Cir. 2002) ............................................................. 15

*Sawyer v. Whitley*,
     505 U.S. 333 (1992) ............................................................. 3, 12, 25

*Schlup v. Delo*,
     513 U.S. 298 (1995) ................................................................. Passim

*Smith v. Allbaugh*,
     921 F.3d 1261 (10th Cir. 2019) ............................................................. 2

*United States v. Harrell*,
     642 F.3d 907 (10th Cir. 2011) ............................................................. 11

*United States v. Walker*,
     918 F.3d 1134 (10th Cir. 2019) ............................................................. 10

*Williams v. Dowling*,
     No. 19-CV-0530-GKF-FHM, 2020 WL 3865078 (N.D. Okla. July 8, 2020) ...... 10

## STATE CASES

*Fontenot v. State*,
     742 P.2d 31 (Okla. Crim. App. 1987) ............................................................. 4

*Fontenot v. State*,
     881 P.2d 69 (Okla. Crim. App. 1994) ............................................................. 4, 20

*Underwood v. State*,
     252 P.3d 221 (Okla. Crim. App. 2011) ............................................................. 17

*Ward v. State*,
     755 P.2d 123 (Okla. Crim. App. 1988) ............................................................. 4

## FEDERAL STATUTES

**28 U.S.C. § 2244**................................................................................................................ **Passim**

**28 U.S.C. § 2254**................................................................................................................ **Passim**

## RULES

**Rule 5.2,** *Rules of the Oklahoma Court of Criminal Appeals*
    **Title 22, Ch. 18, App. (2023)**..................................................................................... **7**

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **THOMAS JESSE WARD,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-23-146-JFH-GLJ** |
| | ) | |
| **DAVID BUSS, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**BRIEF IN SUPPORT OF PRE-ANSWER MOTION TO DISMISS PETITION FOR WRIT
OF HABEAS CORPUS AS TIME-BARRED BY THE STATUTE OF LIMITATIONS**

Comes now Respondent, by and through the Attorney General of the State of Oklahoma,

and respectfully asks that the instant Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254

be dismissed as it is untimely filed, pursuant to 28 U.S.C. § 2244(d).[1] In support hereof,

Respondent shows this Court the following:

## INTRODUCTION

Thomas Jesse Ward, hereinafter referred to as Petitioner, has filed with this Court a Petition

for Writ of Habeas Corpus Under 28 U.S.C. § 2254, seeking relief from his Judgment and Sentence

in District Court of Pontotoc County Case No. CRF-1984-183. *See* Doc. 2.[2] In 1989, an Oklahoma

jury convicted Petitioner of Robbery with a Dangerous Weapon (Count I), Kidnapping (Count II),

---

[1] This Court's Order calling for a response authorizes a motion to dismiss. Doc. 41. Pursuant to LCvR 7.1(c), this supporting brief is limited to twenty-five (25) pages in length. In the event the Court denies this Motion to Dismiss—as well as Respondent's Motion to Dismiss Petition as Unexhausted—Respondent respectfully requests permission to file a response on the merits.

[2] Respondent will cite to the petition using original pagination, and to Petitioner's appendices using the provided citation method, *e.g.*, (C0954–C0990). However, Petitioner has only included excerpts of the 1989 retrial transcripts in his appendices. Thus, Respondent is filing, simultaneous with its Pre-Answer Motions, the entirety of the trial transcripts from the 1989 retrial. Any citations to those transcripts will utilize the original volume and page number, *e.g.*, (Tr. XIII, 8–10). Additionally, for convenience, any relevant pages cited are also attached as exhibits to this brief.

and First-Degree Murder (Count III), and sentenced him to ten (10) years each on Counts I and II, and life imprisonment on Count III (Tr. XIII, 8–10, 167–68). Petitioner's Judgment and Sentence was unanimously affirmed by the Oklahoma Court of Criminal Appeals (OCCA) in an unpublished Summary Opinion issued on January 7, 1994 (A0630–A0632). Petitioner remains confined in state custody at Lexington Correctional Center in Lexington, Oklahoma.

After decades of idleness, Petitioner filed his federal habeas petition in this Court on May 1, 2023, seeking to undo his presumptively valid state court convictions. *See* Doc. 2. In the petition at bar, Petitioner alleges three (3) grounds for relief: (1) "Despite the State's long-standing efforts to bury evidence Favorable to Mr. Ward, the new record establishes his innocence"; (2) "Mr. Ward Is Entitled To A New Trial Because The Pontotoc County District Attorney Suppressed Favorable Material Evidence"; (3) "Mr. Ward Has Demonstrated Cause and Prejudice." Doc. 2, at 47, 59, 82 (syntax and capitalization in original).[3] But this petition comes after nearly two dozen years of inaction in state court, following his affirmance on direct appeal. Petitioner failed to file his petition within the one-year statute of limitations codified by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2244(d)(1). Petitioner's case is statutorily untimely.

---

[3] Although Petitioner purports to present three distinct grounds, his only arguably cognizable claim on habeas review is Ground II, his contention that the State allegedly suppressed favorable material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and allegedly solicited false testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). *See* Doc. 2, at 59–82. Petitioner's claim of actual innocence, *see* Doc. 2, at 47-59, as well as his discussion of "cause and prejudice," *see* Doc. 2, at 82–83, are both procedural mechanisms to have his otherwise untimely and defaulted *Brady/Napue* claim considered on the merits. Indeed, Petitioner cannot present a freestanding claim of actual innocence, since no clearly established federal law permits an innocence claim to be a standalone basis for constitutional relief, as opposed to an equitable gateway by which untimely claims can be considered on all fours. *Herrera v. Collins*, 506 U.S. 390, 404 (1993). And a "cause and prejudice" analysis hinges on whether a habeas petitioner can demonstrate cause for a procedural default in state court, and prejudice as a result of the alleged violation of federal law, but is not itself a standalone claim. *Smith v. Allbaugh*, 921 F.3d 1261, 1267 (10th Cir. 2019).

Nor can Petitioner overcome the untimeliness of his petition by showing his actual innocence, because Petitioner has failed to meet the demanding standard for a gateway innocence claim. *See McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) ("The gateway should only open when a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error."); *Sawyer v. Whitley*, 505 U.S. 333, 340–41 (1992) (recognizing that the "very narrow" actual innocence gateway is reserved for the rare situations where "the State has convicted the wrong person of the crime," or where "it is evident that the law has made a mistake"). Put simply, the merits of Petitioner's belated claims should not be considered by this Court.

