IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| THOMAS JESSE WARD, | ) |
| | ) |
| Petitioner, | ) |
| | ) Case No. CIV-23-146-JFH-GLJ |
| vs. | ) |
| | ) |
| DAVID BUSS, WARDEN, | ) |
| | ) |
| Respondent. | ) |

**PETITIONER'S BRIEF IN OPPOSITION TO RESPONDENT'S MOTION TO DISMISS
PETITION FOR WRIT OF HABEAS CORPUS AS TIME-BARRED**

The State claims Mr. Ward's habeas petition is time-barred. But the evidence Mr. Ward presents is more than sufficient to meet the actual innocence gateway standard that excuses any delay in bringing his claim. In truth, the State's longtime withholding of material and exculpatory evidence is the essential reason for any delay, and, in any event, as the Tenth Circuit has already recognized in a case involving Mr. Ward's co-defendant, the nature and strength of the evidence of Mr. Ward's actual innocence overcomes any delay. The State's case at trial was weak. Mr. Ward's new evidence shows that it was more likely than not that the outcome of Mr. Ward's trial would have been different had the State not withheld the exculpatory evidence that Mr. Ward has now uncovered.[1]

---

[1] The State requests that, should the Court deny its motion to dismiss, it be given an opportunity to respond on the merits. Brief in Support of Motion to Dismiss Habeas Petition as Time-Barred at 1 n.1 Dkt. #55. Because the State has proceeded to argue the merits of Mr. Ward's actual innocence gateway claim in its motion to dismiss, Mr. Ward objects to this request to the extent that such an opportunity would provide the State a second chance to argue against Mr. Ward's actual innocence gateway claim.

I. **MR WARD HAS MET THE *SCHLUP* ACTUAL INNOCENCE GATEWAY STANDARD**

    1. **Judge Inge's 2022 Order Did Not Address Mr. Ward's Actual Innocence Gateway Claim and Therefore Does Not Bind This Court.**

The State tries to circumvent this Court's review of the record by suggesting that the state court has already determined that Mr. Ward is not actually innocent. It invokes a presumption of correctness for that finding here. Brief in Support of Motion to Dismiss Habeas Petition as Time-Barred, Dkt. #55 ("Br."). But the State court simply did not address the question this Court faces for multiple reasons.

First, the "'newly' discovered evidence" the state district court considered in its 2022 order was limited by the OCCA's ruling to evidence discovered since the filing of Mr. Ward's state court post-conviction relief petition in 2017. 2022 Order at ¶ 10 (C1158). This Court is not so limited. For purposes of the *Schlup* analysis, *any* new evidence may be considered "so long as it was 'not presented' at trial." *Fontenot v. Crow*, 4 F.4th 982, 1032 (10th Cir. 2021) (quoting *Kidd v. Norman*, 651 F.3d 947, 952 (8th Cir. 2011)). Put simply, the state district court did not consider the complete record before this Court.

Moreover, the state district court considered a *state law* claim under a *clear and convincing evidence* standard. 2022 Order at 9 and ¶ 10 (C1158–62). This Court faces a federal law question under a materially different evidentiary standard: whether "it is *more likely than not* that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (emphasis added); *cf. id.* ("[T]he showing of 'more likely than not' imposes a lower burden of proof than the 'clear and convincing' standard . . . .").[2]

---

[2] Judge Inge even noted in her Order denying post-conviction relief on remand that she agreed with the State's arguments that an actual innocence gateway claim is "not clearly established under Oklahoma law." 2022 Order at ¶ 18 (C1160–61).

### 2. Any Delay In Mr. Ward's Seeking Post-Conviction Relief Does Not Prevent Him From Meeting the *Schlup* Standard.

Contrary to the State's suggestion, any delay by Mr. Ward in bringing this claim does not weigh materially against his actual innocence gateway claim. *But see* Br. at 12–14. Although *McQuiggin v. Perkins*, 569 U.S. 383, 401 (2013), held that untimeliness could bear on an actual innocence determination, even the State acknowledges that untimeliness is just "one factor" of the analysis and not a "threshold inquiry." Br. at 13 n.6.

