**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

**THOMAS J. WARD,**

**Petitioner,**

**v.** **Case No. 23-CV-146-JFH-GLJ**

**TOMMY SHARP, Interim Warden,**[1]

**Respondent,**

**<u>OPINION AND ORDER</u>**

Thomas J. Ward ("Ward"), an Oklahoma prisoner appearing through counsel, brings this action pursuant to 28 U.S.C. § 2254, seeking federal habeas relief from the judgment entered against him in the District Court of Pottawatomie County, Case No. CF-1988-208. Respondent Tommy Sharp ("Respondent"), by and through the Attorney General of the State of Oklahoma, Gentner F. Drummond, moves to dismiss the Petition for Writ of Habeas Corpus ("Petition") [Dkt. No. 2] arguing Ward's Petition is time barred ("Statute of Limitations Motion") [Dkt. Nos. 54 and 55] and Ward failed to exhaust necessary state court remedies ("Exhaustion Motion") [Dkt. Nos. 56 and 57]. Ward argues the actual innocence gateway allows this Court to consider the merits of his claim that the State of Oklahoma (the "State") violated his Fourteenth Amendment right to due process, as interpreted in *Brady v. Maryland*, 373 U.S. 83 (1963) and *Napue v. Illinois*, 360 U.S. 264 (1959), by failing to disclose exculpatory evidence and soliciting or failing to correct false

---

[1] Thomas J. Ward is presently incarcerated at Joseph Harp Correctional Center in Lexington, Oklahoma, and Tommy Sharp is the interim warden of that facility. The Court therefore substitutes Tommy Sharp, Interim Warden, in place of David Buss as party Respondent. *See* Rule 2(a), *Rules Governing Section 2254 Cases in the United States District Courts*. The Clerk of Court shall note this substitution on the record.

testimony (hereafter, "due process claim") despite these alleged procedural bars.[2] Dkt. No. 2. Having considered the Petition [Dkt. No. 2] and Appendices in Support of the Petition [Dkt. Nos. 3-23], Respondent's Statute of Limitations Motion [Dkt. No. 54] and Brief in Support [Dkt. No. 55], copies of the state court habeas transcripts and records provided by Respondent [Dkt. No. 58], Ward's Response in Opposition [Dkt. No. 61], Respondent's Reply in Support of the Statute of Limitations Motion [Dkt. No. 65], and applicable law, the Court finds and concludes that Respondent's Statute of Limitations Motion [Dkt. No. 54] shall be denied.

Further, having considered the Petition [Dkt. No. 2] and Appendices in Support of the Petition [Dkt. Nos. 3-23], Respondent's Exhaustion Motion [Dkt. No. 56] and Brief in Support [Dkt. No. 57], Ward's Response in Opposition [Dkt. No. 62], Respondent's Reply in Support of the Exhaustion Motion [Dkt. No. 66], and applicable law, the Court finds and concludes that Respondent's Exhaustion Motion [Dkt. No. 56] shall be denied.

2 "[A] claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993). A prisoner "asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Fontenot v. Crow*, 4 F.4th 982, 1030 (10th Cir. 2021) (cleaned up), *cert. denied* 142 S. Ct. 2777 (2022).

## TABLE OF CONTENTS

PRELIMINARY BACKGROUND ........ 5
PROCEDURAL HISTORY ........ 6
I. The Initial, Joint Trial ........ 6
II. Direct Appeal ........ 6
III. Ward's Second Trial ........ 7
IV. The Second, Direct Appeal ........ 8
V. Post-Trial Production of Documents ........ 8
VI. Post-Conviction Proceedings ........ 9
THRESHOLD CONSIDERATIONS ........ 11
I. Statute of Limitations ........ 12
II. Exhaustion ........ 14
III. Procedural Default ........ 18
IV. Exceptions ........ 19
ACTUAL INNOCENCE GATEWAY ........ 19
EVIDENCE PRESENTED AT TRIAL ........ 22
I. Before the Abduction ........ 22
II. Haraway's Abduction ........ 24
III. J.P.'s Pak-to-Go ........ 26
IV. Ward's Whereabouts ........ 27
V. Ward's Confession ........ 30
VI. Ward's Subsequent Statements ........ 34
VII. Searches for Haraway's Body ........ 35
VIII. Haraway's Body Found ........ 36
IX. The Blouse ........ 37
NEW EVIDENCE ........ 38
I. The Blouse ........ 39
II. Moyer ........ 40
III. Other Suspects ........ 43
IV. Obscene Calls ........ 46

V. Ward's Exculpatory Statements ........ 46
VI. Witness Tampering ........ 47
VII. The Science of False Confessions ........ 49
ANALYSIS OF THE EVIDENCE ........ 50
I. Preliminary Matters ........ 50
A. Deference ........ 50
B. Diligence ........ 51
II. Predicted Impact on Reasonable Jurors ........ 53
A. Old Evidence ........ 53
B. Ward's Confession ........ 54
C. The Blouse ........ 57
D. Moyer ........ 59
E. Other Suspects ........ 61
F. Obscene Calls ........ 62
G. Wise's Affidavit ........ 63
III. The Totality of the Record ........ 66
CONCLUSION ........ 68

## PRELIMINARY BACKGROUND[3]

The instant habeas action arises from Ward's conviction of robbery with a dangerous weapon (Count I), kidnapping (Count II) and first-degree murder (Count III). Dkt. No. 58-35 at 8-10.[4] On April 28, 1984, Donna Denice Haraway ("Haraway") disappeared during her evening shift at McAnally's convenience store in Ada, Oklahoma. Dkt. No. 58-26 at 107-113. Haraway remained missing for months. Local law enforcement ultimately received information that Ward may have been involved. Dkt. No. 58-28 at 119. Authorities located Ward in Norman, Oklahoma on October 12, 1984, and arranged to interview him. Dkt. No. 58-28 at 119-121. As detailed below, after initially denying involvement, Ward confessed to abducting and killing Haraway. *See* Dkt. No. 58-30 at 29-65. Ward also implicated Karl Fontenot ("Fontenot"). *See id.* Fontenot also ultimately confessed to the crimes. *Fontenot*, 4 F.4th at 999-1000.

Ward and Fontenot were jointly tried in September of 1985, in District Court of Pontotoc County Case No. CRF-1984-183, and convicted of robbery, kidnapping and first-degree murder. *See* Dkt. No. 58-13 at 24-28, 97-103; *Fontenot*, 4 F.4th at 1007. On January 20, 1986, Haraway's body was located east of Ada. Dkt. 58-24 at 21, 23-24, 92, 100. After the Oklahoma Court of Criminal Appeals ("OCCA") reversed and remanded Ward's original conviction, Ward was retried separately, in Pottawatomie County District Court Case No. CF-1988-208,[5] and convicted of robbery, kidnapping, and murder on June 16, 1989. Dkt. No. 58-35 at 8-10.

---

[3] The record before the Court is voluminous. Here, the Court briefly presents an overview of the case. However, the Court will address additional facts and procedural history in the requisite detail below.

[4] The Court's citations refer to the CM/ECF header pagination.

[5] Ward was granted a change of venue. Dkt. No. 55 at 9.

After state-court post-conviction proceedings, the instant Petition was filed on May 1, 2023. Dkt. No. 2. Ward advances a due process claim that Respondent contends is untimely and unexhausted. Dkt. Nos. 2, 55, 57. But Ward seeks to pass through the actual innocence gateway to have that claim considered on the merits. Dkt. Nos. 2, 61, 62.

## PROCEDURAL HISTORY

### I. The Initial, Joint Trial

A joint preliminary hearing to determine whether probable cause existed to bind Ward and Fontenot over for trial on the charges of robbery, kidnapping, rape, and murder was conducted over a two-week span in January and February 1985. *See* Dkt. No. 58-14 at 13; *see also* Dkt. Nos. 58-14 through 58-18. At the conclusion of the hearing, the trial court bound both Ward and Fontenot over for trial on the charges of robbery, kidnapping, and murder. Dkt. No. 58-18 at 145-146.

The joint trial of Ward and Fontenot took place in September of 1985. *See* Dkt. Nos. 58-2 through 58-13. The videotaped confessions of both Ward and Fontenot were introduced and played for the jury. Dkt. No. 58-9 at 138-175, 237-273. Both men were found guilty of robbery, kidnapping and first-degree murder, and both were sentenced to death. Dkt. No. 58-13 at 24-28, 97-103; *Fontenot*, 4 F.4th at 1007.

### II. Direct Appeal

During the first trial, Fontenot's pretrial confession, which inculpated Ward, was admitted at the joint trial even though neither defendant testified. *See Ward v. State of Oklahoma*, 755 P.2d 123, 124 (Okla. Crim. App. 1988). Based on *Cruz v. New York*, 481 U.S. 186 (1987), the admission of Fontenot's confession violated Ward's right to confront Fontenot. *Ward*, 755 P.2d at 124. Therefore, on May 20, 1988, the OCCA reversed Ward's conviction, and the case was remanded for a new trial. *Id.*

## III. Ward's Second Trial

Before his second trial, Ward filed a discovery motion requesting any information related to the discovery of Haraway's remains, any information that was exculpatory or favorable or might lead to the discovery of the same, and all written and recorded statements or memoranda of written or oral statements from witnesses to the alleged crime, among other categories of evidence. *See*, *e.g.*, Dkt. No. 58-37 at 1, 16-36 (excerpts from discovery motion hearing). As discussed throughout this Opinion, the State did not provide the Oklahoma State Bureau of Investigation ("OSBI") file, documents within the possession of Ada Police Department ("APD"), or the prosecutorial summary[6] to Ward before the second trial. *See* Dkt. No. 20 at 418.[7]

The evidence presented, at the second trial, inculpating Ward included Ward's description of the blouse Haraway was wearing the night of her disappearance and witnesses' identification of Ward. *See*, *e.g.*, Dkt. No. 58-34 at 133-134 (State's closing argument regarding the blouse); Dkt. No. 58-25 at 91-92 (Jim Moyer identified Ward in a live lineup on November 19, 1984); Dkt. No. 58-24 at 143-144 (Karen Wise identified Ward in a live lineup on October 24, 1984); Dkt. No. 58-34 at 36-37, 123 (State's closing argument regarding Jim Moyer and Karen Wise's observations and identification of Ward). There was no physical evidence tying Ward to the crimes. Dkt. No. 20 at 438 ("This case rested on circumstantial evidence in the form of conflicting witnesses' testimony and Ward's inculpatory statements he gave to law enforcement."). On June 16, 1989, Ward was again convicted of robbery, kidnapping, and murder. Dkt. No. 58-35 at 8-10. On July

[6] "Law enforcement would investigate and bring evidence in the form of a prosecutorial summary to the district attorney to discuss. After reviewing the evidence and researching law, the district attorney's office would make a charging decision. The prosecutorial summary was all the written investigative reports and the sole method of receiving such information by the district attorney's office." Dkt. No. 20 at 416-417.

[7] Another preliminary hearing was not conducted before the second trial.

10, 1989, Ward was sentenced to life imprisonment for murder, ten (10) years for kidnapping, and ten (10) years for robbery. Dkt. No. 58-35 at 9, 167-168.

### IV. The Second, Direct Appeal

Ward again appealed the convictions, in Oklahoma Court of Criminal Appeals Case No. F-1990-17, setting forth ten (10) propositions of error. *See* Dkt. No. 23 at 4-6. On January 7, 1994, the OCCA issued a Summary Opinion and affirmed Ward's convictions. Dkt. No. 23 at 182-184.

### V. Post-Trial Production of Documents

In December 1992, the OCCA ordered the OSBI to produce to Fontenot documents pertaining to its investigation in the Haraway case. Dkt. No. 20 at 418. In response, 860 pages were produced to Fontenot's counsel, including the prosecutorial summary. *Id.* In 2003, Ward's counsel, Mark Barrett, received through the Oklahoma Indigent Defense System ("OIDS"), a partially legible version of the OSBI files. *Id.* In 2008, the State produced a mostly legible copy of OSBI's files to Ward's counsel. *Id.* Ward's counsel received the Medical Examiner's complete file of approximately forty-three (43) pages from Fontenot's attorney, sometime between 2010 and 2013. *Id.*[8] In 2019, in response to subpoenas allowed by the state district court in post-conviction proceedings, the APD produced approximately 300 pages of documents containing police interviews with witnesses, alternative suspects and other leads. *Id.*[9]

---

[8] Only three (3) pages of the Medical Examiner's report were introduced as evidence at the time of the second trial. Dkt. No. 20 at 418; Dkt. No. 58-1 at 51-54; *see also* Dkt. No. 16 at 42 (District Attorney Bill Peterson's January 17, 1989 letter to defense counsel enclosing item #7 described as "Report of Investigation by Medical Examiner (three sheets)[.]").

[9] Fontenot sought the same information in 2017 pursuant to a federal court subpoena. *Fontenot*, 4 F.4th at 1015. APD responded to the subpoena stating it had no records pertaining to the Haraway investigation. *Id.*

**VI. Post-Conviction Proceedings**

Based on the post-trial productions, on November 1, 2017, Ward filed his Application for Post-Conviction Relief in the District Court of Pontotoc County. Dkt. No. 19 at 6-11. Ward raised two (2) grounds for relief: i) the interest of justice required Ward's conviction and sentence to be vacated based on newly discovered evidence of his innocence, a state law claim; and ii) relief is warranted under both *Brady* and *Napue* because the Pontotoc County District Attorney failed to disclose exculpatory evidence and solicited or failed to correct false testimony. Dkt. No. 19 at 6-11, 12-76. Ward argued the documents produced post-trial contained statements and reports responsive to Ward's 1988 pre-trial discovery requests that should have been produced by the State. Dkt. No. 2 at 49.

Ward sought and received limited post-conviction discovery from the District Court of Pontotoc County and deposed OSBI Agent Gary Rogers, APD Detective Mike Baskins and Haraway's sister, Janet Weldon. Dkt. No. 2 at 48. Ward also submitted an interrogatory by mail to Steve Haraway, Haraway's husband. *Id.* at 49.

After receiving the APD documents, Ward filed an Amended Application for Post-Conviction Relief on March 2, 2020. Dkt. No. 19 at 359-363; Dkt. No. 20 at 4-97. Ward re-urged the same grounds for relief. Dkt. No. 19 at 361-362. On December 18, 2020, Judge Paula Inge, of the District Court of Pontotoc County, issued an order vacating Ward's judgments and sentences, dismissing the charges originally filed against him and ordering he be discharged from custody. Dkt. No. 20 at 410-443. Judge Inge addressed only the alleged *Brady* violation. *See id.* Judge Inge concluded the State's "process of suppressing favorable evidence to Ward is fundamentally unfair and has deprived him of his right to a fair trial. He has been denied due process as guaranteed by the federal and state constitution." *Id.* at 441.

On January 8, 2021, the State appealed Judge Inge's order. Dkt. No. 20 at 456-464. On August 26, 2022, the OCCA reversed Judge Inge's order as to Ward's second claim, i.e., the due process claim that alleged both *Brady* and *Napue* violations. Dkt. No. 21 at 143-151. The OCCA concluded Ward's due process claim was barred by *res judicata*, waiver and laches. *See id.* at 148-150. The OCCA stated,

> A review of Ward's initial application for post-conviction relief and the OSBI Records reveal that they provided a cognizable basis for his second claim. However, Ward offers no reason sufficient to justify his approximately fourteen years of inaction following 2003, and a thorough review of the record reveals none. As such, consideration of Ward's second claim is forfeited for review.

*Id.* at 150. The OCCA then remanded the matter for "further proceedings consistent with this Order, specifically disposition of Ward's remaining claim that newly discovered evidence requires Ward's conviction be vacated in the interest of justice." *Id.* at 151.

On remand, Judge Inge decided,

> Ward's claims of newly discovered evidence relating to when law enforcement had a description of the blouse described by Ward when he confessed to the crimes; alternate suspect Billy Charley; and impeachment evidence against eyewitness Jim Moyer. The Court, having considered the entirety of the record and materials discussed by Petitioner Ward and the State in their supplemental briefs pertaining to "newly" discovered evidence does not demonstrate, by clear and convincing evidence, Ward's innocence of the crimes for which he was convicted. Therefore, the Court denies Ward's claim for post-conviction relief under Oklahoma's PCPA, 22 O.S. 2011, § 1080(d).

