**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **THOMAS J. WARD,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| **v.** | ) | **Case No. 23-CV-146-JFH-GLJ** |
| | ) | |
| **TOMMY SHARP, Interim Warden,** | ) | |
| | ) | |
| Respondent. | ) | |

**RESPONSE IN OPPOSITION TO
PETITION FOR WRIT OF HABEAS CORPUS**

Respondent, by and through the Attorney General of the State of Oklahoma, Gentner F. Drummond, submits the following response to the instant petition for a writ of habeas corpus:

1. Petitioner Thomas J. Ward is an inmate at the Joseph Harp Correctional Center in Lexington, Oklahoma.

2. Petitioner is in the custody of the Oklahoma Department of Corrections pursuant to the judgment and sentence entered in the District Court of Pottawatomie County, Case No. CF-1988-208.

3. In September 1985, Petitioner and his codefendant, Karl Fontenot, were jointly tried, convicted, and sentenced to death in Pontotoc County District Court Case No. CRF-1984-183. In 1987, the Supreme Court reversed its position on joint trials for defendants with interlocking confessions, and the Oklahoma Court of Criminal Appeals (OCCA) reversed both convictions and remanded the cases. *Ward v. State*, 755 P.2d 123, 124 (Okla. Crim. App. 1988); *Fontenot v. State*, 742 P.2d 31, 32-33 (Okla. Crim. App. 1987).

4. On remand, a change of venue was granted, and Petitioner was retried in Pottawatomie County District Court in June 1989. The jury convicted Petitioner of First Degree

Murder (21 O.S.1981, § 701.7), Kidnapping (21 O.S.1981, § 741), and Robbery with Dangerous Weapon (21 O.S.1981, § 801). Dkt. No. 58-35 at 8-10. Petitioner was sentenced to serve a term of life in prison for the murder conviction, and ten years each for Kidnapping and Robbery with a Dangerous Weapon. Dkt. No. 58-35 at 167-68.

5. Petitioner appealed his convictions and sentences to the OCCA, raising ten propositions of error.[1] Dkt. No. 23 at 4-6. The OCCA affirmed his convictions and sentences in a summary opinion on January 7, 1994. Dkt. No. 23 at 182-84. Petitioner subsequently filed a Petition for Rehearing, which the OCCA denied on March 25, 1994, and issued its mandate.

6. In December 1992, the OCCA ordered the Oklahoma State Bureau of Investigation (OSBI) to produce investigative records to Mr. Fontenot's counsel. Dkt. No. 20 at 418. In response, 860 pages were produced to Fontenot's counsel. *Id.* In 2003, Petitioner's counsel received a partially legible version of the OSBI files, and in 2008, the State produced a copy of the OSBI files to Petitioner's counsel. *Id.*

7. More than a decade later, Petitioner filed an Application for Post-Conviction Relief in Pontotoc County District Court on November 1, 2017, alleging newly discovered evidence of his innocence and *Brady*[2] and *Napue*[3] violations. Dkt. No. 19 at 6-11. He sought and received post-conviction discovery and then filed an Amended Application for Post-Conviction Relief on March 2, 2020. Dkt. No. 19 at 359-63; Dkt. No. 20 at 4-97. On December 18, 2020, District Judge

---

[1] In particular, Petitioner complained that: (1) his confession was coerced; (2) insufficient evidence was presented to convict him; (3) Jim Moyer's and Lenny Timmons' identifications of him should have been suppressed; (4) Fontenot's confession was improperly allowed; (5) evidence of uncharged crimes was improperly allowed; (6) his discovery request was wrongfully denied; (7) the jury was improperly instructed; (8) notices of alibi were improperly produced; (9) Exhibit 80 was not played in its entirety; and (10) investigator expenses were improperly denied. Dkt. No. 23 at 4-6.

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

[3] *Napue v. Illinois*, 360 U.S. 264 (1959).

Paula Inge, addressing only the alleged *Brady* violation, issued an order finding that Petitioner was deprived of a fair trial based on the State's suppression of favorable evidence. Judge Inge vacated Petitioner's convictions and sentences, dismissed the charges against him, and ordered his release from custody. Dkt. No. 20 at 410-43.

8. The State appealed Judge Inge's order. On August 26, 2022, the OCCA reversed, holding that Petitioner's due process claim was barred by res judicata, waiver, and laches. Dkt. No. 21 at 148-50. The OCCA remanded the case for consideration of Petitioner's remaining claim for post-conviction relief based on newly discovered evidence. *Id.* at 151.

9. On remand, Judge Inge denied Petitioner's post-conviction application on December 22, 2022, ruling that the newly discovered evidence failed to demonstrate his innocence by clear and convincing evidence. Dkt. No. 22 at 89. Petitioner did not appeal that ruling. Instead, on May 1, 2023, Petitioner filed the instant Petition, asserting a single due process claim premised on alleged *Brady* and *Napue* violations. Dkt. No. 2.

10. On September 21, 2026, in response to Respondent's motions to dismiss (Dkt. Nos. 54-57), this Court found that Petitioner's due process claim is untimely and procedurally defaulted but nonetheless concluded that it could consider the merits of his claim because Petitioner made a credible showing of actual innocence, permitting federal review of his otherwise barred constitutional claim. Dkt. No. 93 at 2, 13, 68. The Court directed Respondent to answer the Petition. *Id.* at 68.

11. In accordance with this Court's September 21, 2026, Opinion and Order, Respondent submits this response addressing the merits of Petitioner's constitutional claim and respectfully requests that the Court deny the Petition for a Writ of Habeas Corpus.

12. Petitioner has not requested an evidentiary hearing, and one is unnecessary here because the existing record provides an adequate basis for resolving Petitioner's constitutional claim. Federal habeas review is subject to significant limitations on evidentiary development, *see Cullen v. Pinholster*, 563 U.S. 170, 185 (2011); 28 U.S.C. § 2254(e)(2), and Petitioner has not demonstrated that an evidentiary hearing is necessary to resolve any material factual dispute concerning his *Brady*/*Napue* claim. Accordingly, Respondent respectfully requests that the Court adjudicate the Petition on the existing record without conducting an evidentiary hearing.

13. Respondent previously filed the transcripts from Petitioner's preliminary hearing and joint trial with Mr. Fontenot in 1985, proceedings leading up to Petitioner's retrial, and his 1989 retrial, along with the retrial exhibits. *See* Dkt. No. 58. Respondent is unaware of any other proceedings in the state courts that were recorded but not transcribed.

## STATEMENT OF THE FACTS

Juries twice convicted Petitioner in connection with the April 28, 1984 abduction and murder of twenty-four-year-old Donna Denice Haraway. The following factual summary is based on the thirteen days of evidence, testimony, and argument heard by the Pottawatomie County jury upon Petitioner's retrial in May and June 1989.

### I. Eyewitnesses Observe Petitioner at J.P.'s Pac-to-Go Shortly Before Ms. Haraway's Abduction.

At approximately 4:00 p.m. on Saturday, April 28, 1984, Karen Wise, a clerk at J.P.'s Pac-To-Go ("J.P.'s") convenience store, observed "a few" individuals playing pool in the store's game room and purchasing alcohol. Dkt. No. 58-24 at 116, 118-19.[4] She later identified Petitioner as

---

[4] Citations to the thirteen-volume transcript of Petitioner's retrial in Pottawatomie County in June of 1989 and to posttrial documents will be referenced according to the ECF docket entry ("Dkt. No. _").

one of those men. *Id.* at 121. At the time, another employee was assisting Ms. Wise, and the men eventually left the store. *Id.* at 118-19. Later that evening around 7:00 p.m., however, the men returned to J.P.'s when Ms. Wise was alone in the store, arriving in a grey- and red-primered pickup truck. *Id.* at 119-20. Ms. Wise observed the men, including Petitioner, watching her movements, particularly as she went to and from the store's safe, which caused her concern. *Id.* at 119, 121, 166-67.

Between 8:00 and 8:30 p.m., Jack Paschall, a professor at East Central University ("ECU"), stopped at J.P.'s to buy cigarettes. *Id.* at 122; Dkt. No. 58-25 at 27-29. Upon arrival, he observed an occupied sedan and an unoccupied Chevy pickup truck, which he described as "probably in the late 60's or early 70's" model with greyish-blue primer outside the store. Dkt. No. 58-25 at 29. Ms. Wise asked Mr. Paschall, "if he knew these boys," but he did not recognize them. Dkt. No. 58-24 at 122; Dkt. No. 58-25 at 30-31, 48-49.

Mr. Paschall observed one of the men, whom he later identified as Petitioner, approach the counter to get change for a dollar. Dkt. No. 58-25 at 32.[5] Mr. Paschall noted that the men appeared to have been fishing earlier that evening. *Id.* at 33. Approximately ten to fifteen minutes later, around 8:30 p.m., the men departed the store in the pickup truck and drove west toward town. Dkt. No. 58-24 at 148; Dkt. No. 58-25 at 33. J.P.'s was located on the same road as McAnally's convenience store, less than a mile away. Dkt. No. 58-24 at 116; Dkt. No. 58-25 at 28.

## II. Petitioner Is Spotted at McAnally's Convenience Store on the Evening Ms. Haraway Is Abducted.

On the evening of April 28, 1984, Jim Moyer, an ECU student, stopped at McAnally's for a pack of cigarettes and briefly spoke with Ms. Haraway, the clerk at the store. Dkt. No. 58-25 at

[5] Mr. Paschall described another individual that Petitioner was with as "slender build, had dark brown hair, beneath the earlobe length," but could not identify him. Dkt. No. 58-25 at 32-33.

84-85. Mr. Moyer recalled arriving around 7:30 p.m. and remaining at the store for about five minutes, although he acknowledged his recollection of the times was approximate. *Id.* at 85, 112, 133. While Mr. Moyer was at the counter, two men entered the store, one with dark hair and the other with blond hair, whom he later identified as Petitioner. *Id.* at 86-88, 91, 93, 107, 109. Mr. Moyer became suspicious of the men because he felt like they were watching him and believed they might be there to shoplift. *Id.* at 88. Upon leaving McAnally's, Mr. Moyer saw an unoccupied grey-primered Chevy pickup truck that was late-1960s or early-1970s parked outside. *Id.* at 88-89. He attempted unsuccessfully to write down the tag number of the pickup. *Id.* at 88. When another vehicle pulled up, Mr. Moyer concluded that nothing would happen while another car was there, so he left. *Id.* at 89.

At approximately 7:45 p.m., Richard Holkum, an off-duty Ada police officer, stopped at McAnally's and briefly spoke with Ms. Haraway, whom he knew. Dkt. No. 58-26 at 135-36. Officer Holkum recalled that Ms. Haraway was wearing blue jeans, an unzipped grey hoodie, and a light lavender blouse with a print design. *Id.* at 136. He left the store about fifteen minutes later. *Id.* at 139. After learning of Ms. Haraway's disappearance, Officer Holkum reported his observations to investigators, including his description of her blouse, which he provided to Ada Detective Mike Baskin and Captain Dennis Smith on April 29, 1984. *Id.* at 141.

Lenny and David Timmons, two brothers, and their uncle, Gene Welchel, went to McAnally's store between 8:30 and 8:40 p.m. on April 28, 1984, to get change for a poker game. Dkt. No. 58-25 at 143; Dkt. No. 58-26 at 8. Lenny was a passenger in David's vehicle, while Mr. Welchel arrived separately. *Id.* All three observed a late 1960s or early 1970s Chevy truck with faded grey or blue primer parked outside McAnally's. Dkt. No. 58-25 at 144-45, 170; Dkt. No. 58-26 at 9. The truck was parked parallel to the store, facing east. Dkt. No. 58-25 at 170.

As Lenny got out of the car and walked into McAnally's, he glanced at a man and woman walking out at the same time. Dkt. No. 58-25 at 145. He described the man as approximately 5'6" tall with sandy blond hair covering his ears, wearing a t-shirt and blue jeans. *Id.* at 165. Neither seemed to be in a hurry, and Lenny saw nothing unusual about their behavior. *Id.* at 152-53. David and Mr. Welchel, who remained outside, also observed the man and woman leave McAnally's and enter the pickup truck. *Id.* at 171; Dkt. No. 58-26 at 10. Mr. Welchel recalled that the man was "very close" to the woman, with his arm around her waist. Dkt. No. 58-26 at 10, 13, 18. He described the woman as wearing jeans and a light blue or grey hooded sweatshirt with the hood down and later realized she was Ms. Haraway. *Id.* at 11-12, 21, 29-30. Ms. Haraway entered the truck's passenger side, followed by the man, and the truck departed eastbound. Dkt. No. 58-25 at 171, 173, 178; Dkt. No. 58-26 at 10. Meanwhile, inside the store, Lenny discovered that no clerk was present; the cash register was open and missing money, schoolbooks were spread behind the counter, a purse was nearby, and a cigarette was smoldering in an ashtray. Dkt. No. 58-25 at 146-47, 172; Dkt. No. 58-26 at 10. Lenny came out and informed David and Mr. Welchel of his observations, and police were called minutes later. Dkt. No. 58-25 at 146, 160; Dkt. No. 58-26 at 11.

## III. Police Respond to McAnally's and Discover Money Missing from the Register.

Ada Police Officer Harvey Phillips was dispatched to McAnally's around 8:50 p.m. and arrived around 9:00 p.m. Dkt. No. 58-26 at 52, 58-59. At the scene, Sergeant Phillips spoke with Mr. Welchel and observed the open cash register, along with books, a purse, and keys near the counter. *Id.* at 53. Sergeant Phillips searched the purse and found Ms. Haraway's driver's license. *Id.* at 54. Monroe Atkinson, McAnally's manager, was called to the store between 8:30 and 9:00 p.m. and examined the register, determining that $167.42 was missing and that the last recorded

purchase was a can of beer. *Id.* at 63, 65-67. James Watts, the clerk who worked the shift prior to Ms. Haraway on April 28, 1984, was called to McAnally's at approximately 9:00 p.m. *Id.* at 116, 118. He recalled that Ms. Haraway was wearing a white or light-colored shirt with flowers, blue jeans, and tennis shoes, and possibly also had a grey jacket, when he saw her at the store earlier that day. *Id.* at 117-18, 123, 130. Detective Mike Baskin subsequently took over the investigation after arriving at approximately 10:00 p.m. *Id.* at 55, 60; Dkt. No. 58-27 at 53-54. Shortly after 11:00 p.m., store owner O.E. McAnally arrived and confirmed that $167.42 was missing from the cash register. Dkt. No. 58-26 at 71-74.

## IV. Witnesses Observe a Similar Pickup Truck Traveling West Shortly After Ms. Haraway's Disappearance.

Arthur Scroggins and his wife, Mary Scroggins, were returning to Ada on the evening of April 28, 1984. Dkt. No. 58-26 at 38, 48. While traveling to a local Braum's restaurant, between 8:40 and 8:45 p.m., they observed a grey-primered, rough-looking pickup truck traveling west past their vehicle at a high rate of speed, about two miles from McAnally's store. *Id.* at 39, 41, 44, 47, 49-51. Mrs. Scroggins saw three individuals inside the truck and noted that one had blondish hair. *Id.* at 50. The truck continued west through the intersection at Broadway Avenue and disappeared from their view. *Id.* at 42.

## V. Petitioner Reportedly Expresses Remorse on the Night of the Abduction.

Ada Police received information from an individual named Jeff Miller concerning Petitioner's activities on April 28, 1984. According to Mr. Miller's account, Petitioner and Mr. Fontenot had been at Blue River, a camping and recreational area near Tishomingo, approximately twenty-five to thirty miles south of Ada. Dkt. No. 58-27 at 77; Dkt. No. 58-28 at 119. Mr. Miller reported that, on April 28, Petitioner and Mr. Fontenot left Blue River, traveled to Ada, and later

returned; upon returning, Petitioner reportedly cried and said he was "sorry that he had done it." *Id.* at 119.

## VI. Ms. Haraway's Family Communicates with Police.

Steve Haraway, Ms. Haraway's husband, worked at We-Pac-Em Grocery in Ada on April 28, 1984. Dkt. No. 58-26 at 107. He left for work around 10:00 a.m. and did not see what his wife wore to McAnally's that afternoon, where she began her shift around 2:30 p.m. *Id.* at 108. Mr. Haraway spoke with Ms. Haraway by telephone around 7:00 p.m., as they often did. *Id.* at 109. Between 9:00 and 9:30 that night, Mr. Haraway got a call from Monroe Atkinson informing him that Ms. Haraway had disappeared from the store. *Id.* at 109. Upon arrival, Mr. Haraway saw his wife's parked car and her belongings behind the counter. *Id.* at 110. Subsequently, Mr. Haraway looked through Ms. Haraway's clothing to determine what she had been wearing. He testified, however, that the only clothing description he provided to others was that of a grey zip-up sweatshirt. *Id.* at 111-12, 114-15.