Though Petitioner casts his case as a "continuing and terrible miscarriage of justice," Doc. 2, at 1, Petitioner fails to mention his years of silence, inaction, and unreasonable delay in marshaling the claims now before this Court. Indeed, Petitioner's unexplained and unjustified tardiness in seeking relief means memories have inevitably faded, witnesses have passed away or moved on, and other evidence has been lost to the sands of time. "Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing" of actual innocence. *Perkins*, 569 U.S. at 385. Petitioner's inexcusable delay in bringing this habeas action only reinforces the fact that Petitioner is not actually innocent—a fact which Petitioner's jury and the Oklahoma state courts have already known for years. It is time for finality in this case. The untimely petition must be dismissed.

## STATEMENT OF THE CASE

This case is about the abduction of twenty-four-year-old Donna Denice Haraway from McAnally's convenience store in Ada, Oklahoma, on the evening of April 28, 1984, and her gruesome murder at the hands of Petitioner and his co-defendant, Karl Fontenot. In September of

1985, Petitioner and Mr. Fontenot were tried jointly in District Court of Pontotoc County Case No. CRF-1984-183. Petitioner presented an alibi that he was at his mother's home all evening on the day of the crimes, and that he was asleep on the couch when his brother-in-law came home around 11:00 p.m. (Tr. X, 170–80). Petitioner and Mr. Fontenot were convicted and sentenced to death.

The OCCA reversed both convictions on the basis of *Cruz v. New York*, 481 U.S. 186, 193–94 (1987) and remanded the cases for additional proceedings. *Ward v. State*, 755 P.2d 123, 124 (Okla. Crim. App. 1988); *Fontenot v. State*, 742 P.2d 31, 32–33 (Okla. Crim. App. 1987).

A change of venue was granted for both Mr. Fontenot and Petitioner. Mr. Fontenot was retried in Hughes County District Court Case No. CRF-1988-43 in June of 1988, wherein he was convicted and again sentenced to death. On direct appeal in 1994, the OCCA affirmed Mr. Fontenot's convictions for the crimes of Murder in the First Degree, Kidnapping, and Robbery with a Dangerous Weapon, as well as his ten (10) year sentence for Kidnapping and his twenty (20) year sentence for Robbery. *Fontenot v. State*, 881 P.2d 69, 86 (Okla. Crim. App. 1994). In a thorough and complete discussion of the evidence, the OCCA found Mr. Fontenot's confession to be independently corroborated in nine (9) separate ways, and was therefore sufficiently trustworthy to have been admitted against him at trial. *Id.* at 78–79. Despite that finding, the OCCA remanded Mr. Fontenot's murder conviction for resentencing because the trial court refused to follow the State's request to instruct the jury on the sentencing option of life without parole. *Id.* at 73. On September 18, 1995, Mr. Fontenot agreed to be sentenced to life imprisonment without the possibility of parole for Ms. Haraway's murder, thereby waiving jury sentencing on remand. Mr. Fontenot then served his sentence for nearly eighteen (18) years before filing his first collateral attack, in 2013, challenging his 1988 conviction and 1995 agreed-upon resentence, discussed *infra*.

4

During the pendency of Mr. Fontenot's remanded proceedings, Petitioner was retried alone in Pottawatomie County District Court Case No. CF-1988-208 in May and June of 1989. This time, Petitioner presented a different alibi, claiming that he was at a party at Gordon Calhoun's apartment during the commission of the crime (in conflict with the variety of other inconsistent statements Petitioner made regarding his whereabouts on the evening of Ms. Haraway's abduction) (Tr. V, 68, 75, 93, 101; Tr. VI, 76–77, 117–18). The jury rejected Petitioner's alibi defense and found him guilty of the crimes of Robbery with a Dangerous Weapon, Kidnapping, and First-Degree Murder (Tr. XIII, 8–10). The jury recommended punishment of ten (10) years imprisonment for Robbery and ten (10) years imprisonment for Kidnapping (Tr. XIII, 9). At the penalty phase, after the State read the Bill of Particulars, the jury recommended punishment for First-Degree Murder for a term of life imprisonment (Tr. XIII, 168).

Petitioner brought a direct appeal of his Judgment and Sentence in OCCA Case No. F-1990-17, raising a total of ten (10) propositions of error in the Brief of Appellant filed on January 27, 1993 (C1164–C1252). A Corrected Brief of Appellant was filed on August 20, 1993 (C1253–C1341). On January 7, 1994, the OCCA affirmed Petitioner's case in a unanimous unpublished Summary Opinion (A0630–A0632). Petitioner filed a Petition for Rehearing, claiming the OCCA overlooked five (5) separate issues. The OCCA rejected rehearing on March 25, 1994.

Petitioner waited nearly *two decades* after the OCCA affirmed his convictions and sentences—twenty-three (23) years, to be exact—before bringing any collateral challenge in state court. On November 1, 2017, Petitioner filed his initial Application for Post-Conviction Relief in Pontotoc County District Court Case No. CRF-1984-183 (C0003–C0008, C0009–C0075). After two rounds of limited post-conviction discovery, Petitioner filed an Amended Application for Post-Conviction Relief on March 2, 2020, raising the following two claims: (1) "The Interest of Justice

Requires Mr. Ward's Conviction and Sentence to Be Vacated Based on Newly Discovered Evidence of His Innocence", and (2) "Relief is Warranted Under Both *Brady v. Maryland* and *Napue v. Illinois* Because the Pontotoc County District Attorney Failed to Disclose Exculpatory Evidence and Solicited or Failed to Correct False Testimony" (C0356–C0361, C0362–C0457) (capitalization in original). The State responded in briefing on May 18, 2020 (C0511–C0646).

On December 18, 2020, the Honorable Paula Inge, District Judge, granted Petitioner relief on his second claim, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), but did not address Petitioner's other claim that there existed newly discovered material evidence that required vacation of his sentence—*i.e.*, his claim of actual innocence (C0768–C0813).

On January 6, 2021, the State brought an appeal to the OCCA, challenging the district court's award of post-conviction relief, in OCCA Case No. PC-2021-8 (C0814–C0868). The OCCA granted a stay of the district court's judgment on January 7, 2021. Thereafter, on June 4, 2021, the State filed its Brief of Petitioner in Support of Post-Conviction Appeal (C0869–C0953).

On August 26, 2022, the OCCA entered an Order Reversing Grant of Post-Conviction Relief and Remanding for Further Proceedings, finding that Petitioner's *Brady* claim, upon which the district court granted relief, was barred by *laches*, waiver, and *res judicata* (C1008–C1016). The OCCA reasoned: "The District Court found, and the record supports, that [Petitioner] came into possession of the OSBI Records in 2003 when his counsel received them from the Oklahoma Indigent Defense System" (C1015). It further found that Petitioner "offer[ed] no reason sufficient to justify his approximately fourteen years of inaction following 2003, and a thorough review of the record reveals none" (C1015). The OCCA remanded the matter back to the district court for further proceedings for "disposition of [Petitioner's] remaining claim that newly discovered evidence required [Petitioner's] conviction be vacated in the interest of justice" (C1016).