The Tenth Circuit in *Fontenot* has already determined that the nature and strength of the evidence at issue here overcomes the impact of any delay in its presentation. The Tenth Circuit determined that Fontenot, Mr. Ward's former co-defendant, had satisfied the actual innocence gateway standard despite filing his first petition for post-conviction relief in state court two decades after receiving the OSBI materials on which he based his claims. 4 F.4th at 1056. The Court particularly emphasized that Fontenot's new evidence included "a significant amount of contemporaneous documentary evidence" not susceptible to change during the two decades since the trial and that even the affidavits Fontenot had obtained decades after his trial drew "evidentiary strength" from the way they "interlock[ed] with statements made at or prior to Mr. Fontenot's . . . trial." *Id.*

Just as in *Fontenot*, much of the new evidence Mr. Ward brings in his habeas petition is hundreds of pages of originally undisclosed documents from the time of the investigation into Ms. Haraway's disappearance—including the previously undisclosed interview summary of Janet Weldon and her statements from the "Background on Haraway" document, the Updated Missing Persons Report, the summary of Janet Weldon's discussion of Billy Charley with police, and the more than hundred pages from the OSBI File devoted to alternative suspect Floyd Degraw. And the more recent statements on which Mr. Ward relies—including Janet Weldon's deposition

testimony about when she provided the description of the missing blouse to police and David Yockey's statements about what he told police about Billy Charley's potential involvement in the crimes against Ms. Haraway—are valuable precisely because they "interlock" with and shed further light on the new documents Mr. Ward has discovered.

Thus, even if any delay were attributable to Mr. Ward, it would not prevent his satisfying the *Schlup* actual innocence gateway standard.

### 3. Mr. Ward's Evidence Is New and Would More Likely Than Not Have Changed the Outcome of His Trial.

The State also argues that some of Mr. Ward's evidence of actual innocence is neither "newly presented" under *Fontenot* nor enough to satisfy *Schlup*. The State is wrong on both counts.

1. *The Blouse.* The State argues that Mr. Ward's new evidence concerning the blouse description is not new because the issue of whether the police had a description of the blouse before Mr. Ward's confession was argued at trial. Br. at 15. This makes no sense. The issue of when police obtained the blouse description was critical at trial. But that is *precisely why* the new evidence concerning the blouse description is so powerful: the State considered Mr. Ward's identification of the blouse description in his "confession" the "anchor" that tied him to the crimes against Ms. Haraway because "[the State] had no description of that blouse to give to this Defendant." A0617. Mr. Ward's new evidence would have shown this assertion to be false, and the State's own theory of the reliability of Mr. Ward's "confession" would have diminished accordingly.

The State simply has the import of all this evidence backwards. That the previously undisclosed interview summary of Janet Weldon and the final page of the "Background on Haraway" section of the OSBI File, in both of which Weldon describes the same blouse that Mr. Ward described in his false confession, contradict Ms. Weldon's testimony at the trial does not

4

mean the new evidence is weak. Br. at 16. It is, in fact, the precise reason the evidence would have been so important to Mr. Ward at trial. It would have been crucial impeachment evidence on the issue of when exactly Janet Weldon gave police the description of the blouse, and it is exactly the sort of "contemporaneous documentary evidence" the *Fontenot* court held to be so valuable. 4 F.4th at 1056.

The State next attempts to downplay the new evidence concerning the blouse by relying on the testimony of former Ada police officer Richard Holkum. Br. at 16–17. But Holkum's testimony that he provided a description of the blouse he saw Ms. Haraway wearing the day she disappeared to Detective Baskin and Captain Smith the day after her disappearance does *not* mean that all of Mr. Ward's evidence concerning the blouse description is not newly presented. In fact, Detective Baskin denied remembering the conversation, A0396–97, and Detective Smith "didn't know anything about the blouse from Officer Holkum until later after [Mr. Ward and Fontenot] were arrested" because they did not actually interview Holkum about the blouse until six months after the incident. B000466–70. No documentation was ever introduced at trial that police investigating Ms. Haraway's disappearance were ever told she had been wearing a blue blouse with a print pattern. Had the jury heard all the evidence concerning when Weldon provided the blouse description to the police at trial to back up Holkum's testimony—not to mention the Updated Missing Persons Report, the statements from James Boardman and Officer Carson about when the police knew the blouse description, and the post-conviction statements from Weldon herself, Detective Baskin, and Steve Haraway about how early in the investigation police discussed the missing blouse with Weldon—it is highly likely the jury would have realized, as is now clear, that the police knew about the blouse before Mr. Ward's "confession."