Dkt. No. 22 at 89.

Ward did not appeal Judge Inge's December 22, 2022 order. Instead, Ward turned to this Court and filed the instant Petition on May 1, 2023. Dkt. No. 2. Ward advances one (1) claim in his Petition: a due process claim premised upon the State's alleged *Brady* and *Napue* violations. *See* Dkt. No. 2. Ward contends federal habeas review is available via the actual innocence gateway.

Dkt. No. 2 at 51-53.[10] Therefore, the Court first addresses the Anti-Terrorism and Effective Death Penalty Act of 1996's ("AEDPA") constraints and available exceptions.

## THRESHOLD CONSIDERATIONS

A federal court may grant habeas relief to a state prisoner only if the prisoner shows that his custody violates: (1) the United States Constitution, (2) federal law, or (3) treaties of the United States. 28 U.S.C. § 2254(a); *see Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (explaining that "it is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts"). Even when a habeas petitioner presents cognizable federal claims, the habeas provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") and the United States Supreme Court's interpretation of those provisions tightly constrain a federal court's discretion to grant relief. Three (3) constraints are relevant here: the statute of limitations, the exhaustion requirement, and the procedural default doctrine.

---

[10] Fontenot was also convicted of murder after his second trial in June of 1988. *See Fontenot*, 4 F.4th at 1009. Fontenot ultimately petitioned this District Court for federal habeas relief in February of 2016 also relying on the actual innocence gateway. *Id.* at 1014-1017; *see also Fontenot v. Allbaugh*, 402 F. Supp. 3d 1110 (E.D. Okla. 2019). Fontenot advanced nine (9) substantive constitutional claims, including a *Brady* claim premised upon the suppression of alibi evidence, police reports relaying information from customers who were at McAnally's that night, the investigation into alternate suspect Floyd DeGraw, recorded interviews of Jeff Miller and Terri McCartney, and evidence Haraway received obscene phone calls at work prior to her abduction. *See Fontenot*, 4 F. 4th at 1016-17. The Honorable Judge Payne "found that Mr. Fontenot's state court procedural default on the grounds of laches and his failure to abide by AEDPA's time bar were both excused by passing through the actual innocence gateway[]" and "found all his substantive constitutional claims meritorious." *Id.* at 1017. Judge Payne granted Fontenot's writ of habeas corpus. *Id.* at 1018. Fontenot was released from custody on December 19, 2019. *Id.* The Tenth Circuit affirmed the district court's grant of habeas relief. *Id.* at 1083. The Tenth Circuit ordered, "[i]f the State wishes to try Mr. Fontenot once again. . . , it must do so within 120 days of the issuance of this order." *Id.* To date, Fontenot has not been retried. *See* Docket, *State of Oklahoma v. Fontenot*, Case No. CRF-1984-183 (Pontotoc Cnty. Dist. Ct.).

## I. Statute of Limitations

In most cases, a petitioner must file a federal habeas petition within one (1) year of the date his or her state criminal judgment becomes final on the conclusion of direct review. 28 U.S.C. § 2244(d)(1)(A); *Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012). In some cases, a state prisoner can show that some event other than the finality of the judgment triggered a later commencement date for the limitations period. 28 U.S.C. § 2244(d)(1)(B)-(D). Regardless of which event triggers the limitations period, that period is tolled for "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2). To qualify for statutory tolling, the petitioner must seek post-conviction relief or other collateral review in state court before the applicable federal limitations period expires. *See Clark v. Oklahoma*, 468 F.3d 711, 714 (10th Cir. 2006).

Ward's claim is that he was denied due process because the prosecutors failed to disclose material, exculpatory documents and information and allowed false testimony to go uncorrected. Dkt. No. 2 at 8, 52; *see Brady*, 373 U.S. 83; *Napue*, 360 U.S. 264. Overall, Ward appears to concede the untimeliness of this claim and leads with the actual innocence argument. *See* Dkt. No. 2 at 51-52. Nevertheless, Ward states in passing that "he has filed this petition within the AEDPA's statute of limitations, as the timer did not start running while his state court post-conviction was pending when additional *Brady* material was produced by the state. *See* 28 U.S.C. § 2244(d)(2)." *Id.* at 53. Therefore, the Court will address timeliness.

Here, the OCCA affirmed Ward's conviction on January 7, 1994. Dkt. No. 23 at 182-184. Where a conviction became final before the AEDPA took effect, as is the case with Ward, the one-year limitation period for a federal habeas petition starts on AEDPA's effective date, April 24, 1996. *See Preston v. Gibson*, 234 F.3d 1118, 1120 (10th Cir. 2000); *Hoggro v. Boone*, 150 F.3d

1223, 1225-26 (10th Cir. 1998). Thus, Ward should have filed his Petition on or before April 24, 1997. Ward did not file the instant Petition until May 1, 2023, well beyond April 24, 1997. Dkt. No. 2. Accordingly, in the absence of statutory tolling, his due process claim is untimely under Section 2244(d)(1)(A).

To the extent Ward's position is that he did not discover the factual predicate of this claim until he received the 2019 document production while his state application for post-conviction relief was pending, this position fails. *See* Dkt. No. 2 at 53. Under Section 2244(d)(1)(D), the limitations period begins on "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). Section 2244(d)(1)(D)'s due-diligence requirement is an objective standard that requires a federal court to consider when a reasonably diligent petitioner could have discovered the factual predicate of the claim, not when the petitioner asserting the claim actually discovered the factual predicate of the claim. *Madrid v. Wilson*, 590 F. App'x 773, 776 (10th Cir. 2014)[11].

As Judge Inge detailed in her 2020 order,

> In 2003, Ward's *pro bono* attorney, Mark Barrett, received through OIDS, a partially legible version of the OSBI files. In 2008, the State finally produced mostly legible pages to Ward's counsel. Ward's counsel received the Medical Examiner's complete file of approximately forty-three (43) pages from Fontenot's attorney, sometime between 2010 and 2013. Only three (3) pages of the medical examiner's report were introduced as evidence at the time of trial. In 2019, in response to subpoenas allowed by this Court, the Ada Police Department produced approximately 300 pages of documents containing police reports, alternative suspects and other leads.

Dkt. No. 20 at 418 (cleaned up).

[11] The Court cites all unpublished decisions herein as persuasive authority. Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

Setting aside for the moment whether Ward could have discovered the OSBI file prior to 2003, in 2003, Ward received a partially legible copy of the OBSI file. Therefore, as early as 2003, Ward discovered the factual predicate of his due process claim. *See Wood v. Spencer*, 487 F.3d 1, 5 (1st Cir. 2007) (noting "a lawyer's knowledge is attributed to her client" and concluding petitioner's habeas claim was untimely under Section 2244(d)(1)(D) because the petitioner, "through his attorney, had notice" of the factual predicate more than a year before the habeas petition was filed). Ward did not file the instant Petition until 2023, well beyond the 2003 disclosure.[12]

Nor is Ward entitled to any statutory tolling because his Application for Post-Conviction Relief was filed on November 1, 2017 [Dkt. No. 19 at 6-11], well beyond the applicable one-year statute of limitations, April 24, 1997. *Clark*, 468 F.3d at 714. Therefore, Ward's due process claim is untimely and will be dismissed "unless he presents a credible actual innocence claim." *Fontenot*, 4 F.4th at 1028-29 (noting that the cause and prejudice exception does not apply to a time bar).

**II. Exhaustion**

Ordinarily, a habeas petitioner must exhaust available state remedies, before filing a federal habeas petition, by fairly presenting the substance of his federal claims to the highest state appellate court in accordance with applicable state procedural rules. 28 U.S.C. § 2254(b)(1)(A); *see O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."); *Prendergast v. Clements*, 699 F.3d 1182, 1184 (10th Cir. 2012) (noting that "the crucial inquiry" in an exhaustion analysis is "whether the 'substance' of

---

[12] The Petition alleges no facts implicating 28 U.S.C. §§ 2244(d)(1)(B) or (C) and no facts or arguments that would support equitable tolling. Dkt. No. 2, *generally*. Therefore, the Court does not analyze these matters.

the petitioner's claim has been presented to the state courts in a manner sufficient to put the courts on notice of the federal constitutional claim." (citing *Picard v. Connor*, 404 U.S. 270, 278 (1971))).[13] Exhaustion gives "the state courts a 'full and fair opportunity' to correct alleged constitutional errors." *Selsor v. Workman*, 644 F.3d 984, 1026 (10th Cir. 2011) (quoting *O'Sullivan*, 526 U.S. at 845).

"Although the exhaustion rule is not jurisdictional, it creates a 'strong presumption in favor of requiring the prisoner to pursue his available state remedies.'" *Bear v. Boone*, 173 F.3d 782, 784 (10th Cir. 1999) (quoting *Granberry v. Greer*, 481 U.S. 129, 131 (1987)). "The exhaustion requirement is designed to avoid the unseemly result of a federal court upsetting a state court conviction without first according the state courts an opportunity to correct a constitutional violation." *Davila v. Davis*, 582 U.S. 521, 527 (2017) (internal quotations and citations omitted). If a federal constitutional claim has been fairly presented to the state courts, the lack of a merits adjudication does not preclude that claim from being deemed exhausted: "A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer available to him." *Coleman v. Thompson*, 501 U.S. 722, 732 (1991) (internal quotations and citations omitted).

Ward presented his due process claim in his state post-conviction application. *See* Dkt. No. 19 at 6-78 and 359-364; Dkt. No. 20 at 4-99. The district court granted the post-conviction application based on its finding that a *Brady* violation occurred and did not address that portion of the due process claim asserting a *Napue* violation. Dkt. No. 20 at 410-443. The OCCA reversed

---

[13] Exhaustion is not required if a habeas petitioner shows either: (1) that "there is an absence of available State corrective process"; or (2) that "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B). As evidenced by Ward's state post-conviction proceedings, Oklahoma has a corrective process. And Ward does not argue that the process itself is ineffective to protect his rights.

the district court's ruling on procedural grounds and remanded for further consideration of Ward's other post-conviction application claim, a state law innocence claim based on newly discovered evidence. *See* Dkt. No. 21 at 143-151. While Respondent did not expressly waive the exhaustion requirement concerning Ward's due process claim, 28 U.S.C. § 2254(b), Respondent did not raise exhaustion as to Ward's due process claim. *See* Dkt. Nos. 55, 57. Thus, Respondent has forfeited the argument by failing to raise it in its briefing. *Fontenot*, 4 F.4th at 1021 n.16. Nevertheless, Ward's due process claim completed one complete round of the State's established appellate review process rendering it exhausted.

With respect to Ward's actual innocence gateway claim, Respondent contends this claim is unexhausted and barred. Dkt. Nos. 56 and 57. Respondent relies on nonbinding authority for this proposition. *See* Dkt. No. 57 at 18-21. Regardless, Respondent's position is unavailing.

First, "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera*, 506 U.S. at 404; *see also LaFevers v. Gibson*, 238 F.3d 1263, 1265 n.4 (10th Cir. 2001) ("[A]n assertion of actual innocence, although operating as a potential pathway for reaching otherwise defaulted constitutional claims, does not, standing alone, support the granting of the writ of habeas corpus."). A habeas petitioner "cannot allege a free-standing claim of actual innocence." *Boyd v. Martin*, 747 F. App'x 712, 715 (10th Cir. 2018); *see also Miller v. Province*, 09-CV-305-GKF-PJC, 2012 WL 5292884, at *6 (N.D. Okla. Oct. 25, 2012) (unpublished) ("a free standing claim of actual innocence based on newly discovered evidence is not a constitutional claim and is generally not cognizable in federal habeas corpus absent an independent constitutional violation occurring in the underlying state criminal case."). As such, the Court understands Ward as utilizing the actual innocence exception to have the merits of his

due process claim addressed; he is not asserting a free-standing claim of actual innocence. This view is supported by Ward's Petition. *See*, *e.g.*, Dkt. No. 2 at 51-53.

Second, as discussed in more detail below, there are two (2) gateways which allow federal habeas review of a barred claim: cause and prejudice and the actual innocence exception. *Coleman*, 501 U.S. at 750. In *Fontenot*, the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") considered whether a petitioner proceeding through the cause and prejudice gateway must exhaust the underlying "cause." *See Fontenot*, 4 F.4th at 1022. The State argued the petitioner did not properly exhaust "*Brady* as his 'cause' to overcome the procedural bars in state court[.]" *Id.* The Tenth Circuit rejected the State's notion that the underlying "cause" must be exhausted. The Tenth Circuit noted,

> [The state's] contention conflates federal gateways with substantive claims. "'Cause' . . . is not synonymous with 'a ground for relief.'" *Martinez v. Ryan*, 566 U.S. 1, 17 (2012) (quoting 28 U.S.C. § 2254(i)). That is, "[a] finding of cause and prejudice does not entitle the prisoner to habeas relief," but "merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Id.* . . . [A] petitioner's "cause" argument ***does not itself need to be exhausted*** before being presented to a federal habeas court, provided such argument does not depend on an unexhausted constitutional claim for substantive relief.

*Id.* (emphasis added). The same reasoning applies here. Ward's underlying due process claim must be exhausted and it is. But the gateway he seeks to pass through, actual innocence, does not need to be exhausted. *Trease v. Sec'y, Florida Dep't of Corr.*, Case No. 24-11135, 2026 WL 508474, at *8 (11th Cir. Feb. 24, 2026) (unpublished) ("[Petitioner] is correct that he need not 'exhaust' his invocation of actual innocence in state court."). Further, "[t]he actual innocence exception [] serves as an unconditional safety net to ensure that constitutional claims receive consideration in the 'extraordinary' case." *Fontenot*, 4 F.4th at 1033. Requiring a habeas petitioner to exhaust the exception would undermine the exception's purpose. For these reasons,

Respondent's Exhaustion Motion [Dkt. No. 56], premised upon Ward's failure to exhaust his gateway actual innocence claim, is denied. The AEDPA's exhaustion requirement is not a bar to this Court's consideration of either the actual innocence gateway claim or the merits of Ward's due process claim.

**III. Procedural Default**

Finally, "an important 'corollary' to the exhaustion requirement" is that "a federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule." *Davila*, 582 U.S. at 527 (quoting *Dretke v. Haley*, 541 U.S. 386, 392 (2004)). "A state procedural default is 'independent' if it relies on state law, rather than federal law," and is "'adequate' if it is firmly established and regularly followed." *Smith v. Workman*, 550 F.3d 1258, 1274 (10th Cir. 2008) (internal quotations omitted).

The OCCA determined that Ward's due process claim was barred "by the doctrine of *res judicata* to the extent" he alleged *Brady* violations on direct appeal, and barred by the doctrine of waiver "to the extent that additional instances could have been raised on direct appeal, but were not." Dkt. No. 21 at 148. The OCCA also examined laches and concluded, "Ward offers no reason sufficient to justify his approximately fourteen years of inaction following 2003, and a thorough review of the record reveals none. As such, consideration of Ward's [due process] claim is forfeited for review." *Id.* at 150. Ward does not challenge the adequacy or independence of the OCCA's application of *res judicata*, waiver and laches. *See* Dkt. No. 2.

Courts routinely find the OCCA's application of these doctrines to be independent and adequate. *See*, *e.g.*, *Broades v. Gibson*, Case No. 00-7062, 2000 WL 1773237, at *2 (10th Cir. Dec. 4, 2000) (unpublished) (noting the OCCA's application of res judicata to petitioner's claim

was an "independent and adequate state ground[.]"); *Smith*, 550 F.3d at 1274 (noting the Tenth Circuit "has found Oklahoma's bar of claims not raised on direct appeal to be independent and adequate"); *Fontenot*, 4 F.4th at 1028 (determining "Oklahoma's laches doctrine to be a state-law based procedural rule that is both firmly established in the postconviction setting and regularly followed by the OCCA."). It is evident the OCCA applied independent and adequate state procedural rules barring habeas review of Ward's due process claim unless he can show a basis to excuse the procedural default.