Janet Weldon, Ms. Haraway's younger sister, lived in Shawnee, Oklahoma at the time of the abduction. *Id.* at 150. She spoke with Ms. Haraway by telephone for about twenty minutes on the evening of April 28, 1984, and recalled nothing unusual about their conversation. *Id.* at 151. Days after Ms. Haraway's disappearance, Ms. Weldon looked through her sister's clothes but could not determine with certainty which blouse, if any, was missing or what shirt Ms. Haraway had been wearing on the day she disappeared. *Id.* at 152-53. Ms. Weldon testified that, after Petitioner's confession and arrest, she described to police a blouse she believed Ms. Haraway had been wearing, including details about a lace collar, puff sleeves, elastic, front buttons, and little blue flowers. *Id.* at 153-54. According to Ms. Weldon, after Petitioner confessed and described

Ms. Haraway's blouse, Ms. Weldon knew exactly which blouse Petitioner had described; she looked for it among her sister's belongings and could not find it. *Id.* at 154, 157.

Similarly, Pat Virgin, Ms. Haraway's mother, spoke with the District Attorney's Office after Petitioner's confession, learned of the blouse's details in that confession, and told police the blouse was missing from Ms. Haraway's belongings. *Id.* at 168-70. Ms. Virgin testified that she had not told police about the blouse prior to that day. *Id.* at 170-71.

## VII. Police Release Composite Drawings, Prompting at Least Thirty Callers Identifying Petitioner as Resembling One of the Suspects.

Two days after Ms. Haraway's abduction, the OSBI created and distributed two composite drawings in newspapers and on local television stations. Dkt. No. 58-27 at 64, 192; Dkt. No. 58-28 at 114. Eyewitnesses from the April 28 events assisted police in creating the composites, including Karen Wise and Gene Welchel. Dkt. No. 58-24 at 124; Dkt. No. 58-26 at 27-28. Lenny and David Timmons testified that the composite resembled the man they observed leaving McAnally's with Ms. Haraway. Dkt. No. 58-25 at 147-48, 173. Jim Moyer also agreed with the composite depictions, though he believed the suspect's hair should have appeared more "ruffled." *Id.* at 89-90.

Following publication of the composite drawings, police received between seventy-five to a hundred calls suggesting possible information about individuals whom the composite drawings depicted. Dkt. No. 58-27 at 64; Dkt. No. 58-28 at 114-15, 184. At least thirty callers identified Petitioner as the individual in the second composite. Dkt. No. 58-27 at 64; Dkt. No. 58-28 at 115-16, 186. Petitioner would later testify that he "was tired of everybody coming up to me saying, you know, that I kind of resembled that composite drawing[.]" Dkt. No. 58-31 at 127. Based on the information supplied by callers, police asked Petitioner to come down to the Ada Police Station. Dkt. No. 58-27 at 65; Dkt. No. 58-28 at 116.

## VIII. Petitioner Appears for His First Interview Days After the Murder with a Homemade Haircut and Defensive Wounds He Received on the Evening of the Abduction.

On the afternoon of Tuesday, May 1, 1984, Petitioner came to the Ada Police Station to speak to police about his whereabouts on the evening of April 28, 1984. Dkt. No. 58-27 at 65; Dkt. No. 58-28 at 116. He was met by Detective Mike Baskin and Captain Dennis Smith with the Ada Police Department. Dkt. No. 58-27 at 65; Dkt. No. 58-28 at 116. He was read his *Miranda*[6] rights and voluntarily agreed to speak with law enforcement. Dkt. No. 58-27 at 66; Dkt. No. 58-28 at 117. At the time of the interview, Petitioner had a fresh, homemade haircut, which appeared to be uneven and sloppily cut; although Petitioner's hair was considerably shorter than the composite picture, many of his facial features still resembled the composite depiction. Dkt. No. 58-27 at 69, 164-65; Dkt. No. 58-28 at 117. Police took a photograph of Petitioner upon his arrival at the interview, which was later admitted at trial. Dkt. No. 58-28 at 117.

When questioned about his whereabouts on April 28, 1984, Petitioner said that he was fishing in the afternoon with Karl Fontenot at a pond near Richardson Loop in Ada and remained there with Mr. Fontenot until dark. Dkt. No. 58-27 at 68; Dkt. No. 58-28 at 117-18. Afterwards, Petitioner drove Mr. Fontenot to an apartment on South Townsend belonging to Jeanette Blood Roberts, then drove himself home and cleaned up. Dkt. No. 58-27 at 68; Dkt. No. 58-28 at 118. Petitioner then walked back to Ms. Roberts's apartment for a keg party, where he remained the rest of the evening and stayed overnight. Dkt. No. 58-27 at 68; Dkt. No. 58-28 at 118.

At the interview, police observed Petitioner had a scratched, swollen right hand above the knuckles that had begun to scab up. Dkt. No. 58-27 at 69-70; Dkt. No. 58-28 at 117. Petitioner explained that he had suffered a defensive hand wound when, on the evening of April 28, 1984, as

---

[6] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

he walked to the party at Ms. Roberts's apartment, he was attacked by a pit bull and was bitten on the hand. Dkt. No. 58-27 at 70; Dkt. No. 58-28 at 118. After Petitioner's interview, law enforcement attempted to set an interview up with Mr. Fontenot but were unsuccessful in doing so. Dkt. No. 58-27 at 70; Dkt. No. 58-28 at 118-19.

## IX. Police Interview Petitioner on October 12, 1984, and His Story Changes.

After the Ada Police Department received information from Jeff Miller about Petitioner crying on the evening of the abduction and stating that he was "sorry that he had done it," Dkt. No. 58-27 at 77; Dkt. No. 58-28 at 119, Detective Baskin and Captain Smith went to Norman on October 12, 1984, to question Jeanette Blood Roberts, who supposedly had been at Blue River when the events of Mr. Miller's story occurred, Dkt. No. 58-27 at 72; Dkt. No. 58-28 at 119. Unbeknownst to police, Petitioner was living with Ms. Roberts in Norman at the time, and they asked to interview Petitioner at the Norman Police Department. Dkt. No. 58-27 at 71-72; Dkt. No. 58-28 at 120.

Petitioner arrived at the police station around 8:30 that evening and waived his *Miranda* rights. Dkt. No. 58-27 at 73, 89; Dkt. No. 58-28 at 120-21. Petitioner's interview was recorded and admitted at his retrial. Dkt. No. 58-27 at 78, 88. Petitioner's story was "completely different" from his prior explanation of whereabouts at the last interview, on May 1, 1984. Dkt. No. 58-27 at 74; Dkt. No. 58-28 at 121. On this day, Petitioner now claimed that he had been with his brother-in-law, Robert Cavens, on the morning of April 28, 1984, and went with Mr. Cavens to Collins Lumber Co., a few miles from Petitioner's house, to purchase plumbing supplies. Dkt. No. 58-27 at 74. Petitioner and Mr. Cavens then went to Petitioner's mother's house and installed a shower from noon until approximately 8:30 or 9:00 p.m. and then went to Ms. Roberts's house later that evening for a keg party. *Id.* at 74, 89-90. Petitioner claimed that he stayed over at Gordon

Calhoun's apartment and walked back home the next day. Dkt. No. 58-27 at 93.[7] When confronted with the fact that his story was inconsistent with details he previously told law enforcement, Petitioner claimed his prior story happened on Friday, April 27, 1984, and he had been confused, but Petitioner could not remember what prior story he had given to police. Dkt. No. 58-27 at 75, 101.

When confronted with his previous story regarding fishing with Mr. Fontenot at Richardson Loop, Petitioner claimed that the fishing had indeed happened on Friday, the day before, although he fluctuated on the location of the fishing spot. *Id.* at 76, 104, 106-08. Petitioner insisted that he was at the keg party on the night Ms. Haraway was kidnapped, and he denied killing Ms. Haraway. *Id.* at 113, 121. Petitioner claimed that he had last seen Ms. Haraway about six months prior to her disappearance when he visited McAnally's with his girlfriend at the time. *Id.* at 121-22. Petitioner also explained that the Blue River events occurred on Sunday, April 29, 1984. *Id.* at 116.

## X. Petitioner Confesses to Ms. Haraway's Abduction, Rape, and Murder.

A week later, on the morning of October 18, 1984, Petitioner was asked to come to the OSBI regional office in Oklahoma City. *Id.* at 154; Dkt. No. 58-28 at 123; Dkt. No. 58-30 at 6. Petitioner was introduced by Agent Gary Rogers to Deputy Inspector Rusty Featherstone with the OSBI at around 10:30 a.m., and at approximately 11:05 a.m., Petitioner waived his *Miranda* rights and agreed to speak with Inspector Featherstone alone. Dkt. No. 58-29 at 107-08, 110; Dkt. No.

---

[7] Gordon Douglas Calhoun lived in Ada for the first half of 1984, and was neighbors with Jeanette Blood Roberts. Dkt. No. 58-28 at 73-74. On April 28, 1984, Mr. Calhoun had a party at his apartment, beginning around 10:00 p.m. and ending sometime between midnight and 2:00 a.m. *Id.* at 74-75. Although Mr. Calhoun often had parties at his apartment, sometimes multiple nights in a row, he specifically remembered that evening because the police came in response to a noise complaint and told the partygoers to quiet down. *Id.* at 75, 80, 92. Mr. Calhoun was at the party all night and did not recall seeing Petitioner there. *Id.* at 76-77.

58-30 at 6-8. Law enforcement aimed to clear up Petitioner's inconsistent stories about his whereabouts on Saturday, April 28, 1984;[8] no threats, promises, or coercion were made. Dkt. No. 58-30 at 9-10. Petitioner claimed that he was fishing at a pond with Mr. Fontenot on Friday, was plumbing with Mr. Cavens on Saturday, and was at Blue River on Sunday. *Id.* at 10.

Inspector Featherstone did not feel Petitioner was being completely honest, however, and when he expressed that to Petitioner, Petitioner said he had nothing to do with Ms. Haraway's disappearance, but that he had a dream. Dkt. No. 58-30 at 11. Petitioner recounted his dream to Inspector Featherstone, and then, at approximately 2:00 p.m., hung his head, stated that it was not a dream, that he wished it had been only a dream, that he would not have done it if he had not been drunk, and that the events had been real. Dkt. No. 58-29 at 121; Dkt. No. 58-30 at 13, 17, 62. After telling the entire story again, Inspector Featherstone asked if Petitioner would be willing to record his statement on videotape; Petitioner agreed, and a videographer was called. Dkt. No. 58-29 at 123; Dkt. No. 58-30 at 14-16. It took nearly two hours to set up the videotape system, and at 6:58 p.m., Petitioner's statement was recorded. Dkt. No. 58-29 at 123, 150; Dkt. No. 58-30 at 16, 21, 23. During the entirety of his interview, Petitioner had access to the bathroom, snacks, drinks, and cigarettes; Petitioner never asked for an attorney or requested to stop making his statement. Dkt. No. 58-30 at 17-18.[9]

---

[8] Though not heard by the jury, Petitioner had gone to the OSBI office that morning for the purpose of being polygraphed by Inspector Featherstone. Dkt. No. 58-29 at 111-14. The circumstances of Petitioner's polygraph examination were heard in an *in camera* hearing to prevent the jury from improperly learning of the polygraph details.

[9] When Petitioner eventually took the stand during the defense's presentation of evidence, Petitioner claimed that he felt that he was threatened to confess "[m]ainly just being around the presence of police," but was not actually threatened with bodily harm. Dkt. No. 58-31 at 137, 169. Petitioner also claimed that he was too afraid to ask for a lawyer, that police never offered him any food, drink, or cigarettes until the tape was being made, and that he was not permitted to use the restroom (although he also admitted he never asked to use the restroom). *Id.* at 132-33, 167-68.

In his recorded statement, Petitioner explained that, on the evening in question, he was at a keg party and ran into Mr. Fontenot and Odell Titsworth,[10] whom he had not seen in a while. Dkt. No. 58-30 at 34. Petitioner stated that the three of them rode around and got high, and started talking about a good place to rob, and Petitioner suggested McAnally's. *Id.* at 34-35. Petitioner stated that he then went with Mr. Fontenot and Mr. Titsworth to McAnally's in a grey-primered pickup and parked between the gas pumps and the store. *Id.* at 11. Mr. Fontenot remained in the truck while Petitioner and Mr. Titsworth entered. Mr. Titsworth threw bags of chips around the store to lure Ms. Haraway from behind the counter, at which point Mr. Titsworth threw Ms. Haraway into Petitioner, and Petitioner twisted and put Ms. Haraway's arm behind her back and pushed her out the door. *Id.* at 11-12, 35, 38. Mr. Titsworth, having threatened Ms. Haraway with a six-inch locked-blade knife, took more than $100 from the cash register. *Id.* at 37-38, 55. They took Ms. Haraway so she would not be able to identify them in the robbery. *Id.* at 36. Ms. Haraway was put in the middle of the truck cabin, Mr. Titsworth drove, Petitioner sat on the other side, and Mr. Fontenot got into the bed of the truck. Dkt. No. 58-30 at 36. The truck headed east and then turned and went back west on Arlington towards the power plant near Richardson Loop, which was Mr. Titsworth's idea. *Id.* at 36, 39. Along the way, the stereo was loud, and Mr. Titsworth told Ms. Haraway to keep her mouth shut, slapping her a few times on the side of the face. *Id.* at 41.

---

Petitioner's claims of coercion were, of course, rebutted by both Inspector Rusty Featherstone and Agent Gary Rogers, who were each present for Petitioner's October 18, 1984, confession. Dkt. No. 58-30 at 9, 15, 17-18, 27-28; Dkt. No. 58-31 at 49-52. Additionally, in his trial testimony, Petitioner later admitted that he had lied multiple times regarding his whereabouts on the evening of Ms. Haraway's disappearance and averred that he had repeatedly lied to law enforcement in an attempt to get out of trouble and "to take a lighter sentence." Dkt. No. 58-31 at 144, 155, 177-81.

[10] Odell Titsworth had an alibi for the evening of Ms. Haraway's disappearance, as his arm had been broken and placed in a cast on April 26, 1984, after an altercation with police. Dkt. No. 58-27 at 16, 19. Mr. Titsworth's girlfriend's mother, Agnus Lumpmouth, attested that Mr. Titsworth was sitting in her living room on the evening of April 28, 1984. Dkt. No. 58-27 at 16-17.

Petitioner described how, upon arrival at the power plant, Ms. Haraway was taken to the back of the truck, the tailgate was let down, and Mr. Titsworth removed her blouse, blue jeans, and underwear. Dkt. No. 58-30 at 41-42. Petitioner described her blouse as white with little blue roses on it, button up, with buttons on the collar and at the end of the sleeves, and with fringe on the collar and lace on the end of the sleeves. *Id.* at 58. Petitioner stated that Mr. Titsworth raped Ms. Haraway as she struggled; Ms. Haraway screamed, and Mr. Titsworth took out his knife, cut her side, and threatened to kill her. *Id.* at 43. Petitioner stood at the back of the truck, holding Ms. Haraway's head down by her hair, as Mr. Fontenot stood to the side, laughing. After Mr. Titsworth finished, he told Petitioner it was his turn, but Petitioner said he did not want "sloppy seconds"; Petitioner did, however, take the knife and begin teasing her with it. *Id.* at 43-44.[11] Petitioner then pulled his jeans and underwear down "but I was so drunk that when I did try to rape her, that I couldn't rape her." *Id.* at 44. After about two minutes of trying to rape Ms. Haraway, she took off running, but Petitioner caught up to her, tackled her, and "started biting her on the tit," threatening to bite her breast off if she continued struggling. *Id.* at 45. When Petitioner had her down on the ground, Ms. Haraway said, "Tommy, I didn't think you'd ever do anything like this." *Id.* at 59-60. Petitioner cut Ms. Haraway twice on the side and arms with little scratches. *Id.* at 60. Petitioner

[11] The day before the murder, Petitioner was seen by David Yockey at a Love's gas station with a locked-blade knife, which Petitioner carried in his pocket. Dkt. No. 58-26 at 91-92. Mr. Yockey affirmed that Petitioner's hair on that day resembled the composite picture but was a little longer in the back. *Id.* at 95. Similarly, Billy Hammons, an individual who lived in the Portland Park community near Petitioner's home, attested that he had seen Petitioner in possession of a "pretty big" Buck knife. Dkt. No. 58-27 at 25-26. Mr. Hammons also recognized the composites as resembling Mr. Fontenot and Petitioner, and he remembered both men having haircuts after April 28, 1984. *Id.* at 24-25. In fact, in all the time Mr. Hammons had known Petitioner, he had never seen Petitioner's hair as short as in the photograph taken of Petitioner at the Ada Police Department on May 1, 1984. *Id.* at 48.

admitted that he was angry with Ms. Haraway because she had laughed at the fact that Petitioner and his prior girlfriend had broken up. *Id.* at 46. Mr. Titsworth and Mr. Fontenot then dragged Ms. Haraway back to the truck, and Mr. Fontenot began raping her. *Id.* at 45. Mr. Titsworth cut the side of Ms. Haraway's throat and called her a "bitch," saying she should not have run. *Id.* at 49. Petitioner then walked home to his house nearby, but approximately fifteen or twenty minutes later returned to the scene, worried about what might happen to her body. *Id.* at 46.

When he returned, Petitioner observed Mr. Fontenot still raping Ms. Haraway, though her body now had "tremendous long cuts all over her," and her body was completely white and motionless; Petitioner knew Ms. Haraway was dead at that point. *Id.* at 50. In fact, Ms. Haraway was bleeding from deep cuts in her side, neck, legs, and vaginal area, and her ribs and intestines were exposed from the deep cuts. *Id.* at 57, 61. Mr. Fontenot was completely naked and raping Ms. Haraway's body. *Id.* at 50. Mr. Titsworth laughed and told Mr. Fontenot that he was raping a corpse, and Mr. Fontenot responded, saying he "liked it better that way." *Id.* at 51.