On October 12, 2022, Petitioner filed his Supplemental Brief in the district court (C1017–C1076). On October 24, 2022, the State filed its Response to Petitioner's Supplemental Brief (C1077–C1131). On November 8, 2022, Petitioner filed his Reply (C1132–C1153).

On December 29, 2022, the district court entered its Supplemental Findings (C1154–C1163). There, the district court rejected Petitioner's claim that newly discovered evidence warranted vacation of his conviction: "The Court, having considered the entirety of the record and materials discussed by Petitioner Ward and the State in their supplemental briefs pertaining to 'newly' discovered evidence", found that Petitioner failed to demonstrate, "by clear and convincing evidence, [Petitioner's] innocence of the crimes for which he was convicted" (C1162).

Inexplicably, Petitioner failed to bring an appeal to the OCCA challenging the district court's rejection of his actual innocence claim. Rather, Petitioner let the time for lodging a Notice of Intent to Appeal to the OCCA lapse on January 18, 2023. *See* Rule 5.2(C)(1), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2023). Petitioner's failure to exhaust his actual innocence claim at the OCCA, following the district court's findings on December 29, 2022, is the subject of Respondent's Pre-Answer Motion to Dismiss for Failure to Exhaust, filed contemporaneously in this Court herewith. Petitioner, again interjecting unreasonable delay into the litigation, waited more than four more months before this habeas action followed, on May 1, 2023. As shown herein, Petitioner's habeas petition is untimely and must be dismissed.

## ARGUMENT AND AUTHORITY

### A.    *Relevant Background.*

First and foremost, Petitioner's habeas petition is statutorily untimely under the AEDPA, inasmuch as he failed to file the petition within the one-year statute of limitations, 28 U.S.C. § 2244(d)(1). The following dates are relevant to Petitioner's untimeliness:

**May and June 1989:** Petitioner was retried alone in Pottawatomie County District Court. Petitioner was found guilty of Murder, Kidnapping, and Robbery (Tr. XIII, 8–10).

**December 17, 1992:** Mr. Fontenot received access to approximately 886 pages of Oklahoma State Bureau of Investigation (OSBI) records related to the investigation in this case, pursuant to an order from the OCCA on December 1, 1992.

**August 20, 1993:** Petitioner filed the Corrected Brief of Appellant in Case No. F-1990-17 (C1253–C1341).

**January 7, 1994:** Petitioner's conviction was affirmed in a unanimous unpublished summary opinion (A0630–A0632).

**April 24, 1996:** Petitioner's one-year period to file a petition for writ of habeas corpus began to run upon enactment of the AEDPA, and expired on April 24, 1997. *See Fisher v. Gibson*, 262 F.3d 1135, 1142 (10th Cir. 2001).

**In or Around 2003:** Petitioner's lead counsel, Mr. Mark Barrett, took possession of Mr. Fontenot's files when he began representing Petitioner, including those OSBI records. *See* (C1015 ("The District Court found, and the record supports, that Ward came into possession of the OSBI Records in 2003 when his counsel received them from the Oklahoma Indigent Defense System.")).

**July 24, 2013:** Mr. Fontenot filed an Application for Post-Conviction Relief in Pontotoc County Case No. CRF-1984-183, making similar allegations as those made by Petitioner in the case at bar, based on the OSBI records.

**February 24, 2016:** After post-conviction relief was denied in state court, Mr. Fontenot filed his petition for writ of habeas corpus in this Court's Case No. CIV-16-69-JHP-SPS.

**November 1, 2017:** Nearly two years after Mr. Fontenot filed his federal habeas corpus petition, Petitioner filed his first application for state post-conviction relief (C0003–C0075).

**March 2, 2020:** Petitioner filed an Amended Application for Post-Conviction Relief, following two rounds of limited post-conviction discovery (C0356–C0457).

**December 18, 2020:** The state district court granted Petitioner relief on his second claim, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), but did not address Petitioner's other claim that there existed newly discovered material evidence that required vacation of his sentence—*i.e.*, his claim of actual innocence (C0768–C0813).

**June 4, 2021:** In OCCA Case No. PC-2021-8, the State filed its post-conviction appeal brief (C0869–C0953).

**August 26, 2022:** The OCCA entered an Order Reversing Grant of Post-Conviction Relief and Remanding for Further Proceedings, finding the district court had abused its discretion in failing to sustain the procedural bars of *laches*, waiver, and *res judicata* to preclude consideration of Petitioner's *Brady* claim. The matter was remanded to the district court for consideration of Petitioner's claim that newly discovered evidence required vacation of his conviction (C1008–C1016).

**December 29, 2022:** The district court entered Supplemental Post Conviction Findings of Fact and Conclusions of Law, announcing that, based on the entirety of the record, Petitioner was not actually innocent of the crimes in this case (C1154–C1163). Pursuant to Oklahoma law, the time for Petitioner to lodge his Notice of Intent to Appeal the denial of post-conviction relief expired on January 18, 2023, but Petitioner let the time lapse.

**May 1, 2023:** Petitioner filed the instant habeas corpus petition.

**B.      The Petition is Statutorily Untimely under 28 U.S.C. § 2244(d)(1).**

As stated above, the AEDPA affords a state prisoner one year to seek federal habeas corpus review. 28 U.S.C. § 2244(d)(1). The one-year limitations period runs from the latest of four dates: (A) "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;" (B) "the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;" (C) "the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review;" or (D) "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(A)–(D). Additionally, the limitations period may be tolled during the time which "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending" in state court. 28 U.S.C. § 2244(d)(2).

Petitioner's Judgment and Sentence was affirmed on direct appeal on January 7, 1994 (A0630–A0632). Because Petitioner's convictions became final before the effective date of the

AEDPA, his one-year statute of limitations started to run on April 24, 1996, the day the AEDPA was enacted. *Fisher*, 262 F.3d at 1142. Thus, Petitioner's statutory year expired on April 24, 1997. *See id.* The instant petition, filed on May 1, 2023, was therefore brought well after the expiration of the statute of limitations. 28 U.S.C. § 2244(d)(1)(A).