The State then argues that, even if Mr. Ward has shown that the police knew the blouse description, he has "not shown that police infected his confession with that information." Br. at 17. This is not Mr. Ward's burden. He only has to show that, considering all of the evidence, it is "more likely than not" that the outcome of his trial would have been different. *Schlup*, 513 U.S. at 327; *see also House*, 547 U.S. at 538 ("The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors."). It was the State's burden at trial to show that Mr. Ward's "confession" was trustworthy enough to convict him. And that burden was challenging because none of the other details in Mr. Ward's "confession" were corroborated at trial. About every detail was obviously made up. That is why the State emphasized the blouse description at closing as the "anchor" that validated Mr. Ward's otherwise uncorroborated "confession." A0617. The evidence that the police knew of the blouse description prior to Mr. Ward's "confession" would very likely have changed the jury's verdict. The State's argument that somehow the jury would not have considered the police's prior knowledge of the blouse description significant because the *police* said that they did not feed the description to Mr. Ward and said *they* did not view clothing descriptions as important to their investigation does not overcome the strength of the evidence itself. *See* Br. at 17–18. The State told the jury that the blouse description had no explanation. That was false. The notion that, in the face of their own explanation being proven false, the jury would likely have believed *other* statements of government investigators that tried to make that misrepresentation seem unimportant is not credible.

2. *Billy Charley.* As with the blouse description, the State's argument against Mr. Ward's new evidence concerning Billy Charley confuses new evidence with a new issue. Mr. Ward does not dispute that at trial Captain Smith testified that "[a]t least twenty of those calls identified Billy

Charley as the person in this composite" Br. at 22. But neither the jury nor Mr. Ward knew at that time that police documents showed that Janet Weldon, Ms. Haraway's own sister, had discussed Billy Charley with the police, describing his appearance and the fact he had been "out to the store." B000534. Nor did they know that the police meant to reinterview Billy Charley. That police thought Billy Charley worth investigating to this extent would likely have weighed more heavily with the jury than just the fact that some people had said Charley looked like the composite sketch. *Cf. Trammell v. McKune*, 485 F.3d 546, 551 (10th Cir. 2007) ("This evidence [connecting an alternative suspect to the crime] could also have been used to cast doubt on police officers' decision to focus their attention . . . on [the petitioner] rather than [the alternative suspect]."). That Janet Weldon now does not recollect Billy Charley, as the State points out, Br. at 22–23, does not negate the significance of the fact that the police thought him worth investigating in the period following Ms. Haraway's disappearance.[3] And this contemporaneous documentary evidence interlocks with the statements from David Yockey that he suspected Charley's involvement in the crimes against Ms. Haraway and the statements from Billy Charley's own father that the police questioned Charley just days after Ms. Haraway's disappearance. *See* A1580–83, A1588–91 ¶ 8, B000519, B000536–37.

---

[3] The State additionally claims that the evidence concerning Billy Charley is unavailing because he did not confess to the crimes. Br. at 23. But, once again, it is not Mr. Ward's burden to show that Billy Charley committed the crimes against Ms. Haraway, but that this evidence, along with all the new evidence Mr. Ward brings in his habeas petition, would more likely than not have changed the outcome of his trial. That the police thought the other suspect identified by many callers as resembling the composite sketch was worth investigating and that they knew him to be known by Ms. Haraway's own sister is strong evidence in this regard. The same is true of alternative suspect Floyd Degraw, about whom more than a hundred pages in the OSBI File are concerned. *See* A0645–59, A0664–66, A0685–87, A1345–46, A1349–87, A1407–09, A1413–18, A1422–51, A1465–77. The State's citation to *Coleman v. Calderon*, suggesting Mr. Ward must affirmatively link these suspects to the crimes against Ms. Haraway, does not help its case. Br. at 23 (citing *Coleman v. Calderon*, 150 F.3d 1105, 1117 (9th Cir. 1998)). In *Coleman*, the Ninth Circuit held only that evidence the police had investigated alternative suspects was not material for purposes of *Brady* where those suspects had been eliminated by police because their fingerprints did not match those found at the crime scene. *Coleman*, 150 F.3d at 1116–17. Nothing similarly rules out a further investigation into Charley or Degraw.