**IV. Exceptions**

As explained, habeas review of Ward's due process claim is barred by the AEDPA's statute of limitations and the doctrine of procedural default. Therefore, to have that claim heard on the merits by this Court, Ward must find a way around both barriers. There are two (2) exceptions by which a federal habeas court may review a procedurally defaulted claim: "cause and prejudice or the fundamental miscarriage of justice exception (commonly known as a showing of actual innocence)[.]" *Fontenot*, 4 F.4th at 1028. Furthermore, a credible showing of actual innocence also allows a petitioner to overcome the AEDPA's statute of limitations. *Id.* at 1029. Since a credible showing of actual innocence lets a petitioner overcome both a procedural default and AEDPA's limitations period, *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013), the Court will follow the Tenth Circuit's guidance in *Fontenot*, and invert "the standard order of operations" to address Ward's actual innocence claim at the outset. *See Fontenot*, 4 F.4th at 1029.

**ACTUAL INNOCENCE GATEWAY**

"[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief." *Perkins*, 569 U.S. at 392. "This rule, or fundamental miscarriage of justice exception, is grounded in the

'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *Herrera*, 506 U.S. at 404 (citing *McCleskey v. Zant*, 499 U.S. 467, 502 (1991)). While Congress limited the operation of the actual innocence gateway in the AEDPA provisions dealing with second-or-successive petitions, *see* § 2244(b)(2)(B), and the holding of evidentiary hearings in federal court, *see* § 2254(e)(2), "[n]either provision addresses the type of petition at issue here—a first federal habeas petition seeking consideration of [barred] claims based on a showing of actual innocence." *House v. Bell*, 547 U.S. 518, 539 (2006). And "[i]n a case not governed by those provisions, i.e., a first petition for federal habeas relief, the miscarriage of justice exception survived AEDPA's passage intact and unrestricted." *Perkins*, 569 U.S. at 397.

"[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House*, 547 U.S. at 537–38 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). "Removing the double negative, a petitioner's burden at the gateway stage is to demonstrate 'that more likely than not any reasonable juror would have reasonable doubt.'" *Fontenot*, 4 F.4th at 1030 (quoting *House*, 547 U.S. at 538). In this circuit, "new" evidence is any evidence that was not presented at trial, regardless of whether that evidence was available at the time of trial or discovered after. *Id.* at 1031-33.

Evaluating the merits of a gateway actual innocence claim requires a federal court to consider the trial record as supplemented by the new evidence and to make a "holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-doubt standard." *House*, 547 U.S. at 539 (2006) (cleaned up). "Because a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how

reasonable jurors would react to the overall, newly supplemented record." *Id.* at 538. In making that assessment, the Court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *Id.* at 538 (cleaned up and internal quotations omitted). And "the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial" and thus may require the court "to make some credibility assessments." *Schlup*, 513 U.S. at 330.

"[A]ctual innocence" is something of a misnomer, because "the *Schlup* standard does not require absolute certainty about the petitioner's guilt or innocence"—that is, a petitioner need not make "a case of conclusive exoneration." *House*, 547 U.S. at 538, 553; *see also Schlup*, 513 U.S. at 327 ("[T]he showing of 'more likely than not' imposes a lower burden of proof than the 'clear and convincing' standard."). Thus, a "petitioner's showing of innocence is not insufficient solely because the trial record contained sufficient evidence to support the jury's verdict." *Schlup*, 513 U.S. at 331; *see also House*, 547 U.S. at 553–54 (granting a gateway innocence claim despite acknowledging that "[s]ome aspects of the State's evidence . . . still support an inference of guilt"); *Cleveland v. Bradshaw*, 693 F.3d 626, 633 (6th Cir. 2012) (noting that the actual innocence standard "is less strict than the insufficient evidence standard").

At the same time, however, "it is by no means easy for a petitioner to meet the *Schlup* standard." *Case v. Hatch*, 731 F.3d 1015, 1036 (10th Cir. 2013). The Supreme Court has stressed that the standard is "demanding," *Perkins*, 569 U.S. at 401, and "that tenable actual-innocence gateway pleas are rare," *id*. at 386, arising only "in an extraordinary case," *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). The actual innocence standard is designed to "ensure[ ] that [a] petitioner's

case is truly 'extraordinary' while still providing [a] petitioner a meaningful avenue by which to avoid a manifest injustice." *Schlup*, 513 U.S. at 327 (quoting *McCleskey*, 499 U.S. at 494).

With this framework, the Court first outlines the evidence presented at Ward's second trial.

## EVIDENCE PRESENTED AT TRIAL

### I. Before the Abduction

On Saturday, April 28, 1984, 24-year-old Haraway was working the 3:00 p.m. – 11:00 p.m. shift at McAnally's gas station and convenience store at 2727 Arlington Street, on the eastern edge of Ada, Oklahoma. Dkt. No. 58-26 at 63-64, 71. That evening, she was the sole employee working McAnally's night shift. *Id.* at 65, 118.

Haraway called her husband, Steve Haraway ("Mr. Haraway"), around 7:00 p.m. on April 28th. Dkt. 58-26 at 109. This was her normal routine to call and check in with Mr. Haraway. *Id.*

Haraway's sister, Janet Lyons Weldon ("Weldon"), testified she spoke to Haraway on the phone on April 28th while Haraway was working. Dkt. No. 58-26 at 150-151. Weldon testified the conversation lasted approximately twenty (20) minutes and there was not anything unusual about Haraway's behavior, and Weldon could not tell if anything was bothering Haraway. *Id.* at 151.

James Moyer ("Moyer") was a customer at McAnally's around 7:30 p.m. Dkt. No. 58-25 at 85. Moyer testified he bought cigarettes and had a short conversation with Haraway. *Id.* Two (2) people walked in while Moyer was at the front counter. *Id.* at 86.

> [T]he first person had dark hair. He walked in, immediately turned to his right and walked towards the back of the store. And shortly after that, a second person with blond hair walked in and approached the counter, but did not walk all the way up to the counter. He just kind of hesitated, held back.

*Id.* at 86. Moyer testified the first person "was walking around the back aisles in a U-shape from where he entered the front door." *Id.* Moyer "studied [the second person] a little bit" while he

stood near the counter. *Id.* at 87. Moyer observed him for a minute to two (2) minutes. *Id.* at 88. Moyer testified this man wore a "t-shirt, light in color, possibly light blue, blue jeans, and tennis shoes or track shoes." *Id*. Moyer "became suspicious . . . [and] thought maybe they were trying to shoplift something." *Id*.

The men parked "in front of the entrance doors. Basically, north and south." Dkt. No. 58-25 at 87. Moyer described the vehicle as "a Chevy pickup, gray primer, it was a flat color, not glossy. . . . late 60's or early 70's." *Id.* at 89. Moyer testified he got into his vehicle,

> backed up so [he] could get a good look at the license tag, and [he] was attempting to write down the tag number. [He] was reaching for a pencil in the glovebox and couldn't find one, so [he] read the tag through one time and [he] was going to read it through a second time. Another car started pulling up and [he] decided that nothing would happen with another car there and [he] backed out and left.

*Id.* at 88-89. On November 19, 1984, Moyer attended a lineup and identified Ward as one of the individuals he observed at McAnally's the evening of April 28, 1984. *Id.* at 106-107; Dkt. No. 58-1 at 113-114 (State's Exhibit 79).

Off duty, APD Officer Richard Holkum ("Holkum") patronized McAnally's around 7:45 p.m. on April 28th. Dkt. No. 58-26 at 135. Holkum lived east of McAnally's and stopped there "practically every day" on his way home. *Id.* at 135. Haraway was at McAnally's when Holkum stopped in around 7:45 p.m. Holkum testified,

> [he was there] just time enough to gather a couple of items, go to the counter and pay for those and leave. [He] carried on a brief conversation with her. There was a lady that had to pay for gasoline and [] Haraway had gave [sic] her too much change. She came back in and [Haraway and Holkum] made a small conversation about that and then [he] left.

*Id.* at 136. Holkum recalled Haraway wearing a blouse that was "a pastel color, a light lavender or blue. It had what appeared to be a print, small print or design on it." *Id.* at 136. Holkum told

APD Detectives Mike Baskin ("Detective Baskin") and Dennis Smith ("Detective Smith") the next day about his encounter with Haraway on April 28th and what she was wearing. *Id.* at 137.[14]

## II. Haraway's Abduction

Gene Whelchel ("Whelchel") and his nephews, Lenny and David Timmons, stopped at McAnally's around 8:30 – 8:40 p.m. that evening to get change. Dkt. No. 58-26 at 7-8; Dkt. No. 58-25 at 143, 168-169. Whelchel drove one car and the Timmons brothers another. Dkt. No. 58-26 at 8. Whelchel parked "to the extreme right" of the store in front of the telephone and the Timmons brothers parked in front of the ice machine, to the side of Whelchel. *See* Dkt. No. 58-26 at 8; *see also* Dkt. No. 58-1 at 173, 185 (State's Exhibits 3 and 12). Whelchel and David remained in their cars, while Lenny got out and headed toward the entrance. Dkt. No. 58-26 at 9.

Just as Lenny walked into McAnally's, a man and a woman walked out of the store together. Dkt. No. 58-26 at 9-10. The unidentified man and the woman—whom Whelchel later identified as Haraway—walked directly to a pickup parked in front of the store. *Id.* at 10, 12. The pickup was parked facing east, parallel to the gas pumps and the front door, with the passenger side to the store. Dkt. No. 58-25 at 144; Dkt. No. 58-26 at 9. David observed the man and woman both get in on the passenger side. Dkt. No. 58-25 at 171. The woman got in first, followed by the man. *Id.*; Dkt. No. 58-26 at 10. According to David, the couple did not seem to be in any hurry and there was nothing unusual about their behavior. Dkt. No. 58-25 at 177. The pickup then pulled out of McAnally's parking lot and headed east. *Id.* at 173.

No one was in the store or behind the counter when Lenny entered McAnally's. Dkt. No. 58-25 at 146. He noticed the cash register drawer was open with "no money in it." *Id.* A cigarette

---

[14] Detective Baskin testified he did not recall speaking with Holkum on April 29, 1984. Dkt. No. 58-27 at 170-171.

was still burning in an ashtray on the counter. *Id.* at 147. The ashtray was positioned such that the person who placed the cigarette there must have been standing behind the counter.[15] *Id.* Lenny tried to locate the clerk, checking the restroom and freezer and opening the front door again to sound the doorbell. *Id.* at 146. Lenny and Whelchel then called the APD. *Id*; Dkt. No. 58-26 at 10-11.

The call to APD went out at 8:50 p.m. Dkt. No. 58-26 at 58. Officer Harvey Phillips ("Officer Phillips") arrived at McAnally's approximately ten (10) minutes later, he entered the store and "there was [sic] three adults in the store and some kids[.]" *Id.* at 53. Officer Phillips spoke with Whelchel, Lenny, and David. *Id.* at 59. Officer Phillips observed the open cash register and a purse and keys behind the counter. *Id.* at 53. Inside the purse was Haraway's driver's license. *Id.* at 54. Haraway's books lay open on the counter, and her car was parked on the side of the store. *Id.* at 53-54. Officer Phillips testified he did not obtain a description of the people Whelchel and the Timmons brothers observed leaving the store. *See id.* at 62.

The store manager, Monroe Atkinson ("Atkinson"), arrived after Officer Phillips. Dkt. No. 58-26 at 65. He compared the cash register tape to the money in the machine and determined that $167.42 was missing. *Id.* at 65-66. By the time Detective Baskin arrived, roughly an hour after Haraway's disappearance, multiple people had been in and out of the store, and the procedures to close the store had been completed. Dkt. No. 58-27 at 53-55. Detective Baskin testified "it wasn't a secure crime scene when I arrived[.]" *Id.* at 186. Detective Baskin did not take any fingerprints. *Id.* at 185-191.

---

15 Haraway did not smoke. Dkt. No. 58-26 at 112.

## III. J.P.'s Pak-to-Go

J.P.'s Pak-to-Go, another convenience store, was located approximately a quarter mile east of McAnally's on the same street. Dkt. No. 58-24 at 116; Dkt. No. 58-27 at 53. Karen Wise ("Wise") was working the 3:00 p.m. – 11:00 p.m. shift on April 28, 1984. Dkt. No. 58-24 at 118. Around 4:00 p.m., Wise had "a few [individuals] playing games in the game room[.]" Dkt. No. 58-24 at 118. The individuals got change to play pool and made a purchase from the liquor store side of J.P.'s. *Id.* at 118-119. These people left for a time, then returned to J.P.'s around 7:00 p.m., proceeding to shoot pool in the store's back game room. *Id.* at 119. Wise testified "they just seemed to be watching me a lot, watching me a lot instead of the pool table." *Id*. Wise testified the men left around 8:30 p.m. *Id.* at 148. Wise testified the individuals arrived in a pickup truck that was "kind of spotted red primer and grey primer[.]" *Id.* at 120. The prosecution elicited testimony that the individuals Wise remembered were two (2) men. *See id.* at 121-123.

Jack Paschal ("Paschal"), a local resident who often helped out at J.P.'s, came by J.P.'s around 8:00 p.m. on April 28th. Dkt. No. 58-25 at 28-29. When Paschal arrived, Wise "was nervous about some events that had transpired before my entering. She said that at one point the bell had gone off to the liquor store, which adjoins through a door in there. And when she looked in there, there was no one in." *Id.* at 30. In response, Paschal checked the premises "to be sure that everything was locked from the inside and that there was no one on the premises." *Id.* at 31. Wise then informed Paschal "she was concerned about some young men that were shooting pool[.]" *Id*. Paschal did not recognize either of the men. *Id*. While Wise and Paschal were talking, one (1) of these men came to the front counter to get quarters for the pool table. *Id.* at 31-32. Around ten (10) to fifteen (15) minutes after Paschal arrived, these two (2) men exited J.P.'s and headed west, back in the direction of town and McAnally's. *Id.* at 33. Paschal described the pickup

they drove as "late 60's or early 70's. . . . kind of rough" with "primered paint." *Id.* at 29. Paschal remembered "[t]here was something unusual about the tailgate or bumper of it, and the impression I have was that the pickup maybe had wider tires on the back of it than would be standard." *Id.* at 30. The tailgate was possibly gone or "jacked up[.]" *Id.*

The investigation into Haraway's disappearance almost immediately centered on the two (2) suspicious men who had been shooting pool at J.P.'s. APD interviewed Wise that night, and developed profiles of the two (2) suspects believed to be involved in Haraway's abduction from *McAnally's* based on Wise's descriptions of the men she saw *at J.P.'s*. Dkt. No. 58-24 at 130-133. Two (2) days later—after the OSBI was brought in to investigate—an OSBI agent created composite sketches of the two (2) suspects based on Wise's recollection. *Id.* at 135-139; *see also* Dkt. No. 58-1 at 58, 60.[16] During a live lineup on October 24, 1984, Wise identified Ward as one of the men in J.P.'s that evening. Dkt. No. 58-24 at 143-144; *see also* Dkt. No. 58-1 at 61-63 (State's Exhibit 52).[17] On November 8, 1984, Paschal identified Ward in a lineup after visiting with police on "about two or three occasions" to view "numerous photographs" of suspects in addition to the composite sketches. Dkt. No. 58-25 at 46-49; *see also* Dkt. No. 58-1 at 67-69 (State's Exhibit 54).

**IV. Ward's Whereabouts**

Using the composites that were created using Wise's description of the men [Dkt. No. 58-1 at 58, 60 (State's Exhibits 50 and 51)], the APD requested help from the public to identify the

---

[16] Testimony was elicited that Ward resembled Suspect #2, State's Exhibit 51. *See* Dkt. No. 58-25 at 147-148; *id.* at 172-173; Dkt. No. 58-26 at 11-12; *see also* Dkt. No. 58-1 at 60 (State's Exhibit 51).