Afterwards, they put Ms. Haraway's clothes back on and decided they had to dispose of her body, so Mr. Titsworth and Mr. Fontenot walked off into the woods carrying her, and Petitioner went home. *Id.* at 51-53. Mr. Fontenot subsequently told Petitioner they had dumped her body in a concrete bunker near a house by Sandy Creek. *Id.* at 52-53. Mr. Titsworth threatened to kill Petitioner if he said anything about the events of that evening. *Id.* at 54. In the interview, Petitioner stated that he "wouldn't have done it if I wasn't drunk, because I thought it was just a dream." *Id.* at 62. Petitioner's videotaped interview concluded at approximately 7:29 p.m., and he was arrested shortly thereafter. *Id.* at 23, 64.

## XI. Witnesses Identify Petitioner Being at J.P.'s and McAnally's on the Night Ms. Haraway Was Abducted.

Multiple eyewitnesses from J.P.'s and McAnally's confirmed through lineup identification that Petitioner was the individual observed on the evening of April 28, 1984. On October 24, 1984, Karen Wise went to the Ada Police Department for a lineup and immediately identified Petitioner as the individual she had seen in J.P.'s on that evening; Ms. Wise affirmed that police made no suggestions or innuendoes during the lineup. Dkt. No. 58-24 at 127-28, 143-46. Ms. Wise also identified Mr. Fontenot after a second lineup on December 11, 1984, but she did not identify him immediately and instead called Captain Smith later to say that Mr. Fontenot had been in her store and had scared her. *Id.* at 145-46. Jack Paschall identified Petitioner in a lineup on November 8, 1984, at the Ada Police Department, and picked him out as one of the men at J.P.'s on the evening of April 28, 1984; no suggestions or innuendoes were made by police. Dkt. No. 58-25 at 36-39, 46-50. When he picked Petitioner out of the lineup, Mr. Paschall stated: "if that's not him, it's his twin brother." *Id.* at 50.

Jim Moyer immediately identified Petitioner in a lineup on November 19, 1984, at the Ada Police Department; no suggestions or coercion were made. Dkt. No. 58-25 at 91-92, 106-07. When asked whether he was sure about his identification, Mr. Moyer stated: "I never forgot that evening." *Id.* at 107. Mr. Moyer also identified Mr. Fontenot in a lineup on December 11, 1984, at the Ada Police Department, although he admitted he was less sure about his identification of Mr. Fontenot. *Id.* at 92-93, 99, 107-09.

## XII. Petitioner Suggests Ms. Haraway's Body Won't Be Found Where He Described It.

In the days following Petitioner's confession, police conducted a large-scale search for Ms. Haraway's body in west Ada, where he claimed her body was dumped. Dkt. No. 58-27 at 9. A couple of days after his arrest, Petitioner went with law enforcement and directed them where to find Ms. Haraway's body. Dkt. No. 58-31 at 53-56. Petitioner led them to a location near Sandy

Creek during a rainstorm. Upon arrival, without even exiting the vehicle, Petitioner started shaking his head and cried out, "she's not here," and police called off the search that evening. *Id.* at 56.

Then, on the morning of November 1, 1984, Petitioner remarked to Paula Boren, a jailer for Pontotoc County, that "looking for that girl's body out there is like looking for a needle in a haystack, without the needle." Dkt. No. 58-27 at 9-10. Ms. Boren averred that Petitioner could have meant that the body was somewhere else, other than where the search was occurring. *Id.* at 13.

**XIII. Petitioner Confides to an Inmate that He Raped Ms. Haraway.**

James Allen, an inmate and cook for the Pontotoc County Jail in 1984, knew Petitioner and was incarcerated with him in the county jail. Dkt. No. 58-28 at 95-97. In December of 1984, Mr. Allen spoke with Petitioner several times about Ms. Haraway. *Id.* Petitioner told Mr. Allen a story about how he was partying with Marty Ashley, went out to McAnally's, purchased beer, and then went with Ms. Haraway to "some DX tanks" north of town, near a pond, to get drunk and continue partying. *Id.* at 98. Petitioner admitted that he and Mr. Ashley raped Ms. Haraway but insisted that he had nothing to do with the killing. *Id.* Petitioner stated that he and Mr. Ashley then dumped Ms. Haraway's body in the Canadian River. *Id.* According to Mr. Allen, Petitioner recounted these details in asking Mr. Allen to take the information to law enforcement and see if they would offer Petitioner a plea for rape, so that he might avoid the murder charge. *Id.* at 102. Mr. Allen also noted that he had previously seen Petitioner driving an older grey-primered Chevrolet pickup truck when Petitioner worked out at a local garage. *Id.* at 104-05, 109-10. Petitioner told Mr. Allen that it was his truck, that it was stolen, and that he had subsequently sold the truck to Marty Ashley. *Id.* at 104-05.

**XIV. After His Preliminary Hearing, Petitioner Admits that He Was at McAnally's and J.P.'s.**

On January 9, 1985, after his preliminary hearing, Petitioner announced that he wished to make another voluntary statement, since his memory had been refreshed by the witnesses who testified at preliminary hearing. *Id.* at 127-30, 149. With his counsel present and after being advised of his *Miranda* rights, Petitioner stated that on April 28, 1984, Marty Ashley came by his house to pick him up in order to go get beer and shoot some pool. *Id.* at 128-29, 146. At the time, Mr. Ashley had been using marijuana and injecting crystal methamphetamine. Dkt. No. 58-28 at 141-42. Petitioner got in Mr. Ashley's pickup truck, a '69 Chevy pickup that belonged to someone who lived with Mr. Ashley, and they went to J.P.'s. *Id.* at 129, 143-44. Afterwards, Petitioner and Mr. Ashley went to the home of a woman (whose last name was Mantzke), drank beer, went back to J.P.'s and then on to McAnally's. *Id.* at 130, 140, 155. Mr. Ashley leaned over the counter, flirted with and kissed Ms. Haraway, and told her that she would not have to work there if she were married to Mr. Ashley instead. *Id.* at 130, 148-49. According to Petitioner, Ms. Haraway then voluntarily left McAnally's with them, got in the truck, and the three of them drove off. *Id.* at 131, 149-50, 154. Petitioner claimed that he did not know Ms. Haraway's name or that she was married. *Id.* at 151. After driving around awhile, Petitioner was let off at his house, and Mr. Ashley and Ms. Haraway continued on together. *Id.* at 131. Petitioner never saw Ms. Haraway again. *Id.* at 169.[12]

---

[12] Marty Ashley testified that he never went to J.P.'s or McAnally's with Petitioner in April of 1984, was never in possession of a grey-primered pickup truck, and was not even close friends with Petitioner. Dkt. No. 58-29 at 60-61. Other witnesses confirmed that they had not seen Mr. Ashley in a grey pickup, nor had they seen Mr. Ashley with Petitioner. *Id.* at 63, 65, 68, 73. Karen Wise affirmed that she knew Marty Ashley, and that he was not at J.P.'s on April 28, 1984. *Id.* at 57. Additionally, multiple witnesses testified that Ms. Haraway was a reliable worker, had consistently worked the same evening shift at McAnally's for a year, had begun teaching full time by April of 1984, and was always dependable and prompt with her college schoolwork assignments at ECU. Dkt. No. 58-26 at 72, 87, 89-90. One witness testified that Ms. Haraway had class on Monday, April 30, 1984, but was not there; that witness had no reason to believe Ms. Haraway would otherwise not have come to class that day. *Id.* at 87.

Petitioner freely admitted that the witnesses who testified at the preliminary hearing, including the Timmons brothers, were correct in describing a man leave McAnally's with Ms. Haraway. *Id.* at 131, 149, 160. Petitioner explained that he was not contradicting the statements of the other witnesses from McAnally's, except to the extent that they believed Petitioner was with Mr. Fontenot; Petitioner averred that Mr. Fontenot was never at McAnally's that night, nor was Mr. Titsworth. *Id.* at 156-58. Petitioner also stated that Jim Moyer was in the store that night and was still there when Petitioner left the store. *Id.* at 158-59. Additionally, Petitioner admitted that he told Jim Allen, an inmate at the Pontotoc County Jail, that "I had something to do with" Ms. Haraway's disappearance. *Id.* at 164-65. Petitioner claimed that his prior inconsistent statements were lies and were merely "a put-on." *Id.* at 165-66. Petitioner's audio-recorded statement was played for the jury at his retrial.

**XV. Witnesses Connect Petitioner to the Truck Described at McAnally's and J.P.'s.**

J.T. McConnell, a resident of the Portland Park community in which Petitioner lived, recalled seeing Petitioner and Mr. Fontenot driving a grey-primered, late 60s, "junker" Chevy pickup truck with a long wide bed, big tires, and a jacked-up back end sometime prior to April 28, 1984. Dkt. No. 58-29 at 76-77. Mr. McConnell remembered the event because he had cautioned them against speeding up and down the neighborhood, as there were often kids playing on the street. *Id.* at 77. Though Mr. McConnell sometimes saw other boys in the pickup with Petitioner and Mr. Fontenot, he also saw the pickup parked at Petitioner's house on Ashland Avenue in Portland Park, and that the truck was "in and out of there all of the time and was parked there part of the time." Dkt. No. 58-29 at 80. Mr. McConnell never saw the truck again after Ms. Haraway's disappearance. *Id.* at 78.

Wayne Girdner, an insurance agent out of Tulsa, Oklahoma, recalled being contacted in early 1984 by Joel Ward, Petitioner's brother, in an attempt to insure a pickup truck. *Id.* at 94-95. That truck, according to Mr. Girdner, was a post-1965 model grey-primered truck, and Joel Ward indicated that he intended to fix up the truck and bring it back down to Ada. *Id.* at 95-96.

James Allen also recalled previously seeing Petitioner driving an older-model, grey-primered Chevrolet pickup truck. Dkt. No. 58-28 at 104-05. Petitioner told Allen that the truck was his. *Id.* at 109.

**XVI. Ms. Haraway's Remains Are Discovered.**

On January 20, 1986, Allen Tatum was setting hunting traps on a plot of leased land in rural Gerty, Oklahoma, approximately twenty-six miles east of Ada, in Hughes County. Dkt. No. 58-24 at 21-22. The topography of that particular area was described as rough, brushy, and mountainous, with a pond nearby. Mr. Tatum discovered a skull which he initially believed was Styrofoam, but upon closer inspection believed the skull to be real. *Id.* at 23-24. Mr. Tatum returned home and called Sheriff Orville Rose, who went to investigate the scene along with a local undersheriff, Floyd Trivet, and Mr. Tatum, on January 21, 1986. *Id.* at 25-26, 77-78. After further searching the scene, Mr. Tatum found bones scattered around the area, as well as little strings, pieces of cloth, and shoe soles nearby. *Id.* at 26-28. Mr. Tatum observed a pair of blue jeans, size 6, along with another little piece of dark-colored cloth, which he noted had a brown rusty color to it. *Id.* at 32, 37-38. Though the hill on which the remains were found was brushy and had no trash in the immediate vicinity, the pond nearby had been well-traveled by people and displayed signs of trash having been dumped there. *Id.* at 23, 34, 84. After getting on his hands and knees to rake the leaves apart, Undersheriff Trivet found an earring near the skull. *Id.* at 82.

Law enforcement from other agencies, including the OSBI, were called to the scene shortly thereafter.

David Dixon, a criminalist with the OSBI, processed the scene where the skull was found. *Id.* at 44-45. Mr. Dixon collected fragments of clothing in the area, including a faded work shirt in the general area of the bones, as well as part of an old T-shirt, a hair barrette, and a pair of earrings. *Id.* at 47, 50-52, 55, 59. Bruce Johnson, an Investigator with the District Attorney's Office, also responded to the scene to assist in the search. *Id.* at 61-62. Investigator Johnson helped comb the scene about fifty to seventy-five yards in both directions, and confirmed that blue jeans, an old T-shirt, a shoelace eyelet, and a hair barrette were found. *Id.* at 63-64, 70-71, 74. Investigator Johnson also noted that a red shop rag was found near the rest of the remains. *Id.* at 63, 75. A second search of the area was conducted on February 22, 1986, and involved the help of a large group of local ECU students, as well as various members of Ms. Haraway's family. *Id.* at 70-71. Investigator Johnson personally submitted the evidence recovered to the crime lab in the days following. *Id.* at 73.

Jackson D. Haraway, Ms. Haraway's father-in-law, assisted with the search on February 22, 1986. *Id.* at 87-88. Dr. Haraway, a dentist in Ada, recognized Ms. Haraway's molar tooth, based on prior dentistry work he had performed on her. *Id.* at 88-89. Dr. Haraway subsequently submitted Ms. Haraway's dental records to law enforcement to aid in the investigation. Dr. Richard Glass, the Chief Forensic Odontologist for the State, received the dental records from Dr. Haraway, as well as the skeletonized skull with the upper jaw intact and the skull's lower jaw. *Id.* at 91-92. Dr. Glass opined that, based on a dental observation of the skull, the jaws were consistent with belonging to Ms. Haraway. *Id.* at 100.

Larry Balding, a Doctor of Forensic Pathology at the Medical Examiner's Office, examined Ms. Haraway's skeletal remains on January 22, 1986, and prepared a report reflecting his findings. *Id.* at 104-05. Along with her remains, Dr. Balding also received the soles of Ms. Haraway's shoes, a sock, rotted blue jeans, a grey work shirt, and a gold and red colored earring. *Id.* at 112. Dr. Balding observed the skull to have a gunshot entry and exit wound, with the entrance at the back left and the exit at the front right of the skull. *Id.* at 107. Dr. Balding believed the cause of death was likely due to a gunshot wound, though he had no way of telling whether the wound was inflicted before or after death, nor could he determine the angle of the gunshot. *Id.* at 106, 108-09. According to Dr. Balding, the other injuries inflicted on the bones were due to animal activity after Ms. Haraway's death. *Id.* at 107. Dr. Balding opined that the vast majority of stabbing cases show no knife wounds on skeletal remains, and that typically soft tissue must be analyzed to determine the nature of a stabbing. *Id.* at 108-09. Indeed, in only two of the approximately fifty to seventy-five stabbing cases he analyzed had Dr. Balding observed knife wounds apparent on rib bones. *Id.* at 111.

**XVII. Petitioner Proceeds to Trial, and a Jury Convicts Him Again.**

Petitioner was retried in June 1989, where the aforementioned evidence was presented against him. Testifying in his own defense, Petitioner claimed that he falsely confessed after Detective Dennis Smith "told me that it was me and Karl Fontenot and Odell Titsworth" who took Ms. Haraway from the store, and he "figured they would go out and see that she wasn't out there and then just run me out for lying to them, because they seen that the statement wasn't true." Dkt. No. 58-31 at 136. Petitioner also claimed that Detective Smith told him what Ms. Haraway had been wearing: "they told me that she either had a white blouse with blue roses on it or a red and white striped shirt." *Id.* at 139. Petitioner said he "just took a guess" and said "the white shirt with

blue roses," but Det. Smith "was trying to get me to change my mind and say a white shirt with red stripes." *Id.* at 139-40. He further testified that he lied during his preliminary hearing at the suggestion of fellow inmate, Jim Allen, in the hopes of getting a lesser punishment. *Id.* at 144, 174. He claimed he had no access to a grey-primered pickup that was described by witnesses. *Id.* at 160.

Petitioner claimed that, on April 28, 1984, he attended a party at Gordon Calhoun's apartment and then walked home. *Id.* at 146-50. Once home, he went to sleep on the couch but was later woken up by his brother-in-law, Robert Cavens, to help repair burst water pipes under the house. *Id.* at 150. He testified that he was not at J.P.'s or McAnally's on April 28, 1984, and had no knowledge or involvement in Ms. Haraway's disappearance or murder. *Id.* at 144-45, 161. The jury was unconvinced and, on June 16, 1989, convicted Petitioner of robbery, kidnapping, and murder. Dkt. No. 58-35 at 8-10.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this Court's review. The deferential standard of 28 U.S.C. § 2254(d) applies only to "a claim that was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d); *see Harrington v. Richter*, 562 U.S. 86, 98 (2011). After the state district court granted post-conviction relief based on *Brady* alone and did not address the *Napue* allegation, the OCCA reversed on the independent and adequate state grounds of res judicata, waiver, and laches. Thus, the state court did not adjudicate on the merits Petitioner's due process claim, and § 2254(d) deference does not apply. *Cone v. Bell*, 556 U.S. 449, 472 (2009) ("Because the [state] courts did not reach the merits of [the] claim, federal habeas review is not subject to the deferential standard that applies under AEDPA . . . . Instead, the claim is reviewed *de novo*."); *see also Fontenot v. Crow*, 4 F.4th 982,

1061 (10th Cir. 2021) ("The § 2254(d) standard does not apply to issues not decided on the merits by the state court," and "[c]laims to which the state court applied a procedural bar were not decided on the merits," so "because the OCCA applied laches to deny [the] application for postconviction relief, [the court was] not bound by § 2254(d) deference.") (marks and citations omitted).