Petitioner's argument does little to explain his timeliness under the AEDPA's statutory framework. Indeed, Petitioner seems to bypass the statutory timeliness question entirely, instead arguing that his petition should receive the grace of an actual innocence gateway to consider his untimely claims. *See* Doc. 2, at 44–47. Petitioner does not allege, much less attempt to show, how his petition should receive a different statutory trigger date than the date on which his one-year lapsed, April 24, 1997, following the enactment of the AEDPA. 28 U.S.C. § 2244(d)(1)(A). Petitioner fails to invoke or explain any other subsection under 28 U.S.C. § 2244(d)(1). Since Petitioner is amply counseled in this habeas action, this Court cannot make the argument on his behalf.[4] *See Williams v. Dowling*, No. 19-CV-0530-GKF-FHM, 2020 WL 3865078, at *4 n.5 (N.D. Okla. July 8, 2020) (unpublished) ("But here, petitioner's pleadings were drafted by counsel and the rule of liberal construction does not apply. The Court therefore takes the arguments as they are presented."). And even if Petitioner attempts to shoehorn such a claim in his reply brief, any such arguments, raised for the first time in reply, will be deemed waived and forfeited. *United*

---

[4] Although the AEDPA's statute of limitations is an affirmative defense to raise, *see Day v. McDonough*, 547 U.S. 198, 205–06 (2006), this Court should decline to explore different trigger dates when Petitioner has not specifically alleged them. *See, e.g.*, *Harris v. Pettigrew*, No. 20-CV-0533-JED-JFJ, 2021 WL 1723225, at *3 n.4 (N.D. Okla. Apr. 30, 2021) (unpublished) (refusing to accept the respondent's "generous reading" of the petition with respect to different trigger dates than the ones alleged, despite the petition being *pro se*); *Ross v. Pettigrew*, No. 20-CV-0396-JED-CDL, 2021 WL 1535365, at *3 n.5 (N.D. Okla. Apr. 19, 2021) (unpublished) (same). *See also Campbell v. Artus*, No. 14-CV-5594 (RRM), 2019 WL 1434976, at *4 (E.D.N.Y. Mar. 29, 2019) (unpublished) (despite the AEDPA statute of limitations being an affirmative defense, "Campbell did not bear the burden of asserting his compliance with the AEDPA statute of limitations or the applicability of exceptions to the timeliness requirements of the statute in his petition").

*States v. Walker*, 918 F.3d 1134, 1153 (10th Cir. 2019) ("[A]rguments advanced for the first time in a litigant's reply brief will ordinarily not forestall a conclusion of waiver."); *United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) (same).

The only effort Petitioner makes to grapple with his statutory untimeliness comes at the end of his timeliness section, wherein he claims, "the timer did not start running while his state court post-conviction was pending when additional *Brady* material was produced by the state." Doc. 2, at 47. In that sense, Petitioner invokes Section 2244(d)(2), which, as stated above, allows for tolling of the statutory limitations period while a properly filed request for collateral review is pending in state court. 28 U.S.C. § 2244(d)(2). But his reliance on statutory tolling is a red herring. Petitioner did not bring his first Application for Post-Conviction Relief in state court until November 1, 2017, more than twenty years after the expiration of the AEDPA statute of limitations. Petitioner's extremely belated post-conviction filing cannot statutorily toll his one-year limitations period when that one-year had long since lapsed on April 24, 1997.[5] *See Clark v. Oklahoma*, 468 F.3d 711, 714 (10th Cir. 2006) ("Only state petitions for post-conviction relief filed within the one year allowed by AEDPA will toll the statute of limitations."); *Fisher*, 262 F.3d at 1142–43 ("Fisher's petitions cannot be tolled for time spent in state post-conviction proceedings because his applications for post-conviction relief were not filed until after April 24, 1997, the end of the limitations period for convictions."). Since Petitioner identifies no other trigger date for his

---

[5] Even if this Court were to generously read the petition as arguing another trigger date under 28 U.S.C. § 2244(d)(1)—in conflict with the discussion above—the petition is still untimely. The OCCA reasonably found that Petitioner came into possession of the documents underpinning his *Brady*/*Napue* claim in 2003 (C1015). Thus, even if Petitioner were to receive the benefit of 2003 as a later trigger date, *arguendo*, Petitioner still leaves unexplained the approximately fourteen (14) years of inaction before he filed his post-conviction application on November 1, 2017 (C1015 ("Ward offers no reason sufficient to justify his approximately fourteen years of inaction following 2003, and a thorough review of the record reveals none.")).

statutory year, and since his request for collateral relief came long after his statutory year lapsed in 1997, Petitioner's reference to statutory tolling is misplaced. His petition is statutorily untimely.

**C.    *Petitioner is Not Actually Innocent and Cannot Overcome His Untimeliness.***

The crux of Petitioner's argument, as foreshadowed above, centers on his allegation of actual innocence as a gateway to the merits of his untimely claims. As the Supreme Court has recognized, a credible showing of actual innocence can serve as a gateway to consideration of a belated claim of constitutional error. *See Perkins*, 569 U.S. at 386. Nonetheless, "tenable actual-innocence gateway pleas are rare." *Id.* In order for an actual innocence claim to be credible, a habeas petitioner "must support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). *See also House v. Bell*, 547 U.S. 518, 537 (2006) (reaffirming the rule in *Schlup* that a gateway claim of actual innocence requires *new reliable evidence*).

Likewise, the petitioner must demonstrate "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup*, 513 U.S. at 327. "[T]he *Schlup* standard is demanding. The gateway should only open when a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Perkins*, 569 U.S. at 401 (citations and internal quotation marks omitted). *See also Sawyer*, 505 U.S. at 340–41 (actual innocence gateway is "very narrow" and reserved for rare instance "where the State has convicted the wrong person of the crime," or where it is apparent "that the law has made a mistake"). And "untimeliness, although not an unyielding ground for dismissal of a petition, does bear on the credibility of evidence proffered to show actual innocence." *Perkins*, 569 U.S. at 401.

In that sense, then, the extreme belatedness of Petitioner's request for relief should be a factor considered in the credibility of his actual innocence claim.[6] *See id.* Indeed, when the State appealed the state district court's initial grant of post-conviction relief, the OCCA made the following factual observations about Petitioner's tardiness in presenting his claims:

> Ward filed his initial application for post-conviction relief on November 1, 2017, approximately twenty-four years and nine months after this Court affirmed his conviction in *Ward v. State*, F-1990-17 (Jan. 27, 1993) (not for publication).[7] This is a significant delay in Ward filing his application for post-conviction relief and the State argued that Ward forfeited his second claim through his own inaction.
>
> Ward's second claim relies on several disclosures of documents, but chief among them are approximately 886 pages of documents from the Oklahoma State Bureau of Investigation (hereinafter OSBI Records). Upon review of the record before us, it is clear that codefendant Fontenot's Motion to Produce Documents and Things in the Possession, Custody, or Control of the OSBI for Inspection and Copying was granted by this Court on December 1, 1992 and ordered to be completed by December 17, 1992. *See* Motion to Produce Documents and Things and Order Granting, *Fontenot v. State*, D-1988-571 (Dec. 1, 1992). It is from this order that the OSBI records were gathered and supplied to codefendant Fontenot. The District Court found, and the record supports, that Ward came into possession of the OSBI Records in 2003 when his counsel received them from the Oklahoma Indigent Defense System.
>
> A review of Ward's initial application for post-conviction relief and the OSBI Records reveal that they provided a cognizable basis for his second claim. *However, Ward offers no reason sufficient to justify his approximately fourteen years of inaction following 2003, and a thorough review of the record reveals none.* As such, consideration of Ward's second claim is forfeited for review.