3. *James Moyer.* The State argues that Mr. Moyer's later identification of Mr. Ward at an in-person lineup and in court makes it likely that the unnamed photo #1 Moyer selected at the initial photo array—two weeks prior to the live lineup—was Mr. Ward. Br. at 24; B000517. But this gets the analysis backwards. If Moyer's very first identification of the suspect he said he saw at McAnally's the night Ms. Haraway disappeared was *not* Mr. Ward, that throws doubt on his later identifications of Mr. Ward as the suspect. Common sense acknowledges that memory does not strengthen with time. That is what the jury likely would have thought of the evidence

Moreover, the State, which relies on a jury using its "common sense" when rendering a verdict, Br. at 23, ignores the commonsense argument that, had Moyer's photo array identification of photo #1 been of Mr. Ward, the State would certainly have made that point in trial or at least made some record of this fact somewhere. Yet Mr. Ward has never seen any such record, and neither Moyer's interview report nor Boardman's asserts that they identified Mr. Ward. *Id.*; B000517; *see also* 2020 Order at 14–15 (C0781–82). This point is only strengthened by the fact that Mr. Boardman also identified photo #1 as the suspect from the night of Ms. Haraway's disappearance, and the State did not call him as a witness at trial. If Boardman had positively identified Mr. Ward in the photo array, certainly the State would have called him to corroborate Mr. Moyer's identification. And besides all this, the state district court found that "Moyer testified at trial he was shown a photo array but was not able to identify Ward." 2020 Order at 30 (C0797); *see also* Ex. A, *State v. Ward*, No. 88-208, Trial Tr. III at 96:5–97:10 (June 2, 1989). The State has not rebutted—let alone by clear and convincing evidence—the state district court's finding that Moyer himself admitted he identified someone other than Mr. Ward in the photo array. *Cf.* 28 U.S.C. § 2254(e)(1).

Finally, the State argues that Moyer's prior misidentification would not have tainted his positive identification of Mr. Ward because he was so certain of it. Br. at 24–25. But the opposite

is true. Not only did Moyer's recollection of the sequence of events change over time, *compare* B000525 (April 30, 1984 Ada Police report indicating Moyer saw a pickup pull in at McAnally's facing the building and that "a dark haired guy came in the store first, then a blond haired guy came in later" and that Moyer left "approximately one minute after" the two men came in) *with* B000517 (November 6, 1984 interview report indicating Moyer told police that "there was a dark haired male at the back of the store, but he did not get a very good look at him," and that a second man, who was blond, "came in the door and walked past him" while he spoke with Ms. Haraway and not indicating Moyer saw a pickup); B000518 (report from the same day indicating Moyer said that when he arrived at McAnally's, there was "one person *already* in the store" and that a second subject "came into the store and walked past him.") (emphasis added); A0220 at 112:2–24 (Moyer's trial testimony that, when he arrived at McAnally's, his vehicle was the only one there and then two people entered the store), but so did his description of the clothing worn by the suspect he eventually identified as Mr. Ward, *compare* B000517, B00518, B000525 (police reports in which Moyer provided no clothing description) *with* B000396 at 219:9–12 (joint preliminary hearing testimony that both suspects wore blue jeans but that he could not recall their shirts); B000398 at 232:9–10 (under further questioning, testifying "I thought Tommy was wearing a t-shirt" but indicating he was "not positive" not providing a color); A0209 at 88:14–15 (retrial testimony that Mr. Ward wore a "T-shirt, light in color, possibly light blue."). Had the jury known what an inconsistent witness Moyer had been prior to trial, the new evidence that he sought a reward for his testimony against Mr. Ward would certainly have weighed heavily in the jury's minds. A0852–55; *see also* 2020 Order at 13 (C0780).

The State ignores all the initial uncertainty and inconsistency Moyer expressed in his identification of Mr. Ward and cites *only to his testimony in court*, Br. at 24–25—by which time

he expressed more confidence in his identification—as though this resolved the dispute. But a jury using its "common sense" would have scrutinized the testimony of a witness whose story had changed so much over time, had Mr. Ward had this new impeachment evidence to present to them.

### 4. The Other Evidence at Mr. Ward's Trial Was Weak.

As for the "other evidence at trial" that the State claims "substantiated Petitioner's guilt beyond a reasonable doubt," Br. at 20–21, none stands up to scrutiny.[4]

That thirty callers identified Mr. Ward as resembling the composite sketch means little considering the composite sketch was based off the description that Karen Wise gave of the men she saw at J.P.'s, not McAnally's. A0168, A0250–51, A0254–55.