[17] During cross-examination, Wise acknowledged besides Ward there was nobody "else in that line that even remotely resemble[d] the composite." Dkt. No. 58-24 at 170; *see also* Dkt. No. 58-1 at 61-63 (State's Exhibit 52).

two (2) men seen at J.P.'s on April 28th. *See*, *e.g.*, Dkt. No. 58-1 at 198. In the days after Haraway's disappearance, the APD fielded between seventy-five (75) and a hundred (100) calls from locals identifying the individuals in the composites. Dkt. No. 58-28 at 184. Ward was identified by at least thirty (30) people. *Id.* at 186. Based on these calls, Ward was interviewed by Detective Smith on May 1, 1984, and Ward told Detective Smith he had been fishing with Fontenot and then to a party at Fontenot's neighbor's apartment. *See* Dkt. No. 58-27 at 68, 104-105. Detective Baskin testified during the May 1, 1984 interview, Ward had a "poor hair cut" and on the back of his right hand, above the knuckles, he had a few scratches. *Id.* at 68-69; *see also* Dkt. No. 58-1 at 91. Detective Smith testified on May 1, 1984, Ward had a "badly chopped," "homemade haircut" and his hand was "swollen" with "scratches on the top portion of his hand." Dkt. No. 58-28 at 117. Ward was not detained or further questioned at this point.

Months later, working off information provided by a man named Jeff Miller ("Miller"),[18] the police returned their focus to Ward. Detective Smith testified,

> [o]ur department had received information from a person by the name of Jeff Miller, and Jeff Miller provided information that stated Mr. Ward and Mr. Fontenot had been to Blue River, which is, I think it's probably about twenty-five, thirty miles from Ada, south of Ada. And it's a camping area. People go fishing there and swimming.
>
> Anyway, this person said that Mr. Ward and Mr. Fontenot had gone there and had been there on the 28th and left there and gone back to Ada and had come back to the camping area. And Mr. Ward supposedly was crying and made the statement that, you know, he was sorry that he had done it.

[18] The OSBI file lists Miller as a "witness not listed in interviews" as giving a statement to Detective Smith and Detective Baskin about Ward. Dkt. No. 6 at 84. Further, the OSBI file lists a "video taped statement of Miller" as an "exhibit[] not attached and in possession of Gary Rogers." *Id.* at 85. Miller did not testify at trial, and the videotaped statement has never been provided to Ward.

Dkt. No. 58-28 at 119. Based on this information from Miller, Detective Smith and Detective Baskin went to "check[] this story." *Id*. On October 12, 1984, Detective Smith and Detective Baskin located Jeanette Roberts in Norman, Oklahoma, who Ward was living with at the time. *Id*. at 119-120. Via Jeanette Roberts, Detective Smith and Detective Baskin asked that Ward come to the Norman police department to speak with them after work. *Id.* at 120. As requested, Ward went to the Norman police department that evening around 8:30 p.m. *Id*. Detective Smith and Detective Baskin videotaped this "interrogation." *Id.* at 121. Ward was read a *Miranda* warning. Dkt. No. 58-27 at 71, 73.

During the October 12, 1984, interview, according to Detective Baskin, Ward gave a "completely different story" than he gave on May 1, 1984. Dkt. No. 58-27 at 74. Ward stated, on April 28, 1984, he and his brother-in-law installed plumbing in his mother's house until about 8:30 or 9:00 o'clock. *Id.* at 89. Then, he went over to the apartment where Fontenot was living and stayed the night. *See id.* Ward stated he never left the apartment and went to sleep around 4:00 a.m. *Id.* at 93. Ward walked home around 8:00 or 9:00 in the morning. *Id.* After hearing the October 12th version of events, Detective Smith asked, "Tommy, do you remember the statement that you gave us the last time we talked to you?" *Id.* at 97. Ward responded,

> Uh-huh, I think it's the same one. No, it was the day before that happened. I remember. And I said – I can't think what it was about though. I don't remember what it was about, but it was the day before that happened, you know, when you asked me, I remembered that after I left. I was going to come back down and talk to you about it.

*Id*.

Detective Smith and Detective Baskin reminded Ward he originally told them he was fishing with Fontenot. Dkt No. 58-27 at 104. Ward then explained he went fishing and to a party on Friday and helped his brother-in-law with plumbing on Saturday afternoon then went to Jeanette

Roberts' apartment for a keg party. *Id.* at 108. Ward's account of being at the apartment party Saturday night remained the same. *Id.*; *see also Fontenot*, 4 F.4th at 999. Detective Smith and Detective Baskin told Ward they did not think he was telling the truth, and they had a witness who would testify otherwise. Dkt. No. 58-27 at 111-112.

Detective Smith and Detective Baskin confronted Ward with the "Blue River Story" from Miller. Dkt. No. 58-27 at 112-116. Ward told Detective Smith and Detective Baskin he had been to the Blue River before, but it was not the night Haraway disappeared. Dkt. No. 58-27 at 113-116. In response to Ward's adamance that he did not know what happened to Haraway, Detectives Smith and Baskin encouraged him to "use your imagination." *See id.* at 123-124. Detectives Smith and Baskin appealed to Christian morals and even brought up the death penalty. *Id.* at 129-130, 147. Ward expressed his exhaustion after a long day of work, and Detectives Smith and Baskin continued to question him. *Id.* at 131, 149. Nevertheless, Ward maintained his innocence. *Id.* at 122-123, 151-152.

In response to the October 12th interview, arrangements were made for a follow-up interview at OSBI. Dkt. No. 58-27 at 154.[19]

### V. Ward's Confession

On October 18, 1984, the police interviewed Ward again at OSBI headquarters in Oklahoma City. Dkt. No. 58-30 at 6. OSBI polygraph examiner, Rusty Featherstone ("Featherstone"), began questioning Ward around 10:30 a.m. *Id.* Ward was, once again, given a *Miranda* warning. Dkt. *Id.* at 7. Featherstone testified the "object of the interview was to try to clear up some inconsistencies and statements that . . . had previously been received by

[19] The purpose of the follow-up interview was to conduct a polygraph test. However, the jury was not made aware of this purpose. *See* Dkt. No. 58-30 at 19-20.

investigators." *Id.* at 9. The three (3) conflicting stories were: 1) fishing with Fontenot; 2) doing plumbing work at his mom's house; and 3) the Blue River story. *Id.* at 9-10.

Ward initially told Featherstone fishing with Fontenot occurred on Friday, the plumbing work occurred on Saturday, and the Blue River events occurred on Sunday. Dkt. No. 58-30 at 10. Featherstone concluded Ward was not "being completely truthful with me as to his whereabouts." *Id.* at 11. Featherstone, "expressed that to him and ultimately he told me that he really had nothing at all to do with the disappearance of Mrs. Haraway, but that he had had a dream about that and that that was what was disturbing him and causing him to appear as he was in my presence." *Id.* Per Featherstone's account, Ward had dreamed that he was riding with Fontenot and a man named Odell Titsworth in a pickup. *Id.*[20] They drove to McAnally's, left the store with Haraway, and then drove to a power plant on the west side of Ada, where Titsworth threatened to rape Haraway. *Id.* at 11-12. At this point, in his dream, Ward went home. *Id.* at 12.

Featherstone testified,

> I felt that it was unusual that in his dream, that his dream was so consistent with the witnesses' information that I had been provided previously. And I asked him if he could explain that. And he finally stated that it was not a dream, that he wished it had been a dream. But that, in fact, it had indeed happened and that he had been a participant.

*Id.* at 13. It was around 2:00 p.m. when Ward stated it was not a dream. *Id.* at 17. At this point, the interview shifted to an interrogation, and Ward was no longer free to leave. *Id.* 58-30 at 18, 21.

---

[20] As noted by the undersigned's colleagues in previous cases, Ward's conviction "is at least the third murder conviction in Pontotoc County, Oklahoma, from 1985 through 1988 which was based upon an alleged 'dream confession' and circumstantial evidence[.]" *Williamson v. Reynolds*, 904 F. Supp. 1529, 1534 n. 1 (E.D. Okla. 1995); *see also Fontenot*, 402 F. Supp. 3d at 1119 (Fontenot's "case is one of three the United States District Court for the Eastern District of Oklahoma has found to involve a dream confession of dubious validity.").

Featherstone then had Ward recount the story multiple times going through "the entire story of what happened that night[.]" Dkt. No. 58-30 at 13-14. At 6:58 p.m., roughly eight and a half (8.5) hours after Ward arrived at OSBI headquarters, Featherstone, OSBI Agent Gary Rogers ("Agent Rogers"), and Detective Smith turned on a videotape to record Ward's statement. *Id.* at 16. In this recording, which lasted until 7:29 p.m., Ward confessed to the kidnapping, rape, and murder of Haraway, while implicating Fontenot and Titsworth as his accomplices. *Id.* at 23, 29-65.

The video begins with Ward detailing how he was at a keg party, and he ran into "Titsdale" who asked him if he wanted to go riding around, get high, and drink some beer. Dkt. No. 58-30 at 34. Featherstone interrupts Ward, questions Ward's use of the name "Titsdale" and supplies Titsworth's first name, Odell. *Id*. Ward stated Fontenot was with them. *Id.* Ward explains after the joy ride Titsworth asked Ward if he knew a place where they could get some money. *Id.* at 35. Ward answered McAnally's would be the place to rob. *Id*. Ward continued,

> [a]nd so we started going out there, and we got out there and we went in. And Titsworth started throwing stuff around and she came out from behind the counter and he grabbed her and pushed her over to me. And I grabbed her – put her arm around behind my back – I mean, behind her back. And I started to walk out the door with her. And Titsworth, he grabbed money out of the register. And we went out to the pickup.

Dkt. No. 58-30 at 35.

> And so I walked out with her, and we went out to the pickup and Titsdale was – grabbed her from me, and they walked around. And I got in the pickup and Karl Fontenot got in the back of the pickup. And she was sitting in the middle. And Titsworth, he was driving. And so we left there and went out around Richardson Loop to the power plant by Reeves' Packing Plant.

*Id.* at 36.[21]

[21] J.T. McConnell testified prior to April 28, 1984, he observed Ward in a "grey primered Chevrolet pickup, probably in the late sixties. Long wide bed and the back end was jacked up, had big tires

Ward said Titsworth had a lock-blade knife, with a six-inch blade, he carried on his side. Dkt. No. 58-30 at 37-38.[22] Titsworth "pulled his knife out and cut [Haraway] on the side a little bit[.]" *Id.* at 43. During the event, Titsworth proceeded to "cut her on the side of the throat." *Id.* at 49. Ward recounted Haraway had "tremendous long cuts all over her" "[m]ostly in the stomach" and "on her legs." Dkt. No. 58-30 at 50, 57.

Ward stated Fontenot and Titsworth raped Haraway. Dkt. No. 58-30 at 41-42, 56-57. Ward was too intoxicated to rape Haraway. *Id.* at 44. After Fontenot and Ward raped Haraway, Ward told Titsworth about a house and a ditch by Sandy River where they could dispose of Haraway's body. *Id.* at 51-52. Ward stated he then left, and Fontenot and Titsworth were carrying Haraway's body "down towards the woods." *Id.* at 52.[23] A couple days later Fontenot told Ward that they took Haraway's body "down to that bunker down there by Sandy [and] threw her off in it." *Id.* at 53.

The following exchange concerning Haraway's blouse occurred:

> Q [Agent Featherstone]: Can you tell me what her blouse looked like that she was wearing?
> A: It was – it was white with little blue roses on it, I think, blue roses.
> Q: [Agent Rogers]: It had roses on it?
> A: Uh-huh.
> Q: You'll have to speak up just a little bit.
> A: I believe that's what it was, little roses.

---

on it." Dkt. No. 58-29 at 77. Wayne Girdner, an insurance agent from Tulsa, Oklahoma, testified he was aware of a 1965, grey primered pickup truck belonging to Ward's brother. Dkt. No. 58-29 at 94-95.

[22] David Yockey testified he observed Ward in possession of a "regular lock blade knife[.]" Dkt. No. 58-26 at 92. Billy Hammons also testified he had observed Ward with "a few different knives. Pocket knives." Dkt. No. 58-27 at 25-26.

[23] Titsworth was exculpated from any involvement. Dkt. No. 58-28 at 126. "Specifically, on April 26, 1984, Mr. Titsworth broke his arm in an altercation with the police, putting him in a cast for weeks and thus making him unable to participate in an abduction, rape, and murder on April 28." *Fontenot*, 4 F.4th at 1001.

Q: So, it was a white blouse. Button-up or slip on?
A: It was button-up.
Q: Did it have buttons on the collar?
A: Uh-huh.
Q: Or would it be just a regular collar?
A: I[t] had buttons on the collar and then it had little fringe deals around her collar and around the end of her arm, end of the sleeves.
Q: By little fringe, do you mean a lace kind of deal?
A: Yeah, uh-huh.
Q: So, it had lace on the sleeves, and lace on the collar?
A: Collar.
Q: And it was a floral-type pattern, flowers on her shirt?
A: Yeah.

Dkt. No. 58-30 at 58-59.[24]

Based on his confession, Ward was arrested and taken into custody. Dkt. No. 58-29 at 33-34.[25] He was charged with robbery, kidnapping, rape, and murder on November 7, 1984, twenty (20) days after he was arrested. Dkt. No. 58-14 at 13; Dkt. No. 58-31 at 155; *see also Fontenot*, 4 F.4th at 1001.

### VI. Ward's Subsequent Statements

During the preliminary hearing on January 9, 1985, Ward made another statement. Dkt. No. 58-28 at 127-128. A court reporter transcribed the statement, and Ward was, once again, given a *Miranda* warning. *Id.* at 128-129. His attorney at the time was present. *Id.* at 128. This time, Ward stated he and Marty Ashley ("Ashley") went to J.P.'s to play some pool, then they went into town to "Dicus's" house to smoke a joint, returned to J.P.'s to play more pool and bought a bottle

[24] Featherstone explained to the jury he corrected Ward throughout his confession because "through the afternoon there were long detailed statements. At the time the videotape was made the Defendant narrowed that down, summarized it to some degree. So, the questions being asked were questions we already knew the answer to, but we were trying to bring out on to the tape, that he had failed to bring out on his own." Dkt. No. 58-30 at 66.

[25] Ward was originally detained on a material witness warrant. Dkt. No. 58-29 at 25-26; Dkt. No. 58-31 at 155.

of whiskey, and then went to McAnally's. Dkt. No. 58-28 at 145-148. At McAnally's, Ashley flirted with Haraway and told Haraway if she was married to him, she would not have to work. *Id.* at 148-149. Haraway voluntarily walked out of the store and got into the truck with Ashley and Ward. Dkt. No. 58-28 at 149. Ashley and Haraway dropped Ward off at his house. *Id.* at 149. Ward never saw Ashley again. *Id.* at 151.[26]

At the second trial, on June 12, 1989, Ward testified that on October 18, 1984, Featherstone, Rogers and Detective Smith had him add on to his dream and that is how the confession came to be. Dkt. No. 58-31 at 134-136. Ward testified he agreed to "put all that stuff into a statement" because he "figured they would go out and see that she wasn't out there and then just run me out for lying to them, because they seen that the statement wasn't true." *Id.* at 136. Ward testified on the evening of April 28, 1984, he was at Gordon Calhoun's, Jeannette and Mike Roberts' neighbor, apartment. *Id.* at 146. After the party, Ward returned to Jeannette's apartment to find Fontenot asleep on the couch and another man asleep on the floor. *Id.* at 149. Ward then walked home. *Id.* at 149-150. Once home, he went to sleep on the couch but was later woken up by his brother-in-law, Robert Cavens, to help repair burst pipes under the house. *Id.* at 150.