Respondent therefore addresses Petitioner's claim under de novo review. De novo review does not relieve Petitioner of his burden or disturb the deference owed to the state court's factual findings; the burden of establishing a constitutional violation remains on Petitioner, who must prove the elements of a *Brady* claim by a preponderance of the evidence. *United States v. Durham*, 902 F.3d 1180, 1221 (10th Cir. 2018); *see Fontenot*, 4 F.4th at 1062. And on de novo review, "state-court factfinding still receives the benefit of doubt under § 2254(e)(1)," as any state-court findings of fact bearing on the claim "are entitled to a presumption of correctness rebuttable only by 'clear and convincing evidence.'" *Id.* at 1061 (quoting 28 U.S.C. § 2254(e)(1)).

Even under de novo review, this Court's review of Petitioner's claim is restricted by the Supreme Court's anti-retroactivity rule in *Teague v. Lane*, 489 U.S. 288 (1989) (plurality opinion). *See Greene v. Fisher*, 565 U.S. 34, 39 (2011). The *Teague* anti-retroactivity rule, as modified by *Edwards v. Vannoy*, provides that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague*, 489 U.S. at 310; *see also Edwards v. Vannoy*, 593 U.S. 255, 272 (2021) (eliminating the exception to this rule for watershed rules of criminal procedure).

Here, Petitioner's convictions became final on June 23, 1994.[13] To the extent Petitioner attempts to rely on case law subsequent to this date, *e.g.*, Dkt. No. 73 (Petitioner's Notice of

[13] The OCCA denied Petitioner's petition for rehearing on March 25, 1994. Because he did not seek certiorari review in the United States Supreme Court, his convictions became final when the

Supplemental Authority concerning *Glossip v. Oklahoma*, 604 U.S. 226 (2025)), he carries the burden to show the rule on which he is relying is not "new." *See O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) ("Before a state prisoner may upset his state conviction or sentence on federal collateral review, he must demonstrate as a threshold matter that the court-made rule of which he seeks the benefit is not 'new.'"). "[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague*, 489 U.S. at 301 (plurality). "[P]ut . . . differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.* A result is not dictated by precedent unless it "was apparent to all reasonable jurists." *Lambrix v. Singletary*, 520 U.S. 518, 527-28 (1997). The Court's determination that Petitioner may pass through the actual-innocence gateway of *Schlup v. Delo*, 513 U.S. 298 (1995), does not alter the above framework. A gateway showing "does not alter the standard of review applied to a petitioner's underlying constitutional claims." *Fontenot*, 4 F.4th at 1060 (quoting *Gardner v. Galetka*, 568 F.3d 862, 879 (10th Cir. 2009)). Nor does it lower Petitioner's burden or entitle him to relief; it "merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Id.* (quoting *Martinez v. Ryan*, 566 U.S. 1, 17 (2012)). Petitioner must still prove an actual constitutional violation, and for the reasons set forth below, he cannot.

Respondent's analysis of the merits under this standard is without prejudice to, and does not waive, the threshold procedural defenses preserved in the Preservation of Procedural Defenses section below. Because no state court reached the merits, § 2254(d)'s deferential standard does not apply; were it to apply, relief would be unavailable *a fortiori*.

## **PRESERVATION OF PROCEDURAL DEFENSES**

---

ninety-day period for seeking such review expired. *See* Sup. Ct. R. 13.1, 13.3; *Clay v. United States*, 537 U.S. 522, 527 (2003).

Respondent incorporates by reference the procedural defenses previously asserted in this proceeding, including the statute of limitations under 28 U.S.C. § 2244(d), *see* Dkt. Nos. 56 & 57, and exhaustion under 28 U.S.C. § 2254(b), *see* Dkt. Nos. 54 & 55, and procedural default based on the independent and adequate state-law grounds of *res judicata*, waiver, and laches invoked in Petitioner's postconviction proceedings, *see* Dkt. No. 21 at 148. Respondent acknowledges that, in its September 21, 2026 Order (Dkt. No. 93), this Court rejected Respondent's threshold defenses and concluded that Petitioner satisfied the actual-innocence gateway recognized in *Schlup*. Respondent respectfully disagrees with those determinations and maintains its previously asserted procedural defenses for purposes of preserving them for further review. Respondent recognizes, however, that the Court's rulings govern the present proceedings and therefore addresses the merits of Petitioner's constitutional claims as directed.

## ARGUMENT AND AUTHORITY

This Court should not issue a writ of habeas corpus. Petitioner's sole claim—a due process claim premised on alleged *Brady* and *Napue* violations—fails because he cannot demonstrate the requisite materiality. Petitioner alleges the following categories of evidence were suppressed by the State at trial:

- evidence revealing the State possessed a description of Ms. Haraway's floral print blouse prior to Petitioner's confession in which he described it (Dkt. No. 2 at 22-32);
- evidence suggesting eyewitness Mr. Moyer sought a $5,000 reward for information concerning Ms. Haraway's disappearance, his description sharpened over time, and a report suggesting he may have chosen someone else in a photo array lineup (*id.* at 38-42);
- documents revealing law enforcement investigated other individuals, including Floyd DeGraw and Billy Charley (*id.* at 34-38);
- evidence that Ms. Haraway was receiving obscene phone calls at work (*id.* at 26-28);
- two interview reports wherein Petitioner maintained his innocence (*id.* at 44); and

- evidence of alleged witness tampering by the State (*id.* at 45-46, 59).

Respondent is mindful of the Tenth Circuit's ruling in *Fontenot v. Crow*, 4 F.4th 982 (10th Cir. 2021) and this Court's recent *Schlup* ruling. Although *Fontenot* arose from the same investigation into Ms. Haraway's disappearance and involved some of the same categories of investigative material listed above, the evidence against Mr. Fontenot differs materially from the evidence against Petitioner. As discussed below, the evidence suppressed before Petitioner's separate retrial, considered cumulatively against the evidence presented against Petitioner, does not create a reasonable probability of a different result. While *Fontenot* determined the character of much of the suppressed evidence, it does not determine the materiality in Petitioner's separate trial. Similarly, this Court's recent *Schlup* ruling, which considered a broader universe of evidence than is at issue here,[14] does not resolve *Brady* materiality or the *Napue* scienter element.

**I. Petitioner's Trial Record Is Materially Different from Mr. Fontenot's.**

In *Fontenot*, the Tenth Circuit concluded that Mr. Fontenot's conviction for the kidnapping, robbery, and murder of Ms. Haraway was of "highly questionable validity," and when viewed in light of the entire record, the cumulative impact of favorable evidence suppressed by the State was prejudicial and would have created a reasonable probability of acquittal if it had been disclosed. *Fontenot*, 4 F.4th at 1081-82.[15] That conclusion rests on the particular facts of Mr. Fontenot's case

[14] For instance, the Petition discusses advances in the science of false confessions "since Mr. Ward's trial," (Dkt. No. 2 at 61-63) which the Court noted in its Order (Dkt. No. 93 at 49), but such 'evidence' was created after Petitioner's retrial, could not have been suppressed by the State, and is therefore excluded from the *Brady* analysis. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Browning v. Trammell*, 717 F.3d 1092, 1104 (10th Cir. 2013).
[15] In dissenting from the majority's opinion, Judge Eid found that the new evidence Mr. Fontenot put forward was "either peripheral, cumulative of trial evidence, or based on recollections that are three decades old." *Fontenot*, 4 F.4th at 1083 (Eid, J., dissenting).

and does not control the outcome here, where the jury at Petitioner's separate retrial was presented with significantly stronger evidence of guilt.

As an initial matter, Petitioner's confession preceded and generated the case against Mr. Fontenot, not the other way around. Law enforcement's interest in Mr. Fontenot originated from information provided by Petitioner. *Fontenot*, 4 F.4th at 998. "The A[da] P[olice] D[epartment] first contacted Mr. Fontenot on May 1, after Mr. Ward told police that he and Mr. Fontenot were together on April 28." *Id.* When Mr. Fontenot never showed up for a planned meeting with police, they did not follow up with him. *Id.* Then, Petitioner confessed and implicated Mr. Fontenot, which refocused police's attention. *Id.* at 999. Months after having no contact with Mr. Fontenot, law enforcement brought him in for questioning "the day after Mr. Ward inculpated him[.]" *Id.* Police told Mr. Fontenot that Petitioner had already confessed and implicated him, and that police knew he and Petitioner were involved and had been at a party that night with Mr. Titsworth. *Id.* at 1000. Only then did Mr. Fontenot confess to the abduction and murder, describing it in a way that mirrored aspects of Petitioner's confession. *Id.* Mr. Fontenot recanted his confession two days later and claimed that he agreed to the story told him by the agent. *Id.* In contrast, Petitioner cannot—and does not—claim that his confession was derived from a codefendant's version of events.[16]

Second, eyewitness testimony placed Petitioner with Ms. Haraway at and near her abduction but could not do the same for Mr. Fontenot, who was several inches shorter than the description given. *Fontenot*, 4 F.4th at 1008. Mr. Moyer identified Petitioner as being in McAnally's with Ms. Haraway on April 28 around 7:30 p.m., along with a dark-haired man. Dkt.

[16] The two confessions were not identical. For instance, as the Tenth Circuit recognized, Petitioner's description of walking Ms. Haraway out of the convenience store aligns with the description of Mr. Welchel and the Timmons brothers, who described a blond man similar in appearance to Petitioner; whereas Mr. Fontenot's claim that Mr. Titsworth walked Ms. Haraway out of McAnally's conflicts with the other witnesses' accounts. *Fontenot*, 4 F.4th at 1003.

No. 58-25 at 84-88, 91-92, 106-07. While Mr. Moyer was steadfast in his identification of Petitioner, his identification of the dark-haired man, whom he only observed in "glances," was "far more equivocal." *Fontenot*, 4 F.4th at 1040. When examined at Mr. Fontenot's trial, Mr. Moyer acknowledged that he grew confused about his initial identification of Mr. Fontenot and admitted he was "not sure" it was Mr. Fontenot. *Id.* at 1040-41. This left prosecutors to argue in closing that "Ward and a man closely resembling Mr. Fontenot were in J.P.'s on April the 28th." *Id.* at 1049. Later, Mr. Moyer recanted his identification of Mr. Fontenot in a 2012 affidavit that the Tenth Circuit treated as new and reliable. *Id.* at 1041.

Similarly, Ms. Wise, the J.P.'s clerk, identified Petitioner as being at her store on April 28, 1984, Dkt. No. 58-24 at 121, but she could not identify Mr. Fontenot as one of the men in J.P.'s that night, and "she admitted that she also failed to identify Mr. Fontenot at a live lineup," *Fontenot*, 4 F.4th at 1044. So too with Mr. Paschall, who, while "standing right by the door" at J.P.'s "had an excellent chance to observe both men," *id.* at 1053, identified Petitioner in a lineup and at trial, Dkt. No. 58-25 at 36-39, 46-50, but did not identify Mr. Fontenot in a lineup, *Fontenot*, 4 F.4th at 1001 (noting that when presented with the lineup that included Fontenot, Mr. Paschall responded: "Sorry, I don't think I can be any help"). Whereas Petitioner's presence at J.P.'s and McAnally's was confirmed by the testimony of these multiple eyewitnesses, Mr. Fontenot's involvement depended on whether he was the unidentified second man associated with Petitioner at J.P.'s and McAnally's.

Third, certain physical and circumstantial evidence more strongly linked Petitioner to the crime than Mr. Fontenot:

- In the days immediately following the abduction, approximately thirty tipsters identified Petitioner as the man in one of the composite drawings of the suspects seen at J.P.'s,

more identifications than any other individual, including Mr. Fontenot, received. Dkt. No. 58-27 at 64; Dkt. No. 58-28 at 116, 186.

- Three days after the abduction and near the same time that the composite sketches were publicized, police observed Petitioner with an apparently recent "badly chopped" homemade haircut, scratches above the knuckles on the back of his right hand, and swelling in that hand. Dkt. No. 58-27 at 69-70; Dkt. No. 58-28 at 117. Petitioner acknowledged at trial that people approached him because of his resemblance to the composite drawing. Dkt. No. 58-31 at 127. The jury could reasonably consider the change in Petitioner's appearance, together with the injuries observed shortly after the crime, as circumstantial evidence supporting an inference of Petitioner's guilt; the Tenth Circuit identified no comparable contemporaneous physical evidence against Mr. Fontenot.[17]

- Petitioner was linked more closely than Mr. Fontenot to the late 1960s/early 1970s grey-primered Chevy pickup seen at J.P.'s (Dkt. No. 58-24 at 119-20, Ms. Wise; Dkt. No. 58-25 at 29, Mr. Paschall), at McAnally's (Dkt. No. 58-25 at 88-89, Mr. Moyer), entered into by Ms. Haraway (*Id.* at 144-45, 170; Dkt. No. 58-26 at 9-10, Messrs. Timmons and Welchel), and driven from away the direction of McAnally's (Dkt. No. 58-26 at 39-51, Mr. and Mrs. Scroggins). Insurance agent Wayne Girdner testified that he insured a late 1960s/early 1970s grey-primered pickup truck for Petitioner's brother, Joel Ward, in early 1984. Dkt. No. 58-29 at 94-97. James Allen saw Petitioner driving an older, late model grey-primered Chevy truck that Petitioner represented as his own. Dkt. No. 58-28 at 104-05, 109. Meanwhile, J.T. McConnell's testimony that, before the abduction, he had observed Petitioner and Mr. Fontenot riding in a late-1960s

[17] In Petitioner's trial, the jury heard from Mr. Hammons that he remembered both Petitioner and Mr. Fontenot as having haircuts after April 28, 1984, and that he had never seen Petitioner's hair as short as it was when Petitioner met with police on May 1, 1984. Dkt. No. 58-27 at 24-25, 48.

grey-primered Chevrolet pickup that he stopped seeing after Ms. Haraway disappeared (Dkt. No. 58-29 at 77–78), was a rare link between Mr. Fontenot and the grey-primered truck, *Fontenot*, 4 F.4th at 1011. This evidence connected Petitioner to a vehicle resembling the one described by witnesses more directly than the evidence connecting Mr. Fontenot to that vehicle.

Fourth, the number and manner of Petitioner's incriminating statements more strongly evidence guilt than those made by Mr. Fontenot. Petitioner made multiple statements over several months that implicated him in Ms. Haraway's disappearance. These included a statement reportedly made on the night of the abduction, when Petitioner—not Mr. Fontenot—was overheard saying he was "sorry that he had done it." Dkt. No. 58-28 at 119. Petitioner's October 1984 videotaped confession preceded Mr. Fontenot's, but unlike Mr. Fontenot, Petitioner later made a recorded statement after his January 1985 preliminary hearing with his counsel questioning him.[18] Petitioner acknowledged being at both J.P.'s and McAnally's on the night Ms. Haraway disappeared and leaving McAnally's in a pickup truck with Ms. Haraway, though he denied participating in a crime. Dkt. No. 58-28 at 130-31, 140, 149-50, 154-55. The jury also heard that, in November 1984, while authorities were searching for Ms. Haraway's body, Petitioner remarked to a jailer that searching for her was "like looking for a needle in a haystack without the needle,"

[18] In its recent Order, this Court did not accept Petitioner's January 9, 1985 statement as evidence of Petitioner's guilt because the State tried to disprove it at trial. Dkt. No. 93 at 67 n.50. Respondent respectfully submits that the Court erred in disregarding the inculpatory nature of the statement and urges that it be considered here, particularly since testimony from law enforcement recognized that Petitioner's admissions contained classic (and not unusual) attempts at misdirection and minimization. Dkt. No. 58-31 at 50-51. Moreover, Petitioner admitted to readily and repeatedly lying about the extent of his involvement in order to better his position in this case. *Id.* at 177, 181. It is entirely possible to believe some aspects of a defendant's confession while disbelieving other aspects. *See Eizember v. State*, 164 P.3d 208, 240 (Okla. Crim. App. 2007) ("the jury acted well within their authority in choosing to believe parts of Appellant's statements while disbelieving others").

and the next month, he admitted to another inmate that he had raped Ms. Haraway and helped dispose of her body. Dkt. No. 58-27 at 9-10; Dkt. No. 58-28 at 98. Unlike Mr. Fontenot's additional inculpatory statements, which did not independently place him with Ms. Haraway at McAnally's,[19] Petitioner's subsequent statements, particularly his preliminary-hearing account, admitted his own presence with Ms. Haraway at the location and approximate time of the abduction. These multiple statements, made in different settings and containing overlapping inculpatory information, provided the jury with additional grounds for assessing Petitioner's involvement in the crime.

## II. Petitioner Fails to Prove a *Brady* Violation.

### a. Legal Standard

In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. This duty arises regardless of whether a request for such evidence has been made by the defense. *United States v. Agurs*, 427 U.S. 97, 107 (1976). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). "The defense needs to establish these elements by a preponderance of the evidence." *Durham*, 902 F.3d at 1221.

As to the first requirement, evidence is "suppressed by the State, either willfully or inadvertently," when it is "known to the [State] but not disclosed to trial counsel." *Strickler*, 527

[19] Mr. Fontenot reportedly told a friend he knew the identity of who abducted Ms. Haraway, and while Mr. Fontenot awaited trial in the county jail, a fellow inmate overheard him saying "I knew we'd get caught." *Fontenot v. State*, 881 P.2d 69, 78 (Okla. Crim. App. 1994).