---

[6] This is not a threshold inquiry, but rather one factor for the Court to consider in weighing whether Petitioner has presented "new reliable evidence" of his actual innocence. *House*, 547 U.S. at 537; *Schlup*, 513 U.S. at 324. *See also Perkins*, 569 U.S. at 399–400 (timing and diligence is a factor in an actual innocence inquiry, but not *the only* factor to be considered); *Lopez v. Trani*, 628 F.3d 1228, 1230–31 (10th Cir. 2010) (district court erred by solely considering diligence in pursuing actual innocence claim). Petitioner has not invoked the more general type of equitable tolling available through a showing of extraordinary circumstances and diligence. *See Holland v. Florida*, 560 U.S. 631, 649 (2010) (ordinary equitable tolling available only when the petitioner shows both "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing" (citation and internal quotation marks omitted)).

[7] The date of this unpublished opinion was January 7, 1994, meaning the petition was filed twenty-three years and nine months after the conviction was affirmed (A0630–A0632).

(C1014–C1015 (emphasis added)). The OCCA's factual finding regarding Petitioner's lack of diligence—especially in light of the OCCA's "thorough review of the record"—is entitled to a presumption of correctness, one which Petitioner has failed to rebut by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). In his petition, Petitioner spends virtually no time addressing the OCCA's determination as it relates to diligence, *see* Doc. 2, at 43–44, and instead devotes the bulk of his argument attempting to show why, on the merits, his claim deserves to be heard, *see* Doc. 2, at 47–83, irrespective of his exceedingly belated request for relief. Not only should this Court look with skepticism on the timing of his present arguments, *see Perkins*, 569 U.S. at 399, the Court should also conclude, as shown below, that Petitioner has failed to establish actual innocence as a rare gateway to having his untimely claims considered on the merits.

> **1.    The state district court found Petitioner not actually innocent, and Petitioner has failed to rebut those factual findings by clear and convincing evidence.**

As previously described, on remand from the OCCA, the parties presented supplemental briefing, and the state district court decided Petitioner's innocence claim on the merits, in Supplemental Findings issued on December 29, 2022 (C1154–C1163). In rejecting Petitioner's innocence claim, the state district court wisely reasoned:

> Ward's claims of newly discovered evidence relating to when law enforcement had a description of the blouse described by Ward when he confessed to the crimes; alternate suspect Billy Charley; and impeachment evidence against eyewitness Jim Moyer. *The Court, having considered the entirety of the record and materials discussed by Petitioner Ward and the State in their supplemental briefs pertaining to "newly" discovered evidence does not demonstrate, by clear and convincing evidence, Ward's innocence of the crimes for which he was convicted.* Therefore, this Court denies Ward's claim for post-conviction relief under Oklahoma's PCPA, 22 O.S.2011, § 1080(d).

(C1162 (emphasis added)).

These factual findings, made by the state district court on the merits, are entitled to a presumption of correctness, which Petitioner has failed to rebut by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). This presumption extends to *all* factual determinations made in state court, even those made by a lower state court. *Sallahdin v. Gibson*, 275 F.3d 1211, 1225 (10th Cir. 2002) ("Sallahdin has failed to rebut the trial court's findings by clear and convincing evidence (citing 28 U.S.C. § 2254(e)(1))); *see also Hooks v. Workman*, 689 F.3d 1148, 1164 (10th Cir. 2012) ("Any state-court findings of fact that bear upon the claim are entitled to a presumption of correctness.").

### 2. The blouse description is not "new," and Petitioner is not innocent.

Petitioner places great emphasis on the timeline during which police learned of Ms. Haraway's blouse description when she was abducted. *See* Doc. 2, at 5–6, 16–26, 48, 50–52. Petitioner claims that alleged new evidence uncovered in 2019 demonstrated that law enforcement knew about Ms. Haraway's floral print blouse description prior to Petitioner's confession to police Doc. 2, at 17–19. Specifically, Petitioner cites (1) information received from James Boardman in an Ada Police Report; (2) answers given by Janet Weldon during her post-conviction deposition testimony; (3) answers given by law enforcement during post-conviction depositions, and (4) statements from former Ada Police Department officers regarding the blouse. Doc. 2, at 16–26. Petitioner attempts to cobble together strands of random evidence related to the blouse—much of it either conflicting, vague, or unconvincing due to the distortion of hindsight—to show that police knew about the blouse earlier, rather than later in the investigation, and that police therefore somehow coerced Petitioner's confession using the blouse information.

But Petitioner's argument should fail, as it did below, for at least two reasons. *First*, Petitioner's reliance on the blouse to support his defense theory was not new; indeed, the blouse *was a key point of contention at the retrial* and the jury was already well aware of the issue. *Second*, although Petitioner did not previously attempt to make the giant leap from law enforcement's alleged blouse knowledge to the assumption that police coerced his confession, this is

15

unsurprising—such wild speculation is supported by absolutely no evidence and is in fact refuted by state court depositions obtained by Petitioner.

As to the first point, the blouse issue was hotly contested at the 1989 retrial, and the jury heard conflicting testimony about law enforcement's knowledge of Ms. Haraway's floral print blouse. For example, Steve Haraway (the victim's husband) testified at trial that, when he left for work on the morning of the crimes, he did not see what Ms. Haraway was wearing that day, especially since she left for work later that afternoon (Tr. IV, 108, 110–11). Janet Weldon (the victim's sister) offered a similar line of testimony. Indeed, she attested to the jury that, in the days following the crimes, she went through Ms. Haraway's clothes, including a few blouses, but was never certain or definite about what Ms. Haraway had been wearing at the time of her kidnapping (Tr. IV, 152). In that sense, Ms. Weldon was contacted by police *after* Petitioner's confession, at which point she confirmed that the blouse described by Petitioner (*i.e.*, a blouse with little blue flowers) was a blouse Ms. Haraway had, in fact, owned, since Ms. Weldon had given a similar blouse to Ms. Haraway sometime prior (Tr. IV, 153–54, 157). On vigorous cross-examination, Ms. Weldon again confirmed that she had not given the blouse description to police prior to the arrest (Tr. IV, 156–57). Likewise, Pat Virgin (Ms. Haraway's mother) testified that she had occasion to discuss the blouse with law enforcement after Petitioner's confession (Tr. IV, 169–70).