The "defensive wound" on Mr. Ward's hand only appeared at the top of one of his hands, and the scratches were at most a half-inch long and were very minor, (A0348-49; C0721 at 117); almost anything could have caused these marks. Mr. Ward's "sloppy haircut" was based on the unreliable testimony of David Yockey and Billy Hammons. Yockey testified at the preliminary hearing for Mr. Ward's 1985 trial that Mr. Ward's hair was shorter *before* Ms. Haraway's disappearance. And on cross-examination at the 1989 trial, he stated that he could no longer remember whether Mr. Ward's hair was long or short when he saw him on April 27. (C0710–12 at 101–03). Billy Hammons had previously admitted on cross-examination at the 1985 combined trial that he had actually seen Mr. Ward's longer hair about *three months* before April 28, 1984 and that the April 28 date was suggested to him by the District Attorney's office and Mike Baskin. Ex. B, *State v. Ward and Fontenot*, No. 84-183, Trial Tr. III at 722:19–724:16 (September 11, 1985).

---

[4] The State's claim that James Moyer positively identified Mr. Ward at a live lineup is undermined by Mr. Ward's new impeachment evidence against Moyer's identification.

That Mr. Ward had access to a lock-bladed buck knife provides no corroborative value to his false confession because he had said that the knife used to murder Ms. Haraway belonged to Odell Titsworth (whom police subsequently ruled out of their investigation), not himself, and there is no other evidence that Ms. Haraway was stabbed. (A0513, A0519). Likewise, the State's claim that Mr. Ward "had access to, and was often seen driving around his neighborhood in, a grey-primered, late 60s model, 'junker' pickup truck" goes nowhere because the State never showed that Mr. Ward or anyone he knew owned such a vehicle. Dennis Smith also admitted that police never found the truck in the case. (A0471–73).

That Mr. Ward told Paula Boren that searching for Ms. Haraway's body was like searching "for a needle in a haystack, without the needle" and, on another occasion, said "[s]he's not here" provides no details that corroborate Mr. Ward's "confession." The same is true of the State's argument that Mr. Ward's false confession was the first definitive proof that Ms. Haraway was dead. At the time of his false confession, Ms. Haraway had been missing for six months. It would not have been unusual for people to assume she was no longer living.[5] Neither statement shows any specific corroborative knowledge.

And the State's argument that Mr. Ward's " confession" was "so remarkably grotesque and detailed . . . that it could not have been conceived by anyone but a firsthand perpetrator," Br. at 21, is astounding in light of the simple fact that there is no evidence, *other than Mr. Ward's own false confession*, that any of these "remarkably grotesque" events ever took place, and Mr. Ward's "confession" got all the key facts that can be corroborated wrong: the cause of Ms. Haraway's

---

[5] And if Detective Baskin's testimony that the police were already considering dental records more important for identification than a clothing description a mere one day after Ms. Haraway's disappearance is to be given any credit, then the police likewise assumed Ms. Haraway was dead at this point. *See* A0338 at 59:21–25.

death, the location of her body, and the involvement of Odell Titsworth.[6] mmThis also bears on the State's claim that "Petitioner lied multiple times to law enforcement in an effort to escape blame and 'to take a lighter sentence.'" The salient fact is that *none* of Mr. Ward's inculpatory statements were corroborated. Even the State itself gave no credence to Mr. Ward's preliminary hearing "confession" involving Marty Ashley, going so far as to call several witnesses to rebut it. *See* Ex. C, *State v. Ward*, No. 88-208, Trial Tr. VII at 58:15-61:9 (June 8, 1989). The State cannot now have it both ways.

## II. MR. WARD HAS FILED HIS HABEAS PETITION WITHIN AEDPA'S STATUTE OF LIMITATIONS BECAUSE HE DID NOT RECEIVE MUCH OF THE MATERIAL SUPPORTING HIS *BRADY* CLAIM UNTIL 2019

As the State admits, AEDPA's statute of "limitations period may be tolled during the time [in] which 'a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending' in state court." Br. at 9 (citing 28 U.S.C. § 2244(d)(2)). Mr. Ward raised this argument in his habeas petition, and therefore did not waive it. Petition for Writ of Habeas Corpus at 47, Dkt #2. The State's citations to *Harris v. Pettigrew*, No. 20-CV-0533-JED-JFJ, 2021 WL 1723225, at *3 n.4 (N.D. Okla. Apr. 30, 2021) and *Ross v. Pettigrew*, No. 20-CV-0396-JED-CDL, 2021 WL 1535365, at *3 n.5 (N.D. Okla. Apr. 19, 2021) do not show the contrary. They merely found that the particular petitioner in that case had no valid argument as to why one of the later trigger dates for the AEDPA statute of limitations should apply