## VII. Searches for Haraway's Body

On the afternoon of October 18, 1984, based on information received from Ward at OSBI, Detective Baskin went to the power plant west of Ada and began searching for Haraway's body. Dkt. No. 58-27 at 155. Detective Baskin did not locate Haraway's body. *Id.* at 155. Agent Rogers called Detective Baskin later that day, while Ward was still being questioned at OSBI, and

[26] During Ward's trial, the State presented witnesses to debunk Ward's version of events wherein Haraway left McAnally's with Ashley. *See, e.g.*, Dkt. 58-29 at 57 (Wise testified Ashley was not in J.P.'s on April 28, 1984.); Dkt. 58-29 at 60-61 (Ashley testified he never went to McAnally's with Ward, and Haraway never left McAnally's with him.); Dkt. 58-29 at 63 (Shelly Wiggins, a State witness, testified she never saw Ward and Ashley together.).

instructed Detective Baskin to go west of the power plant and search a burned-out house for Haraway's remains. *Id.* at 155-156.[27] Later, Agent Rogers called Detective Baskin and told him to go north of the power plant and look for a concrete bunker. *Id.* at 156. Detective Baskin and a few others repelled into the concrete bunker searching for Haraway's body. *Id.* at 156-157. Subsequently, a "large scale search of the power plant area" with multiple agencies was conducted. *Id.* at 157. Detective Baskin testified other searches west of Ada were conducted. *See, e.g., id.* at 208-212.

Detective Baskin also testified regarding bones he obtained from East Central University that were shown to Ward "to try to find out, as a last ditch effort, where [Haraway's] body was." Dkt. No. 58-27 at 159-160, 214. Detective Baskin testified after Ward was in custody, he went to the jail to talk with Ward "and try to persuade him to do this or that" "not over three or four" times. *Id.* at 216.[28] None of these searches, based on Ward's information, led to the discovery of Haraway's body. Dkt. No. 58-28 at 26.

### VIII. Haraway's Body Found

On January 20, 1986, almost twenty-one (21) months after Haraway disappeared and after the initial, joint trial, a trapper named Alan Tatum ("Tatum") came across human skeletal remains in hilly, rough brushland several miles southwest of Gerty, Oklahoma. Dkt. No. 58-24 at 21-22, 24. Gerty, in Hughes County, is roughly twenty-six (26) miles east of Ada, in Pontotoc County. *Id.* at 21. A comparison of dental records revealed the remains to be Haraway's. *Id.* at 100. Her skull showed an entry wound just behind her left ear and an exit wound above and in front of the

[27] The property owner of the house near the power plant testified it was torn down and burned in June of 1983. *See* Dkt. No. 58-26 at 177-178; *see also* Dkt. No. 58-28 at 27.

[28] Detective Smith testified he did not go over to the county jail to see Ward "after he was appointed an attorney." Dkt. No. 58-28 at 128.

right ear. *Id.* at 107. The probable cause of death was determined by the Oklahoma Office of the Chief Medical Examiner ("OCME") to be a single gunshot wound to the head. *Id.* at 106. Several markings on a rib bone were determined to be caused by animal activity. *Id.* at 106-107. Dr. Larry Balding, a forensic pathologist, testified he "saw no evidence, per se, that she was stabbed." *Id.* at 109.

Found near Haraway's remains were a gold and red earring, decomposing items of clothing, a sock containing foot bones, and the soles and partial uppers of a pair of white tennis shoes. Dkt. No. 58-24 at 82-83, 111-112; *see also* Dkt. No. 4 at 319-320. Tatum also found a small piece of clothing material he characterized as "dark colored cloth." Dkt. No. 58-24 at 32.

**IX. The Blouse**

At trial, multiple witnesses testified they were unsure what Haraway was wearing when she disappeared. *See*, *e.g.*, Dkt. No. 58-26 at 112 (Mr. Haraway); Dkt. No. 58-26 at 153, 170 (Weldon), Dkt. No. 58-31 at 33 (Agent Rogers). Weldon testified prior to Ward's confession she had never talked to any law enforcement person about the blouse. Dkt. No. 58-26 at 170-171. Prosecutors also argued authorities were unaware what Haraway was wearing prior to Ward's confession. Dkt. No. 58-34 at 133-134 ("we had no description of that blouse to give this Defendant."); *see also*, *e.g.*, Dkt. No. 58-31 at 32-33 (Agent Rogers testified he was not aware of the blouse's description prior to Ward's confession). And, after receiving the information from Ward, authorities confirmed with Haraway's family and co-worker that she did own a blouse similar to the one described by Ward. Dkt. No. 58-26 at 118-120 (Watts), Dkt. No. 58-26 at 153-154 (Weldon); Dkt. No. 58-26 at 170-171 (Pat Virgin). Prosecutors relied heavily on Ward's description of the blouse as circumstantial evidence of his guilt. *See*, *e.g.*, Dkt. No. 58-34 at 35, 36, 47-49, 59. In closing, the prosecution argued,

> [t]hat blouse is tied to this Defendant like an anchor to a boat and he can't shake it. And it proves one thing, it proves that he didn't make it up, because it is absolutely impossible to make it up. Actually make up a shirt that someone had on at another occasion. ***It proves that the police didn't tell him because they didn't know***.

Dkt. No. 58-34 at 133-134 (emphasis added).

Further, the Missing Person Report introduced at trial, State's Exhibit 72, was completed by Detective Baskin on April 29, 1984. Dkt. No. 58-27 at 61. For the clothing description, the form stated she was wearing a size seven (7) shirt or blouse, plaid and unknown color. *Id.* at 61-62, *see also* Dkt. No. 58-1 at 99-100.

One witness, Holkum testified he recalled Haraway wearing a blouse that was "pastel color, a light lavender or blue" with a "small print or design on it." Dkt. No. 58-26 at 136. He testified he provided this information to Detectives Smith and Baskin the day after Haraway's disappearance. *Id.* at 137. Detective Baskin testified he did not recall speaking to Holkum on April 29th, and did not recall Holkum providing a description of Haraway's blouse. Dkt. No. 58-27 at 170-171. James Watts, Haraway's co-worker that worked the shift prior to Haraway's on April 28th, testified the "red striped shirt or piece of cloth" found with Haraway's remains was not what Haraway was wearing the day she disappeared. Dkt. No. 58-26 at 119.

**NEW EVIDENCE**

As explained above, after Ward's second trial, additional documents were ultimately produced. *See* Dkt. 20 at 418. While Ward points to different evidence throughout his briefing [*compare* Dkt. No. 2 at 21-47 *with id.* at 54-65], the Court understands Ward's position to be that the following evidence and newly revealed information opens the door to the actual innocence gateway: i) the State possessed a description of Haraway's blouse prior to Ward's confession; ii) Moyer was biased and his testimony changed over time; iii) the investigation revealed other suspects the State failed to disclose; iv) Haraway was receiving obscene phone calls at work; v)

suppressed reports of interviews with Ward wherein he maintained his innocence; vi) the prosecution tampered with witnesses; and vii) today's understanding of false confessions. *See* Dkt. No. 2 at 21-47, 53-65. The Court now outlines the new evidence presented by Ward.

### I. The Blouse

The OSBI file includes a report produced post-trial from Detective Baskin dated August of 1984, prior to Ward's confession, that states,

> Janet [Weldon] said she gave Donna a light lavender blouse that was very lightly tinted. It had blue flowers on it and had lace around the collar with elastic around the sleeves. The shirt was made of thin material and buttoned down the front. Janet said it was a shirt that was worn with blue jeans. Janet checked Donna's clothes and could not find the shirt. She checked her own clothes to make sure that she had given it to Donna and she is positive she gave the shirt to Donna.

Dkt. No. 7 at 27. Also, the prosecutorial summary, included in the OSBI file, contains the following information from Weldon:

> Janet Lyons Weldon told Detective Mike Baskin that Donna Haraway was Janet's sister and she had given Donna a light lavender colored blouse, with small blue flowers on it. It had lace around the collar and gathered with elastic on the sleeves and buttoned down the front. Janet checked Donna's clothes, since the robbery and did not find the blouse.

Dkt. No. 6 at 97. This information from Weldon is undated. *Id*. "Weldon's interview summary is the only undated summary out of 35 interviews contained in the prosecution summary prepared by the OSBI for the State." Dkt. No. 20 at 435; *see also* Dkt. No. 6 at 96-100. Ward argues because the crime is still referred to as a "robbery" in this interview summary and identifies Weldon as Haraway's sister, it is reasonable to conclude the interview occurred early in the investigation. Dkt. No. 2 at 25.

Second, an updated Missing Person Report was produced with the Medical Examiner's Report which has additional information regarding Haraway's blouse. *Compare* Dkt. No. 13 at 37 *with* Dkt. No. 58-1 at 98-101 (State's Exhibit 72); *see also* Dkt. No. 58-27 at 61-62. This updated

document included an additional shirt description of "possibly lavender w/ blue flowers, lace around neck line." Dkt. No. 13 at 37. This addition is undated. *Id.* The OSBI File contains an "ROCIC Submission Card" which was completed on June 11, 1984. Dkt. No. 5 at 97. The ROCIC Card's information, such as Haraway's hair color, aligns with information contained in the Updated Missing Person Report. *Compare* Dkt. No. 13 at 37 (Haraway's hair color updated from "blonde" to "dyed blonde/brown with red tint") *with* Dkt. No. 5 at 97 (Haraway's hair color listed as "blonde/brown"). Ward argues, based on the newly produced documents, it is plausible this document was updated before June 11, 1984. Dkt. No. 2 at 27-28.[29]

Third, James Boardman's ("Boardman") interview summary was produced after the second trial. Dkt. No. 18 at 7. Boardman patronized McAnally's about 5:00 p.m. on April 28, 1984. *Id.* The interview summary states "a few days after Denise Haraway disappeared Mr. Boardman called the police dept." *Id.* "Boardman was pretty sure Denise was wearing a blue short sleeve t shirt." *Id.* Ward argues this report further proves authorities were aware of the description of the blouse prior to Ward's confession and "invented" an alternative narrative. *See* Dkt. No. 2 at 29-30.

## II. Moyer

Ward contends Moyer was critical to the prosecution's case and a newly produced letter from District Attorney Bill Peterson ("Peterson") to Moyer underscores this position. *See* Dkt. No. 2 at 58-59. Peterson wrote to Moyer on September 26, 1985, thanking him for testifying in the first trial. Dkt. No. 6 at 69. Peterson expressed, "[w]ithout your testimony we could have never presented sufficient evidence to the jury for them to return a guilty verdict." *Id.*

[29] The Tenth Circuit treated this piece of evidence as "an April 29, 1984 OSBI missing person report filled out by Detective Baskin[.]" *Fontenot*, 4 F.4th at 1078.

Ward contends there are several peculiarities surrounding Moyer's testimony that were not presented to the jury. First, newly produced documents reveal Moyer's description of the man he saw in McAnally's around 7:30 p.m. sharpened over time. Authorities first interviewed Moyer on April 30, 1984. Dkt. No. 18 at 17. Moyer told authorities,

> a pickup pulled in facing the building between the door and ice machine. A dark haired guy came in the store first, then a blond haired guy came in later. Moyer left approximately one minute after they came in. The pickup was about 67-69 Chevrolet, light gray, rough looking. Moyer glanced at the tag but cannot remember it. The pickup may have had a trailer hitch on it.

Dkt. No. 18 at 17.[30]

Authorities spoke to Moyer again on November 6, 1984, after Ward's confession and arrest. Dkt. 18 at 9. This time Moyer explained,

> there was a dark haired male at the back of the store, but he did not get a very good look at him. While Moyer was at the counter talking with Denise Haraway a second male came in the door and walked past him. This person he described as being blond headed and of average height and weight. Moyer said he stayed in the store only a minute or two after the second subj[ect] came in. As he was leaving he saw a pickup parked into the curb fac[]ing the store. He only knew it was prior to a 1971 model and was a Ford or a Chevy. Moyer looked at the picture lineups and said the pictures that most resembled the men he saw was #1 in the Ward folder and #2 in the Titsworth folder.

*Id.* Handwritten notes from the same day state, "Jim Moyer . . . was in McAnally's on April 28th[.] [O]bserved two suspicious persons in there. He stated the people were acting strange enough for him to [] outside the store and observe their vehicle also." *Id.* 18 at 10. Additional handwritten notes in different handwriting provide,

> [t]here was one person already in the store. He (Moyer) was at the counter talking to Denise Haraway. A second subj. came into the store and walked past him. A pickup was parked straight into the curb facing the store. On 11-6-84 Moyer was shown a picture lineup. The pictures he picked that looked most like the 2 men he saw was #1 out of Ward's folder and #2 out of Titsworth's folder.

[30] At Ward's retrial, Moyer testified he was suspicious of the two (2) men and tried to locate a pencil to write down the tag number. *See* Dkt. No. 58-25 at 88-89.

*Id.*[31]

Ward points out that Moyer's initial reports did not contain a clothing description, but Moyer's trial testimony was similar to Wise's description. *Compare* Dkt. No. 18 at 9-10, 17 (Interviews with Moyer lacking a clothing description) *with* Dkt. No. 58-25 at 123 (Moyer testified one man was wearing "T-shirt, light color. Blue jeans, tennis shoes or track shoes."); *see also* Dkt. No. 58-24 at 123 (Wise testified "one had on a blue T-shirt or shirt, and the other one had a light colored shirt or T-shirt or jersey type … both had on jeans."). Ward argues this information casts doubt onto Moyer's identification of Ward. Dkt. No. 2 at 40-42.

Second, regarding Moyer's participation in the photo lineup, Ward argues,

> a different, previously undisclosed police report reveals important details about the photo array lineup in which Moyer participated on November 6, 1984, almost two weeks before the live lineup where he identified Mr. Ward. At that photo lineup, Moyer selected the picture of an individual referred to as "#1" from the "Ward folder." Like Moyer, James Boardman also selected individual #1 from the "Ward folder . . . around the first of November 1984. Neither Moyer's interview report nor Boardman's interview report asserts that they identified Mr. Ward. The only photo lineup available to Mr. Ward is State's Exhibit 10-S from both the joint trial and Mr. Ward's retrial, and there Mr. Ward is identified as photo #5. This means that Boardman and Moyer both selected someone *other than Mr. Ward* in the photo lineup.

Dkt. No. 2 at 39 (cleaned up, emphasis in original); *see also* Dkt. No. 18 at 9 and Dkt. No. 58-1 at 142-144 (State's Exhibit 10-S).

Third, newly produced documents reveal between the first trial and Ward's re-trial, Moyer sought a $5,000 reward offered by the OSBI for information related to Haraway's disappearance.

---

[31] At the preliminary hearing, Moyer testified he was in the store first and the men arrived after he did. Dkt. No. 58-15 at 12. He testified both came in the store, one walked to the back and one came to the counter. Dkt. No. 58-15 at 12. He testified the dark haired guy was wearing boots and the blonde haired guy was wearing tennis shoes. Dkt. No. 58-15 at 13. They were both wearing blue jeans. Dkt. No. 58-15 at 13. When asked what shirts they were wearing, he responded "I don't remember." Dkt. No. 58-15 at 13.

*See* Dkt. No. 6 at 71-73. Moyer recounted seeing Ward and Fontenot at McAnally's the night of Haraway's disappearance, that he was able to pick both Ward and Fontenot from a live lineup, that he testified at the joint preliminary hearing, the joint trial and Fontenot's second trial. *Id.* at 71. Moyer stated, "[t]his May I will be called to testify in Ward's retrial and again I will identify and place Ward at the scene." *Id*. Moyer included a copy of a letter from Peterson. *See id.* at 69, 72. The OSBI declined to issue the reward to Moyer concluding the reward was available for information leading to the whereabouts of Haraway and the reward expired. *See* Dkt. 6 at 74.[32] Ward contends Moyer's desire to obtain the reward money is relevant evidence of bias. *See* Dkt. No. 2 at 58-59.

**III. Other Suspects**

During a discovery hearing in December of 1988, Peterson stated on the record, "I have no knowledge of any suspects other than Tommy Ward and Karl Fontenot. I don't know how much plainer I could be. I know of no other individuals in this case." Dkt. No. 58-37 at 51. Judge Inge acknowledged, "[t]he previously undisclosed OSBI files show Peterson's statement to be untrue." Dkt. No. 20 at 426. Post-trial production reveals authorities did investigate other suspects and leads.