U.S. at 282. As to the second requirement, "[e]vidence favorable to the defense encompasses exculpatory evidence, which tends to establish a criminal defendant's innocence," and it "also encompasses impeachment evidence, used to undermine a witness's credibility." *Fontenot*, 4 F.4th at 1066-67 (internal marks and citation omitted).

As to the third element, prejudice exists "when the suppressed evidence is material for *Brady* purposes." *Banks v. Dretke*, 540 U.S. 668, 691 (2004). To establish materiality, Petitioner must show a reasonable probability that, had the suppressed favorable evidence been disclosed, the result of the proceeding would have been different. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Consequently, Petitioner must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290 (quoting *Kyles*, 514 U.S. at 435).

Courts evaluating the materiality of withheld evidence "do not consider each piece of withheld evidence in isolation," but rather "review the cumulative impact of the withheld evidence, its utility to the defense as well as its potentially damaging impact on the prosecution's case." *Simpson v. Carpenter*, 912 F.3d 542, 572 (10th Cir. 2018) (quotation marks omitted). Courts "evaluate the materiality of withheld evidence in light of the entire record in order to determine if 'the omitted evidence creates a reasonable doubt that did not otherwise exist.'" *Banks v. Reynolds*, 54 F.3d 1508, 1518 (10th Cir. 1995) (quoting *Agurs*, 427 U.S. at 112).

**b. Blouse**

Petitioner initially contends that the State violated *Brady* by failing to disclose investigative reports that suggest law enforcement had a description of Ms. Haraway's blouse before he confessed. Dkt. No. 2 at 22–32, 77–79. In support, he relies on Detective Baskin's August 1984

report documenting Ms. Weldon's description of a blouse she gave her sister, which, according to that report, was light lavender with blue flowers and lace around the collar, elastic around the sleeves, and buttoned down the front. Dkt. No. 7 at 27; *see also* Dkt. No. 6 at 97; Dkt. No. 2 at 23–24. Petitioner also relies on an updated missing-person report containing a similar description, a June 11, 1984 Regional Organized Crime Information Center (ROCIC) submission card, and subsequent statements from Ms. Weldon, Steve Haraway, and former law enforcement officers concerning when investigators learned about the blouse. Dkt. No. 2 at 26. Petitioner maintains that this evidence undermines the prosecution's reliance on his description of the blouse to corroborate his confession. *Id.* at 23, 77-79.

In *Fontenot*, the Tenth Circuit concluded that the undisclosed blouse descriptions, principally the August 1984 investigative report, were favorable and material to Mr. Fontenot's defense. 4 F.4th at 1079. Respondent recognizes the August 1984 report would have supported Petitioner's contention that an investigator possessed the blouse's description before his confession and would have aided in impeaching Ms. Weldon's testimony that she had never talked to law enforcement about the blouse before the confession. Dkt. No. 58-26 at 153, 157.[20] But that fact alone does not establish that investigators supplied him with the blouse's description before his confession. Indeed, the investigators made clear they did not do so. Dkt. No. 58-28 at 172. No

[20] The impeachment value would have been minimal. Ms. Weldon testified that she examined her sister's belongings after the disappearance but did not initially reach a definite conclusion about which blouse was missing. Dkt. No. 58-26 at 152–54. She explained that she later contacted law enforcement after Petitioner and Mr. Fontenot were arrested, when she believed she could identify the blouse described in Petitioner's confession. *Id.* During her subsequent postconviction deposition, Ms. Weldon repeatedly stated that she could not remember the timing of her conversation with Det. Baskin and declined to speculate about whether it occurred during the first month of the investigation. Dkt. No. 15 at 235. Indeed, the idea that Ms. Weldon was so intimately familiar with her sister's wardrobe that she could examine it and conclusively determine the one missing blouse beggars credulity.

evidence supports Petitioner's self-serving statements that they did, and to conclude that the blouse's description would have any effect on a jury requires concluding a jury would credit Petitioner's ever-changing tales over the investigators. As Agent Rogers would later testify, "And why—why would I want to jeopardize a confession by contaminating it with something like that?" Dkt. No. 15 at 139.

Nor was the jury unaware that investigators had information about Ms. Haraway's blouse before Petitioner confessed. Officer Richard Holkum testified that he visited McAnally's shortly before Ms. Haraway disappeared and saw her wearing a light-colored blouse, lavender or blue, with a small print or design. Dkt. No. 58-26 at 135–41. He testified that he provided the blouse's description to Detectives Smith and Baskin on April 29, 1984, nearly six months before Petitioner confessed. Dkt. No. 58-26 at 140–41. Thus, the jury heard that investigators received information about Ms. Haraway's clothing before Petitioner's interrogation.

The defense had a factual basis to challenge the view that Petitioner's knowledge of the blouse originated from his participation in the crime, and, while the undisclosed reports would have strengthened that argument, the reports do not establish what investigators communicated to Petitioner. Petitioner's theory depends on the additional inference that investigators supplied him with the information, even though at trial, Detective Baskin testified that the clothing description was not a particularly significant aspect of the investigation. Dkt. No. 58-27 at 59, 179.[21]

Similarly, the blouse description was not the only evidence connecting Petitioner to Ms. Haraway's disappearance. Unlike Mr. Fontenot, Petitioner was identified by eyewitness Jim Moyer as one of the men inside McAnally's shortly before Ms. Haraway disappeared. Dkt. No.

---

[21] Similarly, Agent Rogers would later testify and deny providing Petitioner with the blouse description. Dkt. No. 15 at 139 ("I can assure you that, as sure as I'm sitting here, that that was not done").

58-25 at 85–89, 106–07. Petitioner also acknowledged that he had previously visited McAnally's and had seen Ms. Haraway there on multiple occasions. Dkt. No. 58-27 at 121–22. During his October 18 confession, Petitioner described Ms. Haraway recognizing him and addressing him by his first name. Dkt. No. 58-30 at 59–60. The jury additionally heard evidence concerning Petitioner's changing accounts of his whereabouts, his identification by other eyewitnesses at J.P.'s, his inculpatory statement the night of her disappearance, and his subsequent statements concerning the crime, even admitting in a counseled recorded statement following the preliminary hearing to being at J.P.'s and leaving McAnally's with Ms. Haraway the night of her disappearance. Thus, although the blouse description featured in the prosecution's argument, it was only one component of the evidence connecting Petitioner to Ms. Haraway's disappearance.

In sum, considering that the jury already heard evidence of police's knowledge of certain details before Petitioner's confession, the undisclosed reports do not establish that investigators supplied Petitioner with the more detailed blouse description, and substantial evidence connected Petitioner to the offense. Considering these circumstances in the context of the trial and allegedly suppressed evidence collectively, there is no reasonable probability that disclosure of the blouse reports would have produced a different result.

**c. Mr. Moyer**

Petitioner next contends the State violated *Brady* concerning eyewitness James Moyer, who identified Petitioner at McAnally's, by failing to disclose possible impeachment evidence of: (1) Mr. Moyer's participation in a November 6, 1984, photographic lineup in which he might or might not have selected Petitioner; (2) his request to claim a $5,000 reward before Petitioner's retrial; and (3) purported differences between his investigative statements and subsequent

testimony. Dkt. No. 2 at 38-41, 64-66, 88-91. Even if such evidence was suppressed and favorable, Petitioner has not established that it was material under *Brady*.

This Court previously concluded that evidence concerning Mr. Moyer's photographic-lineup participation, changing accounts, and reward request would cause a reasonable juror to harbor doubt about his identification of Petitioner. Dkt. No. 93 at 59-61. That determination, however, arose in the context of Petitioner's actual-innocence gateway claim and does not independently resolve whether the allegedly suppressed evidence, considered cumulatively and against the entire trial record, creates a reasonable probability of a different verdict under *Brady*. Moreover, in reaching its earlier conclusion, this Court declined to consider Petitioner's January 9, 1985 statement as evidence of guilt because the State sought to disprove his account at trial. Dkt. No. 93 at 67 n.50. The Court should consider those admissions here because, as explained above, the State's challenge to Petitioner's exculpatory account does not negate the inculpatory admissions contained in that same statement. Those admissions bear directly on the significance of the impeachment evidence concerning Mr. Moyer.

Indeed, Petitioner corroborated Mr. Moyer's testimony in his recorded January 9 statement, when he acknowledged his presence at McAnally's, his departure with Ms. Haraway, and his agreement that the eyewitnesses who placed him there were correct. Dkt. No. 58-28 at 130-31, 149-50, 158-60. Thus, even if the undisclosed evidence substantially undermined Mr. Moyer's identification, Petitioner's own admissions independently establish he was present at McAnally's and departed with Ms. Haraway. Such evidence negates the materiality of the alleged suppressed impeachment evidence concerning Mr. Moyer discussed below.

1. <u>November 6, 1984 Photographic Lineup</u>

An undisclosed November 6, 1984 investigative report states that Mr. Moyer examined a photographic lineup and selected photograph "#1 in the Ward folder" as one of the individuals who most resembled the man he observed at McAnally's. Dkt. No. 18 at 9; Dkt. No. 2 at 39–40. A separate report reflects that James Boardman selected photograph "#1" from the "Ward folder" earlier that month. Dkt. No. 18 at 7. Petitioner argues that because his photo was designated photograph number five in State's Exhibit 10-S, a photographic exhibit introduced at trial, Mr. Moyer and Mr. Boardman necessarily selected someone other than Petitioner. Dkt. No. 2 at 39–40; Dkt. No. 19 at 4-5.

This Court called that conclusion "speculative" (Dkt. No. 93 at 61), and the Tenth Circuit in *Fontenot* noted "[i]t is unclear if '#1 out of the Ward folder' was a photo of Mr. Ward or of another blond-haired man." 4 F.4th at 1069. Petitioner's theory also presupposes that police placed suspects in the same numbered position, which the record refutes. *Compare* Dkt. No. 2 at 84 (contending that both Moyer and Boardman "selected suspect #1 when the only records show that [Petitioner]'s photo was #5") *with* Dkt. No. 6 at 94-95 (noting that Petitioner was number six in a live lineup for one witness but number four for other witnesses, while Fontenot was positioned as number three in the lineup for one witness but number five for another witness). Compounding the speculation is this Court's inference that, had Mr. Moyer selected Petitioner's photograph during the November 6 lineup, "the prosecution would have elicited this testimony to bolster" Mr. Moyer's testimony. Dkt. No. 93 at 60. But that inference overlooks an equally plausible explanation: the prosecution already had Mr. Moyer's unequivocal identification at the November 19 live lineup and his in-court identification, so Mr. Moyer's earlier selection of photographs that "most resembled" (Dkt. No. 18 at 9) the men he observed would have been cumulative, unnecessary, and potentially counterproductive, as it could have invited questions about whether

his subsequent identification was influenced by the various lineups rather than based on his independent recollection of the events.[22]

Regardless, Mr. Boardman was at McAnally's around 5:00 p.m. on April 28, 1984, several hours prior to the kidnapping, so his identification is of limited use in the case. As to Mr. Moyer, the investigative reports do not identify the individual depicted in photograph number one or if the numbering system used in November 1984 was identical to what appears in State's Exhibit 10-S. Without the original November photographic arrays, Petitioner offers only speculation about what "may well have" occurred to show that such evidence is favorable to support his *Brady* claim. Dkt. No. 2 at 40. A *Brady* claim cannot be granted based on speculation. *Case v. Hatch*, 731 F.3d 1015, 1041 (10th Cir. 2013); *United States v. Ahrensfield*, 698 F.3d 1310, 1319 (10th Cir. 2012).

Moreover, the surrounding evidence of Mr. Moyer's repeated and emphatic years-long identification of Petitioner contradicts the "speculative" assertion that he selected someone else. Days after the photographic lineup, Mr. Moyer "immediately" identified Petitioner in a lineup on November 19, 1984, at the Ada Police Department. Dkt. No. 58-25 at 91-92, 106-07. Photographs of the lineup were made and Mr. Moyer selected Petitioner. *Id.* at 92, 107. Mr. Moyer testified that police did not direct his attention to any particular individual, make any innuendos, insinuations, or do anything that would have caused him to look at a particular individual. Dkt. No. 58-25 at 106. When asked if he was identifying Petitioner from his recollection of April 28, 1984 or from

---

[22] This Court also "call[ed] into question [Moyer's] credibility" because of his "propensity to aid authorities and make identifications[.]" Dkt. No. 93 at 60 n.43. But that characterization is difficult to reconcile with Mr. Moyer's subsequent recantation of his identification of Mr. Fontenot at Petitioner's trial. Dkt. No. 3 at 223-25; *Fontenot*, 4 F.4th at 1041-44. If Mr. Moyer were predisposed to identify suspects merely to assist law enforcement, his willingness to retract his Fontenot identification would be difficult to explain. Similarly, his willingness to withdraw his Fontenot identification while not doing so for his identification of Petitioner is inconsistent with the suggestion that he indiscriminately identified suspects.

that lineup, Mr. Moyer answered unequivocally at Petitioner's retrial in 1989: "I never forgot that evening of April the 28th[.]" *Id.* at 107. In contrast, Mr. Moyer equivocated and subsequently recanted his identification of Mr. Fontenot, but has not done so as to his identification of Petitioner. Dkt. No. 58-25 at 109; *Fontenot*, 4 F.4th at 1041.

2. Mr. Moyer's Request for a Reward

Next, Petitioner looks to Mr. Moyer's letter to OSBI dated April 4, 1989, in which he requested "to be considered for all or part of" a $5,000 reward offered by OSBI in May 1984 for information concerning Ms. Haraway's disappearance. Dkt. No. 2 at 39, 64-65, 83-84, 89-90; Dkt. No. 6 at 71-72. OSBI denied the request on April 19, 1989, stating that the reward was intended to obtain information on Ms. Haraway's whereabouts. Dkt. No. 6 at 74. Even though OSBI denied the request before Petitioner's retrial, Petitioner contends that the correspondence demonstrates Mr. Moyer's financial interest in securing a conviction.

While Mr. Moyer's request for a reward was potentially favorable impeachment evidence, the circumstances surrounding Mr. Moyer's request demonstrate that it was immaterial. Mr. Moyer provided his account to investigators, participated in identification procedures, and testified in earlier proceedings before submitting the request. *See Mastracchio v. Vose*, 274 F.3d 590, 604 (1st Cir. 2001) ("The fact that [the witness] had staked out his position well before he received any emoluments renders remote any possibility that the jury would have thought that he had fabricated his story in return for cash."). He did not receive the requested reward because the reward was offered for information leading to Ms. Haraway's whereabouts and had expired. Dkt. No. 93 at 42–43; Dkt. No. 6 at 74. Moreover, even after having been denied, Mr. Moyer proceeded to testify at Petitioner's retrial. Thus, the correspondence does not establish that Mr. Moyer originally implicated Petitioner in anticipation of receiving compensation or that the State promised him a

benefit in exchange for his testimony. Even if the defense could have used the letter to suggest that Mr. Moyer had a financial interest in maintaining his identification, the denial of his request and the fact that his identification predated the request and that he reaffirmed it after the denial substantially weaken the value of such impeachment and the inference that his account was fabricated for financial gain.

3. Mr. Moyer's Investigative Statements and Trial Testimony

Petitioner next contends that Mr. Moyer's account of his observations changed over time. Dkt. No. 2 at 40-41, 83–85. The reports do not reflect verbatim transcripts of the entirety of conversations with Mr. Moyer, but instead reflect summaries of conversations with Mr. Moyer on different dates. Unsurprisingly, the reports contain some differences in detail but largely reflect substantial consistency concerning central observations underlying Mr. Moyer's identification.

An April 30, 1984 interview summary—consisting of all of eight sentences—reflects that Mr. Moyer reported a dark-haired man entered McAnally's first and a blond-haired man entered later. Dkt. No. 18 at 17. A one-paragraph November 6, 1984 interview summary reflects that Mr. Moyer stated that a dark-haired man was already toward the back of the store while he was speaking with Ms. Haraway at the counter, and that a second, blond-haired man subsequently entered and walked past him. *Id.* at 9. Petitioner emphasizes that Mr. Moyer's earlier investigative reports did not include certain clothing descriptions that appeared in his subsequent testimony, and that his account of his efforts to observe the suspects' vehicle became more detailed. Dkt. No. 2 at 40-41; Dkt. No. 93 at 59–60.

Yet, Mr. Moyer consistently identified two men, one dark-haired and the other blond-haired, inside McAnally's shortly before Ms. Haraway disappeared (which Petitioner then confirmed was accurate). Dkt. No. 18 at 9, 17. Both accounts describe the blond-haired man

entering after the dark-haired man, and both associate the men with a pickup truck parked outside the store. *Id.* The November 6 report's statement that the dark-haired man was already toward the back of the store when Mr. Moyer observed him does not necessarily contradict the April 30 report's statement that the dark-haired man entered first. Rather, the accounts can fairly be read to describe different portions of the same sequence of events.

Likewise, Petitioner was already aware of discrepancies regarding clothing details as Mr. Moyer described the men's jeans and footwear at the preliminary hearing but stated that he did not remember their shirts. Dkt. No. 58-15 at 12–13. At Petitioner's retrial, Mr. Moyer described one man as wearing a light-colored T-shirt, jeans, and tennis or track shoes. Dkt. No. 58-25 at 123. The absence of details concerning clothing in earlier reports does not provide significant impeachment material nor does it establish that Mr. Moyer's identification of Petitioner was knowingly false.