Further, Officer Richard Holkum with the Ada Police Department, testified at the retrial that *he told Detective Mike Baskin and Captain Dennis Smith about the blouse description one day after the crimes, on April 29, 1984* (Tr. IV, 140–41). Thus, Petitioner's suggestion that police might have known about the blouse description very early on in the investigation is neither "newly discovered" evidence, nor is it "newly presented," since the jury heard this information. *Fontenot v. Crow*, 4 F.4th 982, 1032 (10th Cir. 2021). For example, Petitioner's citation to James

Boardman's alleged statement to police that "he was pretty sure Deni[c]e was wearing a blue short sleeve T shirt" is vague and relatively worthless information, since such details would have been even less descriptive than what *trial testimony* shows Officer Holkum told Detective Baskin and Captain Smith just one day after the crimes. Doc. 2, at 24 (all caps omitted). Likewise, Petitioner's attempt to weave together alleged amendments in the "Updated Missing Persons Report" and the interview report summary of Janet Weldon is unavailing since, as quoted above, Ms. Weldon swore under oath that she had not told police about the blouse prior to arrest, and since, again, police could already have known about the blouse description from Officer Holkum's firsthand account. At this point, nearly four decades later, speculation about who added what detail to the interview reports, and when, and why, are details mostly lost to time and present nothing beyond bare speculation. If a blouse description was added during the investigation, it was likely the result of Officer Holkum's information, not based on alleged discrepancies in the family members' remembrance of the blouse. Petitioner's speculation is inadequate to overcome the district court's presumptively correct finding that Petitioner is not actually innocent. 28 U.S.C. § 2254(e)(1).

Furthermore, even assuming Petitioner's alleged new evidence on the blouse timeline holds any value—*i.e.*, shows that police knew about the blouse before Petitioner's confession— Petitioner still fails to show that police actually used that information to coerce his confession or that the validity of his confession would have been undermined. Put another way, the mere fact that police might have known about the blouse only tells half the story; Petitioner has not shown that police infected his confession with that information. *See Underwood v. State*, 252 P.3d 221, 238 (Okla. Crim. App. 2011) ("Whether a suspect's statements to police are voluntary in the legal sense depends on an evaluation of all the surrounding circumstances, including the characteristics of the accused and the details of the interrogation."). Indeed, police did not see clothing description

as an important consideration in a missing person investigation. Detective Baskin explained at the retrial that police hardly paid attention to the clothing information during the investigation because it was not seen as very important (Tr. V, 59). *See also* (Tr. V, 179 ("There was some, like the clothing description there that I really didn't pay that much attention to, actually.")). Agent Gary Rogers, in a post-conviction deposition, confirmed that the blouse was only marginally significant:

> And, you know, I can assure you that, as sure as I'm sitting here, that that was not done, as far as I can remember, as best I can remember, *because like I've told you all along, that blouse, in my mind's eye, was not that significant, at that particular time, until it was brought to my attention later on down—down the way.*

(B000133, Gary Rogers Direct Examination, at 139–40 (emphasis added)). *See also* (B000185, Gary Rogers Cross-Examination, at 213) (Q. "Assuming that you did learn of the blouse before [Petitioner's] confession, would the clothing have been a significant focus of the interview?" A. "Not at that time, as I recall, no.").

And law enforcement has repeatedly disavowed any notion that, even if the blouse had been a relevant investigatory consideration, police allegedly force-fed that blouse description to Petitioner during his confession. At the retrial, Captain Smith clearly and unequivocally explained that he fed no details to Petitioner during his confession, including any clothing descriptors (Tr. VI, 172). Likewise, Agent Rogers, during his recent deposition testimony, confirmed that police did not feed the blouse description to Petitioner and did not force his confession:

> I'm assuming you're alluding to is the description of this blouse was—was force-fed to Mr.—no, I'm just saying—that's my words, not yours, to Mr. Ward when he gave his confession, he was already aware of, you know—from the interrogator, what the blouse description was. [. . .] And why—*why would I want to jeopardize a confession by contaminating it with something like that? It makes no sense to me.*

(B000133, Gary Rogers Direct Examination, at 139–40 (emphasis added)).

All things considered, especially in light of law enforcement's testimony that the clothing was not very important, and testimony that police certainly did not feed the blouse information to

Petitioner, the alleged new evidence at issue does not show that it is more likely than not that no reasonable juror would have convicted Petitioner. *See Schlup*, 513 U.S. at 324.

Petitioner falls particularly short in acknowledging the compelling weight of his guilt established by the trial evidence. Petitioner claims that "[t]he State's case at trial was exceedingly weak," Doc. 2, at i, 48 (some capitalization omitted), since, according to Petitioner, no physical evidence connected him to the crimes, his confession was allegedly false, and the eyewitnesses placing Petitioner at the scene were allegedly flawed and biased. In reality, however, Petitioner ignores the mountain of other evidence supporting the jury's verdicts. And as the Supreme Court has stated, an actual innocence claim requires "a holistic judgment about 'all the evidence.'" *House*, 547 U.S. at 539 (quoting *Schlup*, 513 U.S. at 328). Petitioner is dismissive of his own sworn admission at the preliminary hearing that he was at McAnally's on the night of the crimes and that Ms. Haraway allegedly voluntarily left the convenience store with Petitioner and Marty Ashley (Tr. VI, 127–31, 141–44, 148–50, 154–55, 169). He does not even discuss this evidence within his section on the "[t]he weak evidence supposedly placing [Petitioner] at the location where Ms. Haraway was abducted." Doc. 2, at 8. Perhaps Petitioner does not discuss this evidence there because he knows that it is strong evidence placing him at the location where James Moyer and the Timmons brothers identified Petitioner. Make no mistake, Petitioner freely admitted that the witnesses who had testified at the preliminary hearing, including the Timmons brothers and Gene Welchel, each of whom had been in the parking lot at McAnally's that evening, had been correct in their recollection of Petitioner leaving the store with Ms. Haraway (Tr. VI, 131, 149, 160). Further, Petitioner stated that Jim Moyer (whom Petitioner now labels a flawed eyewitness) was in the store that night and was still there when Petitioner left the store (Tr. VI, 158–59). Petitioner also admitted that he told Jim Allen, an inmate in the Pontotoc County Jail, that he

19

believed he had something to do with Ms. Haraway's disappearance (Tr. VI, 164–65). Petitioner

explained that his prior inconsistent statements were lies and a mere "put-on" (Tr. VI, 165–66).