---

[6]The State claims that Mr. Ward's inaccurate inclusion of Odell Titsworth—as well as Marty Ashley in Mr. Ward's preliminary hearing statement that the State itself rebutted, *see* Ex. C, *State v. Ward*, No. 88-208, Trial Tr. VII at 58:15-61:9 (June 8, 1989)—in his false confession somehow favors the State's theory. Br. at 20 n.8. This is but one example of the State's reliance on an outdated theory of confessions, which assumes that no one would admit to a crime he had not committed and one would certainly not falsely admit to something in such vivid detail. But research in recent decades has debunked this myth. Saul M. Kassin & Gisli H. Gudjonsson, *The Psychology of Confessions: A Review of the Literature and Issues*, 5 Psych. Sci. Pub. Int. 33, 59 (2004) ("[P]art of the problem is that police-induced false confessions *often* contain vivid and accurate sensory details") (emphasis added). The same science of false confessions explains why Mr. Fontenot also falsely confessed. *Contra* Br. at 21 n.8.

to his case. In fact, the State here admits that "AEDPA's statute of limitations is an *affirmative defense,*" Br. at 10 n.4 (emphasis added), and the State itself cited to *Campbell v. Artus*, No. 14-CV-5594 (RRM), 2019 WL 1434976, at *4 (E.D.N.Y. Mar. 29, 2019), which clarifies that a petitioner does "not bear the burden of asserting his compliance with the AEDPA statute of limitations . . . ."

Section 2244(d)(1)(D) provides that AEDPA's statute of limitations runs from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." Because much of the evidence in support of Mr. Ward's *Brady* claim was only turned over to Mr. Ward by the Ada Police Department in 2019—despite Mr. Ward's prior requests for such information at trial, *see generally* A0035–A0055— he could not have previously discovered this evidence by due diligence. Because his properly filed state court post-conviction relief petition was pending from that time until just over four months before he filed his habeas petition with this Court, he was well within the one-year statute of limitations.[7]

## **CONCLUSION**

Especially given the weakness of the State's case against Mr. Ward at trial—weakness recognized by the Tenth Circuit in the case against Mr. Fontenot, *Fontenot*, 4 F.4th at 1052— the new evidence Mr. Ward brings forward in his habeas petition shows that more likely than not, had it been presented at his trial, the outcome would have been different. Moreover, Mr. Ward's *Brady* claim has been brought within AEDPA's statute of limitations. This Court should deny the State's motion to dismiss and proceed to consider the merits of Mr. Ward's habeas petition.

---

[7] Tellingly, the State does not address Mr. Ward's argument that he has shown cause and prejudice, which excuses any procedural default, by proving his *Brady* claim. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Scott*, 303 F.3d at 1232.

Dated this 28th day of July 2023.

Respectfully submitted,

*/s/ Mark H. Barrett*
*An Attorney for the Petitioner*

Mark H. Barrett
P.O. Box 896
Norman, OK 73070
Tel: (405) 326-4758
barrettlawoffice@gmail.com

Daniel G. Webber, Jr., OBA No. 16332
RYAN WHALEY
400 North Walnut Avenue
Oklahoma City, OK 73104
Tel: (405) 239-6040
Facsimile: (405) 239-6766
dwebber@ryanwhaley.com

Gregory R. Swygert (admitted *pro hac vice*)
Center on Wrongful Convictions
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
Tel: (312) 503-8576
gregory.swygert@law.northwestern.edu

Robert N. Hochman (admitted *pro hac vice*)
David H. Hoffman (admitted *pro hac vice*)
John G. Levi (admitted *pro hac vice*)
Emily Scholtes (admitted *pro hac vice*)
Matthew Binder (admitted *pro hac vice*)
William J. Lawrence (admitted *pro hac vice*)
Sidley Austin LLP
1 South Dearborn
Chicago, IL 60603
Tel: (312) 853-7000
rhochman@sidley.com
david.hoffman@sidley.com
jlevi@sidley.com
escholtes@sidley.com
mbinder@sidley.com
bill.lawrence@sidley.com

*Attorneys for Thomas Ward, Petitioner*

**Certificate of Service**

    I certify that on July 28, 2023 I electronically served the foregoing document on all counsel of record via the Court's CM/ECF filing system.

                                              */s/ Matthew Binder*
                                              *An Attorney for the Petitioner*