One individual, Floyd DeGraw was extensively investigated. *See*, *e.g.*, Dkt. No. 5 at 19-33, 38-40; Dkt. No. 11 at 41-42, 45-83, 103, 114; Dkt. No. 12 at 10-39. DeGraw was arrested in Texas days after Haraway's disappearance. Dkt. No. 20 at 427. DeGraw was administered a polygraph test on May 10, 1984, and asked questions regarding the Haraway disappearance. Dkt. No. 5 at 30. Detective Jimmy Stevens of the Amarillo Police Department deemed the results of

---

[32] Despite not receiving the reward, Moyer still testified in the second trial and identified Ward as the man he saw at McAnally's the evening of Haraway's disappearance. Dkt. No. 58-25 at 106-107.

the polygraph "inconclusive, but he had a gut feeling that DeGraw did not rob and kidnap the victim from Ada, Oklahoma." *Id.* Detective Stevens "stated that he thought that an OSBI polygraph examiner should check the charts over and determine the results of the charts." *Id.* However, DeGraw's responses to questions about the "kidnapping of the girl in Ada" were deceptive. *See id.*

Also, during an interrogation, DeGraw had the following reaction to questions about Haraway:

> At one time during the conversation and as Agent Davis put the picture of the victim from Ada before DeGraw, DeGraw held his head in his hands and appeared about to break down, but after recomposed himself, lifted his head with his eyes very red and stated that he did not know anything about the woman who was abducted in Ada . . . DeGraw then became very irritable, pacing the floor, saying he did not want to answer any more questions[.] DeGraw then insisted on being taken back to his jail cell and not answering any more questions."

Dkt. No. 5 at 33.

Ward also emphasizes another individual, Billy Charley ("Charley"). Dkt. No. 2 at 59-60. The jury was not informed about APD's notes regarding Charley shortly after Haraway's disappearance which state,

> Janet Lyons[33] said that Billy Charley was wearing contact lens now and had lost some weight. Said that Billy Charley had been out to the store. Need to reinterview for more information.

Dkt. No. 18 at 26.

Post-trial production also reveals that there were other witnesses in McAnally's the evening of April 28, 1984, who indicated that there were suspicious men in the store. Dkt. No. 2 at 43. At Ward's trial, "[o]nly two McAnally's customers testified, other than Moyer, . . . that they were in

---

33 Haraway's sister's maiden name is Lyons. *See* Dkt. No. 6 at 97.

the store and saw Haraway on the day of her disappearance." Dkt. No. 20 at 424.[34] Other undisclosed interview reports reveal Duney Alford ("Alford") informed investigators he was in McAnally's on April 28, 1984, and he observed "a guy standing by the front door on the inside of the store[.]" Dkt. No. 18 at 12. The man had "dark hair[], kind of slicked down, and that his hair was parted on the side." Dkt. No. 18 at 12. Alford remembered observing a pickup parked outside that was "a chalky gray color[]." *Id*. Shelia Dawn Turner ("Turner") told authorities she was at McAnally's around 5:30 or 6:00 p.m. and she and "Haraway talked about a large heavy set man standing at the magazine rack reading. Haraway told Turner that he had been standing there for about forty-five minutes. Turner said that Haraway seemed to feel uneasy about the individual standing at the magazine rack[.]" Dkt. No. 5 at 72. Turner described the man as "in his late thirties or early forties, exceptionally heavy set, light brown or blonde hair thinning on top, cut short, wearing a light colored tee-shirt, blue jeans and rough cowboy boots." *Id*. John McKinnis ("McKinnis") informed authorities he was in McAnally's around 8:05 p.m. and there was a "man standing at counter, huge guy with full beard[.]" Dkt. No. 18 at 23.[35] McKinnis described him as a "white male, 5'11", 195 – 200 pounds, 26 – 30 years old." *Id.* Ward contends "these witnesses create further doubt as to the identity of the perpetrators[.]" Dkt. No. 2 at 43.

---

[34] The State presented the testimony of Moyer and Holkum. *See supra.* The defense presented Edna Harris' testimony that she was in McAnally's around 7:10 – 7:20 p.m. and she observed a blond-headed man standing next to a van in the parking lot that scared her. Dkt. No. 68-33 at 18-19, 22.

[35] Ward also provides a 2014 Declaration from McKinnis wherein McKinnis states he was in McAnally's on April 28, 1984, around 8:00 p.m. and observed "a man I did not recognize standing behind the counter a few feet from Haraway. He appeared to be someone Haraway knew, an acquaintance, like a boyfriend or a husband or someone like that. He appeared to be unhappy, or concerned about something. Denice Haraway appeared to be her normal, happy self, but the atmosphere was very tense." Dkt. No. 13 at 84.

## IV. Obscene Calls

Weldon's interview summary also reveals Haraway "hated working at the store because it did not have an alarm and a lot of weirdo's come in and out[.]" Dkt. No. 7 at 81. Haraway "felt uneasy working at the store alone at night." *Id.* While investigating Haraway's disappearance, authorities learned Haraway was receiving phone calls at work that made her uncomfortable. Weldon reported to authorities,

> [Haraway] told [Weldon] that the phone calls had started again but didn't go into the story. [Weldon] said that earlier [Haraway] had been receiving some calls at work from a man that said he was going to come out to the store some night and wait outside while she was working. [Weldon] said that [Haraway] was upset because [Haraway] had asked for the night off and a guy refused to work and [Haraway] had to work anyway.

*Id*.

Mr. Haraway reported "he knew of no one that [Haraway] was having problems with at the store, other than she had received two or three obscene phone calls at the store, the last one being approximately two or three weeks prior to her disappearance." Dkt. No. 5 at 71. Mr. Haraway also reported there was a Vietnam Veteran who stopped by the store occasionally and carried on "some strange conversations" with Haraway. *Id*. Atkinson also reported "a Vietnam Veteran had been harassing [Haraway] and [Haraway] had received several obscene telephone calls." *Id.* at 12. "Steve Haraway, Watts, Weldon and Atkinson made no mention at trial of Haraway's fear of working at McAnally's. Ward was never made aware of the problems Haraway was having at the store[.]" Dkt. No. 20 at 431.

## V. Ward's Exculpatory Statements

Ward also points to "two withheld interview reports . . . in which he maintained his innocence." Dkt. No. 2 at 44. On May 1, 1984, Ward told authorities he and Fontenot went fishing and around 10:00 p.m. he walked to Fontenot's house where Fontenot's next-door neighbor was

having a party. Dkt. No. 7 at 9. There is also a report of Ward's interview with Investigator Bond and Deputy Turner on October 31, 1984, after his arrest. *Id.* at 10.

Ward notes these interviews were noted in the prosecutorial summary [Dkt. No. 6 at 81; Dkt. No. 7 at 9-10], but Peterson stated on the record that he had given the defense every audio or video cassette tape of every statement of Ward's he had and that he did not have anything written down from interviews with Ward. Dkt. No. 58-38 at 85-86 ("I have no memorandum as to the conversation that the defendant had with Detective Baskin and Detective Smith on May the 1st."). Ward notes the obvious inaccuracies of Peterson's statement. Dkt. No. 2 at 44-45. Ward's position is that these undisclosed statements are exculpatory. *Id.*

**VI. Witness Tampering**

Next, Ward argues the State "instructed witnesses to avoid giving testimony inconsistent with holding [him] accountable[.]" Dkt. No. 2 at 53. Ward points to three (3) witnesses: Karen Wise, Odell Titsworth, and Stacey Shelton. Dkt. No. 2 at 45-47. Concerning Wise's testimony, Ward provides a 2016 affidavit from Wise wherein she states, "[t]he police wanted drawings of two men I remembered best. I told police that there were two other men present." Dkt. No. 13 at 54. Wise continues, "I told police that I recognized two of the men and knew their names and did not know the names of the other two." *Id.* Prior to the first trial, Wise met with Peterson and told him "that the other two men were in J.P.'s at the same time as the two persons in the sketches. … Peterson said he already had the 'ones who did it.' I told him the names of the two men I knew were in the store. Those two men were Bubba Daggs and Jim Bob Howard." *Id.* Wise states, "Peterson said that I couldn't bring up in Court that Jim Bob Howard and Bubba Daggs were with the other two men. He said it couldn't be mentioned because it wasn't relevant." *Id.* at 55. Ward

further argues that newly produced documents reveal authorities interviewed Howard [Dkt. No. 7 at 36-37] and the interview corroborates Wise's account. Dkt. No. 2 at 46.

Concerning Odell Titsworth, Ward provides a 2014 Declaration wherein Odell Titsworth states he was "encouraged to testify in a way that would incriminate Ward and Fontenot." Dkt. No. 13 at 79. Titsworth "was convinced Peterson was asking [him] to lie." *Id.* Titsworth recounts he was upset because he was informed Ward and Fontenot implicated him in Haraway's murder. *See id.* at 80. Therefore, Titsworth stated,

> [he] agreed with law enforcement to talk to Ward and Fontenot to try to get incriminating information from them. A tape recorder was placed in a shower at the jail[.] . . . [Titsworth] asked Ward and Fontenot questions about the Haraway case. . . . It was obvious to [him] from the way they were talking that Fontenot and Ward didn't have a clue about what happened to Haraway.

*Id.* at 80. Ward states he has never received this potentially exculpatory tape from authorities. Dkt. No. 2 at 46.

Lastly, Ward provides a 2009 Affidavit from Stacy Shelton[36] wherein she explains after she testified for the defense in Ward's second trial, Peterson brought her into an office and told her to "get back on the stand and recant my testimony." Dkt. No. 13 at 82. When she refused, Peterson instructed her not to leave the office until she agreed to recant. *Id.* When she further refused, he instructed her to return every day until she agreed to recant. *Id.* Shelton states, "I returned each day of the trial and was made to sit on a bench in the hallway until the trial concluded, [Peterson] never recalled me and I refused to go on the stand of my own accord and recant." *Id.* at 82. Shelton summarizes, "I interpreted all of the foregoing actions by Peterson as intimidating, although I continued to stand by my testimony." *Id.* at 83. Regarding this affidavit, Ward states, "[t]he Ada

---

[36] At the time of Ward's retrial, Stacy's last name was Stacy DePrater-Brashier. Dkt. No. 58-32 at 192.

Police Department and Pontotoc District Attorney's Office knew that Ms. Shelton's testimony was damaging to their case against Mr. Ward." Dkt. No. 2 at 46-47.

## VII. The Science of False Confessions

Finally, Ward argues, "[u]pdates in understanding the science of false confessions further show Mr. Ward's innocence." Dkt. No. 2 at 61. Ward notes of the 3,299 individuals exonerated nationally since 1989, twenty-three (23) percent involved a false confession to homicide. *Id*. Further, Oklahoma law now requires law enforcement to electronically record custodial interrogations in some or all felony cases to protect against police-induced false confessions. *Id.*

Ward also provides the Declaration of Dr. Richard Leo, who categorizes the State's interrogations of Ward as "highly psychologically coercive" and concludes Ward's statement "bears no indicia of reliability[.]" Dkt. No. 13 at 98, 104-105. Lastly, Ward points to the case of *Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997), wherein Ronald Keith Williamson was convicted of the murder of Debbie Sue Carter in a Pontotoc County case. *See* Dkt. No. 2 at 62-63.

Ward notes the Carter investigation was led by Detective Smith and Agent Rogers, the prosecutorial summary had "conveniently undated reports" and involved a "dream confession." *Id.* at 62-63. Williamson's case also included information from jailhouse informant Terri Holland who also testified at Ward's preliminary hearing and first trial. *Id.* at 63. Williamson was ultimately exonerated in 1999 based on DNA evidence. *Id.* With this updated understanding of false confessions and the backdrop of another similar confession being debunked, Ward's position is that the falsity of his confession should be recognized. *See id.* at 61-63.

## ANALYSIS OF THE EVIDENCE

### I. Preliminary Matters

Before evaluating all the evidence, the Court first addresses two (2) preliminary matters that influence the Court's analysis: deference and diligence.

#### A. Deference

"AEDPA's deferential standard of review for claims decided on the merits by a state court, found in § 2254(d), has no application to a gateway innocence assertion, which is an exception to federal procedural obstacles to relief rather than a substantive claim." *Fontenot*, 4 F.4th at 1034. However, "the presumption of correctness applied to state court factfinding under § 2254(e)(1) does still apply." *Id.* Thus, "when a state court has made a factual determination bearing on the resolution of a *Schlup* issue, the petitioner bears the burden of rebutting this presumption by 'clear and convincing evidence.'" *Id.* (internal citations and quotations omitted).

Respondent argues the state district court's 2022 order denying Ward post-conviction relief is entitled to § 2254(e)(1) deference. Dkt. No. 55 at 19. On remand, the state district court held,

> Ward's claims of newly discovered evidence relating to when law enforcement had a description of the blouse described by Ward when he confessed to the crimes; alternate suspect Billy Charley; and impeachment evidence against eyewitness Jim Moyer. The Court, having considered the entirety of the record and materials discussed by Petitioner Ward and the State in their supplemental briefs pertaining to "newly" discovered evidence does not demonstrate, by clear and convincing evidence, Ward's innocence of the crimes for which he was convicted. Therefore, the Court denies Ward's claim for post-conviction relief under Oklahoma's PCPA, 22 O.S. 2011, § 1080(d).

Dkt. No. 22 at 89. Significantly, the state district court expressly stated, "[t]his Court makes no additional findings of facts other than those enumerated in its Post-Conviction Findings filed herein on December 18, 2020." *Id.* at 86; *see also* Dkt. No. 20 at 410-443.

"[I]ssues of fact" relate to "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators." *Thompson v. Keohane*, 516 U.S. 99, 110 (1995) (quoting *Townsend v. Sain,* 372 U.S. 293, 309 n.6 (1963)). The "statutory presumption of correctness dominantly relates to such "factual issues[.]" *Id.*; *see also Cardwell v. Allbaugh*, Case No. 18-CV-199-CVE-FHM, 2018 WL 6075480, at *2 n.3 (N.D. Okla. Nov. 20, 2018) (unpublished) ("On habeas review, factual findings made in state court as to basic, primary, or historical facts are presumed correct absent clear and convincing evidence to rebut that presumption." (internal quotations and citations omitted)).

Despite Respondent's position to the contrary, the state district court's 2022 conclusion is a mixed question of law and fact.[37] Accordingly, the district court's December 29, 2022 order is not entitled to 28 U.S.C. § 2254(e)(1) deference. However, the district court's factual findings in its December 18, 2020 order, that were incorporated into its December 29, 2022 order, are entitled to deference.

**B. Diligence**

Second, Respondent focuses on Ward's delay in bringing the instant habeas action. Dkt. No. 55 at 17-19. Respondent notes Ward waited approximately fourteen (14) years from the 2003 production of the OSBI file to file the instant Petition. *Id.* Respondent expands,

> [t]he OCCA's factual finding regarding Petitioner's lack of diligence – especially in light of the OCCA's "thorough review of the record" – is entitled to a presumption of correctness, one which Petitioner has failed to rebut by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). In his petition, Petitioner spends virtually no time addressing the OCCA's determination as it relates to diligence.

[37] "[D]eterminations regarding mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations are not factual determinations and are not entitled to a presumption of correctness." *Finch v. Payne,* 983 F.3d 973, 980 (8th Cir. 2020) (internal quotations and citations omitted).

*Id.* at 19.

The Court acknowledges that "[a]lthough a lack of diligence in developing evidence does not disqualify the use of that evidence in support of a *Schlup* showing, the assessment of diligence does still factor into the holistic innocence inquiry, at least with regard to overcoming AEDPA's time bar." *Fontenot*, 4 F.4th at 1033; *see also Floyd v. Vannoy*, 894 F.3d 143, 156 (5th Cir. 2018) ("no threshold diligence requirement applies to actual-innocence claims; the delay is simply a factor in the court's reliability evaluation."). In *Perkins*, the Supreme Court clarified that while not "an absolute barrier to relief" or "an unyielding ground for dismissal," a habeas petitioner's unjustifiable delay in presenting new evidence is "a factor in determining whether actual innocence has been reliably shown." *Perkins*, 569 U.S. at 387, 401. That is, untimeliness "does bear on the credibility of evidence proffered to show actual innocence." *Id.* at 401. "Considering a petitioner's diligence, not discretely, but as part of the assessment whether actual innocence has been convincingly shown, attends to the State's concern that it will be prejudiced by a prisoner's untoward delay in proffering new evidence." *Id.* at 399.