The same is true of Mr. Moyer's description of the pickup truck. His April 30 report states that he glanced at its license plate but could not remember the number. Dkt. No. 18 at 17. At trial, he described looking for a pencil to write down the plate number. Dkt. No. 58-25 at 88–89. Both accounts reflect that Mr. Moyer noticed the vehicle and attempted to obtain information about it. Even if these reports could have been used to question Mr. Moyer about the development of his account and certain differences in detail of his recollections, they also reveal substantial consistency concerning his observations of two men and their vehicle, thereby strengthening support for his credibility.

The State recognizes that Mr. Moyer was an important prosecution witness in corroborating Petitioner's repeated assertions that he was at McAnally's and left with Ms. Haraway the night she disappeared. Yet, the State did not depend exclusively on Mr. Moyer to establish Petitioner's

presence at the store, and additional impeachment of Mr. Moyer would not have undermined the evidence placing Petitioner at McAnally's, particularly where Petitioner himself acknowledged the accuracy of the eyewitnesses' observations in a statement presented to the jury.

The remaining impeachment evidence is evaluated in context. The photographic-lineup reports do not establish that Mr. Moyer selected someone other than Petitioner; Mr. Moyer's investigative statements contain differences in detail but preserve substantial consistency concerning the presence of two men and a pickup truck at McAnally's; and, although Mr. Moyer requested a reward, he did so years after originally identifying Petitioner and testifying in earlier proceedings, and the OSBI denied his request. In sum, when the allegedly suppressed impeachment evidence concerning Mr. Moyer is considered cumulatively in light of the entire trial record, Petitioner has not demonstrated that disclosure of the evidence undermines confidence in the verdict.

**d. Other investigated individuals and obscene phone calls**

Petitioner contends that the OSBI File and other documents produced post-trial contain exculpatory information suggesting other perpetrators, namely Billy Charley and Floyd DeGraw, were the cause of Ms. Haraway's disappearance. Dkt. No. 2 at 32-38. Petitioner also claims that the State committed a *Brady* violation by not disclosing evidence that Ms. Haraway received two to three obscene phone calls at work several weeks before her abduction. Dkt. No. 2 at 33.

Petitioner, however, does not address the admissibility of this evidence. While the actual innocence gateway analysis allows courts to consider all evidence "without regard to" its admissibility, *Fontenot*, 4 F.4th at 1031-32, the *Brady* inquiry is different. "To be material under *Brady,* undisclosed information or evidence acquired through that information must be admissible." *Banks v. Reynolds*, 54 F.3d 1508, 1521 n.34 (10th Cir. 1995) (quoting *United States*

*v. Kennedy*, 890 F.2d 1056, 1059 (9th Cir. 1989)); *see also Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (holding that evidence inadmissible under state law, even for impeachment purposes, "is not 'evidence' at all" under *Brady*).

In Oklahoma, "evidence offered to show that some other person committed the crime charged must connect such other person with the fact; that is some overt act on the part of another towards the commission of the crime itself." *Woodruff v. State*, 846 P.2d 1124, 1137 (Okla. Crim. App. 1993). "There must be evidence of acts or circumstances that tend clearly to point to another, rather than the accused." *Id.* It is "not enough to show a possible motive on the part of another; the evidence must show an overt act by the third person toward the commission of a crime." *Id.* (citing *Tahdooahnippah v. State*, 610 P.2d 808, 810 (Okla. Crim. App. 1980)). Similarly, "[r]emote acts, disconnected, and outside of the crime itself, cannot be separately proved for such a purpose[.]" *Gore v. State*, 119 P.3d 1268, 1275 (Okla. Crim. App. 2005) (quoting *Irvin v. State*, 146 P. 453, 464 (Okla. Crim. App. 1915)).

Petitioner identifies no overt act or other circumstances sufficiently connecting Billy Charley, Floyd DeGraw, or the unidentified caller to Ms. Haraway's abduction or murder. Instead, as to Mr. Charley, Petitioner relies on information from Ms. Haraway's sister mentioning Mr. Charley changing his appearance[23] and having "been out to the store," as well as Ada Police Department notes describing Mr. Charley's resemblance to the composite sketches and the alleged need to subsequently follow up on the lead to retrieve more information. Dkt. No. 2 at 36-38. None of this meets the quantum of evidence to exceed mere "speculation, suspicion and innuendo." *See Stouffer v. State*, 147 P.3d 245, 262 (Okla. Crim. App. 2006). Moreover, as this Court recognized,

---

[23] Ms. Weldon would later testify that she did not know and had never heard of Mr. Charley. *See* Dkt. No. 15 at 226 (responding to questions about Mr. Charley: "I've never heard of this guy.").

Petitioner "was aware early in the prosecution that Charley was identified as resembling the composite, and the jury was also informed of this." Dkt. No. 93 at 53 (citing the preliminary hearing and trial testimony). The jury heard that law enforcement "investigated Charley." *Id.* Petitioner's counsel cross-examined law enforcement at trial on Mr. Charley's resemblance to the composite sketches, and the jury heard how "[a]t least twenty of those calls identified Billy Charley as the person in this composite." Dkt. No. 58-28 at 183, 186. The records Petitioner points to in support of his *Brady* claim are cumulative to what the jury heard and not material. *See* Dkt. No. 93 at 53 (concluding that "information regarding Charley does not support [Petitioner]'s actual innocence claim"); *Case*, 731 F.3d at 1025 (denying *Brady* claim based on cumulative evidence).

As to Mr. DeGraw, Petitioner claims undisclosed records from the OSBI files reveal him to be a suspect. Dkt. No. 2 at 35. There is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." *Moore v. Illinois*, 408 U.S. 786, 795 (1972). Even if there was such a requirement, the Tenth Circuit considered the evidence of Mr. DeGraw and concluded that, "[b]ecause not enough evidence tied Mr. DeGraw to Ms. Haraway's murder, law enforcement was justified in abandoning this lead." *Fontenot*, 4 F.4th at 1073. As a result, "the investigation of Mr. Degraw was not ripe ground for impeachment of law enforcement," and "the OSBI reports on Mr. DeGraw do not rise to the level of *Brady* material." *Id.* Similarly, this Court concluded that "[i]f the jury was presented with this information regarding DeGraw, it likely would not have created reasonable doubt in the mind of a reasonable juror." Dkt. No. 93 at 61.

As to the phone calls, Ms. Haraway's husband reported that "he knew of no one that Donna was having problems with at the store, other than she had received two to three obscene phone calls at the store, the last one being approximately two to three weeks prior to the disappearance."

Dkt. No. 5 at 71; *see also id.* at 12 (OSBI report reflecting that Mr. Haraway told McAnally's store manager about the calls). Ms. Haraway's sister reported Ms. Haraway felt uneasy working at the store alone and had stated at some point that "the phone calls had started again but didn't go into the story." Dkt. No. 7 at 81.[24] The report does not clarify when Ms. Haraway conveyed this information to her sister, but Ms. Weldon testified at Petitioner's trial that her sister gave no indication during their telephone conversation on the night of her disappearance that anything was wrong. Dkt. No. 58-26 at 151.

The Tenth Circuit concluded in Mr. Fontenot's case that the suppressed evidence concerning the calls was favorable to Mr. Fontenot's defense because the calls suggested an alternative suspect with a possible motive for Ms. Haraway's abduction. *Fontenot*, 4 F.4th at 1075-77. But the Tenth Circuit did not address the "threshold showing" that Oklahoma requires, which is "proof of an overt act in the commission of the crime." *Gore*, 119 P.3d at 1276; *see Stouffer*, 147 P.3d at 262 (rejecting alternative suspect evidence where "extraneous evidence is purely speculative regarding an unknown third party"). The undisclosed reports reflect that Ms. Haraway received obscene calls, but they do not identify the caller, connect that individual to the abduction or murder, or establish that the calls constituted an overt act toward the commission of either offense. Their relevance rests on speculation rather than the factual foundation required by Oklahoma law.

Moreover, the Tenth Circuit's conclusion regarding the calls must be understood in the context of Mr. Fontenot's prosecution. The court emphasized that the "unidentified caller obviously knew that Ms. Haraway worked at McAnally's and knew when she worked." *Fontenot*,

---

[24] Ms. Haraway's sister, Janet Weldon, later clarified in a deposition that her sister "had been getting crank calls, like people calling and hanging up, but when you work at a convenience store, that's what comes with it." Dkt. No. 15 at 227.

4 F.4th at 1038. Significantly, the majority relied on the absence of evidence "that Mr. Fontenot had been in McAnally's prior to April 28, 1984, knew Ms. Haraway, or, indeed, had ever even seen her before." *Id.* at 1077; *see also id.* at 1039 n.26. Thus, the court considered it more reasonable to infer that the calls originated from an unidentified alternative person than from Mr. Fontenot himself. *Id.* at 1039.

The factual premise that the majority relied on in Fontenot's case does not apply to Petitioner. Unlike Mr. Fontenot, Petitioner acknowledged that he knew Ms. Haraway and had previously visited McAnally's. Dkt. No. 58-27 at 121-22. During Petitioner's October 12, 1984 interview with investigators, he explained that his girlfriend had worked at McAnally's with Ms. Haraway, and that he had seen Ms. Haraway "a few times" at the store, most recently approximately six months earlier. *Id.* at 121–22. Days later, during his October 18, 1984 interview, Petitioner described how he knew Ms. Haraway personally and that she recognized him during the offense, calling him by his first name, stating "Tommy, I didn't think you'd ever do anything like this." Dkt. No. 58-30 at 59–60.

Petitioner's familiarity with McAnally's and Ms. Haraway thus distinguishes a central factual premise in the *Fontenot* majority's reasoning. The majority rejected the suggestion that Mr. Fontenot placed the calls himself because there was no evidence he previously encountered Ms. Haraway or visited McAnally's. *Fontenot*, 4 F.4th at 1039 n.26, 1077. Unlike Mr. Fontenot, Petitioner had an established connection to both. The reports of the calls, which do not identify the caller, leave unresolved whether the calls had any connection to the offense. Although the Tenth Circuit also recognized that the reports could have provided investigative leads and a basis for challenging law enforcement's investigation and Ms. Weldon's testimony, *id.* at 1075-77, those potential uses must be evaluated against the evidence presented at Petitioner's trial, including

eyewitness testimony placing him inside McAnally's shortly before Ms. Haraway's disappearance and his multiple inculpatory statements. Dkt. No. 58-25 at 85-89, 106-07; Dkt. No. 58-30 at 59-60. In light of the materially different evidence presented at Petitioner's trial, the calls' speculative connection to Ms. Haraway's abduction and murder, and considered together with the other allegedly suppressed evidence, there is not a reasonable probability that disclosure of the telephone-call reports would have produced a different verdict. *See Case*, 731 F.3d at 1041; *Ahrensfield*, 698 F.3d at 1319.

**e. Petitioner's exculpatory statements**

Petitioner asserts that two reports of his interviews were withheld in which he maintained his innocence to police. Dkt. No. 2 at 44. As an initial matter, because the reports recount statements that Petitioner himself made, his knowledge of those statements "implicates the element of prejudice, or materiality." *Fontenot*, 4 F.4th at 1066. Petitioner's "independent awareness of the exculpatory evidence is critical in determining whether a *Brady* violation has occurred. If a defendant already has a particular piece of evidence, the prosecution's disclosure of that evidence is considered cumulative, rendering the suppressed evidence immaterial." *United States v. Quintanilla*, 193 F.3d 1139, 1149 (10th Cir. 1999); *see also Banks (Reynolds)*, 54 F.3d at 1517 ("[I]f the defense already has a particular piece of evidence, the prosecution's disclosure of that evidence would, in many cases, be cumulative and the withheld evidence would not be material."). Here, such reports did not add substantive content to what was known to Petitioner and presented to the jury at trial.

First, Petitioner complains about a withheld "report from his first interview on May 1, 1984." Dkt. No. 2 at 44. But the written interview summary is not material because, as described by this Court, it "is merely a recitation of [Petitioner] telling authorities he was fishing with

Fontenot and then went to a party at Fontenot's neighbor's apartment." Dkt. No. 93 at 53. Detective Baskin recounted for the jury this version of events told to him by Petitioner when interviewed on May 1, 1984. *See* Dkt. No. 58-27 at 67-70; Dkt. No. 58-28 at 117-18.

Second, Petitioner complains about a withheld "report from an October 31, 1984 interview from jail, conducted by a District Attorney investigator." Dkt. No. 2 at 44. The interview summary recounts how Petitioner told authorities that he was home the night of April 28, 1984, and woke up around midnight when his brother-in-law needed help fixing a broken pipe. Dkt. No. 7 at 10. This interview summary is not material because, as this Court recognized, "[w]hile this exact statement was not presented to the jury, the jury was aware of [Petitioner]'s changing stories and the version wherein he helped his brother-in-law fix a broken pipe under the house." Dkt. No. 93 at 54. Because these interview reports are cumulative of evidence the jury already heard, they do not establish a *Brady* violation. *See Case*, 731 F.3d at 1041; *Ahrensfield*, 698 F.3d at 1319.

**f. Alleged Witness Tampering**

Petitioner alleges that the State withheld evidence that it attempted to tamper with three witnesses' testimony at trial: Stacey Shelton, Odell Titsworth, and Karen Wise. Dkt. No. 2 at 45.

1. Stacey Shelton

As for Ms. Shelton, Petitioner relies on her 2009 affidavit, alleging that District Attorney William Peterson attempted to pressure her into recanting testimony she provided for the defense at Petitioner's retrial. Dkt. No. 2 at 46-47; Dkt. No. 13 at 81-83. During the retrial, Ms. Shelton was called by the defense and testified that she attended a party at Gordon Calhoun's apartment around midnight in the evening of April 28, 1984, which was several hours after Ms. Haraway's abduction. Dkt. No. 58-32 at 192-94. She could not recall whether she saw Petitioner at the party.

*Id.* at 194. She testified regarding her attempts to inform the State about her belief that Petitioner was at the party, based on details she had heard Petitioner describe. *Id.* at 195-98.

In her affidavit, Ms. Shelton claims that Mr. Peterson confronted her after she testified, demanded that she return to the stand and recant, and required her to remain at the courthouse when she refused. Dkt. No. 13 at 82 ¶¶ 10-12. Yet, the affidavit also establishes that the alleged efforts were unsuccessful, as Ms. Shelton expressly stated that she refused to recant because she believed her testimony was truthful, that Mr. Peterson never recalled her as a witness, and that she continued to stand by her testimony. *Id.* at ¶¶ 12-13.

Importantly, the alleged confrontation occurred after Ms. Shelton had already testified concerning the party at Mr. Calhoun's apartment, and Petitioner does not identify any testimony that Ms. Shelton changed or withdrew as a result of Mr. Peterson's alleged conduct, nor does he establish that the confrontation prevented him from presenting additional favorable testimony from her. Thus, even assuming the allegations in Ms. Shelton's affidavit are true, Petitioner has not demonstrated that the alleged intimidation deprived his jury of material exculpatory evidence or otherwise rendered his trial fundamentally unfair. *See* Dkt. No. 93 at 54 (finding Petitioner's "stance regarding . . . Shelton is unavailing").

2. <u>Odell Titsworth</u>

Likewise, Petitioner's allegations concerning Odell Titsworth do not establish a constitutional violation. *See id.* (finding Petitioner's "stance regarding Titsworth . . . is unavailing"). Petitioner relies on a 2014 declaration from Mr. Titsworth, whom Petitioner identified as a third participant in his October 1984 confession. Dkt. No. 2 at 46; Dkt. No. 13 at 79-80. In the declaration, Mr. Titsworth alleges that District Attorney Peterson encouraged him to testify in a way that would incriminate Petitioner and Mr. Fontenot, purportedly so that Mr.

Titsworth could "get even" with them for implicating him in Ms. Haraway's disappearance. Dkt. No. 13 at 79-80. Mr. Titsworth further states that he was "convinced Mr. Peterson was asking [him] to lie." *Id.* at 79.

These allegations, however, do not establish that Mr. Titsworth actually testified falsely or that the prosecution knowingly presented false testimony. Mr. Titsworth, whose testimony from the preliminary hearing was read into the record at Petitioner's retrial (Dkt. No. 58-32 at 23-83), claims that Mr. Peterson encouraged him to incriminate Petitioner and Mr. Fontenot; he does not identify any statement in his testimony that was false or altered in response to that alleged encouragement. His claimed belief that Mr. Peterson wanted him to lie is not evidence that he complied with that request. Moreover, as this Court recognized in finding Petitioner's "stance regarding Titsworth . . . unavailing," Petitioner "presented Titsworth's testimony at trial where he detailed authorities' multiple attempts to get him to admit to the crime and how authorities placed Titsworth in situations with Ward and Fontenot while they were all detained in an attempt to find out if [Petitioner and Fontenot] had anything to do with it." Dkt. No. 93 at 54. Thus, the jury heard evidence of the same tactics that Petitioner cites as evidence of withheld wrongdoing. Dkt. No. 58-32 at 36-40.