But other evidence at trial also substantiated Petitioner's guilt beyond a reasonable doubt,

including the fact that Petitioner drastically and noticeably changed his appearance within days of

the crimes by way of a homemade, sloppy haircut (Tr. V, 48, 69, 164–65; Tr. VI, 117); that

Petitioner was found with a scabbed and swollen defensive wound on his hand consistent with the

struggle he described during Ms. Haraway's violent assault (Tr. V, 69–70; Tr. VI, 117); that Jim

Moyer positively identified Petitioner in a live lineup on November 19, 1984, at the Ada Police

Department, and that no suggestions or coercion was offered by police (Tr. III, 50, 91–92, 106–

07); that Petitioner glibly remarked to a Pontotoc County Jailer during the search for Ms.

Haraway's body that "[t]hem looking for that girl's body out there is like looking for a needle in a

haystack, without the needle," indicating his knowledge that the details of his confession

(including the location of her body) was given in an intentionally misleading manner (Tr. V, 8–

10, 13); that Petitioner had access to, and was often seen driving around his neighborhood in, a

grey-primered, late 60s model, "junker" pickup truck, matching the description of the vehicle used

to abduct Ms. Haraway, and that such truck was never seen again after the crimes (Tr. VII, 76–78,

80, 94–96); that Petitioner confessed to James Allen that he had raped Ms. Haraway with Marty

Ashley[8] and the pair had dumped Ms. Haraway's body in the Canadian River (Tr. VI, 95–97, 102);

---

[8] Just like Odell Titsworth, Marty Ashley's name turned out to be a false detail added by Petitioner.
The other person who murdered Ms. Haraway was Karl Fontenot. Notwithstanding the Supreme
Court's decision in *Cruz*, 481 U.S. at 193–94, regarding the use of co-defendant statements at trial,
the fact that Mr. Fontenot also credibly confessed to these crimes and placed Ward at the scene of
the crime is a fact which must be taken into account in resolving Petitioner's actual innocence
claim in this case. *See House*, 547 U.S. at 539 (evidence of alleged actual innocence must be
viewed holistically). Again, the OCCA found Mr. Fontenot's confession to be independently
corroborated in nine (9) separate ways. *Fontenot*, 881 P.2d at 78–79. Petitioner has failed to
overcome this finding by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Further, while

that Petitioner had access to a lock-bladed Buck knife, significant to Petitioner's confession details that Ms. Haraway was killed with a knife (Tr. IV, 91–95; Tr. V, 25–26); that at least thirty (30) callers identified Petitioner in the composite drawings, which were prepared just days after the crimes with the help of witnesses from the night of the crimes (Tr. V, 64, 192; Tr. VI, 114, 116); that Petitioner lied multiple times to law enforcement in an effort to escape blame and "to take a lighter sentence" (Tr. IX, 181); that Petitioner's confession was itself so remarkably grotesque and detailed (such as his description of biting Ms. Haraway "on the tit" as she struggled to get free, slashing and torturing her with a knife, and his recollection of Mr. Fontenot raping Ms. Haraway's dead and disemboweled corpse) that it could not have been conceived by anyone but a firsthand perpetrator (Tr. VIII, 43, 45, 49–51, 57, 61); and the fact that Petitioner's confession was the first definitive proof that Ms. Haraway was deceased, even long before her remains were discovered.

**3.    Billy Charley and Floyd Degraw are not "new," and Petitioner is not innocent.**

Next, Petitioner claims that alleged new evidence regarding Billy Charley demonstrates his actual innocence. Doc. 2, at 30–31. Petitioner claims that such evidence reveals that Mr. Charley was another lead pursued by police during the pendency of law enforcement's investigation. In this regard, Petitioner cites alleged new information from "Janet Lyons" (presumed by Petitioner to be Janet Weldon, Ms. Haraway's sister) mentioning Mr. Charley changing his appearance and having "been out to the store," as well as Ada Police Department notes describing Charley's resemblance to the composite sketches and the alleged need to subsequently follow up on the lead to retrieve more information. Doc. 2, at 31. Petitioner's reliance on information related to Mr. Charley fails to demonstrate Petitioner's actual innocence, for a few key reasons.

---

Petitioner claims the science of false confession has advanced, *see* Doc. 55–57, such "science" does not account for the admissions which Petitioner continued to make in this case, nor does it account for the fact that Petitioner's co-defendant also placed Petitioner at the scene.

For starters, much like the blouse description discussed above, information about Mr. Charley was plainly available *and was already utilized by the defense at the retrial*, and is not, by any stretch of the imagination, "new." Indeed, Petitioner previously admitted this fact, but evasively and misleadingly claimed that "police's knowledge of Charley was barely acknowledged at trial" (C1031). To the contrary, defense counsel cross-examined Captain Smith on Mr. Charley's resemblance to the composite sketches, causing Captain Smith to acknowledge that out of the seventy-five to one hundred calls received regarding the composite, "at least thirty people identified Mr. Ward," and "[a]t least twenty of those calls identified Billy Charley as the person in this composite" (Tr. VI, 183, 186). Following that exchange, defense counsel further explored Captain Smith's alleged mishandling of the list of alleged other leads (Tr. VI, 186–88).

Since the jury was already aware of Mr. Charley as an alleged other lead—including the fact that at least twenty callers identified Mr. Charley in the composite sketches, as well as law enforcement's alleged shortcomings related to Mr. Charley, as elicited through defense counsel's cross—Petitioner's alleged new evidence on Mr. Charley is a far cry from showing "actual innocence" so strong that "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329.

This is especially true given the deposition testimony of Janet Weldon during post-conviction discovery—evidence which Petitioner now tries to distance himself from, since it cuts against his theory that Mr. Charley was crucial. Petitioner's current counsel repeatedly badgered Ms. Weldon about Mr. Charley during her deposition, to no avail, with Ms. Weldon repeatedly testifying under oath that she did not know who Mr. Charley even was (B000220, Janet Weldon

Direct Examination, at 46–47, 49 (emphasis added)). *See also* (B000220, Janet Weldon Direct Examination, at 48 (responding to questions about Mr. Charley: "I've never heard of this guy")).[9]

A jury is expected to use common sense in rendering its verdict. Unlike Petitioner, Mr. Charley did not confess in grotesque detail to the abduction and murder of Ms. Haraway, and Mr. Charley did not freely and voluntarily admit, under oath and during sworn in-court proceedings, to leaving McAnally's with Ms. Haraway on the night of the crimes. Petitioner is not actually innocent based on alleged "new" evidence regarding Mr. Charley, Mr. Degraw, or some unnamed Vietnam veteran (who would have necessarily been considerably older than the men seen leaving McAnally's since such a person would have had to have been no younger than eighteen years old in 1975 when U.S. involvement in the war ended). *Perkins*, 569 U.S. at 386–87. *See Coleman v. Calderon*, 150 F.3d 1105, 1117 (9th Cir. 1998) ("In this case, the information about the other suspects consisted of (1) police files on the convicted kidnapper/rapist and (2) police notes of two telephone calls reporting that Hill was bothered by both a violent ex-boyfriend and a convicted rapist" . . . "What is missing in Coleman's argument is any evidence linking any of these other suspects to the crime, or any showing that disclosure of their existence would have led to the discovery of admissible evidence. This missing link compels the conclusion that the information about the other suspects was not material."), *cert. granted on other grounds, judgment rev'd, Calderon v. Coleman*, 525 U.S. 141, 147 (1998).