The Court will consider Ward's delay in its holistic innocence inquiry. However, the Court first notes the diligence inquiry the OCCA undertook when analyzing laches to bar Ward's due process claim differs from the actual innocence inquiry currently before this Court. Second, Ward only proffers one piece of evidence, Wise's affidavit, which necessitates a reliability analysis. The remaining evidence proffered consists of the State's own documents which were not produced to Ward pre-trial and were generated close in time to the charged crimes. Therefore, the credibility concerns expressed by the *Perkins* Court are largely inapplicable to the instant case, and Ward's delay is not "an absolute barrier to relief." *Perkins,* 569 U.S. at 387.

## II. Predicted Impact on Reasonable Jurors

Having outlined all the evidence, the Court must now "assess the probative force of the newly present evidence in connection with the evidence of guilt adduced at trial." *Schlup*, 513 U.S. at 332. The Court must decide if it is more likely than not that any reasonable juror would have reasonable doubt regarding Ward's guilt by making a holistic judgment about all the evidence. *House*, 547 U.S. at 537-539.

### A. Old Evidence

A few pieces of evidence Ward points to as support for his actual innocence claim are not new. The Court addresses these items first.

#### 1. Charley

Concerning Charley, the jury did not receive the benefit of underlying documents regarding the State's investigation into Charley. *See*, *e.g.*, Dkt. No. 18 at 26. Respondent argues this evidence is not new. Dkt. No. 55 at 26-28. The Court agrees. Ward was aware early in the prosecution that Charley was identified as resembling the composite, and the jury was also informed of this. Dkt. No. 58-17 at 37-38 (preliminary hearing); Dkt. No. 58-28 at 186 (trial testimony). Further, the jury was informed authorities investigated Charley. Dkt. No. 58-31 at 21. Therefore, the information regarding Charley does not support Ward's actual innocence claim.

#### 2. Ward's Exculpatory Statements

While it is true Peterson misrepresented the State's possession of any written reports of interviews with Ward, these newly presented written reports are not new evidence. The May 1, 1984 interview summary is merely a recitation of Ward telling authorities he was fishing with Fontenot and then went to a party at Fontenot's neighbor's apartment. Dkt. No. 7 at 9. The jury was presented with this version of events. *See* Dkt. No. 58-27 at 68, 104-105. The October 31,

1984 interview summary is partially illegible but the Court deciphers Ward told authorities on April 28, 1984, he was home all night and woke up around midnight when his brother-in-law needed help fixing a broken pipe. Dkt. No. 7 at 10. While this exact statement was not presented to the jury, the jury was aware of Ward's changing stories and the version wherein he helped his brother-in-law fix a broken pipe under the house. *See* Dkt. No. 58-27 at 108; Dkt. No. 58-31 at 146-150. Therefore, neither of these newly produced summaries constitute new evidence for the purposes of the instant actual innocence inquiry.

**3. Titsworth and Shelton's Affidavits**

Ward's stance regarding Titsworth and Shelton is unavailing. Ward presented Titsworth's testimony at trial where he detailed authorities' multiple attempts to get him to admit to the crime and how authorities placed Titsworth in situations with Ward and Fontenot while they were all detained in an attempt "to find out if [Ward and Fontenot] had anything to do with it." Dkt. No. 58-32 at 25-41. Furthermore, Titsworth testified regarding the existence of a tape recording. *Id.* at 40. Ward also presented Shelton's testimony at trial. *Id.* at 192-208. Shelton testified regarding her attempts to inform the State regarding her belief that Ward was in fact at Gordon Calhoun's party the evening of April 28, 1984. *Id.* at 195-198. In all, these two pieces of evidence are not new and do not support Ward's actual innocence claim.

For these reasons, the Court concludes these four (4) pieces of evidence do not establish it is more likely than not that any reasonable juror would have reasonable doubt.

**B. Ward's Confession**

The State's prosecution of Ward hinged largely on his confession. Accordingly, the Court starts here. Ward's reliability was questionable from the start. First, multiple versions of Ward's confession and whereabouts on April 28, 1984, were presented to the jury. *Compare* Dkt. No. 58-

27 at 104-105 (May 1, 1984 statement), Dkt. No. 58-27 at 74-97 (October 12, 1984 statement), Dkt. No. 58-28 at 146-151 (Ashley story given during Preliminary Hearing), Dkt. No. 58-31 at 146-150 (Ward's testimony at retrial) *with* Dkt. No. 58-30 at 29-65 (October 18, 1984 confession). The State even went to lengths to disprove Ward's alternate versions by, for example, calling witnesses to disprove the Ashley story. *See*, *e.g.*, Dkt. No. 58-29 at 57, 60-61, 63. Nevertheless, the State pressed that the version Ward presented to the OSBI on October 18, 1984, was the truth. *See* Dkt. No. 58-34 at 57-59 (Ward began "to recite facts that only a person would know who had been there.").

Second, one of the main actors in Ward's confession was Odell Titsworth. The State cleared Odell Titsworth from any involvement [Dkt. No. 58-28 at 126] and never provided an alternate, third accomplice. Ward referred to Titsworth as "Titsdale" on multiple occasions throughout his confession. Dkt. No. 58-30 at 34, 36, 39, 40, 47. Ward also did not know Titsworth's first name. Dkt. No. 58-30 at 34 ("Q: What's his first name? A: I can't recall it. Q: Is it Odell? A: Odell."). Authorities were not even confident Ward knew Titsworth and worked to determine this fact after Ward was arrested. Dkt. No. 58-28 at 35-36.[38] Authorities did determine Fontenot did not know Titsworth. Dkt. No. 58-29 at 43-44. The State's reliance on the October 18th version despite Titsworth being cleared impaired the confession's credibility.

Third, authorities were unable to confirm the veracity of any pieces of Ward's confession. Haraway's body was found in another county east of Ada [Dkt. No. 58-24 at 21-24]; Ward said her body was disposed west of Ada. Dkt. No. 58-27 at 155-157, 208-212. The cause of death was determined to be a gunshot wound to the head. Dkt. No. 58-24 at 106. Ward said she was stabbed

[38] Newly produced notes from an October 31, 1984 interview with Ward conducted by Investigator Bond and Deputy Turner reveals "Deputy Turner showed Ward a picture of Ronald Gene Tisdale and asked him who it was and Ward replied that it was Titsworth." Dkt. No. 6 at 96.

to death. *See* Dkt. No. 58-30 at 50-51, 56-57. Dr. Balding testified he "saw no evidence, per se, that she was stabbed." Dkt. No. 58-24. at 109.[39] The blouse Ward described "was not found with her remains[.]" Dkt. No. 20 at 433. Detective Baskin testified,

> Q: Everything that [Ward] stated in the, in any of the videotapes that you made, that you tried to confirm you have found out that not one single thing was true. Isn't that right?
> A: No, sir, I don't believe that.
> Q: What is it that was true? Other than your assumption that he and Fontenot were responsible for taking this girl out of this store and what happened to her afterwards, tell this jury one physical thing that had been described that was true. That you know for a fact is true.
> A: That I know for a fact?
> Q: Yes.
> A: **That I know of, none**.

Dkt. No. 58-28 at 26 (emphasis added). Detective Smith similarly "could not list 'anything to be true' from the October 18, 1984, 'confession' and also admitted the police never found a weapon or the gray-primered pickup truck in the case." Dkt. No. 20 at 433; *see also* Dkt. No. 58-29 at 29-31.

Third, other testimony did not match Ward's confession. Ward stated Titsworth entered McAnally's and "started throwing stuff around." Dkt. No. 58-30 at 37-38. Ward explained Titsworth threw "potato chips and stuff that was on the aisle, the side aisle right when you go in the door." *Id.* at 38. However, Lenny Timmons testified he did not see "any disarray of any kind on the floors or anything[.]" Dkt. No. 58-25 at 156. David Timmons testified there was not "anything about the store, cluttered or anything like that, to arouse your suspicions that anything was wrong." *Id.* at 176. Atkinson testified when he arrived, "[n]othing was out of place or anything." Dkt. No. 58-26 at 65. Ward confessed to three (3) men being involved in Haraway's

---

[39] The newly produced Medical Examiner's records include a January 21, 1986 Supplemental Report that is highly critical of the crime scene processing where Haraway's body was found. *See* Dkt. No. 13 at 18.

abduction and murder. Dkt. No. 58-30 at 29-65. Ward stated Fontenot was in the back of the truck. *Id*. The Timmons brothers testified they saw one man and one woman leave McAnally's *See* Dkt. No. 58-25 at 145, 153; Dkt. No. 58-25 at 175. David Timmons further testified he did not see anybody else in the pickup. Dkt. No. 58-25 at 175.

In all, "none of Ward's statements about where they took Haraway or what happened to her before and after her death fit the statements he made." Dkt. No. 20 at 433; *see also Fontenot*, 402 F. Supp. 3d at 1206 n.44 ("Ward's description of the dream was considered a confession by police, but was not corroborated by any credible evidence.").[40] Against this backdrop, the reliability of Ward's confession was always questionable. If the jury was informed regarding the new evidence outlined herein, it is "more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538.

**C. The Blouse**

Respondent argues the evidence regarding the blouse is not new because "the blouse was a key point of contention at the retrial and the jury was already well aware of the issue." Dkt. No. 55 at 20; *see also id.* at 21 ("the blouse issue was hotly contested at the 1989 retrial."). Respondent outlines the testimony from multiple witnesses wherein witnesses testified regarding if and when they provided authorities a description of the blouse. *See id.* at 21-22.

However, Respondent ignores the newly produced documents, namely the report dated August 1984 wherein Weldon provided a description of the blouse. Dkt. No. 7 at 27. At trial, it was an unanswered question if authorities were aware of the description prior to Ward's confession

---

[40] The Tenth Circuit concluded Fontenot's similar confession, which was obtained after Ward implicated him, "was shot through with clear falsehoods and inconsistencies, produced no independently verifiable information, and provided the police with no new facts about the crime." *Fontenot,* 4 F.4th at 1052.

as there was conflicting testimony. However, the State advocated that authorities were unaware of the blouse's description prior to Ward's confession. Dkt. No. 58-34 at 133-134 ("we had no description of that blouse to give this Defendant."); *see also* Dkt. No. 58-31 at 32-33 (Agent Rogers testified he was not aware of the blouse's description prior to Ward's confession). The August 1984 report answers the unanswered question and is new evidence. It is also reliable as it is Detective Baskin's own report. Dkt. No. 7 at 27.

The only "evidence" linking Ward to his confession was his description of Haraway's blouse. Dkt. No. 20 at 433 ("The only detail from Ward's October 18th confession that was not disproved when Haraway's body was discovered was his description of the blouse Haraway was supposedly wearing when she disappeared."); *cf.* Dkt. No. 58-34 at 133-134 ("[The blouse] proves one thing, it proves that [Ward] didn't make it up, because it is absolutely impossible to make up."). Now, the August 1984 Weldon report demonstrates the theory championed to the jury – that Ward committed this crime and his description of the blouse proves this because authorities did not know about this blouse prior to Ward's confession – was inaccurate.

If the jury was informed that authorities possessed the blouse's description prior to Ward's confession, a reasonable juror would have questioned if this information was provided to Ward.[41,42] This is so especially considering Ward maintained his innocence during his first two

---

[41] At the preliminary hearing Detective Smith testified he may have provided Ward with Titsworth's name during the October 12, 1984 interview. *See* Dkt. No. 58-29 at 45-46. Detective Smith disavowed this testimony at Ward's trial. *Id.* at 46. Ward also stated Detective Smith provided him with Titsworth's name. Dkt. No. 58-28 at 158.

[42] Respondent argues Ward "fails to show that police actually used that information to coerce his confession or that the validity of his confession would have been undermined." Dkt. No. 55 at 22. However, Ward need not make a case of conclusive exoneration. *House*, 547 U.S. at 553. Ward's burden is to demonstrate "that more likely than not any reasonable juror would have reasonable doubt." *Id.* at 538.

(2) encounters with authorities, on May 1, 1984 and October 12, 1984, voluntarily attended the October 12, 1984, and October 18, 1984 meetings, the first eight (8) hours of Ward's interview turned interrogation at the OSBI were not recorded in any manner, and the October 18, 1984 confession was replete with leading questions. This new information demonstrates "that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538.

**D. Moyer**

Beyond the confession, the only evidence the jury had linking Ward to McAnally's was Moyer's identification. Dkt. No. 20 at 439 (Moyer was "the only witness to identify Ward as being at McAnally's[.]"). Respondent argues the documents regarding Moyer's participation in a photo lineup and Moyer's efforts to collect the OSBI's reward do not constitute "new" evidence. Dkt. No. 55 at 29-30. Respondent then proceeds to challenge the impact of this evidence in relation to the rest of the evidence. *See id.* The Court rejects Respondent's position that this evidence is not "new."

The Court notes the State's endorsement of Moyer's testimony possessed a blemish from the beginning: Moyer identified Ward as the individual at McAnally's around 7:30 p.m. Dkt. No. 58-25 at 111-112. However, the individual Wise identified as Ward was at J.P.'s from 7:00 to approximately 8:30 p.m. Dkt. No. 58-24 at 121, 143-144. The new documents further challenge the reliability of Moyer's identification of Ward which would raise reasonable doubt in the mind of a reasonable juror. *See Schlup*, 513 U.S. at 330. First, Moyer's testimony was "inconsistent and changed over time." Dkt. No. 20 at 422. If the jury had the benefit of Moyer's different interviews with authorities, they would have been able to ascertain how Moyer's details improved over time. *Compare* Dkt. No. 18 at 9-10, 17 (Moyer did not provide a clothing description) *with* Dkt. No. 58-25 at 88, 123 (Moyer testified regarding one man's clothing); *compare also* Dkt. No.

18 at 17 (Moyer stated he "glanced at the tag") *with* Dkt. No. 28-25 at 88-89 (Moyer testified he was going to write down the tag number).

Second, Moyer's participation in the newly disclosed photo lineup casts further doubt regarding Moyer's credibility. Dkt. No. 18 at 9. On November 6, 1984, prior to Moyer's participation in the live lineup on November 19, 1984, Moyer "looked at the picture lineups and said the pictures that most resembled the men he saw was #1 in the Ward folder and #2 in the Titsworth folder." Dkt. No. 18 at 9.[43] At Ward's trial, Moyer only testified regarding his attendance at the live lineup on November 19th; the jury was unaware of the November 6th lineup. *See* Dkt. No. 58-25 at 83-90, 106-136. It is reasonable to infer if Moyer selected a photograph of Ward on November 6th, the prosecution would have elicited this testimony to bolster the only witness to place Ward at McAnally's the evening of Haraway's disappearance.[44]

Respondent, emphasizing Ward's lack of diligence and ignoring the State's lack of production, argues Ward's assertion regarding the photo lineup is "bare speculation[.]" Dkt. No.

---

[43] Moyer was also "the only witness who placed Mr. Fontenot in McAnally's the night of Ms. Haraway's disappearance." *Fontenot*, 4 F.4th at 1043. Moyer later recanted his identification of Fontenot. *See id.* at 1041. The Tenth Circuit treated Moyer's 2012 affidavit recanting his identification of Fontenot as new and reliable evidence in support of Fontenot's actual innocence gateway claim. *See id.* at 1041-44. Moyer only ever indicated he saw two (2) men. *See* Dkt. No. 18 at 17. The newly produced documents reveal, during the investigation, Moyer was willing to identify someone in a "Titsworth folder" as the second individual he saw in McAnally's that evening. Dkt. No. 18 at 9. Moyer's propensity to aid authorities and make identifications further calls into question his credibility.

[44] Ward's suspicion that Moyer did not identify Ward on November 6th is strengthened by another, newly produced document. Boardman informed authorities "a few days after" Haraway's disappearance that he was in McAnally's around 5:00 p.m. on April 28, 1984. Dkt. No. 18 at 7. On November 1, 1984, Boardman "was shown a picture lineup. Boardman picked #1 out of the Ward folder." *Id.* The state district court made the factual finding that Moyer and Boardman selected the same photograph. Dkt. No. 20 at 424. This finding is entitled to deference. It follows, if Boardman did select Ward, the prosecution would have also called him to testify at Ward's second trial. A logical assumption could be drawn from the current information is that Moyer and Boardman did not select a photograph of Ward.