Petitioner also relies on Mr. Titsworth's account of conversations he recorded with Petitioner and Mr. Fontenot while they were incarcerated, in which Mr. Titsworth concludes they lacked knowledge of Ms. Haraway's disappearance. Dkt. No. 2 at 46. Yet, his account does not identify or quote any particular exculpatory statement made by Petitioner during those conversations, much less one that contradicts evidence presented at Petitioner's retrial. Significantly, as this Court already recognized, Mr. Titsworth informed the jury of the recording operation itself. Dkt. No. 93 at 54, Dkt. No. 58-32 at 40. Accordingly, neither the authorities'

efforts to obtain incriminating statements through Mr. Titsworth nor the existence of a recording was concealed from the jury.[25] In sum, Petitioner's allegations concerning Mr. Titsworth do not establish the suppression of material exculpatory evidence in violation of *Brady*.

3. Karen Wise

Petitioner next contends that the State suppressed evidence concerning J.P.'s employee Karen Wise, who testified about men she observed there on the night of Ms. Haraway's disappearance. Dkt. No. 2 at 45-47, 80-81. Petitioner relies principally on Ms. Wise's 2016 declaration, in which she states that she observed four men together at J.P.'s, and that District Attorney Peterson discouraged her from discussing the additional men, Bob Howard and Bubba Daggs, at trial. Dkt. No. 13 at 54–56.

Respondent recognizes that this Court found Ms. Wise's declaration sufficiently reliable to constitute new evidence for purposes of Petitioner's actual-innocence gateway claim, Dkt. No. 93 at 63-65, but that determination does not resolve whether the information, considered with the other allegedly suppressed evidence, establishes a reasonable probability of a different verdict under *Brady*. Similarly, the Tenth Circuit concluded in *Fontenot* that Ms. Wise's affidavit constituted "new reliable evidence of innocence" because her identification of two additional men who made her nervous could have caused a reasonable juror to question Mr. Fontenot's involvement and the investigators' failure to pursue those individuals. 4 F.4th at 1045. That conclusion, however, concerned Mr. Fontenot's particular actual innocence claim and did not determine whether the same evidence would undermine confidence in Petitioner's separate

[25] Petitioner complains that the recordings themselves were not disclosed, but he does not establish that such recordings contained material exculpatory evidence. Mr. Titsworth's declaration does not identify the recordings' specific contents nor establish that they contained material information beyond what was presented at trial. Petitioner also does not explain how the recordings, considered with the other evidence presented and allegedly withheld, undermine confidence in the verdict.

conviction. The distinction is particularly significant here because Ms. Wise's affidavit does not undermine her identification of Petitioner at J.P.'s, which was independently corroborated by Mr. Paschall and by Petitioner's own admissions. Dkt. No. 58-25 at 36–39, 46–50; Dkt. No. 58-28 at 127-31, 149-50. Moreover, although the Tenth Circuit recognized that Ms. Wise's account raised questions concerning the investigation's failure to pursue the additional men, those questions must be evaluated in light of the substantially different evidence connecting Petitioner to the offense. Thus, accepting the Tenth Circuit's assessment of Ms. Wise's affidavit in Mr. Fontenot's case does not compel the same materiality finding to Petitioner.

First, the jury was not left unaware that additional men were present at J.P.'s. Ms. Wise testified repeatedly—not merely "a passing reference" (Dkt. No. 93 at 63)—that there were more than just two men there. She testified that she observed "a few" individuals playing pool in the store's game room and purchasing alcohol, including an individual she later identified as Petitioner. Dkt. No. 58-24 at 116, 118-19. Later, she clarified that "[t]here were three or four people back there playing pool and other games." *Id.* at 153. She then reaffirmed again that "there were four of them back in the game room." *Id.* And, lest there be any doubt, she testified again that there were "[t]wo others besides these two," referring to the two men under discussion, in the back playing pool. *Id.* Defense counsel, therefore, had a basis to challenge any suggestion that the investigation had accounted for every person present, as the jury heard Ms. Wise testify repeatedly that more than two individuals were present in the poolroom on the evening of Ms. Haraway's disappearance.

Respondent acknowledges that Ms. Wise's declaration goes beyond the number of men present, as she alleges that Mr. Howard's and Mr. Daggs' conduct made her nervous, that investigators disregarded her attempts to identify them, and that District Attorney Peterson

discouraged her from mentioning them. Dkt. No. 13 at 54–56. Ms. Wise's allegations, if believed, would have permitted the defense to challenge the thoroughness and objectivity of the investigation. But they do not establish that Ms. Wise falsely identified Petitioner or that either Mr. Howard or Mr. Daggs participated in Ms. Haraway's abduction. Indeed, despite the alleged efforts to limit her testimony, Ms. Wise expressly acknowledged the presence of additional men at Petitioner's retrial. Dkt. No. 58-24 at 153.

Further, Ms. Wise's identification of Mr. Howard and Mr. Daggs does not exculpate Petitioner or establish that he was absent from J.P.'s or McAnally's. Although the jury did not hear Ms. Wise identify Mr. Howard and Mr. Daggs or recount her allegations concerning Mr. Peterson, the additional evidence does not itself establish that either man participated in the crimes or that Petitioner was mistakenly identified. Indeed, Petitioner independently acknowledged his presence at those locations in his October confession and January 1985 counseled statement. Dkt. No. 58-28 at 127–31, 149–50. Nor was Ms. Wise the only witness who placed Petitioner at J.P.'s, as Mr. Paschall identified Petitioner as well. Dkt. No. 58-25 at 36-39, 46-50.

And, unlike in Mr. Fontenot's case, where Mr. Howard's professed unfamiliarity with Mr. Fontenot undermined the identification of Fontenot as one of the men present, Mr. Howard's familiarity with Petitioner distinguishes this case from Mr. Fontenot's. *See Fontenot*, 4 F.4th at 1046–47 (describing how Mr. Howard identified Petitioner but did not know Mr. Fontenot). Thus, even crediting Ms. Wise's identification of the additional men, the new information does not undermine the evidence independently placing Petitioner at locations associated with Ms. Haraway's disappearance.

Ms. Wise's declaration must also be assessed in light of the substantial passage of time. It comes nearly three decades after her sworn testimony. Testimony of this kind, especially after such

a long period of time, is "notoriously unreliable." *Case*, 731 F.3d at 1044. Belated testimony like Ms. Wise's is "easy to find but difficult to confirm or refute: witnesses forget, witnesses disappear, witnesses with personal motives change their stories many times, before and after trial." *Case*, 731 F.3d at 1044. Although Ms. Wise's earlier testimony corroborates her recollection that more than two men were present, it does not independently corroborate every later allegation concerning their identities, their conduct, or her conversations with District Attorney Peterson. The delay therefore remains relevant to the weight a jury might assign those additional allegations, even accepting this Court's determination that the declaration bears sufficient indicia of reliability for purposes of *Schlup*. *See* Dkt. No. 93 at 63–65.

Her declaration is also inconsistent. She claims that she knew the other two men in the store that night (Mr. Howard and Mr. Daggs) so well that she could recognize them "on sight," yet, when police requested her assistance with "drawings of the two men I remembered best" (Dkt. No. 13 at 54-55), she assisted in preparing composite drawings depicting Petitioner and a man resembling Mr. Fontenot. For these reasons, a reasonable juror would tend to discount her affidavit.

In sum, Ms. Wise's declaration is not material in light of the evidence presented to the jury that there were three or four individuals present in the game room at J.P.'s, the substantial decades-long delay in her disclosure that creates reliability concerns, and Petitioner's acknowledgment that he visited both J.P.'s and McAnally's in a recorded counseled statement presented at his retrial. Ms. Wise's declaration may have strengthened the defense's criticism of the investigation, but it would not have undermined Petitioner's own admissions or Mr. Paschall's identification. Even considered with the other allegedly suppressed evidence, it does not establish a reasonable probability of a different verdict.

**g. Considering Materiality Cumulatively**

The allegedly suppressed evidence is immaterial even considered cumulatively. A court weighs cumulatively each piece of withheld evidence in light of the entire record to decide whether the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290 (quoting *Kyles*, 514 U.S. at 435). Respondent has addressed each category above individually; collectively, they do not meet that standard.

The materials Petitioner identifies amount to a report reflecting that an investigator possessed a description of Ms. Haraway's blouse before Petitioner's confession; impeachment of Mr. Moyer in the form of a photo-array report in which he may or may not have picked Petitioner, a reward request the OSBI denied, and variations in his account over time; investigative leads on Billy Charley and Floyd DeGraw; reports that Ms. Haraway had received obscene phone calls; two interview summaries in which Petitioner denied involvement; and affidavits alleging that District Attorney Peterson pressured Stacey Shelton, Odell Titsworth, and Karen Wise. *See generally* Dkt. No. 2.

Much of this duplicates evidence the jury already had. The jury heard that investigators possessed some information concerning Ms. Haraway's clothing before the confession, through Officer Holkum and the missing person's report (Dkt. No. 58-27 at 61; Dkt. No. 58-26 at 141), that Billy Charley resembled the composite and was investigated (Dkt. No. 93 at 53), and that Petitioner gave shifting, self-exculpatory accounts of his whereabouts. The additional impeachment evidence, as explained above, did not materially undermine the independent evidence connecting Petitioner to McAnally's. The jury already heard evidence bearing on his credibility, and Petitioner admitted being at McAnally's that evening. Considered with the other

allegedly suppressed evidence, the additional impeachment does not undermine confidence in the verdict.

Notably, none of this evidence, considered alone or in combination, replaces the independent proof of guilt that distinguishes this case from Mr. Fontenot's. In his counseled statement following the January 1985 preliminary hearing, Petitioner placed himself at J.P.'s and McAnally's and admitted leaving McAnally's with Ms. Haraway, an admission made with counsel present that cannot be explained away by an allegation of coercion during the earlier interrogation. Dkt. No. 58-28 at 130, 140, 145-50, 155. Multiple eyewitnesses—Ms. Wise, Mr. Paschall, and Mr. Moyer—independently identified Petitioner in lineups conducted without suggestion. Dkt. No. 58-24 at 127-28, 143-46; Dkt. No. 58-25 at 36-39, 46-50, 91-92, 106-07. Approximately thirty tipsters identified him from the composite drawing, more than any other individual. Dkt. No. 58-27 at 64; Dkt. No. 58-28 at 116, 186. Several witnesses connected him to the grey-primered pickup described at both stores. Dkt. No. 58-28 at 104-05; Dkt. No. 58-29 at 76-77, 94-96. He was overheard on the night of the abduction saying he was "sorry that he had done it." Dkt. No. 58-28 at 119. He told inmate James Allen that he had raped Ms. Haraway and helped dispose of her body. *Id.* at 98. He remarked to a jailer that searching for her body was "like looking for a needle in a haystack, without the needle." Dkt. No. 58-27 at 9-10. The Tenth Circuit found some of the same categories of suppressed evidence material in *Fontenot* precisely because Mr. Fontenot's conviction rested on no comparable independent proof. 4 F.4th at 1080-82. Although the Tenth Circuit found similar evidence material in *Fontenot*, the evidence against Petitioner at his separate retrial was substantially stronger, particularly his January 1985 counseled statement admitting that he left McAnally's with Ms. Haraway.

Considered together and in light of the entire record, the evidence Petitioner identifies does not create a reasonable probability of a different result. Petitioner's *Brady* claim fails.

**III. Petitioner Fails to Prove a *Napue* Violation.**

Petitioner separately contends that his convictions violate due process because the prosecution knowingly presented or permitted false testimony at his retrial. Dkt. No. 2 at 79–81. Relying on *Napue v. Illinois*, 360 U.S. 264 (1959), Petitioner alleges that District Attorney Peterson pressured witnesses to suppress or alter information favorable to the defense and that the prosecution knowingly elicited false testimony concerning when investigators learned the description of Ms. Haraway's blouse. Petitioner further argues that the prosecution compounded the alleged misconduct by representing during closing argument that investigators lacked a description of the blouse before Petitioner's October 1984 confession. Because no state court adjudicated Petitioner's *Napue* claim on the merits, the Court reviews that claim de novo. De novo review does not lessen Petitioner's burden, as he must still prove each element of a *Napue* violation.

The Supreme Court held in *Napue* that a defendant's due process rights are violated when the prosecution "knowingly failed to correct perjured testimony in its case, even when the evidence went only to the credibility of the witness." *United States v. Garcia*, 793 F.3d 1194, 1207 (10th Cir. 2015) (citing *Napue*, 360 U.S. at 269). It is Petitioner's burden to establish a violation of *Napue*. *United States v. Smalls*, 752 F.3d 1227, 1245 (10th Cir. 2014) (citing *Smith v. Gibson*, 197 F.3d 454, 458 (10th Cir. 1999)). "A *Napue* violation occurs when (1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material." *Garcia*, 793 F.3d at 1207 (citing *United States v. Caballero*, 277 F.3d 1235, 1243 (10th Cir. 2002)). Courts deem false testimony material "unless failure to disclose the perjury would be

harmless beyond a reasonable doubt." *Id.* (quoting *Bagley*, 473 U.S. at 680). Whereas "[a] defendant may have a *Brady* claim if the witness *unintentionally* gave false testimony or the prosecution did not correct testimony that it *should have known* was false," a *Napue* violation requires a witness to commit perjury and a prosecutor's knowledge of the falsity. *Id.* (emphasis in original) (collecting cases). "A prosecutor's knowing use of perjured testimony is misconduct that goes beyond the denial of a fair trial, which is the focus of *Brady*." *Id.*

Here, as a threshold matter, as previously noted, Petitioner relies on *Glossip v. Oklahoma*, 604 U.S. 226 (2025), in support of his *Napue* claim. Dkt. No. 73 at 1–3; Dkt. No. 76 at 1–3. In *Glossip*, the Supreme Court "conclude[d] that the prosecution's failure to correct [key prosecution witness] Sneed's trial testimony [regarding his use of lithium and whether he had ever been seen by a psychiatrist] violated the Due Process Clause." *Glossip*, 604 U.S. at 252. However, in *Glossip*, the State of Oklahoma *confessed* a material *Napue* violation, and the Supreme Court repeatedly stressed this confession of error in its opinion. *See, e.g.*, *id.* at 246, 250. Indeed, the State of Oklahoma emphasized to the Supreme Court that its confession of error as to its own conviction and death sentence—via the State's chief law officer, the Attorney General—carried significant weight. *Glossip v. Oklahoma*, Case No. 22-7466, Brief for Respondent in Support of Petitioner, at 36–37 (filed Apr. 23, 2024) ("[T]he judgment of the State's oath-bound chief legal officer that a conviction *its officers procured* was the unconstitutional product of prosecutorial misconduct surely deserves respectful consideration. . . . When those prosecutors themselves recognize that they have overstepped, that judgment cannot be dismissed as just another litigation position."). Accordingly, *Glossip* should carry little to no precedential value outside of State-confessed *Napue* errors. *See United States v. Parks*, No. 19-CR-87-LJV-JJM, 2025 WL 3122791, at *19 (W.D.N.Y.

Nov. 7, 2025) ("*Glossip* is inapposite for several reasons. . . . Second, in *Glossip*, the State *admitted* error and was itself seeking a new trial.").

Alternatively, to the extent *Glossip* has any application outside of the context of State-confessed *Napue* errors, Petitioner's reliance on it fails for another reason: he has not even attempted to carry his burden pursuant to *Teague*'s anti-retroactivity rule. As Respondent establishes above, *Glossip* post-dates the finality of Petitioner's convictions by more than twenty years, meaning Petitioner must show that *Glossip* is not new. *See O'Dell*, 521 U.S. at 156 ("Before a state prisoner may upset his state conviction or sentence on federal collateral review, he must demonstrate as a threshold matter that the court-made rule of which he seeks the benefit is not 'new.'"). The Supreme Court has "stated variously the formula for determining when a rule is new." *Id.* *Teague* stated that "a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301 (plurality). In turn, a result is not dictated by precedent unless it "was apparent to all reasonable jurists." *Lambrix*, 520 U.S. at 527–28 ("[O]ur first and principal task is to survey the legal landscape as of [the date Lambrix's conviction became final], to determine whether the rule later announced in *Espinosa* [*v. Florida*, 505 U.S. 1079 (1992) (*per curiam*),] was dictated by then-existing precedent—whether, that is, the unlawfulness of Lambrix's conviction was apparent to all reasonable jurists."). Similarly, the Supreme Court has described new rules as those over which "reasonable jurists could disagree," *Caspari v. Bohlen*, 510 U.S. 383, 395 (1994) (quotation marks omitted, alteration adopted), and those "susceptible to debate among reasonable minds," *Butler v. McKellar*, 494 U.S. 407, 415 (1990). *Saffle v. Parks*, 494 U.S. 484, 490 (1990), stated that a result is not dictated by precedent if there is any "simple and logical difference between" the Court's conclusion and the precise holding of prior decisions.