---

[9] Until the instant proceedings, Petitioner has focused his innocence claim almost entirely upon Mr. Charley as the possible alternate suspect. Floyd Degraw did not drive a truck like the one Ms. Haraway was seen leaving in and did not confess in grotesque detail to the abduction and murder of Ms. Haraway, either. Moreover, while it is true that Mr. Degraw was arrested for rape in Shamrock, Texas, a few days after Ms. Haraway's disappearance, the fact that his car, a Renault, bore the phrase "Floyd Loves Donna" is readily explained by the fact that the person he was accused of raping in Texas was named Donna, and it was more of an acquaintance-rape scenario after someone introduced the two (A1349–A1350). Mr. Degraw had just come from California, making any connection to this case extremely improbable (A0648).

**4.     Alleged impeachment evidence regarding the eyewitness is not "new," and Petitioner is not innocent.**

Petitioner has also alleged that new evidence would have impeached "star eyewitness" Jim Moyer. Doc 2, at 77. In particular, Petitioner cites new documents that allegedly demonstrate that (1) Jim Moyer (and another individual, James Boardman) purportedly selected an unknown individual from a photographic lineup prior to the live lineup (at which time Mr. Moyer selected Petitioner as the man he saw in McAnally's on the evening of the crimes); and that (2) Mr. Moyer's story allegedly evolved during the investigation, prior to trial, regarding his recollection of Petitioner and Mr. Fontenot in McAnally's on the evening of the crimes. Doc. 2, at 79.

Petitioner fails to show how Mr. Moyer and Mr. Boardman's alleged selection of individual #1 in some prior photo lineup amounts to "evidence of a prior misidentification," since there is no indication in the record whether Petitioner was, or was not, the individual depicted as #1 in that photo lineup. Indeed, Petitioner admits that the police report does not specify the identity of suspect "#1" but relies on the fact that Petitioner was identified as "#5" in another lineup to suggest misidentification. Doc. 2, at 33. Since Petitioner did not diligently pursue this claim for decades, Petitioner has only bare speculation about whether Petitioner was or was not, in fact, individual #1 in that photo lineup. Given the remainder of the investigation—including the fact that Mr. Moyer subsequently positively identified Petitioner in a live lineup, and testified to that identification at trial—and taking the evidence in the light most favorable to the State, it is highly likely that Petitioner was the man whom Mr. Moyer (and Mr. Boardman) selected as the unknown #1 in the photo lineup, assuming, *arguendo*, even such a prior identification was made in the first place.

While Petitioner also claims that Mr. Moyer's testimony was tainted by the fact that he requested a reward before testifying at the retrial, it must be remembered that Mr. Moyer was positive as to his identification of Petitioner, and that identification was both reliable and

unimpeachable. In fact, during the *in camera* hearing on the validity of Mr. Moyer's live-lineup identifications, after defense counsel revealed that Mr. Moyer was uncertain about Mr. Fontenot, defense counsel asked Moyer if he "could be just as mistaken about" Petitioner's identity, but Mr. Moyer replied, "No." (Tr. III, 100). And in front of the jury, Mr. Moyer explained that he had studied Petitioner's face at McAnally's that evening, had gotten a good look at him in the store, and that he "never forgot that evening" (Tr. III, 87–88, 107). Even Petitioner concedes that Mr. Moyer was at McAnally's that evening. Doc. 2, at 2–3. In light of Mr. Moyer's certainty in identifying Petitioner, as well as other evidence heard by the jury that Petitioner admitted, under oath, that Mr. Moyer's recollection of Petitioner at McAnally's that evening had been correct, any reliance defense counsel could have had on Mr. Moyer's allegedly evolving story (to the extent not already deployed at trial during cross-examination), by way of these alleged new documents, would have been ineffectual in impeaching Moyer's solid eyewitness identification of Petitioner.

## CONCLUSION

The district court found that Petitioner failed to show "by clear and convincing evidence, [his] innocence of the crimes for which he was convicted" (C1162). The district court's factual finding that Petitioner is not innocent is presumed to be correct, and Petitioner has not rebutted this finding by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Nor has Petitioner overcome the OCCA's factual finding that he possessed the material supporting his *Brady* claims since 2003 (C1015). Simply put, Petitioner has not satisfied the "very narrow" actual innocence gateway. *Sawyer*, 505 U.S. at 340–41. *See also Perkins*, 569 U.S. at 401; *Schlup*, 513 U.S. at 327.

Because Petitioner's habeas petition is statutorily untimely under the AEDPA, 28 U.S.C. § 2244(d), and since Petitioner has failed to demonstrate his actual innocence as a gateway for his untimely claims, the petition is time-barred and must be dismissed. The time has come for finality.

Respectfully submitted,

**GENTNER F. DRUMMOND**
**ATTORNEY GENERAL OF OKLAHOMA**

**s/ Theodore M. Peeper**
**THEODORE M. PEEPER, OBA #19909**
**ASSISTANT ATTORNEY GENERAL**

**s/ Joshua R. Fanelli**
**JOSHUA R. FANELLI, OBA #33503**
**ASSISTANT ATTORNEY GENERAL**

**OKLAHOMA ATTORNEY GENERAL'S OFFICE**

313 N.E. 21st Street
Oklahoma City, Oklahoma 73105
(405) 521-3921          FAX (405) 522-4534

**Service email: fhc.docket@oag.ok.gov**

**ATTORNEYS FOR RESPONDENT**

## CERTIFICATE OF SERVICE

**X**      I hereby certify that on June 30, 2023, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.

**X**      I hereby certify that on June 30, 2023, I electronically transmitted the attached document to the following ECF registrants using the ECF System for filing:

Mark H. Barrett, OBA #557
P.O. Box 896
Norman, Oklahoma 73070

Daniel G. Webber, Jr., OBA #16332
400 North Walnut Avenue
Oklahoma City, Oklahoma 73104

Gregory Swygert (*pro hac vice*)
375 East Chicago Avenue
Chicago, Illinois 60611

Robert N. Hochman (*pro hac vice*)
David H. Hoffman (*pro hac vice*)
John G. Levi (*pro hac vice*)
Emily Scholtes (*pro hac vice*)
Matthew Binder (*pro hac vice*)
William Lawrence (*pro hac vice*)
1 South Dearborn
Chicago, Illinois 60603


*Attorneys for Petitioner*


                                        s/ Theodore M. Peeper
                                        *Assistant Attorney General*