55 at 29. The Court recognizes, due to the State's failure to ever produce the photo lineups,[45] Ward's position is speculative. But so is any assumption that Moyer and Boardman identified Ward in the photo lineup. Nevertheless, the current state of the record supports the conclusion that had the jury been informed of Moyer and Boardman's participation in a photo lineup and selection of #1 in the Ward folder, the jury would have garnered reasonable doubt about the identification of Ward.

Third, as the state district court concluded [Dkt. No. 20 at 422], Moyer's involvement with the case over a span of multiple years, his undisclosed sharpening memory and his desire to obtain the OSBI reward is indicative of bias and does impact his credibility.

In all, as noted by Peterson, Moyer was central to the State's prosecution. Dkt No. 6 at 69. If any reasonable juror was aware of Moyer's changing testimony, participation in the photo lineup prior to the live lineup and motivation to obtain a cash reward, more likely than not he or she would have reasonable doubt. *House*, 547 U.S. at 538.

**E. Other Suspects**

The purported new evidence regarding DeGraw is unavailing. Concerning DeGraw, the Tenth Circuit noted, "because not enough evidence tied Mr. DeGraw to Ms. Haraway's murder, law enforcement was justified in abandoning this lead." *Fontenot*, 4 F.4th at 1072. If the jury was presented with this information regarding DeGraw, it likely would not have created reasonable doubt in the mind of a reasonable juror.

---

[45] "The State has never produced the photo array folders shown to Moyer and Boardman, or the photograph selected by both men, even though Ward requested it prior to the 1989 re-trial and again during limited discovery allowed in these post-conviction proceedings." Dkt. No. 20 at 424.

However, the evidence from customers in McAnally's the evening of April 28, 1984, is noteworthy. Especially when coupled with the new information regarding the phone calls Haraway was receiving at work. *See infra.* Ward's identification as the perpetrator stemmed from Wise's composite drawings from the men at J.P.'s. If the jury was informed regarding Turner's report of a suspicious man in McAnally's on April 28, 1984, that did not match Ward's characteristics, or McKinnis' observations of a man standing behind the counter with Haraway around 8:00 p.m. on April 28, 1984, it is "more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538.

**F. Obscene Calls**

Weldon's newly produced statement that a caller told Haraway "he was going to come out to the store some night and wait outside while she was working," [Dkt. No. 7 at 81], dovetails into one customer's account of a suspicious person at McAnally's on April 28, 1984. *See*, *e.g.*, Dkt. No. 5 at 72 (Turner's statement that a heavy-set man was standing at the magazines for 45 minutes and Haraway was uneasy).[46] Additionally, multiple witnesses recounted observing a pickup outside of McAnally's that evening. *See*, *e.g.*, Dkt. No. 18 at 7 (Boardman remembered a "light colored pickup" at McAnally's around 5:00 p.m.); *id.* at 17 (Moyer remembered a "67-69 Chevrolet, light gray, rough looking" parked at McAnally's around 7:30 p.m.); *id.* at 12 (Duney Alford remembered a "chalky gray colored" pick up parked outside McAnally's).

---

[46] Weldon's newly produced statement [Dkt. No. 7 at 81] could have been used to impeach Weldon's testimony that she could not tell, during their phone call, if anything was bothering Haraway on the night of her disappearance. *Compare* Dkt. No. 7 at 81 (Weldon informed authorities Haraway "hated working at the store because it did not have an alarm" and Haraway "felt uneasy working at the store alone at night.") *with* Dkt. No. 58-26 at 151 ("Q: Did she tell you if anything was bothering her or not? A: No.").

The evidence of the concerning calls, along with information that multiple customers visiting McAnally's at different times over the course of the evening similarly described a pickup that was parked at McAnally's, provides a viable alternate suspect with a motive. *See Fontenot*, 4 F.4th at 1038-39. This new information also creates questions regarding the comprehensiveness of the State's investigation. *See* Dkt. No. 20 at 431 ("There is no evidence that authorities ever investigated who was making the harassing or obscene phone calls[.]"). With knowledge of a possibly incomplete investigation and an alternate suspect, it is "more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538.

**G. Wise's Affidavit**

Turning to Ward's arguments regarding Wise's affidavit, the Court must first determine if Wise's affidavit [Dkt. No. 13 at 54-56] is new and reliable. *Fontenot*, 4 F.4th at 1031. The critical piece of information from Wise's affidavit is that she observed four (4) men, not (2), in J.P.'s on April 28, 1984. Dkt. No. 13 at 54-55. Wise did make a passing reference at the retrial that there were "three or four people back there playing pool[.]" Dkt. No. 58-24 at 153. However, Wise's affidavit does provide new facts beyond this piece of information: 1) that the authorities ignored her description of the four (4) men and, instead, focused on only two (2) of them; and 2) Peterson pressured her to avoid bringing up the other men because the information was irrelevant and the State already had the "ones who did it." Dkt. No. 13 at 54-55; *see also Fontenot*, 4 F.4th at 1047. Therefore, the Court considers Wise's affidavit as "new" evidence for purposes of the actual innocence analysis and next considers the affidavit's reliability.

As noted by the Tenth Circuit, if Wise's affidavit was "the sole evidence presented in support of [Ward's] innocence, [Ward's] lack of diligence might devalue the credibility of his submission enough to bar provision of procedural relief." *Fontenot*, 4 F.4th at 1056. However,

Wise's affidavit is accompanied by contemporaneous testimony which buoys her reliability and mitigates any prejudice to the State arising from Ward's delay. *Perkins*, 569 U.S. at 399.

Critically, Wise's affidavit interlocks with her testimony during the preliminary hearing and Ward's retrial. Specifically, at the preliminary hearing, Wise alluded to there being more than two (2) individuals playing pool that evening. *See*, *e.g.*, Dkt. No. 58-18 at 128-129, 135-136. At the second trial, on cross-examination, Wise testified there were "three or four of them back there in the game room." Dkt. No. 58-24 at 153; Dkt. No. 20 at 429. She testified there was at least one (1) more person in addition to Ward and Fontenot in J.P.'s that evening. Dkt. No. 58-24 at 153. Therefore, Wise's recent affidavit stating there were more than two (2) men in J.P.'s that evening is corroborated by her statements made closer-in-time to Haraway's disappearance and weighs in favor of considering the affidavit reliable.

While the delay in providing the affidavit does influence its evidentiary value, the affidavit's credibility is improved for additional reasons. First, Wise claims these facts are not being revealed for the first time in 2016 but that she informed authorities in 1984 and they ignored her. Dkt. No. 13 at 54. Second, Wise offers a plausible explanation for her failing to testify fully to these facts at trial: Peterson told her they were irrelevant, that she could not mention them in court, and that the defense was the enemy. *Id.* at 55. Finally, Wise's fear of being involved in the case and her reluctance to name Howard and Daggs is credible in light of her experience of an unknown man walking past her apartment multiple times late at night and peeking into her apartment. Dkt. 58-5 at 110-111; Dkt. No. 13 at 54-56.

In all, the delay does impact Wise's credibility, but the Court determines the affidavit bears sufficient indicia of reliability as explained above. *Schlup*, 513 U.S. at 330. ("The habeas court

may have to make some credibility assessments.").[47] Therefore, the Court considers Wise's affidavit to be "newly discovered evidence" for purposes of the actual innocence assessment.

Now the Court considers the affidavit's impact on a reasonable juror. Wise identifies the two (2) other men present at J.P.'s that evening as Daggs and Howard. Dkt. No. 13 at 54-55.[48] Newly produced documents reveal Howard was investigated. *See* Dkt. No. 7 at 36-37 (Interview with Howard); *see also* Dkt. No. 7 at 34-35 (Interview with David Yockey). Howard stated he had been to J.P.'s before to get a sandwich but he never played pool there. Dkt. No. 7 at 36. Howard did not provide an alibi for the evening of April 28, 1984. *Id.* ("He didn't know where he was on April 28, 1984. But he was probably at home."). Howard told authorities he had ridden in Brian Cox's ("Cox") pickup several times. *Id.*

Further, David Yockey, an associate of Cox, Ward, and Howard, revealed Cox "had a grey primered pick-up and painted it red after the robbery to keep the police from stopping him[.]" Dkt. No. 7 at 35. Subsequently, authorities gave Cox a polygraph test in December of 1984. Dkt. No. 10 at 67-72; *see also id.* at 71-72 (Featherstone concluded Cox's polygraph examination was inconclusive.). Cox denied "loaning his vehicle to anyone on any occasion, however, police records reflect that four to five days prior to the Haraway incident three males identified as Billy Shelton, Jim Bob Howard and Joe 'Rabbit' Lyda were arrested in the truck belonging to Cox." *Id.* at 67. Accordingly, these newly produced documents place an alternate suspect unknown to the jury, Howard, in a truck matching the description of the suspect truck near the time of the

---

[47] The Tenth Circuit evaluated a nearly identical affidavit from Wise as it relates to Fontenot's case and deemed Wise's affidavit a "trustworthy eyewitness account[.]" *Fontenot*, 4 F.4th at 982; *compare* Exhibit 13, *Fontenot v. Crow*, Case No. 16-CV-069-RAW (E.D. Okla. Aug. 18, 2017), Dkt. No. 78-14 *with* Dkt. No. 13 at 54-56.

[48] "The identification of Howard and Daggs by Wise as being in J.P.'s with the other two (2) men is material either to exculpate or inculpate Ward." Dkt. No. 20 at 430.

abduction. Further, Wise's new affidavit identifies him as one of the four (4) men she observed in J.P.'s the evening of April 28th. A reasonable juror equipped with this newly revealed information more likely than not would have reasonable doubt. *House*, 547 U.S. at 538.

## III. The Totality of the Record

Overall, the State's evidence against Ward presented at his second trial was weak. The State lacked any physical evidence or a motive (beyond a $167.42 robbery gone wrong). Without ever connecting the dots, the State used Wise's description of men at J.P.'s from 7:00 p.m. – 8:30 p.m. and Moyer's identification of Ward at McAnally's at 7:30 p.m., along with Ward's confession, to charge and convict Ward of kidnapping Haraway, around 8:30 – 8:40 p.m. on April 28, 1984, and killing her. Significantly, the State did not ask Whelchel, David Timmons, or Lenny Timmons to identify Ward at trial. The Timmons brothers only testified that the composite was an accurate depiction of the man they saw leaving McAnally's with a woman. *See* Dkt. No. 58-25 at 147-148; *see also id.* at 172-173.[49] Whelchel testified that he "never made any identification" of the man he saw leaving. Dkt. No. 58-26 at 21.

Therefore, the only witness testimony the State possessed to convict Ward was Moyer and Wise's identification. The newly produced documents call into question the reliability of Moyer and Wise's identification of Ward. As explained above, if the jury was aware of Moyer's credibility issues and Wise's identification of the other two (2) men in J.P.'s the night of the crime along with Peterson's influence on Wise's testimony, it is more likely than not that a properly instructed,

[49] Newly produced documents reveal authorities spoke to Lenny Timmons in May of 1984 and the agent noted, "it is doubtful that Timmons would be able to pick the individual he saw out of a photo lineup or a live lineup should the occasion arise." Dkt. No. 5 at 70.

reasonable juror would have possessed reasonable doubt regarding these witnesses' identification of Ward. *House*, 547 U.S. at 538.

Respondent points to Ward's various, conflicting statements as "compelling" proof of Ward's guilt. Dkt. No. 55 at 24-26. The Court acknowledges throughout the investigation and multiple trials Ward provided various versions of events without much justification for his changes. Nevertheless, as evidenced by the guilty verdicts, the jury did accept his confession. Therefore, the confession does support the inference of guilt. *House*, 547 U.S. at 553-554.[50] Furthermore, testimony that Ward had a bad haircut, scratches on his hand on May 1, 1984, and access to a grey primered truck also supports the inference of guilt. *Id.; see also Schlup,* 513 U.S. at 331.

However, the Court cannot ignore that the flaws in Ward's confession coupled with the newly produced documents present legitimate concerns regarding the integrity of the State's investigation and prosecution and erode any remaining confidence in Ward's confession. The newly produced documents unravel the State's theory regarding Haraway's blouse and the State's insistence that the description of her blouse was unknown to authorities and could not have been provided to Ward. The State did have a description of the blouse prior to Ward's confession. It is possible authorities provided the description to Ward. If any reasonable juror was aware of this information, it is more likely than not he or she would have possessed reasonable doubt as Ward's

[50] Respondent points to statements from Ward's January 9, 1985, preliminary hearing version of events as part of "the mountain of other evidence supporting the jury's verdicts" and "compelling weight of his guilt established by the trial evidence." Dkt. No. 55 at 24. As previously noted, the State endeavored to disprove Ward's January 9, 1985 statement at trial. *See*, *e.g.*, Dkt. 58-29 at 57, 60-61 and 63. Accordingly, the Court does not accept Ward's January 9, 1985 statement as proof of his guilt. Respondent also notes Ward told James Allen that Haraway's body was dumped in the Canadian River as substantiating Ward's guilt. Dkt. No. 55 at 25 (citing Dkt. No. 58-28 at 97-98). Tatum's discovery of Haraway's body disproved this statement. Dkt. No. 58-24 at 21-22, 24. Therefore, the Court does not consider this statement as proof of Ward's guilt.

description of the blouse was the only item in Ward's confession that was not contradicted by the trial evidence.

The newly produced documents also reveal Haraway was receiving concerning phone calls at work and multiple customers provided authorities with descriptions of individuals in the store the day of Haraway's disappearance. The jury was not presented with any of this information, and it is more likely than not this information would have created a reasonable doubt in a properly instructed juror's mind.

After considering all the evidence, old and new, and making a holistic judgment about all the evidence, the Court determines it is more likely than not that any reasonable juror would have reasonable doubt concerning Ward's guilt. This case is an "extraordinary case" fulfilling the purpose of the actual innocence gateway. "While this may not be 'a case of conclusive exoneration,' *House*, 547 U.S. at 553—a virtual impossibility given the lack of any physical evidence—[Ward] has nevertheless presented 'evidence of innocence so strong that [this] [C]ourt cannot have confidence in the outcome of the trial[.]' *Schlup*, 513 U.S. at 316." *Fontenot*, 4 F.4th at 1056.

For these reasons, the Court concludes Ward may pass through the actual innocence gateway, and Respondent's Statute of Limitations Motion [Dkt. No. 54] is denied.

## CONCLUSION

Having denied Respondent's Motions to Dismiss [Dkt. Nos. 54 and 56], the Court orders Respondent to show cause why the writ should not issue by filing, within thirty (30) days of this Opinion and Order, an answer to the Petition, in accordance with Rule 5 of the Rules Governing Section 2254 Cases. Ward may submit a reply to Respondent's answer within fifteen (15) days after the filing of Respondent's answer.

IT IS THEREFORE ORDERED that Respondent's Pre-Answer Motion to Dismiss Petition for Writ of Habeas Corpus as Time-Barred by the Statute of Limitations [Dkt. No. 54] is DENIED.

IT IS FURTHER ORDERED that Respondent's Pre-Answer Motion to Dismiss Petition for Writ of Habeas Corpus, in the alternative, for Failure to Exhaust Necessary State Court Remedies [Dkt. No. 56] is DENIED.

IT IS FURTHER ORDERED that, within thirty (30) days of this Opinion and Order, Respondent shall file an answer to the Petition, in accordance with Rule 5 of the Rules Governing Section 2254 Cases.

IT IS FURTHER ORDERED that Ward's Motion for Status Conference [Dkt. No. 82] is DENIED AS MOOT.

IT IS FURTHER ORDERED that the Clerk of Court shall note on the record the substitution of Tommy Sharp, Interim Warden, in place of David Buss as party Respondent.

Dated this 21st day of September, 2026.

JOHN F. HEIL, III
CHIEF UNITED STATES DISTRICT JUDGE