In *Sawyer v. Smith*, 497 U.S. 227, 236, 241 (1990), the Supreme Court explained that a result is not dictated by precedent merely because the result was "lent general support" by a prior precedent, was "congruent" with prior precedent, or was "inform[ed], or even control[led] or govern[ed]," by a prior precedent. The Court further rejected the petitioner's argument that a rule is dictated by precedent where it was a "predictable development" to state courts or because the case was dictated by a general principle from a prior case—"the test would be meaningless if applied at this level of generality." *Sawyer*, 497 U.S. at 236. *Butler v. McKellar* likewise said:

> [T]he fact that a court says that its decision is within the "logical compass" of an earlier decision, or indeed that it is "controlled" by a prior decision, is not conclusive for purposes of deciding whether the current decision is a "new rule" under *Teague.* Courts frequently view their decisions as being "controlled" or "governed" by prior opinions even when aware of reasonable contrary conclusions reached by other courts.

*Butler v. McKellar*, 494 U.S. 407, 415 (1990).

A strong indicator that the result of a Supreme Court decision was not dictated by precedent is the existence of a dissent. In *Beard v. Banks*, 542 U.S. 406, 414–15 (2004), the Supreme Court said—as to whether "reasonable jurists could have differed as to whether the *Lockett* [*v. Ohio*, 438 U.S. 586 (1978),] principle compelled *Mills* [*v. Maryland*, 486 U.S. 367 (1988)]"—"there is no need to guess. In *Mills*, four Justices dissented, reasoning that because nothing prevented the jurors from hearing any mitigating evidence that the defendant proffered, the *Lockett* principle did not control." *Beard* "conclude[d] that *Mills* announced a new rule." *Beard*, 542 U.S. at 408. Likewise, the Tenth Circuit, in concluding that the case at issue announced a new rule, emphasized that three justices dissented in the case. *Sawyer*, 497 U.S. at 236–37. "A Supreme Court decision recognizing a right over a dissent is less likely to be dictated by precedent." *United States v. Hopkins*, 920 F.3d 690, 698 (10th Cir. 2019). *Hopkins* noted that *Padilla v. Kentucky*, 559 U.S. 356 (2010), which the Tenth Circuit determined was new, "generated both a strong concurrence and dissent, including

an opinion by Justice Alito calling the ruling a major upheaval in Sixth Amendment law." *Id.* (quotation marks omitted).[26]

Petitioner has not carried his burden of showing that *Glossip* is not new. *See O'Dell*, 521 U.S. at 156. Petitioner states in conclusory fashion that "*Glossip* made no new law." Dkt. No. 76 at 2. For starters, if this is true, then it begs the question why Petitioner filed a multi-page notice of supplemental authority focused exclusively on *Glossip* and attached the lengthy opinion, and then followed up with a reply after the State responded to his notice. *See generally* Dkt. Nos. 73, 76.

Petitioner specifically invokes the principle from *Glossip* that "the lie itself, not the particular details of the lie, was of central importance: 'Even if Sneed's bipolar disorder were wholly irrelevant, as *amicus* argues, his willingness to lie about it to the jury was not. "A lie is a lie no matter its subject."'" Dkt. No. 76 at 1 (quoting *Glossip*, 604 U.S. at 249). He claims "[t]he existence of falsehood was also what mattered in *Napue*, the long-standing Supreme Court precedent." Dkt. No. 76 at 1. However, the *Glossip* dissent concluded otherwise:

> The majority [finds materiality] only by redefining the *Napue* materiality inquiry. In its view, Sneed's testimony is material because the jury's verdict could have changed "[h]ad the prosecution corrected" the testimony. *Ante,* at 627 – 628. Thus, even "wholly irrelevant" testimony that had no impact on the jury can be material, so long as *the act of correcting it* might have caused the jury to doubt the witness's credibility. *Ibid.* We have never defined materiality in these terms. Rather, we have

[26] The fact that the Supreme Court announced a rule on collateral review does not prevent it from being "new" for *Teague* purposes. *Padilla* was such a case. There, the particular post-conviction petitioner who brought the case to the Supreme Court (Jose Padilla) received the benefit of the new rule on collateral review, but the Supreme Court later held that the new rule did not apply retroactively on collateral review to anyone else. *See Padilla*, 559 U.S. at 360–61 (holding, on certiorari review of Supreme Court of Kentucky's denial of post-conviction relief, that the Sixth Amendment requires an attorney for a criminal defendant to provide advice about the risk of deportation arising from a guilty plea); *Chaidez v. United States*, 568 U.S. 342, 358 (2013) (holding that *Padilla* announced a new rule that does not apply retroactively on collateral review and that "defendants whose convictions became final prior to *Padilla* therefore cannot benefit from its holding").

> consistently framed the issue as whether "the false testimony" itself "had an effect on the outcome." *Napue*, 360 U.S. at 272, 79 S.Ct. 1173. Thus, the relevant inquiry under *Napue* is whether the *content* of the false testimony at issue is material. Were the test for materiality whether a counterfactual correction of a false statement might tend to undermine the witness's credibility, the materiality requirement would be meaningless in a great number of cases.

*Glossip*, 604 U.S. at 288 (Thomas, J., dissenting, joined by Alito, J.).[27]

Clearly Justices Thomas and Alito are reasonable jurists. Thus, their viewpoint, at the very least, raises a question as to whether the materiality test from *Glossip* that Petitioner seeks to apply "was apparent to all reasonable jurists" at the time his convictions became final. *Lambrix*, 520 U.S. at 527–28; *see Hopkins*, 920 F.3d at 698; *see also Matthew v. Johnson*, 201 F.3d 353, 362 (5th Cir. 2000) (recognizing that—because "a *Brady* violation is defined in terms of the potential effects of undisclosed information on a judge's or jury's assessment of guilt"—a case that expands the definition of materiality announces a new rule insofar as it "creates a due process right where none previously existed"). Moreover, assuming a new materiality test was announced, it was undoubtedly procedural. *See id.* at 369–70 (holding that new *Brady*-related rule was a non-retroactive procedural rule).

At bottom, however, this Court need not decide whether *Glossip* announced a new rule. Petitioner has not cited—let alone engaged with—any of the above-discussed case law defining the *Teague* inquiry into whether a legal principle is "new." He has utterly failed to carry his burden of showing that *Glossip*—decided more than *two decades* after his convictions became final—should apply here. *See Grant v. Trammell*, 727 F.3d 1006, 1025 (10th Cir. 2013) ("Even a capital defendant can waive an argument by inadequately briefing an issue."); *Archambault v. State*, ___

[27] Justice Barrett concurred in part and dissented in part but did not join this portion of the dissent. Justice Gorsuch recused from the case, meaning Justice Sotomayor's majority opinion was joined fully by only four additional Justices.

N.W.3d ___, 2026 WL 3368739, at *7 (N.D. 2026) ("Even if we were to assume without deciding *Glossip* is a new interpretation of law, Archambault's argument on retroactivity is inadequately briefed, and he has not met his burden to show *Glossip* should be applied retroactively. Therefore, we decline to further address whether Glossip articulated a new rule of law that applies retroactively to Archambault's case."). It is sufficient to conclude that Petitioner has not shown that *Glossip* is not *Teague*-barred, and the *Glossip* opinion should have no further place in this Court's analysis.[28]

Turning to Petitioner's remaining arguments, they do not warrant relief. Petitioner first relies on Ms. Wise's belated declaration, in which she alleges that District Attorney Peterson discouraged her from testifying about two additional men she observed at J.P.'s convenience store on the evening of Ms. Haraway's disappearance. Dkt. No. 13 at 54–56. Petitioner characterizes these allegations as evidence that the prosecution knowingly presented false testimony concerning the number of men present at J.P.'s, since, according to Petitioner, "testimony that four men were at J.P.'s could have called the State's entire theory into question." Dkt. No. 2 at 87. Yet, if Ms. Wise were instructed not to mention the additional men, she refused to heed that instruction, and the State's entire theory—supported by eyewitnesses and Petitioner's repeated inculpatory

[28] In any event, *Glossip* is readily distinguishable, and the contrast is instructive. First, the violation there was established by the State's own confession of error and by documentary proof that the trial prosecutor actually knew the testimony was false, as her handwritten notes reflected a pretrial conversation in which the witness disclosed the very facts he later denied under oath. *Glossip*, 604 U.S. at 246. Here there is no confession of error, and Petitioner offers no comparable proof that any prosecutor knew any witness testified falsely. At most, he points to an investigator's report; but a *Napue* claim requires the prosecutor's actual knowledge, and the knowledge of police or investigators is not imputed to the prosecution as it is under *Brady*. *Garcia*, 793 F.3d at 1207-08; *Smith v. Sec'y of New Mexico Dep't of Corr.*, 50 F.3d 801, 830-31 (10th Cir. 1995). Second, materiality in *Glossip* was established because, in addition to the State's confession, the false testimony came from the witness whose testimony "was the only direct evidence of Glossip's guilt," so the jury's assessment of his credibility was "necessarily determinative," *Glossip*, 604 U.S. at 248, but Petitioner's conviction rests on no such single, uncorroborated witness.

admissions—did not crumble, even as Ms. Wise testified repeatedly that there were more than two men in the game room. Dkt. No. 58-24 at 153. Her unsupported allegations are contradicted by the trial record and do not establish that the prosecution knowingly presented false testimony.

Similarly, Petitioner relies on declarations from Stacey Shelton and Odell Titsworth alleging improper pressure by District Attorney Peterson, Dkt. No. 2 at 80; Dkt. No. 13 at 79–82, but he does not identify any false testimony that the prosecution knowingly introduced. Ms. Shelton's account concerns alleged unsuccessful efforts to have her recant testimony she had already given, which she refused to do. Dkt. No. 13 at 82. Mr. Titsworth's declaration alleges pressure to provide incriminating information, but such pressure does not, without identification of materially false testimony actually presented, establish the knowing use of perjury.

Petitioner's remaining *Napue* theory concerns the prosecution's treatment of the description of Ms. Haraway's blouse. Petitioner alleges that investigators knew the blouse's description before his October 1984 confession, but that prosecution witnesses testified otherwise. Dkt. No. 2 at 79–81. The State acknowledges that the August 1984 report reveals that Det. Baskin—who was not present at Petitioner's confession—had received information from Ms. Weldon concerning Ms. Haraway's blouse before Petitioner's confession. Dkt. No. 7 at 27. That fact, however, does not resolve the separate questions whether the particular witnesses identified by Petitioner knowingly testified falsely and whether the prosecution knew of the false testimony.

Notably, the knowledge requirement under *Napue* is distinct from *Brady*. To establish a *Napue* violation, Petitioner must demonstrate that the prosecution actually knew the challenged testimony was false. *See Garcia*, 793 F.3d at 1207–08; *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 830–31 (10th Cir. 1995). Unlike under *Brady*, an investigator's undisclosed knowledge is not automatically imputed to the prosecutor for purposes of establishing the knowing use of false

testimony. *Smith*, 50 F.3d at 831. Petitioner contends that prosecutors' knowledge is shown by Detective Baskin's August 1984 report containing a description of the blouse (Dkt. No. 7 at 27) but does not demonstrate that the prosecutors reviewed that report before trial. Rather, as Petitioner acknowledges, the lead prosecutors received only the "prosecutorial summary." Dkt. No. 2 at 68 n.32, 71 (noting that the prosecutors testified that "We only got the prosecutorial, which was, like, 144 [pages]."). Although the prosecutorial summary noted that Ms. Weldon provided Detective Baskin with a description of the blouse, Dkt. No. 6 at 97, it did not identify when that information was communicated, nor did it, on its face, contradict Ms. Weldon's sworn testimony concerning when she provided the blouse's description to law enforcement. Dkt. No. 58-26 at 154, 157.

At retrial, Agent Rogers—who did not draft the August 1984 report—testified that he was unaware of the blouse's description before Petitioner's confession. Dkt. No. 58-31 at 32–33. Petitioner does not demonstrate that Agent Rogers testified falsely or that the prosecution knew it to be false. Similarly, Ms. Weldon testified that she had never talked to law enforcement about the blouse until after Petitioner's confession, even though the August 1984 report suggested she had. Dkt. No. 58-26 at 153, 157. Subsequently, Ms. Weldon testified in a deposition that she did not remember when she first described the blouse to law enforcement. Dkt. No. 15 at 235. "Contradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony." *Tapia v. Tansy*, 926 F.2d 1554, 1563 (10th Cir. 1991). Unsurprisingly, given the passage of time attributable to Petitioner's delay in raising the issue, witnesses like Ms. Weldon are unable to remember the precise details and chronologies of events from decades ago. But she was adamant that prosecutors did not pressure her to testify a certain way. Dkt. No. 15 at 242.

While Petitioner has demonstrated that Ms. Weldon's testimony conflicts with a report by law enforcement, he "does not sustain his burden of demonstrating perjury merely by proving that a government witness has testified falsely or has given testimony that conflicts with other statements." *United States v. Crockett*, 435 F.3d 1305, 1317 (10th Cir. 2006). Indeed, the record does not reflect that the prosecutor, Mr. Peterson, knew of the conflict or reviewed the August 1984 report, which was part of the OSBI file. Dkt. No. 7 at 27; *see* Dkt. No. 14 at 97 (Mr. Ross testifying that he did not receive all of the OSBI documents prior to the prosecution). Mr. Peterson testified that all of the written reports he received were in the prosecutorial. Dkt. No. 14 at 63. The prosecutorial summarized Ms. Weldon's blouse description to Detective Baskin but did not provide the date that the description occurred and does not reveal an inconsistency with her trial testimony. Dkt. No. 6 at 97. Thus, even if Ms. Weldon's testimony was inaccurate, Petitioner has not shown the prosecutors knew it was false, and it thus does not establish a *Napue* violation. *See Garcia*, 793 F.3d at 1207.

Petitioner's remaining blouse witnesses fare no better. Petitioner names Steve Haraway, but Mr. Haraway did not testify that no description existed before the confession; he testified only that the clothing description he personally provided was of a grey zip-up sweatshirt. Dkt. No. 58-26 at 111-12, 114-15. Ms. Haraway's mother, Pat Virgin, testified that she learned of the blouse's details from Petitioner's confession and had not told police of the blouse before that day. *Id.* at 168-71. Petitioner identifies no evidence that Ms. Virgin's account of her own conduct was false—much less that the prosecution knew it to be false—and the August 1984 report concerned Ms. Weldon, not Ms. Virgin. As to Detective Baskin, Petitioner identifies no false statement at all; Baskin authored the very report documenting the pre-confession description, which refutes rather than supports any inference that he perjured himself to conceal it.

Petitioner's contention that the prosecution "doubled down" on a false timeline during closing argument fails for the same reasons. *Napue* addresses the knowing use of false testimony and the prosecutor's knowledge of the falsity, *Garcia*, 793 F.3d at 1207–08, not an inaccurate characterization of the evidence during closing argument standing alone. Although subsequently disclosed investigative records establish that the prosecution's categorical assertion concerning investigators' knowledge of the blouse description was inaccurate, that discrepancy does not, without more, establish that the prosecution knowingly presented or failed to correct false testimony. The premise of the argument about when investigators learned of the blouse's description was, in any event, contested before the jury. The jury heard that Officer Holkum described Ms. Haraway's blouse to investigators the day after she disappeared and that a clothing description appeared in the April 29, 1984 missing-person report. Dkt. No. 58-27 at 61; Dkt. No. 58-26 at 136, 141. Thus, the jury was not left entirely unaware of evidence contradicting the prosecution's asserted timeline. While the subsequently disclosed report provides additional evidence that the assertion was inaccurate, the closing argument itself does not establish the knowing use of false testimony required for relief under *Napue*.

Finally, even if Petitioner could establish false testimony and the prosecution's knowledge of its falsity, any failure to correct the challenged testimony was harmless beyond a reasonable doubt. *Garcia*, 793 F.3d at 1207 ("[T]he failure to disclose is material unless it was harmless beyond a reasonable doubt."). The jury already heard, through Officer Holkum's testimony and the missing person's report, that investigators possessed a description of Ms. Haraway's clothing before Petitioner confessed, so corrected testimony on that point would have added little. Nor did the verdict rest on the blouse timeline or on the handful of witnesses Petitioner challenges. As set forth above, Petitioner repeatedly inculpated himself—in his October 18, 1984 confession, in his

January 1985 preliminary-hearing statement admitting that he was at McAnally's and left with Ms. Haraway, in his admission to inmate James Allen, and in his remark to the jailer—and multiple eyewitnesses independently placed him at J.P.'s and McAnally's. On this record, any failure to correct the challenged testimony was harmless beyond a reasonable doubt.

In sum, as Petitioner has not pointed to testimony that was material, false, and known to the prosecution to be false, his *Napue* claim fails.

## CONCLUSION

For the foregoing reasons, federal habeas corpus relief is unwarranted. Petitioner's petition for federal habeas corpus relief should therefore be denied in its entirety by this Court.

Respectfully submitted,

**GENTNER F. DRUMMOND**
**ATTORNEY GENERAL OF OKLAHOMA**

**s/CHRISTOPHER HOWARD**
**CHRISTOPHER HOWARD, O.B.A. #36880**
**ASSISTANT ATTORNEY GENERAL**
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
(405) 522-4534 (FAX)
Service email: fhc.docket@oag.ok.gov

**ATTORNEYS FOR RESPONDENT**

## CERTIFICATE OF SERVICE

**X** I hereby certify that on November 20, 2026, I electronically transmitted the foregoing Response in Opposition to Petition for Writ of Habeas Corpus to the Clerk of Court using the ECF System for filing, which will cause service to be made electronically on all counsel of record who are registered participants of the ECF System.

**s/ CHRISTOPHER HOWARD**